# **Exhibit**

Application Record from Canadian Proceeding

Court File No.:  CV-19-00617777-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF Section 101 of the *Courts of Justice Act*, R.S.O. 1990 c.C.43,**
**as amended, and in the matter of Section 243(1) of the *Bankruptcy and Insolvency Act*,**
**R.S.C. 1985, c. B-3, as amended**

**B E T W E E N:**

**ROYAL BANK OF CANADA**

Applicant

**- and -**

**MUNDO MEDIA LTD., MUNDO INC., 2538853 ONTARIO LTD., 2518769 ONTARIO**
**LTD., 2307521 ONTARIO INC., 36 LABS, LLC., ACTIVE SIGNAL MARKETING, LLC,**
**FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., MUNDO MEDIA (US), LLC,**
**M ZONE MARKETING INC., APPTHIS HOLDINGS, INC., MOVIL WAVE S.A.R.L.,**
**MUNDO MEDIA (LUXEMBOURG) S.A.R.L., and MOGENIO S.A.**

Respondents

# APPLICATION RECORD

April 8, 2019

**Thornton Grout Finnigan LLP**
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON  M5K 1K7
Fax:    (416) 304-1313

**D.J. Miller** (LSO# 34393P)
Email: djmiller@tgf.ca / Tel: (416) 304-0559

**Rachel Bengino** (LSO# 68348V)
Email: rbengino@tgf.ca / Tel: (416) 304-1153

Lawyers for the Applicant, Royal Bank of Canada

Court File No.:  CV-19-00617777-00CL

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF Section 101 of the *Courts of Justice Act*, R.S.O. 1990 c.C.43,
as amended, and in the matter of Section 243(1) of the *Bankruptcy and Insolvency Act*,
R.S.C. 1985, c. B-3, as amended

B E T W E E N:

**ROYAL BANK OF CANADA**

Applicant

**- and -**

**MUNDO MEDIA LTD., MUNDO INC., 2538853 ONTARIO LTD., 2518769 ONTARIO
LTD., 2307521 ONTARIO INC., 36 LABS, LLC., ACTIVE SIGNAL MARKETING, LLC,
FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., MUNDO MEDIA (US), LLC,
M ZONE MARKETING INC., APPTHIS HOLDINGS, INC., MOVIL WAVE S.A.R.L.,
MUNDO MEDIA (LUXEMBOURG) S.A.R.L., and MOGENIO S.A.**

Respondents

**INDEX**

| Tab | Document |
|-----|----------|
| 1 | Notice of Application |
| 2 | Affidavit of Gary Ivany sworn April 8, 2019 |
| Exhibit "A" | Corporate Profile Reports for Canadian Debtors |
| Exhibit "B" | Results of Corporate Searches regarding US Debtors |
| Exhibit "C" | RCS Excepts regarding Luxembourg Debtors |
| Exhibit "D" | Mundo Media Ltd. Organizational Chart |
| Exhibit "E" | AppThis Holdings, Inc. Organizational Chart |

- 2 -

| | |
|---|---|
| Exhibit "F" | Credit Facility Agreements dated December 21, 2017 and Amendments thereto |
| Exhibit "G" | Canadian Guarantee dated July 26, 2016 and the Canadian Guarantee Joinders dated October 13, 2016 and June 2, 2017 |
| Exhibit "H" | US Guarantee dated October 13, 2016 and the US Guarantee Joinders dated December 1, 2016 and November 14, 2017 |
| Exhibit "I" | AppThis Holdings, Inc. Guarantee dated February 5, 2019 |
| Exhibit "J" | Canadian General Security Agreement dated July 26, 2016 and the Canadian General Security Agreement Joinders dated October 13, 2016 and June 2, 2017 |
| Exhibit "K" | US General Security Agreement dated December 1, 2016 and the US General Security Agreement Joinder dated November 14, 2017 |
| Exhibit "L" | AppThis Holdings, Inc. General Security Agreement dated February 5, 2019 |
| Exhibit "M" | Deposit Account Control Agreements dated November 29, 2017 |
| Exhibit "N" | Default Letter dated February 26, 2019 |
| Exhibit "O" | Borrower Demand and BIA Notice dated April 3, 2019 |
| Exhibit "P" | Guarantor Demands and BIA Notices dated April 3, 2019 |
| Exhibit "Q" | Notices of Exclusive Control dated April 3, 2019 |
| Exhibit "R" | Subordination and Postponement Agreements dated February 26, 2019 |
| Exhibit "S" | Electronic PPSA Searches and UCC Searches |
| Exhibit "T" | Consent of Ernst & Young Inc. to act as receiver |
| **3** | Draft Receivership Order |
| **4** | Blackline of Draft Receivership Order to Model Receivership Order |

# TAB 1

Court File No.:  CV-19- 00617777-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF Section 101 of the *Courts of Justice Act*, R.S.O. 1990 c.C.43, as amended, and in the matter of Section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended**



B E T W E E N:

### ROYAL BANK OF CANADA

Applicant

**- and -**

### MUNDO MEDIA LTD., MUNDO INC., 2538853 ONTARIO LTD., 2518769 ONTARIO LTD., 2307521 ONTARIO INC., 36 LABS, LLC., ACTIVE SIGNAL MARKETING, LLC, FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., MUNDO MEDIA (US), LLC, M ZONE MARKETING INC., APPTHIS HOLDINGS, INC., MOVIL WAVE, S.A.R.L., MUNDO MEDIA (LUXEMBOURG) S.A.R.L., and MOGENIO S.A.

Respondents

### NOTICE OF APPLICATION

**TO THE RESPONDENTS:**

**A LEGAL PROCEEDING HAS BEEN COMMENCED** by the Applicant.  The claim made by the Applicant appears on the following pages.

**THIS APPLICATION** will come on for an urgent hearing before a Judge on **Monday, April 8, 2019 at 9:30 a.m.** or as soon after that time as the application can be heard at 330 University Avenue, in the City of Toronto, in the Province of Ontario, M5G 1R7.

**IF YOU WISH TO OPPOSE THIS APPLICATION**, to receive notice of any step in the application or to be served with any documents in the application, you or an Ontario lawyer acting for you must forthwith prepare a notice of appearance in Form 38A prescribed by the *Rules of Civil Procedure*, serve it on the Applicant's lawyer or, where the Applicant does not have a lawyer, serve it on the Applicant, and file it, with proof of service, in this court office, and you or your lawyer must appear at the hearing.

**IF YOU WISH TO PRESENT AFFIDAVIT OR OTHER DOCUMENTARY EVIDENCE TO THE COURT OR TO EXAMINE OR CROSS-EXAMINE WITNESSES ON THE APPLICATION**, you or your lawyer must, in addition to serving your notice of appearance, serve a copy of the evidence on the Applicant's lawyer or, where the Applicant does not have a lawyer, serve it on the Applicant, and file it, with proof of service, in the court office where the application is to be heard as soon as possible, but not later than 2:00 p.m. on the day before the hearing.

**IF YOU FAIL TO APPEAR AT THE HEARING, AN ORDER MAY BE MADE IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.** If you wish to oppose this application but are unable to pay legal fees, legal aid may be available to you by contracting a Local Legal Aid office.

DATE: April ___9___, 2019                Issued by:

                                         _____
                                         Address of Court Office: Alexandra Medeiros Cardoso
                                         330 University Avenue Registrar, Superior Court of Justice
                                         Toronto, Ontario  M5G 1R7

TO:                    THIS HONOURABLE COURT

AND TO THE             MUNDO MEDIA LTD.
RESPONDENTS:           120 East Beaver Creek Road, Suite 200
                       Richmond Hill, ON  L4B 4V1

                       MUNDO INC.
                       120 East Beaver Creek Road, Suite 200
                       Richmond Hill, ON  L4B 4V1

                       2538853 ONTARIO LTD.
                       120 East Beaver Creek Road, Suite 200
                       Richmond Hill, ON  L4B 4V1

                       2518769 ONTARIO LTD.
                       1 Yonge Street, Suite 1801
                       Toronto, ON  M5E 1W7

                       2307521 ONTARIO INC.
                       120 East Beaver Creek Road, Suite 200
                       Richmond Hill, ON  L4B 4V1

**36 LABS, LLC.**
c/o Harvard Business Services, Inc.
16192 Coastal Hwy
Delaware, 19958
U.S.A.

**ACTIVE SIGNAL MARKETING, LLC**
c/o Harvard Business Services, Inc.
16192 Coastal Hwy
Delaware, 19958
U.S.A.

**FIND CLICK ENGAGE, LLC**
c/o Harvard Business Services, Inc.
16192 Coastal Hwy
Delaware, 19958
U.S.A.

**FLI DIGITAL, INC.**
9450 SW Gemini Drive
#77068
Beaverton, Oregon  97008
U.S.A.

**MUNDO MEDIA (US), LLC**
c/o Cogency Global Inc.
805 New Burton Road, Suite 201
Dover, County of Kent
Delaware, 19904
U.S.A.

**M ZONE MARKETING INC.**
c/o Cogency Global Inc.
805 New Burton Road, Suite 201
Dover, County of Kent
Delaware, 19904
U.S.A.

**APPTHIS HOLDINGS, INC.**
c/o Cogency Global Inc.
805 New Burton Road, Suite 201
Dover, County of Kent
Delaware, 19904
U.S.A.

**MOVIL WAVE S.A.R.L.**
5-11 avenue Gaston Diderich
L-1420 Luxembourg

**MUNDO MEDIA (LUXEMBOURG) S.A.R.L.**

**MUNDO MEDIA (LUXEMBOURG) S.A.R.L.**
5-11 avenue Gaston Diderich
L-1420 Luxembourg

**MOGENIO S.A.**
5-11 avenue Gaston Diderich
L-1420 Luxembourg

## APPLICATION

**THE APPLICANT**, Royal Bank of Canada (the "**Applicant**"), makes an application for an Order:

1.  abridging the time for service of this Notice of Application and the materials filed in support of the application and dispensing with further service thereof;

2.  appointing Ernst & Young Inc. ("**E&Y**") as the receiver (the "**Receiver**") of the property, assets and undertaking of Mundo Media Ltd. (the "**Borrower**"), Mundo Inc., 2538853 Ontario Ltd., 2518769 Ontario Ltd., 2307521 Ontario Inc. (collectively with the Borrower, the "**Canadian Debtors**"), 36 Labs, LLC., Active Signal Marketing, LLC, Find Click Engage, LLC, Fli Digital, Inc., Mundo Media (US), LLC, M Zone Marketing Inc. (collectively, the "**US Debtors**"), AppThis Holdings, Inc. ("**AppThis**"), Movil Wave S.a.r.l., Mundo Media (Luxembourg) S.a.r.l., and Mogenio S.A. (collectively with the Borrower, the Canadian Debtors, the US Debtors and AppThis, the "**Debtors**") pursuant to Section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c.B-3, as amended (the "**BIA**") and Section 101 of the *Courts of Justice Act*, R.S.O. 1990, c. C-43, as amended (the "**CJA**");

3.  sealing the Pre-Filing Report of the proposed Receiver; and

4.  granting such other relief as counsel may request and this Honourable Court may deem just.

## THE GROUNDS FOR THE APPLICATION ARE:

5.  the Borrower, along with its wholly owned subsidiaries, is an advertising technology company that offers mobile marketing expertise to its customers. Its consulting services

focus on strategy development, audience targeting, brand development, and more. It also offers MUNDOTrack, a data platform that enables its users to manage their marketing campaigns;

6.    as of April 8, 2019, the Borrower and its subsidiaries employed approximately 45 salaried employees across Canada, the United States and Luxembourg and all significant strategic, corporate and financial management decisions are made at the Borrower's premises located in Richmond Hill, Ontario;

7.    pursuant to two credit agreements, both most recently dated December 21, 2017 (together, as amended, the "**Credit Agreements**"), the Bank made available certain credit facilities to the Borrower (the "**Credit Facilities**");

8.    as at the close of business on April 2, 2019, the Borrower was indebted to the Bank under the Credit Facilities in the amounts of CAD$43,594.76 and USD$25,694,011.23, together with accrued and accruing interest, costs and professional fees and disbursements incurred by the Bank to the date of payment;

9.    as security for their obligations to the Bank, the Debtors granted security over all of their personal and real property to the Bank pursuant to, *inter alia*:

(a)    a general security agreement from the Canadian Debtors dated July 26, 2016, and the joinders thereto (the "**Canadian GSA**");

(b)    a general security agreement from the US Debtors dated December 1, 2016, and the joinders thereto (the "**US GSA**"); and

(c)    a general security agreement from AppThis dated February 5, 2019 (collectively with the Canadian GSA and US GSA, the "**GSAs**")

10.     it is a term of the GSAs that the Bank may appoint a receiver upon default by the Debtors in any of their obligations to the Bank;

11.     the Bank registered its security interest against the Canadian Debtors, the US Debtors and AppThis pursuant to the *Personal Property Security Act* in Ontario and against the US Debtors and AppThis pursuant to the Uniform Commercial Code in the relevant states of their formation;

12.     by letter dated February 15, 2019, the Borrower consented to the appointment by the Bank's counsel on behalf of the Bank, of E&Y as the Bank's consultant to, among other things, review the Borrower's operations, financial forecasts and financial reporting (including accounts receivables and work in progress balances) and the security position of the Bank;

13.     the Borrower has been experiencing declining revenues over the past year as a result of, among other things, increased scrutiny on the online advertising industry and Facebook's deletion of over 1.5 billion fake accounts, which has reduced the activity that leads to revenue generation for the Borrower;

14.     as a result, the Borrower, in consultation with FTI Consulting, Inc., has been negotiating with several interested parties in an attempt to secure a transaction whereby the Borrower would sell its business;

15.     the Borrower has been unable to secure such a transaction that is acceptable to the Applicant as first secured creditor and operating lender and the Borrower's cash position continues to deteriorate;

16.    by letter dated April 3, 2019,  the Bank demanded repayment from each of the Debtors of all amounts then outstanding to it (collectively, the "**Demands**") and together therewith delivered Notices of Intention to Enforce Security (collectively, the "**BIA Notices**") pursuant to Section 244 of the BIA;

17.    the Bank's need for the appointment of a Receiver is apparent based on the current circumstances, including the following facts:

(a)    the Bank has provided the Borrower considerable time to pursue a sale of its business.  Despite such opportunity, the Borrower has been unable to secure a sale of its business on terms that would result in an amount even close to that required to repay amounts owing to the Bank, or in an amount that would produce a recovery that is acceptable to the Bank;

(b)    the Bank's security position has deteriorated in the period of time it has permitted the Borrower to pursue a sale of its business and the Bank is concerned that its security position will further deteriorate absent the appointment of the Receiver;

(c)    the Borrower has been unable to reach terms of a proposed transaction acceptable to the Bank. The Bank is no longer willing to permit the Borrower to remain in control of a process for the sale of its business or assets subject to the Bank's security;

(d)    the Borrower's continued operations are at immediate risk, with the most recent cash flow forecast showing the Borrower running out of funds in the coming weeks without funds being made available by the Bank to the Receiver.  In addition, uncertainty regarding efforts to secure a potential transaction involving

the Debtors and the need to bring immediate stability to the situation under the control of a Receiver necessitates the appointment of a Receiver at this time to protect the Bank's security;

(e)    the Borrower does not have sufficient cash on hand to continue operations and the Bank is not prepared to fund such costs without a Receiver being appointed by the Court and funds being made available to the Receiver, if required; and

(f)    the appointment of the Receiver is necessary to protect and ultimately realize on the collateral subject to the Bank's security through a liquidation thereof for the benefit of the Bank as it relates to its anticipated significant shortfall.

18.    E&Y has consented to act as the Receiver;

19.    Rules 2.03, 3.02, 14.05(2), 41 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg 194, Section 243(1) of the BIA and Section 101 of the CJA; and

20.    such other grounds as counsel may advise and this Honourable Court may deem just.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of this application:

1.    the Affidavit of Gary Ivany, sworn April 8, 2019;

2.    Pre-Filing Receiver's Report of the Intended Receiver, Ernst & Young Inc.;

3.    Consent of Ernst & Young Inc.; and

4.    such further and other evidence as counsel may advise and this Honourable Court may permit.

April 9, 2019

**Thornton Grout Finnigan LLP**
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON  M5K 1K7
Fax:    (416) 304-1313

**D.J. Miller** (LSO# 34393P)
Email: djmiller@tgf.ca
Tel:    (416) 304-0559

**Rachel Bengino** (LSO# 68348V)
Email: rbengino@tgf.ca
Tel: (416) 304-1153


Lawyers for the Applicant, Royal Bank of Canada

IN THE MATTER OF Section 101 of the *Courts of Justice Act*, R.S.O. 1990 c.C.43, as amended, and in the matter of Section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended

ROYAL BANK OF CANADA

Applicant

- and -

MUNDO MEDIA LTD., *et al.*

Respondents

Court File No. CV-19-_____

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced at Toronto

**NOTICE OF APPLICATION**

**Thornton Grout Finnigan LLP**
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON  M5K 1K7
Fax:    (416) 304-1313

**D.J. Miller (LSO# 34393P)**
Email: djmiller@tgf.ca
Tel:    (416) 304-0559

**Rachel Bengino (LSO# 68348V)**
Email: rbengino@tgf.ca
Tel: (416) 304-1153

Lawyers for the Applicant, Royal Bank of Canada

# TAB 2

Court File No.:  CV-19-_____

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF Section 101 of the *Courts of Justice Act*, R.S.O. 1990 c.C.43,
as amended, and in the matter of Section 243(1) of the *Bankruptcy and Insolvency Act*,
R.S.C. 1985, c. B-3, as amended

B E T W E E N:

**ROYAL BANK OF CANADA**

Applicant

**- and -**

**MUNDO MEDIA LTD., MUNDO INC., 2538853 ONTARIO LTD., 2518769 ONTARIO**
**LTD., 2307521 ONTARIO INC., 36 LABS, LLC., ACTIVE SIGNAL MARKETING, LLC,**
**FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., MUNDO MEDIA (US), LLC,**
**M ZONE MARKETING INC., APPTHIS HOLDINGS, INC., MOVIL WAVE S.A.R.L.,**
**MUNDO MEDIA (LUXEMBOURG) S.A.R.L., and MOGENIO S.A.**

Respondents

**AFFIDAVIT OF GARY IVANY**
**(Sworn April 8, 2019)**

I, **GARY IVANY**, of the City of Pickering, in the Province of Ontario, MAKE OATH
AND SAY AS FOLLOWS:

1.      I am a Senior Director, Group Risk Management at Royal Bank of Canada (the "**Bank**")

and, as such, I have knowledge of the matters to which I depose herein and attest to the fact

that they are true.  Unless I indicate to the contrary, the facts herein are within my own

personal knowledge.  Where I have indicated that I have obtained facts from other sources,

I have identified the sources and believe those facts to be true.

- 2 -

2.    This affidavit is sworn in support of an application by the Bank for an order appointing

Ernst & Young Inc. as the receiver (the "**Receiver**"), of the property, assets and

undertaking of Mundo Media Ltd. (the "**Borrower**"), Mundo Inc., 2538853 Ontario Ltd.,

2518769 Ontario Ltd., 2307521 Ontario Inc., 36 Labs, LLC., Active Signal Marketing,

LLC, Find Click Engage, LLC, Fli Digital, Inc., Mundo Media (US), LLC, M Zone

Marketing Inc., AppThis Holdings, Inc., Movil Wave S.a.r.l., Mundo Media (Luxembourg)

S.a.r.l., and Mogenio S.A. (collectively, the "**Guarantors**" and together with the Borrower,

the "**Debtors**") pursuant to section 101 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43,

as amended, and section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-

3, as amended (the "**BIA**").

3.    The Bank, in working with the Borrower, provided time for the Borrower and its advisors

to find a solution to the Debtors' liquidity constraints. Specifically, to permit the Borrower

to find a purchaser for its business or for specific property (the "**Property**").  The Debtors

are experiencing a severely stressed liquidity position and do not have sufficient cash to

support their ongoing operations. The Bank is extremely concerned about its security

position, which has eroded with the passage of time, and is seeking the appointment of the

Receiver.  The best option that the Borrower was able to present to the Bank, after months

of efforts, would result in the Bank incurring a significant shortfall in the indebtedness

owing to it.  The terms of that proposed transaction were not acceptable to the Bank.

**The Respondents**

*Corporate Information*

4.    According to the records maintained by the Ontario Ministry of Government Services, the

Borrower was formed under the Ontario *Business Corporations Act* on July 26, 2016 as a

- 3 -

result of an amalgamation between Voom Media Corp. and Mundo Media Ltd.  The registered head office of the Borrower, and where it conducts its business, is in Richmond Hill, Ontario. The Corporation Profile Report for the Borrower lists Jason Theofilos as Director and Officer and Anthony Lam as Officer.

5.      Mundo Inc. is the parent company of the Borrower.  According to the records maintained by the Ontario Ministry of Government Services, Mundo Inc. was formed under the Ontario *Business Corporations Act* (the "**OBCA**") on June 2, 2017 as a result of an amalgamation between Customer Acquisition Network (Canada) Inc. and Mundo Inc.  The Corporation Profile Report for Mundo Inc. lists Jason Theofilos as Director and Officer, Sam Pai, and Peter Simeon as Directors and Jeff Cordeiro, Anthony Lam, and Mitch Richler as Officers.

6.      According to the records maintained by the Ontario Ministry of Government Services, 2538853 Ontario Ltd. ("**253 Ontario**") was incorporated under the OBCA pursuant to the laws of the Province of Ontario on September 28, 2016. The Corporation Profile Report for 253 Ontario lists Jason Theofilos as the sole Director and Officer.

7.      According to the records maintained by the Ontario Ministry of Government Services, 2518769 Ontario Ltd. ("**251 Ontario**") was incorporated under the OBCA pursuant to the laws of the Province of Ontario on May 17, 2016.  The Corporation Profile Report for 251 Ontario lists Jason Theofilos as the sole Director and Officer.

8.      According to the records maintained by the Ontario Ministry of Government Services, 2307521 Ontario Inc. ("**230 Ontario**") was incorporated under the OBCA pursuant to the

laws of the Province of Ontario on November 29, 2011. The Corporation Profile Report for 230 Ontario lists Jason Theofilos as the Sole Director and Officer.

9. According to the records maintained by the State of Delaware, Division of Corporations, 36 Labs, LLC. ("**36 Labs**") was incorporated in the State of Delaware on October 15, 2013.

10. According to the records maintained by the State of Delaware, Division of Corporations, Active Signal Marketing, LLC ("**ASM**") was incorporated in the State of Delaware on November 6, 2015.

11. According to the records maintained by the State of Delaware, Division of Corporations, Find Click Engage, LLC ("**FCE**") was incorporated in the State of Delaware on January 5, 2015.

12. According to the records maintained by the State of New York, Division of Corporations, Fli Digital, Inc. ("**Fli Digital**") was incorporated in the State of New York on May 21, 2002.

13. According to the records maintained by the State of Delaware, Division of Corporations, Mundo Media (US), LLC ("**Mundo Media**") was incorporated in the State of Delaware on September 26, 2016.

14. According to the records maintained by the State of Delaware, Division of Corporations, M Zone Marketing Inc. ("**M Zone**") was incorporated in the State of Delaware on June 23, 2017.

15.     According to the records maintained by the State of Delaware, Division of Corporations, AppThis Holdings, Inc. ("**AppThis**") was incorporated in the State of Delaware on October 11, 2018.

16.     According to the records maintained by the Luxembourg Register of Commerce and Companies (the "**RCS**"), Mundo Media (Luxembourg) S.a.r.l. ("**Mundo Luxembourg**") was incorporated in Luxembourg on December 22, 2017.

17.     According to the records maintained by the RCS, Movil Wave S.a.r.l. ("**Movil**") was incorporated in Luxembourg on December 19, 2012.

18.     According to the records maintained by the RCS, Mogenio S.A. ("**Mogenio**") was incorporated in Luxembourg on August 26, 2013.

19.     Copies of the Corporate Profile Reports of the Borrower, its parent, and its Canadian subsidiaries are attached hereto as **Exhibit "A"**.

20.     Copies of the results of corporate searches made with respect to the Borrower's U.S. subsidiaries are attached hereto as **Exhibit "B"**.

21.     Copies of the RCS excerpts issued by the RCS pertaining to Mundo Luxembourg, Movil, and Mogenio (collectively, the "**Luxembourg Entities**") are attached hereto as **Exhibit "C"**.

*Organization and Operations*

22.    The Borrower's major assets include the shares it owns in respect of its subsidiaries, which includes the Guarantors, and certain accounts receivable (the "**Accounts Receivable**"). A copy of the Borrower's most recent organizational chart is attached hereto as **Exhibit "D"**.

23.    AppThis and its related entities, though affiliated with the Borrower and the other Guarantors, do not form part of the Borrower's organizational structure. A copy of AppThis's most recent organizational chart is attached hereto as **Exhibit "E"**.

24.    The Borrower, along with its wholly owned subsidiaries, is an advertising technology company that offers mobile marketing expertise to its customers. Its consulting services focus on strategy development, audience targeting, brand development, and more. It also offers MUNDOTrack, a data platform that enables its users to manage their marketing campaigns.

25.    Mundo generates revenue from its database, algorithms and skilled staff when an individual 'performs' the specific action desired by the customer after seeing the advertisement in an on-line publication.  Specific 'actions' include phoning a call centre seeking information or following (i.e. clicking on) a link to a particular website (rather than just viewing an on-line advertisement). Sophisticated software and technology developed by the Debtors tracks the 'performance' of these specific actions to the publication (supplier) and the advertisement (customer) for purposes of Mundo generating revenue and incurring direct costs.

26.     Although the Borrower has operations in Ontario, California, and Luxembourg, the primary location from which the Debtors operate is Toronto, Ontario. All significant strategic, corporate and financial management decisions are made at this location.

27.     While such decisions are made at the Debtors' Canadian office, the cash management system and relationships with advertisers and publishers are spread throughout the Borrower's organizational structure, necessitating control over all of the entities therein to effectively manage the Debtors' operations. Accordingly, in order to realize the full value of the Accounts Receivable, the Receiver needs to be appointed over entities incorporated in the United States and Luxembourg, as well as Ontario.  Control over those entities has been pledged to the Bank as security by way of pledges of the shares of those other entities, among other types of security in the case of the U.S. entities.

28.     As of April 3, 2019, the Borrower and its subsidiaries employed approximately 45 salaried employees across Canada, the United States, Luxembourg and Israel.

**Obligations of the Borrower**

29.     Pursuant to a credit facility agreement most recently dated December 21, 2017 (as amended, the "**Senior Credit Facility Agreement**") and a credit facility agreement most recently dated December 21, 2017 (as amended, the "**Subordinate Credit Facility Agreement**" and, collectively with the Senior Credit Facility Agreement, the "**Credit Facility Agreements**"), the Bank made the following credit facilities available to the Borrower (collectively, the "**Credit Facilities**"):

(a)     Non-revolving term loan in the aggregate principal amount of USD$9,100,000.00;

(b)      Non-revolving term loan in the aggregate principal amount of USD$10,600,000.00; and

(c)      Revolving credit facility up to the aggregate principal amount of USD$5,500,000, subject to the Borrowing Base (as defined in the Credit Agreement) (the "**Revolving Facility**").

30.      As at the close of business on April 2, 2019, the Borrower was indebted to the Bank under the Credit Facilities in the amounts of CAD$43,594.76 and USD$25,694,011.23, together with accrued and accruing interest, costs and fees, including legal fees and disbursements, incurred by the Bank to the date of payment.  Attached as **Exhibit "F"** is a true copy of the Credit Facility Agreements (including all amendments thereto).

**Security Held by the Bank**

*Guarantees*

31.      Mundo Inc., 251 Ontario, 230 Ontario, Movil, and Mogenio each guaranteed the obligations of the Borrower to the Bank pursuant to an unlimited guarantee dated July 26, 2016 (the "**Canadian Guarantee**"). Pursuant to the Joinder Agreements dated October 13, 2016, June 2, 2017, and January 31, 2018 (together, the "**Canadian Guarantee Joinders**"), 253 Ontario, Mundo Inc., and Mundo Luxembourg agreed to become obligors under the Canadian Guarantee and be bound by the terms of the Canadian Guarantee with the same force and effect as if originally named therein as obligors. Attached as **Exhibit "G"** is a copy of the Canadian Guarantee and the Canadian Guarantee Joinders.

32.      Mundo Media guaranteed the obligations of the Borrower to the Bank pursuant to an unlimited guarantee dated October 13, 2016 (the "**US Guarantee**"). Pursuant to the Joinder

Agreements dated December 1, 2016 and November 14, 2017 (collectively, the "**US Guarantee Joinders**"), ASM, FCE, Fli Digital, 36 Labs, and M Zone each agreed to become obligors under the US Guarantee and be bound by the terms of the US Guarantee with the same force and effect as if originally named therein as obligors. Attached as **Exhibit "H"** is a copy of the US Guarantee and the US Guarantee Joinders.

33.    AppThis is an entity that the Borrower was providing certain funding to from the Credit Facilities made available to the Borrower by the Bank.  At the request of the Bank, AppThis guaranteed the obligations of the Borrower to the Bank pursuant to an unlimited guarantee dated February 5, 2019 (the "**AppThis Guarantee**"). Attached as **Exhibit "I"** is a copy of the AppThis Guarantee.

*General Security Agreements*

34.    Pursuant to the Credit Facility Agreements and as security for its obligations to the Bank, the Borrower, 230 Ontario, and 251 Ontario each granted to the Bank security over all of their real and personal property pursuant to a General Security Agreement dated July 26, 2016 (the "**Canadian GSA**").

35.    Pursuant to the Joinder Agreements dated October 13, 2016 and June 2, 2017 (together, the "**Canadian GSA Joinders**"), 253 Ontario and Mundo Inc. each agreed to become obligors under the Canadian GSA and be bound by the terms of the Canadian GSA with the same force and effect as if originally named therein as obligors. Attached as **Exhibit "J"** is a copy of the Canadian GSA and the Canadian GSA Joinders.

36.    Pursuant to the Credit Facility Agreements and as security for their obligations to the Bank, Mundo Media, ASM, FCE, Fli Digital, and 36 Labs each granted to the Bank security over

all of their real and personal property pursuant to a General Security Agreement dated December 1, 2016 (the "**US GSA**").

37. Pursuant to a Joinder Agreement dated November 14, 2017 (the "**US GSA Joinder**"), M Zone agreed to become an obligor under the US GSA and be bound by the terms of the US GSA with the same force and effect as if originally named therein as an obligor. Attached as **Exhibit "K"** is a copy of the US GSA and the US GSA Joinder.

38. As security for its obligations to the Bank, AppThis granted to the Bank security over all of its real and personal property pursuant to a General Security Agreement dated February 5, 2019 (the "**AppThis GSA**"). Attached as **Exhibit "L"** is a copy of the AppThis GSA.

39. It is a term under each of the Canadian GSA, the US GSA, and the AppThis GSA that the Bank may appoint a receiver upon default by the Debtors in any of its obligations to the Bank.

*Deposit Account Control Agreements*

40. The Borrower and the Guarantors conduct a substantial portion of their cash management through accounts (the "**SVB Accounts**") held with Silicon Valley Bank ("**SVB**").  In consideration for the Credit Facilities made available by the Bank to the Borrower, each of the Borrower, several of the Guarantors, the Bank and SVB entered into a number of Deposit Account Control Agreements ("**DACAs**"). Attached as **Exhibit "M"** are copies of the DACAs.

41. The DACAs, among other things, permit the Bank to exercise control over the SVB Accounts by restricting the respective account holder's ability to direct the funds therein.

Once the DACAs become effective, SVB will only take directions regarding the subject accounts from the Bank.

**Decline in the Borrower's Financial Performance**

42.     In mid-2018, the Borrower experienced a substantial and sustained decline in its revenue as a result of, among other things, increased scrutiny in the online advertising industry and the deletion of over 1.5 billion fake accounts on Facebook. This decline in revenue, combined with the acquisition of another online marketing company, 36 Labs, created long-term liquidity issues for the Borrower. In response to such decline, the Borrower engaged FTI Capital Advisors Canada (the "**Financial Advisor**") to, among other things, assist the Borrower in its attempt to sell its business.

**Defaults under the Credit Facilities**

43.     In January 2019, the Bank became concerned with the Borrower's continuing financial performance issues and requested that the Borrower consent to the appointment by the Bank's counsel of a financial advisor to review the Borrower's operations. By letter dated February 15, 2019 (the "**Engagement Letter**"), the Bank's counsel, with the consent of the Borrower and on behalf of the Bank, engaged Ernst & Young Inc. (in such capacity, the "**Consultant**") as its consultant to, among other things, review the Debtors' operations, financial forecasts and financial reporting (including accounts receivables and work in progress balances) and the security position of the Bank. As a term of the Engagement Letter, the Borrower agreed to provide the Consultant with access to its books and records and premises for the purpose of carrying out its mandate.

44.     In a meeting with the Bank on February 22, 2019, the Borrower and the Financial Advisor advised the Bank that they were in discussions with certain parties who were interested in pursuing an acquisition of the Borrower's business. Of these parties, one (the "**Prospective Purchaser**") was identified as having advanced its review more than the others, and was expressing serious interest.

45.     By letter dated February 26, 2019 (the "**Default Letter**"), the Bank notified the Borrower that (i) it was in default of certain of its obligations under the Credit Agreements, (ii) the Credit Facilities were fully drawn, and (iii) that there was no further availability thereunder. Although the Credit Facilities were fully drawn, the Borrower held a portion of the funds drawn thereunder in numerous bank accounts both with the Bank and other financial institutions, including with SVB, which funds continued to be used in the day-to-day operations of the Debtors. A copy of the Default Letter is attached hereto as **Exhibit "N"**.

**Receipt of Unsatisfactory Letter of Intent**

46.     Following the issuance of the Default Letter, on March 4, 2019 the Bank, its counsel, and the Consultant met with the Borrower, its counsel, and the Financial Advisor (the "**March 4 Meeting**"). At the March 4 Meeting, the Borrower and the Financial Advisor advised the Bank that the Prospective Purchaser was expected to be delivering a letter of intent (the "**LOI**") shortly.

47.     Following the March 4 Meeting, the Bank and the Consultant continued to work with the Borrower and the Financial Advisor and allowed them time to attempt to negotiate a deal with the Prospective Purchaser. During this period, the collateral subject to the Bank's security continued to decline and the cash available to the Borrower was being depleted.

48.     On March 20, 2019, the Financial Advisor provided the Bank with a draft LOI they had received from the Prospective Purchaser. The Bank advised the Financial Advisor that the terms contained therein were not satisfactory to the Bank.

49.     On March 28, 2019 the Bank, its counsel, and the Consultant met with the Borrower, its counsel, and the Financial Advisor to discuss the status of the Borrower's efforts to negotiate a transaction with the Prospective Purchaser or otherwise, that would be acceptable to the Bank.   The Bank advised that it would provide the Borrower with a final opportunity to secure terms for a transaction acceptable to the Bank, and required a written report on same by 12:00 pm on April 3, 2019.

50.     A scheduled payment of principal and interest under the Credit Facilities in the amount of approximately $900,000 became owing to the Bank on March 31, 2019 (the "**April 1 Payment**"). The April 1 Payment was reflected in the cash flow forecast that had been prepared by the Borrower and provided to the Bank.   However, when the Bank attempted to process the payment on April 1, 2019, there were insufficient funds in the Borrower's account to do so.

51.     At the request of the Borrower, the Bank met with the Financial Advisor on April 2, 2019 to discuss the status of discussions between the Borrower and the Prospective Purchaser. The Bank communicated to the Financial Advisor that the revised offer was also not satisfactory to the Bank.

52.     Given the continuing erosion of the Bank's security and the downward trend in the Borrower's cash position, the Bank's counsel, D.J. Miller of Thornton Grout Finnigan LLP ("**TGF**"), advised Borrower's counsel, Virginie Gauthier of Norton Rose Fulbright LLP

on April 2, 2019 that the Bank would be issuing demands for payment to the Borrower and the Guarantors and notices of intention to enforce the following day.

53.    The Borrower and its Financial Advisor have repeatedly advised the Bank that if they were unable to present a transaction acceptable to the Bank, that they would proceed consensually with the Bank in any steps that may be taken.  On April 2, 2019 the Bank's counsel TGF requested that the Borrower's counsel confirm that the cooperation of the Debtors would be forthcoming following the issuance of the demands, to permit an immediate attendance for the appointment of a Receiver.  That request has also been made in further emails and discussions with the Borrower's counsel since that time.  The Bank is proceeding with the application for the appointment of a Receiver on that basis but will advise the Court at the time of the Chambers attendance if anything has changed in that regard.

**Issuance of Demand for Payment**

54.    By letter dated April 3, 2019 (the "**Borrower Demand**"), the Bank demanded payment from the Borrower of all amounts then outstanding under the Credit Facilities and together therewith delivered a Notice of Intention to Enforce Security (the "**Borrower BIA Notice**") pursuant to Section 244 of the *Bankruptcy and Insolvency Act* (the "**BIA**"). Attached as **Exhibit "O"** are copies of the Borrower Demand and the Borrower BIA Notice.

55.    By letters dated April 3, 2019 (collectively, the "**Guarantor Demands**" and together with the Borrower Demand, the "**Demands**"), the Bank demanded payment from each of the Guarantors of all amounts outstanding under the Credit Facilities and together therewith

delivered a Notice of Intention to Enforce Security (collectively, the "**Guarantor BIA Notices**" and together with the Borrower BIA Notice, the "**BIA Notices**") pursuant to Section 244 of the BIA.  Attached as **Exhibit "P"** are copies of the Guarantor Demands and the Guarantor BIA Notices.

56.    On April 3, 2019, the Bank delivered Notices of Exclusive Control (the "**Notices of Exclusive Control**") to SVB, pursuant to the DACAs. As outlined above, the effect of the Notices of Exclusive Control is to restrict the Borrower's ability to unilaterally direct the funds held in the SVB Accounts. Attached as **Exhibit "Q"** are copies of the Notices of Exclusive Control delivered by the Bank.  SVB has acknowledged the Notices of Exclusive Control. As a result of the Notices of Exclusive Control being delivered, the Bank's authorization is required for any disbursements from the SVB Accounts. The Bank has requested that the Borrower and its Financial Advisor provide it with a list of cheques that they believe should be honoured by SVB (and permitted by the Bank) as critical payments.

57.    In addition to the aforementioned list, the Bank has also requested, but not received, the following information from the Borrower:

(a)    a financial model for the proposed business combination between the Borrower and the Prospective Purchaser;

(b)    anticipated payments and receipts regarding the Debtors' bank accounts that are not subject to the Notices of Exclusive Control;

(c)    a detailed accounts receivable listing as at February 28, 2019 and related borrowing base calculation;

(d)     a certificate of insurance including a schedule showing "Other Loss Payees" thereunder;

(e)     details of issues surrounding certain accounts receivable from one of the Borrower's largest customers submitted to Export Development Canada;

(f)     certain contracts related to the Borrower's Luxembourg subsidiaries;

(g)     an analysis regarding a tax liability issue in the Luxembourg subsidiaries; and

(h)     documentation regarding the plan and/or structure that will be used to transition customers from those Luxembourg subsidiaries to the Borrower and the proposed terms of same.

**Registrations against the Debtors**

_Borrower_

58.     The Bank made two registrations against the Borrower pursuant to the _Personal Property Security Act_ (Ontario) (the "**PPSA**") on July 22, 2016 against all classes of collateral, except "consumer goods" (the "**Borrower Registrations**").

59.     There are no registrations against the Borrower under the PPSA (Ontario) prior in time to the Borrower Registrations.

_Mundo Inc._

60.     The Bank made one registration against Mundo Inc. pursuant to the PPSA (Ontario) on July 22, 2016 against all classes of collateral except "consumer goods" (the "**Mundo Registration**").

61.     There are no registrations against Mundo Inc. under the PPSA (Ontario) prior in time to the Mundo Registration.

*253 Ontario*

62.     The Bank made one registration against 253 Ontario pursuant to the PPSA (Ontario) on October 6, 2016 against all classes of collateral except "consumer goods" (the "**253 Ontario Registration**").

63.     There are no registrations against 253 Ontario under the PPSA (Ontario) prior in time to the 253 Ontario Registration.

64.     The Bank has also registered its security interest against 253 Ontario with the Recorder of Deeds in the District of Columbia pursuant to the UCC on October 14, 2016.

*251 Ontario*

65.     The Bank made one registration against 251 Ontario pursuant to the PPSA (Ontario) on July 22, 2016 against all classes of collateral except "consumer goods" (the "**251 Ontario Registration**").

66.     There are no registrations against 251 Ontario under the PPSA (Ontario) prior in time to the 251 Ontario Registration.

*230 Ontario*

67.     The Bank made one registration against 230 Ontario pursuant to the PPSA (Ontario) on July 22, 2016 against all classes of collateral except "consumer goods" (the "**230 Ontario Registration**").

68.     There are no registrations against 230 Ontario under the PPSA (Ontario) prior in time to the 230 Ontario Registration.

*36 Labs, LLC.*

69.     The Bank made one registration against 36 Labs pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**36 Labs Ontario Registration**").

70.     There are no registrations against 36 Labs under the PPSA (Ontario) prior in time to the 36 Labs Ontario Registration.

71.     As noted above, 36 Labs is domiciled in Delaware. Accordingly, the Bank has also registered its security interest against 36 Labs in the State of Delaware pursuant to the UCC on December 2, 2016.

*Active Signal Marketing, LLC*

72.     The Bank made one registration against ASM pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**ASM Ontario Registration**").

73.     There are no registrations against ASM under the PPSA (Ontario) prior in time to the ASM Ontario Registration.

74.     As noted above, ASM is domiciled in Delaware. Accordingly, the Bank has registered its security interest against ASM in the State of Delaware pursuant to the UCC on December 12, 2016.

*Find Click Engage, LLC*

75.   The Bank made one registration against FCE pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**FCE Ontario Registration**").

76.   There are no registrations against FCE under the PPSA (Ontario) prior in time to the FCE Ontario Registration.

77.   As noted above, FCE is domiciled in Delaware. Accordingly, the Bank has registered its security interest against FCE in the State of Delaware pursuant to the UCC on December 2, 2016.

*Fli Digital, Inc.*

78.   The Bank made one registration against Fli Digital pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**Fli Digital Ontario Registration**").

79.   There are no registrations against Fli Digital under the PPSA (Ontario) prior in time to the Fli Digital Ontario Registration.

80.   As noted above, Fli Digital is domiciled in the State of New York. Accordingly, the Bank has registered its security interest against Fli Digital in the State of New York pursuant to the UCC on December 5, 2016.

*Mundo Media (US), LLC*

81.     The Bank made one registration against Mundo Media pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**Mundo Media Ontario Registration**").

82.     There are no registrations against Mundo Media under the PPSA (Ontario) prior in time to the Mundo Media Ontario Registration.

83.     As noted above, Mundo Media is domiciled in Delaware. Accordingly, the Bank made two registrations regarding its security interest against Mundo Media in the State of Delaware pursuant to the UCC on October 13, 2016 and December 2, 2016.

*M Zone Marketing Inc.*

84.     The Bank made one registration against M Zone pursuant to the PPSA (Ontario) on January 25, 2019 against all classes of collateral except "consumer goods" (the "**M Zone Ontario Registration**").

85.     There are no registrations against M Zone under the PPSA (Ontario) prior in time to the M Zone Ontario Registration.

86.     As noted above, M Zone is domiciled in Delaware. Accordingly, the Bank has registered its security interest against M Zone in the State of Delaware pursuant to the UCC on November 14, 2017.

*AppThis Holdings, Inc.*

87.     The Bank made one registration against AppThis pursuant to the PPSA (Ontario) on February 12, 2019 against all classes of collateral except "consumer goods" (the "**AppThis Ontario Registration**").

88.     There are no registrations against AppThis under the PPSA (Ontario) prior in time to the AppThis Ontario Registration.

89.     As noted above, AppThis is domiciled in Delaware. Accordingly, the Bank has registered its security interest against AppThis in the State of Delaware pursuant to the UCC on February 12, 2019. There are two UCC registrations in priority to the Bank's in favour of 3283-726, LP and 2224440 Ontario Inc. However, such registrations are subject to two subordination and postponement agreements dated February 26, 2019 (the "**Subordination Agreements**") subordinating the security in favour of 3283-726, LP and 2224440 Ontario Inc. to the Bank's security. Copies of the Subordination Agreements are attached hereto as **Exhibit "R"**.

90.     Copies of electronic PPSA searches conducted in Ontario in respect of the Debtors, along with certified reports under the Uniform Commercial Code ("**UCC**") in respect of those Debtors incorporated in the United States are attached hereto as **Exhibit "S"**.

**Need for a Receiver**

91.     The appointment of a Receiver is necessary and appropriate as a result of the following:

(a)     The Bank has provided the Borrower with considerable time to pursue a sale of its business.  Despite such opportunity, the Borrower has been unable to secure a sale

on terms that would result in an amount that would be close to repaying amounts owing to the Bank, or sufficient to produce a recovery that is otherwise acceptable to the Bank;

(b)     The Bank's security position has deteriorated in the period of time it permitted the Borrower to pursue a sale of its business and the Bank is concerned that its security position will further deteriorate absent the appointment of the Receiver;

(c)     The Borrower has been unable to reach terms of a proposed transaction acceptable to the Bank.  The Bank is no longer willing to allow an informal process under the supervision of the Borrower and its advisors to continue, while the Borrower's available cash becomes further depleted;

(d)     The Borrower's continued operations are at a significant and immediate risk;

(e)     The Borrower does not have sufficient cash on hand to continue operations beyond the very immediate short term and the Bank is not prepared to fund such costs without a Receiver being appointed by the Court and funding being made available to the Receiver; and

(f)     The appointment of the Receiver is necessary to protect and ultimately realize on the collateral subject to the Bank's security through a liquidation thereof for the benefit of the Bank as it relates to its anticipated significant shortfall.

92.     Ernst & Young Inc. has consented to act as the Receiver.  A copy of its consent to act as Receiver is attached hereto as **Exhibit "T"**.

93.     In order to preserve the Bank's security position as much as possible, I am advised by the Receiver that its intention, which the Bank supports, is to run a very compressed sale

- 23 -

process with the goal to achieve the best recovery possible in an efficient and cost-effective manner, given the cash constraints.

94.  I have also been advised by the Consultant that four months' arrears are owing to the Debtors' various landlords. The relevant properties include those where the Debtors' servers are located. If any landlords were to take enforcement steps under their leases, the effects on the Debtors' business and the Bank's security position would be potentially irreparable. As an information technology company, the going-concern value of the Borrower's business is dependent on continued and uninterrupted access to its platform and data.

95.  Moreover, despite repeated requests from the Bank and the Consultant, neither the Borrower nor the Financial Advisor have provided the detailed information that the Bank requires including, but not limited to, the details behind certain payroll disbursements that the Borrower has asked be made, and details as to receipts over the last week. This lack of transparency greatly concerns the Bank, particularly in light of the significant shortfall that it will experience in a best-case scenario.

96.  The proposed Order appointing the Receiver permits the Receiver to borrow funds from the Bank for the purpose of financing the receivership proceeding.  If necessary, these borrowings will be secured by Receiver's certificates to be issued by the Receiver or by the security held by the Bank upon the Borrower's assets.  In all cases, it is to be a priority charge over all assets of the Borrower and Guarantors (the "**Receiver's Borrowing Charge**").

- 24 -

97.    The Order sought by the Bank provides for the retention of independent counsel by the Receiver to address any issue or matter where there may be an actual or perceived conflict with the Bank. In all other situations, and in view of the very significant shortfall expected to be incurred by the Bank, the draft Order provides authorization for the Receiver to use the Bank's counsel as a matter of cost efficiency.

98.    I swear this affidavit in support of an application by the Bank for the appointment of the Receiver on the terms set out in the draft Order contained in the Application Record, and for no other or improper purpose.

SWORN before me at the City of Toronto,
in the Province of Ontario, this 8th day of
April, 2019.

_____
Commissioner for Taking Affidavits

**GARY IVANY**

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

This is **Exhibit "A",** referred to in the

**Affidavit of Gary lvany,** sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

**Owen Gaffney**
**Barrister & Solicitor**
**LSO# 75017B**

Request ID:       022603574
Transaction ID: 70542204
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:04
Page:                          1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | | Amalgamation Date |
|---|---|---|---|
| 1958484 | MUNDO MEDIA LTD. | | 2016/07/26 |
| | | | **Jurisdiction** |
| | | | ONTARIO |
| **Corporation Type** | **Corporation Status** | | **Former Jurisdiction** |
| ONTARIO BUSINESS CORP. | ACTIVE | | NOT APPLICABLE |

| Registered Office Address | | Date Amalgamated | Amalgamation Ind. |
|---|---|---|---|
| | | NOT APPLICABLE | A |
| 120 EAST BEAVER CREEK ROAD | | **New Amal. Number** | **Notice Date** |
| Suite # 200 | | | |
| RICHMOND HILL | | NOT APPLICABLE | NOT APPLICABLE |
| ONTARIO | | | |
| CANADA   L4B 4V1 | | | **Letter Date** |
| **Mailing Address** | | | NOT APPLICABLE |
| | | **Revival Date** | **Continuation Date** |
| 120 EAST BEAVER CREEK ROAD | | NOT APPLICABLE | NOT APPLICABLE |
| Suite # 200 | | | |
| RICHMOND HILL | | **Transferred Out Date** | **Cancel/Inactive Date** |
| ONTARIO | | | |
| CANADA   L4B 4V1 | | NOT APPLICABLE | NOT APPLICABLE |
| | | **EP Licence Eff.Date** | **EP Licence Term.Date** |
| | | NOT APPLICABLE | NOT APPLICABLE |

| | Number of Directors | | Date Commenced | Date Ceased |
|---|---|---|---|---|
| | **Minimum** | **Maximum** | **in Ontario** | **in Ontario** |
| | 00001 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

Request ID:      022603574
Transaction ID: 70542204
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:04
Page:                    2

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1958484

**Corporation Name**

MUNDO MEDIA LTD.

| **Corporate Name History** | **Effective Date** |
|---|---|
| MUNDO MEDIA LTD. | 2016/07/26 |

**Current Business Name(s) Exist:**     YES

**Expired Business Name(s) Exist:**     NO

**Amalgamating Corporations**

| **Corporation Name** | **Corporate Number** |
|---|---|
| VOOM MEDIA CORP. | 1889725 |
| MUNDO MEDIA LTD. | 2304947 |

Request ID:      022603574
Transaction ID: 70542204
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:04
Page:                3

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1958484

**Corporation Name**

MUNDO MEDIA LTD.

**Administrator:**
**Name (Individual / Corporation)**

ANTHONY

LAM

**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| **Date Began** | **First Director** | |
|---|---|---|
| 2018/10/05 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | CHIEF FINANCIAL OFFICER | |

**Name (Individual / Corporation)**

JASON

THEOFILOS

**Administrator:**
**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| **Date Began** | **First Director** | |
|---|---|---|
| 2016/07/26 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | CHIEF EXECUTIVE OFFICER | |

Transaction ID: 70542204
Category ID:   UN/E

Ministry of Government Services

Request ID:  022603574 Province of Ontario Date Report Produced: 2019/01/17
Time Report Produced: 16:53:04
Page:                4

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1958484

**Corporation Name**

MUNDO MEDIA LTD.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2016/07/26 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| DIRECTOR | | Y |

Request ID:       022603574
Transaction ID: 70542204
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:04
Page:                        5

# CORPORATION PROFILE REPORT

Ontario Corp Number

1958484

Corporation Name

MUNDO MEDIA LTD.

**Last Document Recorded**

Act/Code  Description                              Form          Date

CIA        CHANGE NOTICE                    1              2018/10/09  (ELECTRONIC FILING)

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING. ALL PERSONS WHO ARE RECORDED AS CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

Request ID:      022603562
Transaction ID: 70542170
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                          1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | | Amalgamation Date |
|---|---|---|---|
| 1977309 | MUNDO INC. | | 2017/06/02 |

Jurisdiction

ONTARIO

| Corporation Type | Corporation Status | Former Jurisdiction |
|---|---|---|
| ONTARIO BUSINESS CORP. | ACTIVE | NOT APPLICABLE |

**Registered Office Address**

120 EAST BEAVER CREEK ROAD

**Suite #** 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

**Mailing Address**

120 EAST BEAVER CREEK ROAD

**Suite #** 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| | Date Amalgamated | Amalgamation Ind. |
|---|---|---|
| | NOT APPLICABLE | A |

| New Amal. Number | Notice Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

**Letter Date**

NOT APPLICABLE

| Revival Date | Continuation Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Transferred Out Date | Cancel/Inactive Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| EP Licence Eff.Date | EP Licence Term.Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Number of Directors | | Date Commenced in Ontario | Date Ceased in Ontario |
|---|---|---|---|
| Minimum | Maximum | | |
| 00003 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

Request ID:      022603562
Transaction ID: 70542170
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                    2

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name |
|---|---|
| 1977309 | MUNDO INC. |

| Corporate Name History | Effective Date |
|---|---|
| MUNDO INC. | 2017/06/02 |

| | |
|---|---|
| Current Business Name(s) Exist: | NO |
| Expired Business Name(s) Exist: | NO |

**Amalgamating Corporations**

| Corporation Name | Corporate Number |
|---|---|
| CUSTOMER ACQUISITION NETWORK (CANADA) INC. | 2527566 |
| MUNDO INC. | 2580098 |

Request ID: 022603562
Transaction ID: 70542170
Category ID: UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:               3

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1977309

**Corporation Name**

MUNDO INC.

**Administrator:**
**Name (Individual / Corporation)**

JEFF

CORDEIRO

**Address**

5748 LAGO DEL SOL DRIVE

LAKE WORTH
FLORIDA
UNITED STATES OF AMERICA   33449

| Date Began | First Director | |
|---|---|---|
| 2018/01/17 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | PRESIDENT | |

**Administrator:**
**Name (Individual / Corporation)**

ANTHONY

LAM

**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2018/10/05 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | CHIEF FINANCIAL OFFICER | |

Transaction ID: 70542170
Cetegory ID:  UN/E

Ministry of Government Services

Request ID: 022603562 Province of Ontario Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                4

# CORPORATION PROFILE REPORT

Ontario Corp Number

1977309

Corporation Name

MUNDO INC.

Administrator:
Name (Individual / Corporation)

SAM

PAI

Address

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2018/05/01 | NOT APPLICABLE | |
| Designation | Officer Type | Resident Canadian |
| DIRECTOR | | Y |

Administrator:
Name (Individual / Corporation)

MITCH

RICHLER

Address

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2018/01/17 | NOT APPLICABLE | |
| Designation | Officer Type | Resident Canadian |
| OFFICER | VICE-PRESIDENT | |

Request ID:      022603562
Transaction ID: 70542170
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                 5

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1977309

**Corporation Name**

MUNDO INC.

**Administrator:**
**Name (Individual / Corporation)**

PETER

SIMEON

**Address**

100 KING STREET WEST
FIRST CANADIAN PLACE
Suite # 1600
TORONTO
ONTARIO
CANADA   M5X 1G5

| Date Began | First Director | |
|---|---|---|
| 2018/05/01 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| DIRECTOR | | Y |

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2017/06/02 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | CHIEF EXECUTIVE OFFICER | |

Transaction ID: 70542170
Category ID:   UN/E

Ministry of Government Services

Request ID:  022603562 Province of Ontario Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                    6

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1977309

**Corporation Name**

MUNDO INC.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

**Suite # 200**
**RICHMOND HILL**
**ONTARIO**
**CANADA   L4B 4V1**

**Date Began**

2017/06/02

**First Director**

NOT APPLICABLE

**Designation**

DIRECTOR

**Officer Type**

**Resident Canadian**

Y

Request ID:      022603562
Transaction ID: 70542170
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:50:58
Page:                          7

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1977309

**Corporation Name**

MUNDO INC.

**Last Document Recorded**

| Act/Code | Description | Form | Date |
|---|---|---|---|
| CIA | CHANGE NOTICE | 1 | 2018/10/24  (ELECTRONIC FILING) |

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING.  ALL PERSONS WHO ARE RECORDED AS CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

Request ID:      022603584
Transaction ID:  70542229
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:36
Page:                 1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | | | Incorporation Date |
|---|---|---|---|---|
| 2307521 | 2307521 ONTARIO INC. | | | 2011/11/29 |
| | | | | **Jurisdiction** |
| | | | | ONTARIO |
| **Corporation Type** | **Corporation Status** | | | **Former Jurisdiction** |
| ONTARIO BUSINESS CORP. | ACTIVE | | | NOT APPLICABLE |

| Registered Office Address | | Date Amalgamated | Amalgamation Ind. |
|---|---|---|---|
| | | NOT APPLICABLE | NOT APPLICABLE |
| 120 EAST BEAVER CREEK RD | | **New Amal. Number** | **Notice Date** |
| Suite # 200 | | NOT APPLICABLE | NOT APPLICABLE |
| RICHMOND HILL | | | |
| ONTARIO | | | |
| CANADA   L4B 4V1 | | | **Letter Date** |
| **Mailing Address** | | | NOT APPLICABLE |
| | | **Revival Date** | **Continuation Date** |
| 120 EAST BEAVER CREEK RD | | NOT APPLICABLE | NOT APPLICABLE |
| Suite # 200 | | **Transferred Out Date** | **Cancel/Inactive Date** |
| RICHMOND HILL | | | |
| ONTARIO | | NOT APPLICABLE | NOT APPLICABLE |
| CANADA   L4B 4V1 | | | |
| | | **EP Licence Eff.Date** | **EP Licence Term.Date** |
| | | NOT APPLICABLE | NOT APPLICABLE |

| | Number of Directors | | Date Commenced | Date Ceased |
|---|---|---|---|---|
| | Minimum | Maximum | in Ontario | in Ontario |
| | 00001 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

Request ID:    022603584
Transaction ID: 70542229
Category ID:   UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:36
Page:              2

# CORPORATION PROFILE REPORT

Ontario Corp Number                          Corporation Name

2307521                                      2307521 ONTARIO INC.


Corporate Name History                       Effective Date

2307521 ONTARIO INC.                         2011/11/29


Current Business Name(s) Exist:              NO

Expired Business Name(s) Exist:              NO


Administrator:
Name (Individual / Corporation)              Address

JASON                                        120 EAST BEAVER CREEK RD

THEOFILOS
                                             Suite # 200
                                             RICHMOND HILL
                                             ONTARIO
                                             CANADA   L4B 4V1

Date Began          First Director

2016/07/20          NOT APPLICABLE

Designation         Officer Type             Resident Canadian

DIRECTOR                                     Y

Request ID:    022603584
Transaction ID: 70542229
Category ID:   UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:36
Page:            3

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name |
| --- | --- |
| 2307521 | 2307521 ONTARIO INC. |

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK RD

**Suite # 200**
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
| --- | --- | --- |
| 2016/07/20 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | PRESIDENT | |

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK RD

**Suite # 200**
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| Date Began | First Director | |
| --- | --- | --- |
| 2016/07/20 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | SECRETARY | |

Request ID:       022603584
Transaction ID: 70542229
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:36
Page:                          4

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

2307521

**Corporation Name**

2307521 ONTARIO INC.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK RD

**Suite # 200**
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

**Date Began**

2016/07/20

**First Director**

NOT APPLICABLE

**Designation**

OFFICER

**Officer Type**

TREASURER

**Resident Canadian**

Request ID:      022603584
Transaction ID: 70542229
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:36
Page:                        5

# CORPORATION PROFILE REPORT

Ontario Corp Number

2307521

Corporation Name

2307521 ONTARIO INC.

**Last Document Recorded**
Act/Code  Description                          Form              Date

CIA       CHANGE NOTICE                        1                 2016/07/26  (ELECTRONIC FILING)

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED
IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING. ALL PERSONS WHO ARE RECORDED AS
CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

Request ID:     022603580
Transaction ID: 70542216
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:07
Page:             1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | | Incorporation Date |
|---|---|---|---|
| 2518769 | 2518769 ONTARIO LTD. | | 2016/05/17 |
| | | | **Jurisdiction** |
| | | | ONTARIO |

| Corporation Type | Corporation Status | | Former Jurisdiction |
|---|---|---|---|
| ONTARIO BUSINESS CORP. | ACTIVE | | NOT APPLICABLE |

| Registered Office Address | | Date Amalgamated | Amalgamation Ind. |
|---|---|---|---|
| | | NOT APPLICABLE | NOT APPLICABLE |
| 1 YONGE STREET | | **New Amal. Number** | **Notice Date** |
| Suite # 1801 | | NOT APPLICABLE | NOT APPLICABLE |
| TORONTO | | | |
| ONTARIO | | | |
| CANADA   M5E 1W7 | | | **Letter Date** |
| **Mailing Address** | | | NOT APPLICABLE |
| | | **Revival Date** | **Continuation Date** |
| 1 YONGE STREET | | NOT APPLICABLE | NOT APPLICABLE |
| Suite # 1801 | | **Transferred Out Date** | **Cancel/Inactive Date** |
| TORONTO | | | |
| ONTARIO | | | |
| CANADA   M5E 1W7 | | NOT APPLICABLE | NOT APPLICABLE |
| | | **EP Licence Eff.Date** | **EP Licence Term.Date** |
| | | NOT APPLICABLE | NOT APPLICABLE |

| | Number of Directors | | Date Commenced | Date Ceased |
|---|---|---|---|---|
| | **Minimum** | **Maximum** | **in Ontario** | **in Ontario** |
| | 00001 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

Request ID:    022603580
Transaction ID: 70542216
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:07
Page:                2

# CORPORATION PROFILE REPORT

Ontario Corp Number

2518769

Corporation Name

2518769 ONTARIO LTD.

Corporate Name History

2518769 ONTARIO LTD.

Effective Date

2016/05/17

Current Business Name(s) Exist:                NO

Expired Business Name(s) Exist:                NO

Administrator:
Name.(Individual / Corporation)

JASON

THEOFILOS

Address

1 YONGE STREET

Suite # 1801
TORONTO
ONTARIO
CANADA   M5E 1W7

Date Began                First Director

2016/05/17                NOT APPLICABLE

Designation               Officer Type              Resident Canadian

DIRECTOR                                            Y

Request ID:    022603580
Transaction ID: 70542216
Category ID:   UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:07
Page:            3

# CORPORATION PROFILE REPORT

Ontario Corp Number

2518769

Corporation Name

2518769 ONTARIO LTD.

Administrator:
Name (Individual / Corporation)

JASON

THEOFILOS

Address

1 YONGE STREET

Suite # 1801
TORONTO
ONTARIO
CANADA   M5E 1W7

| Date Began | First Director | |
|---|---|---|
| 2016/05/17 | NOT APPLICABLE | |
| Designation | Officer Type | Resident Canadian |
| OFFICER | PRESIDENT | Y |

Administrator:
Name (Individual / Corporation)

JASON

THEOFILOS

Address

1 YONGE STREET

Suite # 1801
TORONTO
ONTARIO
CANADA   M5E 1W7

| Date Began | First Director | |
|---|---|---|
| 2016/05/17 | NOT APPLICABLE | |
| Designation | Officer Type | Resident Canadian |
| OFFICER | SECRETARY | Y |

Request ID:      022603580
Transaction ID: 70542216
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:07
Page:                4

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

2518769

**Corporation Name**

2518769 ONTARIO LTD.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

1 YONGE STREET

**Suite #** 1801
TORONTO
ONTARIO
CANADA   M5E 1W7

| Date Began | First Director | |
|---|---|---|
| 2016/05/17 | NOT APPLICABLE | |

| Designation | Officer Type | Resident Canadian |
|---|---|---|
| OFFICER | TREASURER | Y |

Request ID:      022603580
Transaction ID: 70542216
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:54:07
Page:                    5

# CORPORATION PROFILE REPORT

**Ontario Corp Number**                                    **Corporation Name**

2518769                                                    2518769 ONTARIO LTD.

**Last Document Recorded**

| Act/Code | Description | Form | Date |
|----------|-------------|------|------|
| CIA | ANNUAL RETURN 2017 | 1C | 2018/07/22  (ELECTRONIC FILING) |

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED
IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING.  ALL PERSONS WHO ARE RECORDED AS
CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

Request ID:     022603579
Transaction ID: 70542214
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:40
Page:                 1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | | Incorporation Date |
|---|---|---|---|
| 2538853 | 2538853 ONTARIO LTD. | | 2016/09/28 |

**Jurisdiction**

ONTARIO

| Corporation Type | Corporation Status | | Former Jurisdiction |
|---|---|---|---|
| ONTARIO BUSINESS CORP. | ACTIVE | | NOT APPLICABLE |

**Registered Office Address**

120 EAST BEAVER CREEK ROAD

**Suite # 200**
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

**Mailing Address**

JASON THEOFILOS
120 EAST BEAVER CREEK ROAD

**Suite # 200**
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

| | Date Amalgamated | Amalgamation Ind. |
|---|---|---|
| | NOT APPLICABLE | NOT APPLICABLE |

| | New Amal. Number | Notice Date |
|---|---|---|
| | NOT APPLICABLE | NOT APPLICABLE |

**Letter Date**

NOT APPLICABLE

| | Revival Date | Continuation Date |
|---|---|---|
| | NOT APPLICABLE | NOT APPLICABLE |

| | Transferred Out Date | Cancel/Inactive Date |
|---|---|---|
| | NOT APPLICABLE | NOT APPLICABLE |

| | EP Licence Eff.Date | EP Licence Term.Date |
|---|---|---|
| | NOT APPLICABLE | NOT APPLICABLE |

| Number of Directors | | Date Commenced | Date Ceased |
| Minimum | Maximum | in Ontario | in Ontario |
|---|---|---|---|
| 00001 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

Request ID:      022603579
Transaction ID: 70542214
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:40
Page:                  2

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name |
|---|---|
| 2538853 | 2538853 ONTARIO LTD. |

| Corporate Name History | Effective Date |
|---|---|
| 2538853 ONTARIO LTD. | 2016/09/28 |

| | |
|---|---|
| Current Business Name(s) Exist: | NO |
| Expired Business Name(s) Exist: | NO |

Administrator:
Name (Individual / Corporation)               Address

JASON
THEOFILOS                                     120 EAST BEAVER CREEK ROAD

                                              Suite # 200
                                              RICHMOND HILL
                                              ONTARIO
                                              CANADA   L4B 4V1

| Date Began | First Director | |
|---|---|---|
| 2016/09/28 | NOT APPLICABLE | |
| Designation | Officer Type | Resident Canadian |
| OFFICER | PRESIDENT | |

Request ID:    022603579
Transaction ID: 70542214
Category ID:    UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:40
Page:            3

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

2538853

**Corporation Name**

2538853 ONTARIO LTD.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

**Suite # 200**
**RICHMOND HILL**
**ONTARIO**
**CANADA   L4B 4V1**

| **Date Began** | **First Director** | |
| --- | --- | --- |
| 2016/09/28 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| OFFICER | SECRETARY | |

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

**Suite # 200**
**RICHMOND HILL**
**ONTARIO**
**CANADA   L4B 4V1**

| **Date Began** | **First Director** | |
| --- | --- | --- |
| 2016/09/28 | NOT APPLICABLE | |
| **Designation** | **Officer Type** | **Resident Canadian** |
| DIRECTOR | | Y |

Request ID:    022603579
Transaction ID: 70542214
Category ID:   UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced: 2019/01/17
Time Report Produced: 16:53:40
Page:                 4

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

2538853

**Corporation Name**

2538853 ONTARIO LTD.

**Administrator:**
**Name (Individual / Corporation)**

JASON

THEOFILOS

**Address**

120 EAST BEAVER CREEK ROAD

Suite # 200
RICHMOND HILL
ONTARIO
CANADA   L4B 4V1

**Date Began**

2016/09/28

**First Director**

NOT APPLICABLE

**Designation**

OFFICER

**Officer Type**

TREASURER

**Resident Canadian**

Request ID:      022603579
Transaction ID:  70542214
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced:  2019/01/17
Time Report Produced:  16:53:40
Page:                  5

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

2538853

**Corporation Name**

2538853 ONTARIO LTD.

**Last Document Recorded**

| Act/Code | Description | Form | Date |
|----------|-------------|------|------|
| CIA | ANNUAL RETURN 2017 | 1C | 2018/07/22  (ELECTRONIC FILING) |

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING.  ALL PERSONS WHO ARE RECORDED AS CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

This is **Exhibit "B"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**M ZONE MARKETING INC.**
**Matter Number   n/a**

### D E L A W A R E   S T A T U S   S E A R C H

www.cscglobal.com

## Entity Information

| Entity Information | Search Results Date/Time | | **01-18-2019   10:08** |
|---|---|---|---|
| **Entity Name** | M ZONE MARKETING INC. | | |
| **File Number** | **6454191** | **Status** | **Good Standing since 20170623** |
| | | | |
| **Entity Type** | Corporation | **Corp Type** | General |
| **Tax Type** | A/R Filing Required | **Stock Corporation** | Yes |
| **Residency** | Domestic | **State** | DE |
| | | | |
| **Incorporation Date** | 20170623 | | |
| **Renew Date** | | **Expire Date** | |
| **Bankruptcy** | | **Bankrupt Date** | |
| **Case No** | | | |
| **Orig Incorp Country** | | **Orig Date** | |
| **Merged To Number** | | | |
| **Qtrly Filings** | False | **Last Ann Rpt** | 2017 |
| **Foreign incorporation date** | | | |
| **Original foreign name** | | | |
| **Original foreign kind** | Unknown | | |

## Registered Agent

| Agent Name | COGENCY GLOBAL INC. | | **Agent ID** | 9070044 |
|---|---|---|---|---|
| **Address** | 850 NEW BURTON ROAD | | | |
| | SUITE 201 | | | |
| | ,DOVER,Kent | | | |
| **State** | DE | **Country** | US | **Zip** | 19904 |

## Stock Information

| Amendment Number | 0 | | **Effective Date** | 20170623 | **End Date** | |
|---|---|---|---|---|---|---|

| Description | Class | Series | Authorized | Par Value | Designated shares | |
|---|---|---|---|---|---|---|
| COMMON | | | 5,000 | 0.001000 | 0 | |
| | | | | | | |
| **Total Shares Authorized** | | | | | | 5,000 |
| **No Par Shares** | | | | | | 0 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**M ZONE MARKETING INC.**
**Matter Number   n/a**

D E L A W A R E   S T A T U S   S E A R C H

www.cscglobal.com

**Filing History (last 5 filings)**

| Filing Year | Document Code | Pages | Filing Date/Time | Effective Date | Filing Status | Merger Type |
|---|---|---|---|---|---|---|
| 2017 | Stock Corporation | 1 | 20170623T10:37:00:0000 | 20170623 | Archived | |

**Taxes Due**

| Tax Year | Filing Fee | Total Tax | Penalty | Interest | Other | Paid | Balance |
|---|---|---|---|---|---|---|---|
| 2019 | 50.00 | 175.00 | 0.00 | 0.00 | 0.00 | 0.00 | 225.00 |
| 2018 | 50.00 | 175.00 | 0.00 | 0.00 | 0.00 | 0.00 | 225.00 |
| 2017 | 50.00 | 175.00 | 0.00 | 0.00 | 0.00 | 225.00 | 0.00 |
| | | | | | | **Tax Balance** | 450.00 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.

18-Jan-2019  10:08 AM



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**MUNDO MEDIA (US), LLC**
**Matter Number   n/a**

**D E L A W A R E   S T A T U S   S E A R C H**

www.cscglobal.com

## Entity Information

| | Search Results Date/Time | **01-18-2019    10:09** | |
|---|---|---|---|
| **Entity Name** | MUNDO MEDIA (US), LLC | | |
| **File Number** | 6164811 | **Status** | **Good Standing since 20160926** |
| | | | |
| **Entity Type** | Limited Liability Company | **Corp Type** | General |
| **Tax Type** | Annual L.L.C. Tax | **Stock Corporation** | No |
| **Residency** | Domestic | **State** | DE |
| | | | |
| **Incorporation Date** | 20160926 | | |
| **Renew Date** | | **Expire Date** | |
| **Bankruptcy** | | **Bankrupt Date** | |
| **Case No** | | | |
| **Orig Incorp Country** | | **Orig Date** | |
| **Merged To Number** | | | |
| **Qtrly Filings** | False | **Last Ann Rpt** | 0 |
| **Foreign incorporation date** | | | |
| **Original foreign name** | | | |
| **Original foreign kind** | Unknown | | |

## Registered Agent

| **Agent Name** | COGENCY GLOBAL INC. | | | **Agent ID** | 9070044 |
|---|---|---|---|---|---|
| **Address** | 850 NEW BURTON ROAD | | | | |
| | SUITE 201 | | | | |
| | ,DOVER,Kent | | | | |
| **State** | DE | **Country** | US | **Zip** | 19904 |

## Stock Information

| **Amendment Number** | 0 | | **Effective Date** | | **End Date** | |
|---|---|---|---|---|---|---|
| **Description** | **Class** | **Series** | **Authorized** | **Par Value** | **Designated shares** | |
| | | | | | | |
| **Total Shares Authorized** | | | | | | 0 |
| **No Par Shares** | | | | | | 0 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.


**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**MUNDO MEDIA (US), LLC**
**Matter Number   n/a**

### DELAWARE STATUS SEARCH

www.cscglobal.com

## Filing History (last 5 filings)

| Filing Year | Document Code | Pages | Filing Date/Time | Effective Date | Filing Status | Merger Type |
|---|---|---|---|---|---|---|
| 2017 | Blnkt Name - LLC | 1 | 20170501T08:06:00:0000 | 20170501 | Archived | |
| 2016 | Merger | 2 | 20161013T16:52:00:0000 | 20161013 | Archived | Certificate of Merger |
| 2016 | LLC | 1 | 20160926T17:41:00:0000 | 20160926 | Archived | |

## Taxes Due

| Tax Year | Filing Fee | Total Tax | Penalty | Interest | Other | Paid | Balance |
|---|---|---|---|---|---|---|---|
| 2019 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2018 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2017 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 |
| | | | | | | **Tax Balance** | 600.00 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.

18-Jan-2019  10:10 AM



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

www.cscglobal.com

**ACTIVE SIGNAL MARKETING, LLC**
**Matter Number   n/a**

## D E L A W A R E   S T A T U S   S E A R C H

### Entity Information

|  |  |  |  |
|---|---|---|---|
|  |  | Search Results Date/Time | **01-18-2019    10:11** |
| **Entity Name** | ACTIVE SIGNAL MARKETING, LLC |  |  |
| **File Number** | 5870538 | **Status** | **Good Standing since 20151106** |
|  |  |  |  |
| **Entity Type** | Limited Liability Company | **Corp Type** | General |
| **Tax Type** | Annual L.L.C. Tax | **Stock Corporation** | No |
| **Residency** | Domestic | **State** | DE |
|  |  |  |  |
| **Incorporation Date** | 20151106 |  |  |
| **Renew Date** |  | **Expire Date** |  |
| **Bankruptcy** |  | **Bankrupt Date** |  |
| **Case No** |  |  |  |
| **Orig Incorp Country** |  | **Orig Date** |  |
| **Merged To Number** |  |  |  |
| **Qtrly Filings** | False | **Last Ann Rpt** | 0 |
| **Foreign incorporation date** |  |  |  |
| **Original foreign name** |  |  |  |
| **Original foreign kind** | Unknown |  |  |

### Registered Agent

| **Agent Name** | HARVARD BUSINESS SERVICES, INC. |  | **Agent ID** | 9020245 |
|---|---|---|---|---|
| **Address** | 16192 COASTAL HWY |  |  |  |
|  |  |  |  |  |
|  | ,LEWES,Sussex |  |  |  |
| **State** | DE | **Country** | US | **Zip** | 19958 |

### Stock Information

| **Amendment Number** | 0 |  | **Effective Date** |  | **End Date** |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| **Description** | **Class** | **Series** | **Authorized** | **Par Value** | **Designated shares** |  |
|  |  |  |  |  |  |  |
| **Total Shares Authorized** |  |  |  |  |  | 0 |
| **No Par Shares** |  |  |  |  |  | 0 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.


**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**ACTIVE SIGNAL MARKETING, LLC**
**Matter Number   n/a**

### DELAWARE STATUS SEARCH

www.cscglobal.com

#### Filing History (last 5 filings)

| Filing Year | Document Code | Pages | Filing Date/Time | Effective Date | Filing Status | Merger Type |
|---|---|---|---|---|---|---|
| 2015 | LLC | 1 | 20151106T15:01:00:0000 | 20151106 | Archived | |

#### Taxes Due

| Tax Year | Filing Fee | Total Tax | Penalty | Interest | Other | Paid | Balance |
|---|---|---|---|---|---|---|---|
| 2019 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2018 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2017 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 |
| | | | | | | Tax Balance | 600.00 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**FIND CLICK ENGAGE, LLC**
**Matter Number   n/a**

**D E L A W A R E   S T A T U S   S E A R C H**

www.cscglobal.com

## Entity Information

| | | | |
|---|---|---|---|
| | Search Results Date/Time | | **01-18-2019    10:12** |
| **Entity Name** | FIND CLICK ENGAGE, LLC | | |
| **File Number** | 5668273 | **Status** | **Good Standing since 20150105** |
| | | | |
| **Entity Type** | Limited Liability Company | **Corp Type** | General |
| **Tax Type** | Annual L.L.C. Tax | **Stock Corporation** | No |
| **Residency** | Domestic | **State** | DE |
| | | | |
| **Incorporation Date** | 20150105 | | |
| **Renew Date** | | **Expire Date** | |
| **Bankruptcy** | | **Bankrupt Date** | |
| **Case No** | | | |
| **Orig Incorp Country** | | **Orig Date** | |
| **Merged To Number** | | | |
| **Qtrly Filings** | False | **Last Ann Rpt** | 0 |
| **Foreign incorporation date** | | | |
| **Original foreign name** | | | |
| **Original foreign kind** | | | |

## Registered Agent

| | | | |
|---|---|---|---|
| **Agent Name** | HARVARD BUSINESS SERVICES, INC. | **Agent ID** | 9020245 |
| **Address** | 16192 COASTAL HWY | | |
| | | | |
| | ,LEWES,Sussex | | |
| **State** | DE | **Country** | US | **Zip** | 19958 |

## Stock Information

| **Amendment Number** | 0 | | **Effective Date** | | **End Date** | |
|---|---|---|---|---|---|---|

| **Description** | **Class** | **Series** | **Authorized** | **Par Value** | **Designated shares** | |
|---|---|---|---|---|---|---|
| | | | | | | |
| **Total Shares Authorized** | | | | | | 0 |
| **No Par Shares** | | | | | | 0 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.


**CSC**

**FIND CLICK ENGAGE, LLC**
**Matter Number   n/a**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**D E L A W A R E   S T A T U S   S E A R C H**

www.cscglobal.com

### Filing History (last 5 filings)

| Filing Year | Document Code | Pages | Filing Date/Time | Effective Date | Filing Status | Merger Type |
|---|---|---|---|---|---|---|
| 2015 | LLC | 1 | 20150105T11:59:00:0000 | 20150105 | Completed | |

### Taxes Due

| Tax Year | Filing Fee | Total Tax | Penalty | Interest | Other | Paid | Balance |
|---|---|---|---|---|---|---|---|
| 2019 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2018 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2017 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 |
| | | | | | | **Tax Balance** | 600.00 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.



**CSC**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

**36 LABS, LLC.**
**Matter Number   n/a**

**D E L A W A R E   S T A T U S   S E A R C H**

www.cscglobal.com

## Entity Information

| | | Search Results Date/Time | **01-18-2019    10:12** |
|---|---|---|---|
| **Entity Name** | 36 LABS, LLC. | | |
| **File Number** | 5415147 | **Status** | **Good Standing since 20131015** |
| | | | |
| **Entity Type** | Limited Liability Company | **Corp Type** | General |
| **Tax Type** | Annual L.L.C. Tax | **Stock Corporation** | No |
| **Residency** | Domestic | **State** | DE |
| | | | |
| **Incorporation Date** | 20131015 | | |
| **Renew Date** | | **Expire Date** | |
| **Bankruptcy** | | **Bankrupt Date** | |
| **Case No** | | | |
| **Orig Incorp Country** | | **Orig Date** | |
| **Merged To Number** | | | |
| **Qtrly Filings** | False | **Last Ann Rpt** | 0 |
| **Foreign incorporation date** | | | |
| **Original foreign name** | | | |
| **Original foreign kind** | | | |

## Registered Agent

| **Agent Name** | HARVARD BUSINESS SERVICES, INC. | | **Agent ID** | 9020245 |
|---|---|---|---|---|
| **Address** | 16192 COASTAL HWY | | | |
| | | | | |
| | ,LEWES,Sussex | | | |
| **State** | DE | **Country** | US | **Zip** | 19958 |

## Stock Information

| **Amendment Number** | 0 | | **Effective Date** | | **End Date** | |
|---|---|---|---|---|---|---|
| **Description** | **Class** | **Series** | **Authorized** | **Par Value** | **Designated shares** | |
| | **Total Shares Authorized** | | | | | 0 |
| | **No Par Shares** | | | | | 0 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.

18-Jan-2019  10:13 AM


**CSC**

**36 LABS, LLC.**
**Matter Number   n/a**

**DELAWARE STATUS SEARCH**

CSC
251 Little Falls Drive
Wilmington, DE 19808-1674
800.927.9800
302.636.5454 fax

www.cscglobal.com

### Filing History (last 5 filings)

| Filing Year | Document Code | Pages | Filing Date/Time | Effective Date | Filing Status | Merger Type |
|---|---|---|---|---|---|---|
| 2013 | LLC | 1 | 20131015T11:39:00:0000 | 20131015 | Completed | |

### Taxes Due

| Tax Year | Filing Fee | Total Tax | Penalty | Interest | Other | Paid | Balance |
|---|---|---|---|---|---|---|---|
| 2019 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2018 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| 2017 | 0.00 | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 |
| | | | | | | | |
| | | | | | Tax Balance | | 600.00 |

The information above is taken from the records of Delaware's Office of the Secretary of State and reflects information of record as of the thru date listed on this report. CSC cannot and does not independently verify the accuracy or completeness of this information and, accordingly, we make no guaranties or representations about the accuracy or completeness of the information and disclaim any warranties about it and any liability for errors or omissions. If you wish to obtain a certified copy of documents on file or an official good standing, please contact your CSC Customer Service Representative.

18-Jan-2019  10:13 AM

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through January 17, 2019.

Selected Entity Name: FLI DIGITAL, INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | FLI DIGITAL, INC. |
| **DOS ID #:** | 2769714 |
| **Initial DOS Filing Date:** | MAY 21, 2002 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
REGISTERED AGENT SOLUTIONS, INC
99 WASHINGTON AVENUE
SUITE 1008
ALBANY, NEW YORK, 12260

**Chief Executive Officer**

JASON THEOFILOS
120 E BEAVER CREEK ROAD
SUITE 200
RICHMOND HILL, ONTARIO, L4B-4V1

**Principal Executive Office**

FLI DIGITAL, INC.
9450 SW GEMINI DRIVE
#77068
BEAVERTON, OREGON, 97008

**Registered Agent**

NONE

This office does not record information regarding the names and
addresses of officers, shareholders or directors of nonprofessional
corporations except the chief executive officer, if provided, which
would be listed above. Professional corporations must include the
name(s) and address(es) of the initial officers, directors, and
shareholders in the initial certificate of incorporation, however this
information is not recorded and only available by viewing the
certificate.

**\*Stock Information**

**# of Shares  Type of Stock  $ Value per Share**

200          No Par Value

\*Stock information is applicable to domestic business corporations.

**Name History**

**Filing Date     Name Type       Entity Name**

MAY 21, 2002  Actual        FLI DIGITAL, INC.

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

This is **Exhibit "C"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Registre de Commerce
et des Sociétés**
Luxembourg



# EXTRAIT

## Mundo Media (Luxembourg) S.à r.l.
Numéro d'immatriculation : **B220729**

### Date d'immatriculation
08/01/2018

### Dénomination ou raison sociale
Mundo Media (Luxembourg) S.à r.l.

### Forme juridique
Société à responsabilité limitée

### Siège social

| Numéro | Rue |
|---|---|
| 5-11 | avenue Gaston Diderich |

| Code postal | Localité |
|---|---|
| 1420 | Luxembourg |

### Objet social
Extrait de l'inscription : Pour le détail prière de se reporter au dossier
3.1. L'objet de la Société est la prise de participations, tant au Luxembourg qu'à l'étranger, dans toute société ou entreprise sous quelque forme que ce soit, et la gestion de ces participations. La Société peut notamment acquérir par souscription, achat et échange ou de toute autre manière tous titres, actions et autres valeurs de participation, obligations, créances, certificats de dépôt et autres instruments de dette, et plus généralement, toutes valeurs et instruments financiers émis par toute entité publique ou privée. Elle peut participer à la création, au développement, à la gestion et au contrôle de toute société ou entreprise. Elle peut en outre investir dans l'acquisition et la gestion d'un portefeuille de brevets ou d'autres droits de propriété intellectuelle de quelque nature ou origine que ce soit. 3.2. La Société peut emprunter sous quelque forme que ce soit, soit par voie d'offre publique ou privée. Elle peut procéder à l'émission de billets à ordre, d'obligations et de tous types de titres et instruments de dette privés ou publics. Elle peut émettre des titres représentatifs de fonds propres uniquement par voie de placement privé La Société peut prêter des fonds, y compris notamment les revenus de tous emprunts, à ses filiales, sociétés affiliées, ainsi qu'à toutes autres sociétés. La Société peut également consentir des garanties et nantir, céder, grever de...

### Capital social / Fonds social

| Type | Montant | Devise | Etat de libération |
|---|---|---|---|
| Fixe | 20 000 | Dollar des Etats-Unis | Total |

### Date de constitution
22/12/2017

### Durée
Illimitée

# Registre de Commerce
## et des Sociétés
### Luxembourg

R C S

## Exercice social

**Premier exercice ou exercice raccourci**

| Du | Au |
|---|---|
| 22/12/2017 | 31/12/2018 |

**Exercice social**

| Du | Au |
|---|---|
| 01/01 | 31/12 |

## Associé(s)

### 2307521 Ontario Inc.

N° d'immatriculation
002307521

Dénomination ou raison sociale
2307521 Ontario Inc.

| Pays | Nom du registre |
|---|---|
| Canada | Ministère des Services Gouvernementaux d'Ontario |

Forme juridique étrangère
Inc.

**Siège**

| Numéro | Rue |
|---|---|
| 120 | East Beaver Creek Road |

Etage
Suite 200

| Code postal | Localité | Pays |
|---|---|---|
| L4B 4V1 | Richmond Hill, Ontario | Canada |

**Parts détenues**

Nombre
20 000

## Administrateur(s) / Gérant(s)

Régime de signature statutaire
(i) La Société est engagée vis-à-vis des tiers, en toutes circonstances par les signatures conjointes de deux (2) gérants. (ii) La Société est également engagée vis-à-vis des tiers par la signature unique ou conjointe de toutes personnes à qui des pouvoirs de signature spéciaux ont été délégués par le Conseil.

### Borzillo Alessia

| Nom | Prénom(s) |
|---|---|
| Borzillo | Alessia |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 53 | rue de Vianden |

| Code postal | Localité | Pays |
|---|---|---|
| 2680 | Luxembourg | Luxembourg |

**Type de mandat**

| Organe | Fonction |
|---|---|
| Conseil de gérance | Gérant |

**Durée du mandat**

| Date de nomination | Durée du mandat |
|---|---|
| 22/12/2017 | Indéterminée |

### Pletsch Frank

| Nom | Prénom(s) |
|---|---|
| Pletsch | Frank |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 5-11 | avenue Gaston Diderich |

| Code postal | Localité | Pays |
|---|---|---|
| 1420 | Luxembourg | Luxembourg |

### Registre de Commerce
### et des Sociétés
Luxembourg



## Type de mandat
Organe                  Fonction
Conseil de gérance      Gérant

## Durée du mandat
Date de nomination      Durée du mandat
22/12/2017              Indéterminée

## Sar Sinan

Nom        Prénom(s)
Sar        Sinan

### Adresse privée ou professionnelle
Numéro     Rue
5-11       avenue Gaston Diderich
Code postal    Localité      Pays
1420           Luxembourg    Luxembourg

## Type de mandat
Organe                  Fonction
Conseil de gérance      Gérant

## Durée du mandat
Date de nomination      Durée du mandat
22/12/2017              Indéterminée

## Délégué(s) à la gestion journalière
Régime de signature statutaire
(i) La Société est engagée vis-à-vis des tiers, en toutes circonstances par les signatures conjointes de deux (2) gérants. (ii) La Société est également engagée vis-à-vis des tiers par la signature unique ou conjointe de toutes personnes à qui des pouvoirs de signature spéciaux ont été délégués par le Conseil.

**Pour extrait conforme [1]**

**Luxembourg, le 31/01/2018**

**Pour le gestionnaire du registre de commerce et des sociétés [2]**

Signé électroniquement par
RCSL groupement d'intérêt économique
Date de signature indiquée : 2018-01-31 10:06:07
Numéro de série :

[1] En application de l'article 21 paragraphe 2 de la loi modifiée du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises et l'article 21 du règlement grand-ducal modifié du 23 janvier 2003 portant exécution de la loi du 19 décembre 2002, le présent extrait reprend au moins la situation à jour des données communiquées au registre de commerce et des sociétés jusqu'à trois jours avant la date d'émission dudit extrait. Si une modification a été notifiée au registre de commerce et des sociétés entre temps, il se peut qu'elle n'ait pas été prise en compte lors de l'émission de l'extrait.

[2] Le présent extrait est établi et signé électroniquement. Le gestionnaire du registre de commerce et des sociétés ne garantit l'authenticité de l'origine et l'intégrité des informations contenues sur le présent extrait par rapport aux informations inscrites au registre de commerce et des sociétés que si le présent extrait comporte une signature électronique émise par le gestionnaire du registre de commerce et des sociétés.

**Registre de Commerce
et des Sociétés**
Luxembourg



# EXTRAIT

**Movil Wave**
Numéro d'immatriculation : **B165409**

## Date d'immatriculation
20/12/2011

## Dénomination ou raison sociale
Movil Wave

## Forme juridique
Société à responsabilité limitée

## Siège social

| Numéro | Rue |
| --- | --- |
| 5-11 | avenue Gaston Diderich |

| Code postal | Localité |
| --- | --- |
| 1420 | Luxembourg |

## Objet social
Extrait de l'inscription : Pour le détail prière de se reporter au dossier

La Société a pour objet la fourniture de contenus aux consommateurs de téléphones cellulaires et d'agir entant que prestataire de service dans le domaine des téléphones cellulaires. La Société peut également développer et commercialiser des logiciels informatiques de toute nature. La Société peut acheter, gérer, mettre en valeur et aliéner des participations, de quelque manière que ce soit, dans d'autres sociétés luxembourgeoises et étrangères. La Société peut aussi contracter des emprunts et accorder aux sociétés, dans lesquelles elle a une participation directe ou indirecte ou qui sont membres du même groupe, toutes sortes d'aides, de prêts, d'avances et de garanties. Elle peut créer des succursales au Luxembourg et à l'étranger. Par ailleurs, la Société peut acquérir et aliéner toutes autres valeurs mobilières par souscription, achat, échange, vente ou autrement. Elle peut également acquérir, mettre en valeur et aliéner des brevets et licences, ainsi que des droits en dérivant ou les complétant. De plus, la Société a pour objet l'acquisition, la gestion, la mise en valeur et l'aliénation d'immeubles situés tant au Luxembourg qu'à l'étranger. Dans le cadre de son activité, la Société pourra accorder hypothèque, emprunter avec ou sans garantie ou se porter caution pour d'autres personnes morales et physiques, sous réserve des dispositions légales afférentes. D'une façon ...(*)

## Capital social / Fonds social

| Type | Montant | Devise | Etat de libération |
| --- | --- | --- | --- |
| Fixe | 12 500 | Euro | Total |

## Date de constitution
14/12/2011

## Durée
Illimitée

# Registre de Commerce
## et des Sociétés
### Luxembourg

R  C  S

## Exercice social

**Premier exercice ou exercice raccourci**

| Du | Au |
|---|---|
| 01/06/2012 | 31/12/2012 |

**Exercice social**

| Du | Au |
|---|---|
| 01/01 | 31/12 |

## Associé(s)

### 2307521 Ontario Inc. Luxembourg Branch

| N° d'immatriculation au RCS | Dénomination ou raison sociale |
|---|---|
| B169578 | 2307521 Ontario Inc. Luxembourg Branch |

Forme juridique
Société anonyme

**Siège social**

| Numéro | Rue |
|---|---|
| 7 | avenue Gaston Diderich |

| Code postal | Localité | Pays |
|---|---|---|
| 1420 | Luxembourg | Luxembourg |

**Parts détenues**

| Nombre | Type(s) de parts |
|---|---|
| 20 | parts sociales de classe A |
| 105 | parts sociales de classe B |

## Administrateur(s) / Gérant(s)

### Dattée Romain

| Nom | Prénom(s) |
|---|---|
| Dattée | Romain |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 5-11 | avenue Gaston Diderich |

| Code postal | Localité | Pays |
|---|---|---|
| 1420 | Luxembourg | Luxembourg |

**Type de mandat**

Fonction
Gérant

Pouvoir de signature
La Société est valablement engagée en toutes circonstances par la signature conjointe de deux gérants.

**Durée du mandat**

| Date de nomination | Durée du mandat |
|---|---|
| 18/12/2015 | Indéterminée |

### PLETSCH Frank

| Nom | Prénom(s) |
|---|---|
| PLETSCH | Frank |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 5 | Avenue Gaston Diderich |

| Code postal | Localité | Pays |
|---|---|---|
| 1420 | Luxembourg | Luxembourg |

**Type de mandat**

Fonction
Gérant

**Durée du mandat**

| Date de nomination | Durée du mandat |
|---|---|
| 21/10/2015 | Indéterminée |

# Registre de Commerce
## et des Sociétés
### Luxembourg



## SAR Sinan

Nom       Prénom(s)
SAR       Sinan

### Adresse privée ou professionnelle

Numéro    Rue
5         avenue Gaston Diderich
Code postal   Localité      Pays
1420      Luxembourg    Luxembourg

### Type de mandat

Fonction
Gérant
Pouvoir de signature
La Société est valablement engagée en toutes circonstances par la signature conjointe de deux gérants.

### Durée du mandat

Date de nomination   Durée du mandat
14/12/2011       Indéterminée

---

**Pour extrait conforme** [1]

**Luxembourg, le 26/07/2016**

**Pour le gestionnaire du registre de commerce et des sociétés** [2]

Signé électroniquement par
RCSL groupement d'intérêt économique

Date de signature indiquée : 2016-07-26 09:01:52

Numéro de série :                                        eSign

[1] En application de l'article 21 paragraphe 2 de la loi modifiée du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises et l'article 21 du règlement grand-ducal modifié du 23 janvier 2003 portant exécution de la loi du 19 décembre 2002, le présent extrait reprend au moins la situation à jour des données communiquées au registre de commerce et des sociétés jusqu'à trois jours avant la date d'émission dudit extrait. Si une modification a été notifiée au registre de commerce et des sociétés entre temps, il se peut qu'elle n'ait été prise en compte lors de l'émission de l'extrait.

[2] Le présent extrait est établi et signé électroniquement. Le gestionnaire du registre de commerce et des sociétés ne garantit l'authenticité de l'origine et l'intégrité des informations contenues sur le présent extrait par rapport aux informations inscrites au registre de commerce et des sociétés que si le présent extrait comporte une signature électronique émise par le gestionnaire du registre de commerce et des sociétés.

**Registre de Commerce
et des Sociétés**

Luxembourg

# EXTRAIT

## Mogenio

Numéro d'immatriculation : **B166420**

## Date d'immatriculation

25/01/2012

## Dénomination ou raison sociale

Mogenio

## Forme juridique

Société anonyme

## Siège social

| Numéro | Rue |
|--------|-----|
| 5-11 | avenue Gaston Diderich |

| Code postal | Localité |
|-------------|----------|
| 1420 | Luxembourg |

## Objet social

Extrait de l'inscription : Pour le détail prière de se reporter au dossier

L'objet de la Société est la prise de participations, tant au Luxembourg qu'à l'étranger, sous quelque forme que ce soit, et la gestion de ces participations. La Société pourra en particulier acquérir par voie de souscription, achat, échange ou de toute autre manière des actions, parts et autres valeurs mobilières, obligations, bons de caisse, certificats de dépôt et autres instruments de dettes et plus généralement toutes valeurs mobilières et instruments financiers émis par toute entité publique ou privée. La Société pourra emprunter, sous quelque forme que ce soit, sauf par voie d'offre publique. Elle peut procéder, uniquement par voie de placement privé, à l'émission de titres, obligations, bons de caisse et tous titres de dettes et/ou de valeurs mobilières. La Société pourra accorder tous crédits, y compris les intérêts de prêts et/ou par l'émission de valeurs mobilières à ses filiales, sociétés affiliées ou toute autre société. Elle peut aussi apporter des garanties en faveur de tiers afin d'assurer ses obligations ou les obligations de ses filiales, sociétés affiliées ou toute autre société. La Société pourra en outre mettre en gage, transférer, encombrer ou autrement créer une garantie sur certains de ses actifs. La Société pourra en outre investir dans l'acquisition et la gestion d'un portefeuille de brevets et/ou autres droits de propriété intellectuelle de ... (*)

## Capital social / Fonds social

| Type | Montant | Devise | Etat de libération |
|------|---------|--------|--------------------|
| Fixe | 31 000 | Euro | Total |

## Date de constitution

11/01/2012

## Durée

Illimitée



**Page 2 / 4**
**B166420**

**Registre de Commerce**
**et des Sociétés**
Luxembourg

## Exercice social

**Premier exercice ou exercice raccourci**
Du          Au
01/06/2012    31/12/2012

**Exercice social**
Du          Au
01/01        31/12

## Administrateur(s) / Gérant(s)

Régime de signature statutaire
La Société sera engagée, en toutes circonstances (y compris dans le cadre de la gestion journalière), vis-à-vis des tiers par (i) la signature conjointe de deux administrateurs de la Société, ou (ii) dans le cas d'un administrateur unique, la signature de l'Administrateur Unique, ou (iii) par les signatures conjointes de toutes personnes ou l'unique signature de toute personne à qui de tels pouvoirs de signature auront été délégués par le Conseil d'Administration et ce dans les limites des pouvoirs qui leur auront été conférés.

### Dattée Romain

Nom          Prénom(s)
Dattée        Romain

**Adresse privée ou professionnelle**
Numéro    Rue
5-11      avenue Gaston Diderich
Code postal   Localité      Pays
1420         Luxembourg    Luxembourg

**Type de mandat**
Organe                      Fonction
Conseil d'Administration    Administrateur

**Durée du mandat**
Date de nomination    Durée du mandat    jusqu'à l'assemblée générale qui se tiendra en l'année
18/12/2015            Déterminée         2020

### PLETSCH Frank

Nom          Prénom(s)
PLETSCH       Frank

**Adresse privée ou professionnelle**
Numéro    Rue
5         Avenue Gaston Diderich
Code postal   Localité      Pays
1420         Luxembourg    Luxembourg

**Type de mandat**
Organe                      Fonction
Conseil d'Administration    Administrateur

**Durée du mandat**
Date de nomination    Durée du mandat    jusqu'à l'assemblée générale qui se tiendra en l'année
21/10/2015            Déterminée         2020

### PRZYBYSLAWSKA Urszula

Nom              Prénom(s)
PRZYBYSLAWSKA    Urszula

**Adresse privée ou professionnelle**
Numéro    Rue
5         Avenue Gaston Diderich
Code postal   Localité      Pays
1420         Luxembourg    Luxembourg

**Type de mandat**
Organe                      Fonction
Conseil d'Administration    Administrateur



**Registre de Commerce**
**et des Sociétés**
Luxembourg

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 21/10/2015 | Déterminée | 2020 |

## SAR Sinan

| Nom | Prénom(s) |
|---|---|
| SAR | Sinan |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 5 | avenue Gaston Diderich |

| Code postal | Localité | Pays |
|---|---|---|
| 1420 | Luxembourg | Luxembourg |

**Type de mandat**

| Organe | Fonction |
|---|---|
| Conseil d'Administration | Administrateur |

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 11/01/2012 | Déterminée | 2017 |

# Personne(s) chargée(s) du contrôle des comptes

## Kohnen & Associés S.à r.l.

| N° d'immatriculation au RCS | Dénomination ou raison sociale |
|---|---|
| B114190 | Kohnen & Associés S.à r.l. |

| Forme juridique |
|---|
| Société à responsabilité limitée |

**Siège social**

| Numéro | Rue |
|---|---|
| 62 | avenue de la Liberté |

| Code postal | Localité | Pays |
|---|---|---|
| 1930 | Luxembourg | Luxembourg |

**Type de mandat**

Commissaire aux comptes

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 11/01/2012 | Déterminée | 2017 |

**Page 4 / 4**
**B166420**

# Registre de Commerce
## et des Sociétés
### Luxembourg



---

**Pour extrait conforme** [1]

**Luxembourg, le 26/07/2016**

**Pour le gestionnaire du registre de commerce et des sociétés** [2]

> Signé électroniquement par
> ## RCSL groupement d'intérêt économique
> Date de signature indiquée : 2016-07-26 09:07:59
> Numéro de série :

[1] En application de l'article 21 paragraphe 2 de la loi modifiée du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises et l'article 21 du règlement grand-ducal modifié du 23 janvier 2003 portant exécution de la loi du 19 décembre 2002, le présent extrait reprend au moins la situation à jour des données communiquées au registre de commerce et des sociétés jusqu'à trois jours avant la date d'émission dudit extrait. Si une modification a été notifiée au registre de commerce et des sociétés entre temps, il se peut qu'elle n'ait pas été prise en compte lors de l'émission de l'extrait.

[2] Le présent extrait est établi et signé électroniquement. Le gestionnaire du registre de commerce et des sociétés ne garantit l'authenticité de l'origine et l'intégrité des informations contenues sur le présent extrait par rapport aux informations inscrites au registre de commerce et des sociétés que si le présent extrait comporte une signature électronique émise par le gestionnaire du registre de commerce et des sociétés.

This is **Exhibit "D"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**MUNDO MEDIA LTD. ORGANIZATIONAL CHART**

Mundo Inc. (Ontario)

100%

Mundo Media Ltd. (Ontario)

100% — 2538853 Ontario Ltd. (Ontario)
100% — 2518769 Ontario Ltd. (Ontario)
100% — MEG Technologies Limited (Hong Kong)
100% — 2307521 Ontario Inc. (Ontario)

100% — M Zone Marketing Inc. (Delaware)
100% — Mundo Media (US), LLC (Delaware)
100% — Mundo (Beijing) Limited
100% — Movil Wave S.a.r.L. (Ontario)
100% — Mundo Media (Luxembourg) S.a.r.L.

100% — Active Signal Marketing, LLC (Delaware)
100% — Find Click Engage, LLC (Delaware)
100% — 36 Labs, LLC (Delaware)
100% — Fli Digital, Inc. (New York)

100% — Mogenio S.A. (Luxembourg)
100% — Mob 1 S.a.r.L. (Luxembourg)
100% — Downloadius S.a.r.L. (Luxembourg)

Legend:
- Guarantee
- General Security Agreement
- Share Pledge Agreement
- Pledge of Bank Accounts/Receivables
- Deposit Account Control Agreement

Thornton Grout Finnigan
RESTRUCTURING + LITIGATION

This is **Exhibit "E"**, referred to in the

**Affidavit of Gary Ivany,** sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**APPTHIS HOLDINGS, INC.**
**ORGANIZATIONAL CHART**



This is **Exhibit "F"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

_____

A Commissioner for taking Affidavits, etc.

Owen **Gaffney**
Barrister & Solicitor
LSO# 75017B

**Execution Version**

**AMENDED AND RESTATED CREDIT AGREEMENT**

**BETWEEN**

**MUNDO MEDIA LTD.,**
**as Borrower**

**AND**

**ROYAL BANK OF CANADA,**
**as Lender**

**MADE AS OF**

**December 21, 2017**

**McCarthy Tétrault LLP**

# TABLE OF CONTENTS

**ARTICLE 1 - INTERPRETATION** ............................................................................... 1

   1.01   Definitions ........................................................................................... 1
   1.02   Extended Meanings .......................................................................... 25
   1.03   Accounting Principles ...................................................................... 25
   1.04   Interest Calculations and Payments .................................................. 25
   1.05   Interest Act (Canada) ....................................................................... 25
   1.06   Permitted Encumbrances .................................................................. 26
   1.07   Currency .......................................................................................... 26
   1.08   Conflicts .......................................................................................... 26
   1.09   Schedules ......................................................................................... 26

**ARTICLE 2 - THE CREDIT FACILITIES** ................................................................. 27

   2.01   Credit Facilities ............................................................................... 27
   2.02   Purpose of Credit Facilities .............................................................. 27
   2.03   Revolving Facility Limit .................................................................. 27
   2.04   Manner of Borrowing ...................................................................... 27
   2.05   Revolving Nature of Revolving Facility ........................................... 28
   2.06   Drawdowns, Conversions and Rollovers........................................... 28
   2.07   Drawdowns of Overdraft Loans ....................................................... 29
   2.08   Irrevocability ................................................................................... 29
   2.09   Cancellation or Reduction of Revolving Facility .............................. 29
   2.10   Account of Record ........................................................................... 29
   2.11   Termination of LIBO Rate Loans ..................................................... 29

**ARTICLE 3 – CONDITIONS PRECEDENT** ............................................................. 30

   3.01   Conditions Precedent to the Effectiveness of this Agreement ........... 30
   3.02   Conditions Precedent to all Loans .................................................... 32
   3.03   Waiver ............................................................................................. 32

**ARTICLE 4 - PAYMENTS OF INTEREST AND STANDBY FEES** ......................... 32

   4.01   Interest on Prime Rate Loans............................................................ 32
   4.02   Interest on Base Rate Loans ............................................................. 33
   4.03   Interest on LIBO Rate Loans............................................................ 33
   4.04   Interest on BA Rate Loans ............................................................... 33
   4.05   Standby Fees .................................................................................... 34
   4.06   Amendment Fee................................................................................ 34
   4.07   Maximum Rate of Interest ................................................................ 34

**ARTICLE 5 - REPAYMENT** ..................................................................................... 34

   5.01   Mandatory Repayment at Maturity- Revolving Facility .................... 34
   5.02   Mandatory Repayment at Maturity - Term Facility .......................... 34

5.03     Other Mandatory Repayments ........................................................................ 35
5.04     Voluntary Prepayments .................................................................................. 36
5.05     Excess Over the Maximum Amounts ............................................................... 36
5.06     Repayment Compensation .............................................................................. 36

**ARTICLE 6** - PLACE AND APPLICATION OF PAYMENTS ................................................ 36

6.01     Place of Payment of Principal, Interest and Fees ........................................... 36

**ARTICLE 7** - REPRESENTATIONS AND WARRANTIES ................................................... 37

7.01     Representations and Warranties .................................................................... 37
7.02     Survival and Repetition of Representations and Warranties ......................... 41

**ARTICLE 8** - COVENANTS ............................................................................................. 41

8.01     Positive Covenants ........................................................................................ 41
8.02     Financial Covenants ...................................................................................... 44
8.03     Reporting Requirements ................................................................................ 44
8.04     Negative Covenants ....................................................................................... 45

**ARTICLE 9** – GUARANTEE AND SECURITY .................................................................. 49

9.01     Guarantee and Security.................................................................................. 49
9.02     After Acquired Property and Further Assurances ......................................... 51

**ARTICLE 10** - DEFAULT ............................................................................................... 51

10.01   Events of Default .......................................................................................... 51
10.02   Acceleration and Enforcement ...................................................................... 54
10.03   Remedies Cumulative..................................................................................... 54
10.04   Perform Obligations ...................................................................................... 54
10.05   Third Parties ................................................................................................. 55
10.06   Application of Payments ................................................................................ 55
10.07   Right of Set-off ............................................................................................. 55

**ARTICLE 11** – CHANGE IN CIRCUMSTANCES AND INDEMNITIES ............................... 55

11.01   Increased Costs ............................................................................................. 55
11.02   Taxes............................................................................................................. 56
11.03   Illegality........................................................................................................ 57
11.04   Inability to Determine Rates, Etc. ................................................................. 58
11.05   Indemnity by the Borrower ............................................................................ 58

**ARTICLE 12** - GENERAL .............................................................................................. 59

12.01   Costs and Expenses ....................................................................................... 59
12.02   Governing Law, Jurisdiction, Etc. ................................................................. 60

12.03  Judgment Currency ...................................................................................................... 60
12.04  Confidentiality ........................................................................................................... 61
12.05  Benefit and Burden of Agreement .............................................................................. 62
12.06  No Assignment by the Borrower ................................................................................. 62
12.07  Assignment or Participation by Lender ....................................................................... 62
12.08  Notices ....................................................................................................................... 63
12.09  Effect of Assignment .................................................................................................. 63
12.10  Survival ..................................................................................................................... 64
12.11  Severability ................................................................................................................ 64
12.12  Further Assurances .................................................................................................... 64
12.13  Entire Agreement; Amendments and Waivers ............................................................. 64
12.14  Time of the Essence .................................................................................................. 65
12.15  Tombstone Marketing ................................................................................................ 65
12.16  Anti-Money Laundering Legislation ........................................................................... 65

# AMENDED AND RESTATED CREDIT AGREEMENT

THIS AGREEMENT is made as of December 21, 2017

BETWEEN

> MUNDO MEDIA LTD., a corporation amalgamated under the laws of the Province of Ontario (the **"Borrower"**),

> - and -

> ROYAL BANK OF CANADA, a Canadian chartered bank (the **"Lender"**).

WHEREAS the Borrower and the Lender are parties to a credit agreement made as of July 26, 2016 (as amended by the first amending agreement made as of October 13, 2016 and the second amending agreement made as of June 2, 2017, the "**Original Credit Agreement**");

AND WHEREAS the Borrower has requested the Credit Facilities and the Lender agreed to provide the Credit Facilities to the Borrower upon and subject to the terms and conditions set out in the Original Credit Agreement;

AND WHEREAS the Borrower and the Lender wish to amend and restate the Original Credit Agreement as set out herein;

NOW THEREFORE, in consideration of the covenants and agreements herein contained, the parties agree as follows:

## ARTICLE 1 - INTERPRETATION

1.01        **Definitions**

In this Agreement, unless something in the subject matter or context is inconsistent therewith:

"**2017 Shareholder Loans**" means, collectively, (i) the loan in the principal amount of $733,333.40 made by The Theofilos Family Trust to the Borrower on or about November 21, 2017, paid partially in cash in the amount of $533,333.35 and partially through a release of employment salary owed to Jason Theofilos in the amount of $199,999.99; (ii) the loan in the principal amount of $733,333.40 made by Mansfield International Trade Ltd. to the Borrower on November 21, 2017, paid in cash, and (iii) the loan in the principal amount of $733,333.40 made by Customer Acquisition Network, LLC to the Borrower on November 21, 2017, paid in cash.

"**2017 Transaction Costs**" means costs incurred by the Parent and its Subsidiaries in connection with (i) the reorganization transactions consented to by the Lender under the Second Amendment, (ii) the unconsummated initial public offering by the Parent of its common Equity Interests, (iii) the Second Amendment, this Agreement and the Subordinated Credit Agreement,

and (iv) the incorporation of Luxco Newco and delivery of the documentation required by Section 7.01(19).

"**2538853**" means 2538853 Ontario Ltd., a corporation incorporated under the laws of the Province of Ontario, which is a direct wholly-owned Subsidiary of the Borrower.

"**36 Labs Group**" means, collectively, 36 Labs, LLC., Active Signal Marketing, LLC, Find Click Engage, LLC, Fli Digital Inc. and 36 Group, LLC.

"**36 Labs Group Acquisition**" means the acquisition of all of the shares, units, membership interests and other Equity Interests of 36 Group, LLC (which will directly own 36 Labs, LLC., Active Signal Marketing, LLC, Find Click Engage, LLC and Fli Digital Inc.) and includes the merger transaction in which 36 Group, LLC is merged into New LLC2.

"**36 Labs Group Acquisition Agreement**" means the share purchase agreement, made as of October 13, 2016 between the 36 Labs Group Vendors and New LLC2.

"**36 Labs Group Vendors**" means, collectively, Nick Griffith, Thomas Massaro, Ryan Stevens and Scott Teger.

"**Acquisition**" means, with respect to any Person, any purchase or other acquisition, regardless of how accomplished or effected (including any such purchase or other acquisition effected by way of amalgamation, merger, arrangement, business combination or other form of corporate reorganization or by way of purchase, lease or other acquisition arrangements), of (i) any other Person (including any purchase or acquisition of such number of the issued and outstanding securities of, or such portion of an Equity Interest in, such other Person that such other Person becomes a Subsidiary of the purchaser or of any of its Affiliates) or of all or substantially all of the Property of any other Person, or (ii) any division, business, operation or undertaking of any other Person or of all or substantially all of the Property of any division, business, operation or undertaking of any other Person.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agreement**" means this amended and restated credit agreement, including its recitals and schedules.

"**Anti-Corruption Laws**" means the *Corruption of Foreign Officials Act* (Canada) and all other similar Applicable Law with respect to the prevention of corruption and bribery.

"**AML Laws**" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and all other Applicable Laws with respect to anti-terrorist financing, anti-money laundering, government sanction and "know your client" laws, including any guidelines or orders thereunder.

"**Applicable Law**" means:

(i)     any domestic or foreign statute, law (including common and civil law), treaty, code, ordinance, rule, regulation, restriction or by-law (zoning or otherwise);

(ii)    any judgement, order, writ, injunction, decision, ruling, decree or award;

(iii)   any regulatory policy, practice, guideline or directive; or

(iv)    any franchise, licence, qualification, authorization, consent, exemption, waiver, right, permit or other approval of any Governmental Authority, binding on or affecting the Person referred to in the context in which the term is used or binding on or affecting the property of such Person, in each case whether or not having the force of law.

**"Applicable Margin"** means the percentage rate *per annum*, in the case of Loans other than LIBO Rate Loans, or a rate for a period of 360 days, in the case of LIBO Rate Loans, determined in accordance with the applicable table below:

| Prime Rate Margin | BA Rate Margin | Standby Fee Rate | Base Rate Margin | LIBO Rate Margin |
|---|---|---|---|---|
| 1.50% | 3.00% | 0.60% | 1.50% | 3.00% |

**"Assignment"** has the meaning set out in Section 12.07(1).

**"Availability"** means, as of any date of determination, the amount by which (i) the Revolving Facility Limit exceeds (ii) the aggregate outstanding principal balance of Loans outstanding under the Revolving Facility.

**"BA Rate"** means, in respect of any Interest Period applicable to a BA Rate Loan, the rate per annum determined by Lender by reference to the average rate quoted on the Reuters Monitor Screen (CDOR Page, or such other page as may replace such page on such screen for the purpose of displaying Canadian interbank bid rates for Canadian Dollar bankers' acceptances) applicable to Canadian Dollars bankers' acceptances with a term comparable to such Interest Period as of 11:00 a.m. (Toronto time) on the first day of such Interest Period.  If for any reason the Reuters Monitor Screen rates are unavailable, BA Rate means the rate of interest determined by Lender that is equal to the rate quoted by the Lender in respect of Canadian Dollar bankers' acceptances with a term comparable to such Interest Period.  For greater certainty, if the BA Rate would otherwise be less than zero, the BA Rate shall instead be deemed for all purposes of this Agreement to be zero.

**"BA Rate Loan"** means a Loan in Canadian Dollars with respect to which the Borrower has specified that interest is to be calculated by reference to the BA Rate.

**"BA Rate Margin"** means, for any period, the applicable percentage rate *per annum* applicable to that period as set out below the heading "BA Rate Margin" in the applicable table in the definition of "Applicable Margin".

**"Base Rate"** means the greater of (i) the variable *per annum* reference rate of interest announced and adjusted by the Lender from time to time for United States Dollar loans in Canada, (ii) the

sum of (A) the Federal Funds Effective Rate, and (B) 0.75 % *per annum,* and (iii) the sum of (A) the LIBO Rate for an Interest Period of 30 days, and (B) 1.00% *per annum.*

**"Base Rate Loan"** means a Loan in United States Dollars with respect to which the Borrower has specified that interest is to be calculated by reference to the Base Rate.

**"Base Rate Margin"** means, for any period, the applicable percentage rate *per annum* applicable to that period as set out below the heading "Base Rate Margin" in the applicable table in the definition of "Applicable Margin".

"**Borrower**" means Mundo Media Ltd. (as successor by amalgamation to Voom Media Corp.), an Ontario corporation.

**"Borrower's Accounts"** means the accounts maintained from time to time by the Borrower with the Lender.

**"Borrower's Counsel"** means Gowling WLG (Canada) LLP or such other firm of legal counsel as the Borrower may from time to time designate and that is acceptable to the Lender.

"**Borrowing Base**" an amount determined at such time as follows:

(i)      85% of Eligible Accounts Receivable insured by Export Development Corporation (Canada) or another insurer satisfactory to the Lender; plus

(ii)     75% of all other Eligible Accounts Receivable

less

(iii)    reasonable reserves established in the credit judgment (acting reasonably) of the Lender, in respect of the Priority Payables at such time.

"**Borrowing Base Certificate**" means a certificate substantially in the form of Schedule 1.01(A), completed and delivered by the Borrower to the Lender.

**"Business Day"** shall mean any day other than a Saturday or a Sunday on which banks generally are open for business in Toronto, Ontario and when used in respect of LIBO Rate Loans, shall mean any day other than a Saturday or a Sunday on which banks are generally open for business in Toronto, Ontario and London, England and on which transactions can be carried on in the London interbank market and when used in respect of Base Rate Loans, shall mean any day other than a Saturday or a Sunday on which banks generally are open for business in Toronto, Ontario and New York, New York.

"**Canadian Dollars**" and "**Cdn.$**" mean the lawful money of Canada.

"**Capital Expenditures**" means, for any particular period, with respect to any particular Person, any expenditure made by such Person during such period that is required in accordance with GAAP to be capitalized on the balance sheet of such Person, including without limitation any

expenditure in connection with the acquisition, development, improvement or maintenance of any capital or fixed asset of such Person.

**"Capital Lease"** means a capital lease or a lease that should be treated as a capital lease under GAAP.

 **"Cash Equivalents"** means:

(i)     marketable direct obligations issued by, or unconditionally guaranteed by, the Government of Canada or the Government of the United States or any agency or instrumentality of either of them, and backed by the full faith and credit of Canada or the United States, as the case may be, in each case maturing within one year from the date of acquisition;

(ii)    term deposits, certificates of deposit or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of Canada or the United States or any state thereof having combined capital and surplus of not less than Cdn.$300,000,000; and

(iii)   commercial paper of an issuer rated at least A-1+ or the equivalent thereof by Standard & Poor's Ratings Services or at least P-1 or the equivalent thereof by Moody's Investor Service Inc. or at least R-1 (High) or the equivalent thereof by Dominion Bond Rating Service Limited, and in each case maturing within six months from the date of acquisition.

**"Change in Law"** means the occurrence, after the date of this Agreement, of any of the following:

(i)     the adoption or taking effect of any Applicable Law;

(ii)    any change in any Applicable Law or in the administration, interpretation or application thereof by any Governmental Authority; or

(iii)   the making or issuance of any Applicable Law by any Governmental Authority.

Notwithstanding anything contained in this Agreement, (i) the Dodd-Frank Wall Street Reform and *Consumer Protection Act* (United States) and all requests, rules, regulations, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, regulations, guidelines or directives whether concerning capital adequacy or liquidity promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed a "Change in Law" regardless of the date enacted, adopted, applied or issued.

**"Change of Control"** means (i) if anyone other than Jason Theofilos or Barry Honig (or corporations or trusts controlled by them) acquires directly or indirectly 45% or more of the voting or non-voting Equity Interests of the Parent or otherwise acquires the ability, directly or indirectly, to appoint a majority of the directors of the Parent, (ii) the Parent ceases to own 100%

of the Equity Interests of the Borrower or (iii) the Borrower ceases to own 100% of its Subsidiaries.

**"Closing Date"** means December 21, 2017.

**"Compliance Certificate"** means the certificate required pursuant to Section 8.03(2), substantially in the form attached as Schedule 1.01(B), signed by a senior officer of the Borrower.

**"Contingent Obligation"** means, with respect to any Person, any obligation, whether secured or unsecured, of such Person guaranteeing or indemnifying, or in effect guaranteeing or indemnifying, any indebtedness, leases, dividends, letters of credit or other monetary obligations (the "**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person as an account party in respect of a letter of credit or letter of guarantee issued to assure payment by the primary obligor of any such primary obligation and any obligations of such Person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds for the purchase or payment of any such primary obligation or to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the obligee under any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (iv) otherwise to assure or hold harmless the obligee under such primary obligation against loss in respect of such primary obligation; provided, however, that the term Contingent Obligation does not include endorsements of instruments for deposit or collection in the ordinary course of business.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have corresponding meanings.

**"Conversion"** means a conversion of a Loan pursuant to Section 2.06.

**"Conversion Date"** means the Business Day specified by the Borrower in a Conversion Notice as being the date on which the Borrower has elected to convert one type of Loan into another type of Loan.

**"Conversion Notice"** means a Notice, substantially in the form set out in Schedule 1.01(C), to be given to the Lender by the Borrower pursuant to Section 2.06.

**"Credit Facilities"** means the Revolving Facility and the Term Facility and **"Credit Facility"** means either of them.

"**Debt**" means, with respect to any Person, all obligations that, in accordance with GAAP, would then be classified as a liability of such Person, and, without duplication, includes, with respect to such Person,

(i) an obligation in respect of borrowed money or for the deferred purchase price of Property (excluding, for greater certainty, trade accounts payable in the ordinary course of business) or services or an obligation that is evidenced by a note, bond, debenture or any other similar instrument;

(ii) a transfer with recourse or with an obligation to repurchase, to the extent of the liability of such Person with respect thereto;

(iii) obligations under a Capital Lease;

(iv) a reimbursement obligation or other obligation in connection with a bankers' acceptance or any similar instrument, or letter of credit or letter of guarantee issued by or for the account of such Person;

(v) a Contingent Obligation to the extent that the primary obligation so guaranteed would be classified as "Debt" (within the meaning of this definition) of such Person;

(vi) the aggregate amount at which any shares of such Person that are redeemable or retractable at the option of the holder of such shares (except where the holder is such Person) may be redeemed or retracted prior to the Maturity Date for cash or obligations constituting Debt or any combination thereof; or

(vii) Earn Out Obligations.

"**Default**" means any event or condition that would constitute an Event of Default except for satisfaction of any condition subsequent required to make the event or condition an Event of Default, including giving of any notice, passage of time, or both.

"**Depreciation Expense**" means, for any period with respect to any Person, depreciation, amortization, depletion and other like reductions to income of such Person for such period not involving any outlay of cash determined on a consolidated basis in accordance with GAAP, including, without limitation, amortization of deferred financing costs associated with raising Debt.

"**Disposition**" means, with respect to a Person, any sale, assignment, transfer, conveyance, lease, licence or other disposition of any nature or kind whatsoever of any Property or of any right, title or interest in or to any Property that is out of the ordinary course of business of such Person, and the verb "**Dispose**" has a corresponding meaning.

"**Distribution**" means (i) any payment, declaration of dividend or other distribution, whether in cash or Property, (but expressly excluding any distribution by way of the payment of dividends by the issuance of equity securities of an issuer) to any holder of shares of any class of the Borrower or any other Restricted Party, or (ii) any repurchase, redemption, retraction or other retirement or purchase for cancellation of shares of the Borrower or any other Restricted Party, or of any options, warrants or other rights to acquire any of such shares, or (iii) any payment in cash of interest or principal on the 2017 Shareholder Loans or any purchase or redemption of all or any part thereof.

**"Drawdown"** means the advance of a Prime Rate Loan, a Base Rate Loan or one or more LIBO Rate Loans or BA Rate Loans.

**"Drawdown Date"** means the date on which a Drawdown is made by the Borrower pursuant to the provisions hereof.

**"Drawdown Notice"** means a notice, substantially in the form set out in Schedule 1.01(D), to be given to the Lender by the Borrower pursuant to Section 2.06.

 "**Earn Out Obligation**" means any earn out obligations, similar performance payments or similar obligations of any Restricted Party to any one or more sellers of the applicable assets or Equity Interests arising out of or in connection with an acquisition.

**"EBITDA"** means, with respect to any Person for any period, the Net Income of such Person for such period,

plus, without duplication and to the extent deducted in determining the Net Income of such Person:

(i)      Interest Expense;

(ii)     Tax Expense;

(iii)    Depreciation Expense;

(iv)     Transaction Costs not to exceed $2,000,000 in the aggregate;

(v)      unrealized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries;

(vi)     any non-cash expense or loss resulting from any increase in the expected liability amount of Earn Out Obligations relating to the acquisition of the 36 Labs Group including accretion expense on the Earn Out Obligations as determined under GAAP;

(vii)    non-cash expenses including stock option and restricted stock unit expenses, provided that the terms of such stock or stock options or any related plan, do not obligate the Borrower to redeem such options or units for cash;

(viii)   costs associated with (a) the terminated agreement and plan of reorganization by and among the Parent, Harmony Merger Corp., Harmony Merger Sub (Canada) Inc. and the shareholders of the Parent, the 36 Labs Group Acquisition, and the preparation for an initial public offering by the Parent, in the aggregate amounts of $1,244,786 in the fourth fiscal quarter of 2016 and $1,387,699 in the first fiscal quarter of 2017, (b) $1,461,985 in respect of 2017 Transaction Costs for the second fiscal quarter of 2017, (c) $668,737 in respect of 2017 Transaction Costs for the third fiscal quarter of 2017, and (d) up to the aggregate amount of $300,000 in respect of 2017 Transaction Costs for the fourth fiscal quarter of 2017 and the first fiscal quarter of 2018;

(ix)     such other amounts as the Lender may approve;

less, without duplication and to the extent included in determining the Net Income of such Person:

(i)     any income or gains resulting from transactions or events that are not expected to re-occur, or do not typify normal business activities (determined in accordance with GAAP);

(ii)     unrealized non-cash foreign exchange gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries;

(iii)     any non-cash gain or income resulting from any decrease in the expected liability of the amount of the Earn Out Obligations relating the acquisition of the 36 Labs Group;

(iv)     the amount which is the greater of the following: (a) amounts accrued for Earn Out Obligations relating to the 36 Labs Group Acquisition paid by a Restricted Party to the 36 Labs Group Vendors during such period; and (b) the minimum payment amount required to be paid by a Restricted Party to the 36 Labs Group Vendors in connection with Earn Out Obligations under the 36 Labs Group Acquisition Agreement; and

(v)     such other amounts as the Lender and the Borrower may agree.

For the purposes of calculating the financial covenants in Section 8.02: (a) for the period ending December 31, 2016, all Debt denominated in United Stated Dollars will be converted to Canadian Dollars based on the official closing rate of exchange published by the Bank of Canada on the Original Closing Date and (b) the EBITDA of the Borrower shall be deemed to be the following:

(i)     Cdn.$2,569,600 (or the Equivalent Amount in United States Dollars being $1,924,946) for the fiscal quarter ending December 31, 2015;

(ii)     Cdn.$2,711,879 (or the Equivalent Amount in United States Dollars being $1,973,504) for the fiscal quarter ending March 31, 2016, and

(iii)     Cdn.$3,957,335 (or the Equivalent Amount in United States Dollars being $3,059,131) for the fiscal quarter ending June 30, 2016.

"**Eligible Accounts Receivable**" means, in respect of the Borrower or a Guarantor at the time of determination, accounts receivable of such Person (in this definition, individually called an "**account**") which satisfy the following eligibility criteria:

(1)     the account arises from a bona fide, fully-completed transaction consisting of provision of services to an account debtor;

(2)     the account is subject to a valid security interest held by the Lender pursuant to the Security and is not subject to any other Encumbrance except for Permitted Encumbrances;

(3)    the account debtor is located in Canada or the United States of America, unless such account is supported by a letter of credit, in form and substance acceptable to Lender or, insured by Export Development Corporation (Canada) or another insurer satisfactory to the Lender ("**EDC**");

(4)    the account debtor is not the Borrower or an Affiliate thereof;

(5)    the account debtor is not a Governmental Authority, except to the extent the account is assignable without consent or all necessary consents to assignment have been obtained and all applicable statutory requirements for consent have been obtained;

(6)    the account is not in dispute or subject to any defence, counterclaim or claim by the account debtor for credit, set-off, allowance or adjustment;

(7)    to the extent that any such account is not insured by EDC, such account is not payable by an account debtor who (or who, together with its Affiliates) has outstanding accounts which are more than ninety one (91) days from the date of the invoice, with respect to 10% or more of the total accounts owed to the Borrower and Guarantors by such account debtor and its Affiliates;

(8)    unless insured by EDC, the account is not outstanding for more than ninety-one (91) days from the date of the applicable invoice, regardless of the payment date specified in the invoice; and

(9)    the account debtor is not, to the knowledge of the Borrower or any Guarantor or the Lender, insolvent or subject to any proceeding under insolvency laws.

"**Encumbrance**" means, with respect to any Person, any mortgage, debenture, pledge, hypothec, lien, charge, assignment by way of security, hypothecation or security interest granted or permitted by such Person or arising by operation of law, in respect of any of such Person's Property, or any consignment by way of security or Capital Lease of Property by such Person as consignee or lessee, as the case may be, or any other security agreement, trust or arrangement having the effect of security for the payment of any debt, liability or other obligation, and "**Encumbrances**", "**Encumbrancer**", "**Encumber**" and "**Encumbered**" have corresponding meanings.

"**Environmental Law**" means any Applicable Law relating to the environment including those pertaining to

(i)    reporting, licensing, permitting, investigating, remediating and cleaning up in connection with any presence or Release, or the threat of the same, of Hazardous Substances, and

(ii)    the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling and the like of Hazardous Substances, including those pertaining to occupational health and safety.

"**Equity Interest**" means: (i) in the case of any corporation, all capital stock and any securities exchangeable for or convertible into capital stock; (ii) in the case of an association or business

entity, any and all shares, interests, participation rights or other equivalents of corporate stock (however designated) in or to such association or entity; (iii) in the case of a partnership, limited liability company or unlimited liability company, partnership or membership interests (whether general or limited), as applicable; and (iv) any other ownership interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing Person, and including, in all of the foregoing cases described in clauses (i), (ii), (iii) or (iv), any warrants, rights or other options to purchase or otherwise acquire any of the interests described in any of the foregoing cases.

"**Equivalent Amount**" means, on any day, the equivalent amount in Canadian Dollars or United States Dollars, as the case may be, after giving effect to a conversion of a specified amount of United States Dollars to Canadian Dollars or of Canadian Dollars to United States Dollars , as the case may be, at the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the day in question for the conversion of United States Dollars to Canadian Dollars or at the rate that is the reciprocal thereof for the conversion of Canadian Dollars to United States Dollars, as the case may be, or, if such rate is not so published by the Bank of Canada for any such day, then at the spot rate quoted by the Lender at approximately noon (Toronto time) on that day in accordance with its normal practice for the applicable currency conversion in the wholesale market.

"**Event of Default**" has the meaning set out in Section 10.01.

"**Excluded Taxes**" means, with respect to the Lender, (i) taxes imposed on or measured by its net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which its lending office is located, and (ii) any branch profits taxes or any similar tax imposed by any jurisdiction in which the Lender is located; (iii) any deduction or withholding from a payment under a Loan Document required by FATCA; and (iv) for any Luxembourg stamp duty, registration tax or other similar Taxes payable upon a voluntary registration made by the Lender (including any Taxes payable due to the registration by the Lender of a Loan Document with the *Administration de l'Enregistrement et des Domaines* in Luxembourg) if such registration is not necessary to evidence, prove, maintain, enforce, compel or otherwise assert the rights of the Lender or obligations of any Party under a Loan Document.

"**FATCA**" means (i) Sections 1471 through 1474 of the Internal Revenue Code of 1986, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, (ii) any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the United States and any other jurisdiction with the purpose (in either case) of facilitating the implementation of (i) above, or (iii) any agreement pursuant to the implementation of paragraphs (i) or (ii) above with the United States Internal Revenue Service, the United States government or any governmental or taxation authority in the United States.

"**Federal Funds Effective Rate**" means, for any day, a fluctuating rate of interest expressed as a percentage rate *per annum* equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers as

published for such day (or, if such day is not a Business Day, for the preceding Business Day) by the Federal Reserve Bank of New York or, for any day on which that rate is not published for that day by the Federal Reserve Bank of New York, the simple average of the quotations for that day for such transactions received by the Lender from three federal funds brokers of recognized standing selected by it.

"**Financial Assistance**" means, without duplication and with respect to any Person, all loans granted by that Person and guarantees or Contingent Obligations incurred by that Person for the purpose of or having the effect of providing financial assistance to another Person or Persons, including letters of guarantee, letters of credit, legally binding comfort letters or indemnities issued in connection therewith, endorsements of bills of exchange (other than for collection or deposit in the ordinary course of business), obligations to purchase assets regardless of the delivery or non-delivery thereof and obligations to make advances or otherwise provide financial assistance to any other Person.

"**Fixed Charge Coverage Ratio**" means, with respect to the Borrower on a consolidated basis, the ratio of (i) EBITDA for the most recently completed four fiscal quarters, less the amount of all Capital Expenditures of such Person actually paid in cash to the extent not funded by Debt (excluding Loans made under the Revolving Facility) less current Tax Expense, less Distributions (other than any Distributions made in respect of interest payments made in cash on the 2017 Shareholder Loans) to (ii) Fixed Charges of the Borrower, for the same period.

"**Fixed Charges**" means, with respect to any Person for any period and on a consolidated basis, the sum of (without duplication) (i) Interest Expense paid in cash (including, for greater certainty, payments made in cash on account of interest which was paid in kind or capitalized in prior fiscal period), and (ii) scheduled principal payments of Debt provided that Fixed Charges for the 12-month period ending on each of the first three fiscal quarters following the Original Closing Date shall be deemed to the Fixed Charges incurred during the period commencing on the Original Closing Date and ending on such fiscal quarter end (the "**Stub Period**") multiplied by a fraction, the numerator of which is 365 and the denominator of which is the number of days in such Stub Period.

"**GAAP**" means (i) for any period of time prior to December 31, 2016, the Accounting Standards for Private Enterprises as approved by the Accounting Standards Board of Canada or its successor, applied on a basis consistent; and (ii) for any period of time after December 31, 2016, the International Financial Reporting Standards as approved by the Accounting Standards Board of Canada or its successor, applied on a basis consistent.

"**Governmental Authority**" means the government of Canada or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including any supra-national bodies such as the European Union or the European Central Bank and including a Minister of the Crown, the Superintendent of Financial Institutions or other comparable authority or agency.

"**Guarantee**" means a guarantee in form and substance satisfactory to the Lender.

**"Guarantors"** means each Person who has executed a Guarantee and Security in favour of the Lender as of the Closing Date and each other Subsidiary of the Parent that may from time to time deliver a Guarantee to the Lender in accordance with Section 8.04(18) and their successors and assigns, and **"Guarantor"** means any one of them.

**"Hazardous Substance"** means any substance or material that is prohibited, controlled or regulated by any Governmental Authority pursuant to Environmental Laws, including pollutants, contaminants, dangerous goods or substances, toxic or hazardous substances or materials, wastes (including solid non-hazardous wastes and subject wastes), petroleum and its derivatives and by-products and other hydrocarbons, all as defined in or pursuant to any Environmental Law.

**"Hedge Arrangement"** means, with respect to any Person, any arrangement or transaction between such Person and any other Person (other than another Restricted Party) that is a rate swap transaction, basis swap, forward rate transaction, commodity swap, interest rate option, forward foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of such transactions or arrangements) designed to protect or mitigate against risks in interest, currency exchange or commodity price fluctuations.

**"Indemnified Taxes"** means Taxes other than Excluded Taxes.

**"Insolvency Law"** means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes for greater certainty the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada), the *Bankruptcy Code* (United States), the restructuring provisions of applicable corporate statutes, each as now and hereafter in effect, any successors to such statutes and any other applicable insolvency or other similar law of any jurisdiction, including any law of any jurisdiction permitting a debtor to obtain a stay or a compromise of the claims of its creditors against it.

**"Intellectual Property"** means any and all intellectual and industrial property, whether recorded or not and regardless of form or method of recording, including all works in which copyright subsists or may subsist (such as computer software), data bases (whether or not protected by copyright), designs, documentation, manuals, specifications, industrial designs, trade secrets, confidential information, ideas, concepts, know-how, trademarks, service marks, trade names, domain names, discoveries, inventions, formulae, recipes, product formulations, processes and processing methods, technology and techniques, improvements and modifications, integrated circuit topographies and mask works.

**"Intellectual Property Rights"** includes all intellectual and industrial and other proprietary rights in any Intellectual Property.

**"Interest Expense"** means, with respect to any Person for any period, without duplication, the aggregate amount of interest and other financing charges expensed by such Person on account of such period with respect to Debt, including interest, discount financing fees, commissions,

discounts, the interest or time value of money component of costs related to factoring or securitizing receivables or monetizing inventory and other fees and charges payable with respect to letters of credit, letters of guarantee and bankers' acceptance financing, standby fees, the interest component of Capital Leases and net payments (if any) pursuant to Hedge Arrangements involving interest, but excluding any amount, such as amortization of debt discount and expenses, that would qualify as Depreciation Expense and the amount reflected in Net Income for such period in respect of gains (or losses) attributable to translation of Debt from one currency to another currency, all as determined on a consolidated basis in accordance with GAAP.

**"Interest Payment Date"** means

(i)  with respect to each Prime Rate Loan and each Base Rate Loan, the last Business Day of each calendar month, and

(ii)  with respect to each LIBO Rate Loan, the last Business Day of each applicable Interest Period, and, if any Interest Period is longer than three months, the last Business Day of each successive three month period during such Interest Period.

**"Interest Period"** means

(i)  with respect to each Prime Rate Loan and each Base Rate Loan, the period commencing on the applicable Drawdown Date or Conversion Date, as the case may be, and ending on the date selected by the Borrower for the Conversion of such Loan into another type of Loan or for the repayment of such Loan;

(ii)  with respect to each BA Rate Loan, the period selected by the Borrower hereunder and being of one, two, three or six months duration commencing on the Drawdown Date, Rollover Date or Conversion Date of such Loan; and

(iii)  with respect to each LIBO Rate Loan, the period selected by the Borrower and being of one, two, three or six months duration commencing on the applicable Drawdown Date, Rollover Date or Conversion Date, as the case may be;

provided that in any case the last day of each Interest Period will be also the first day of the next Interest Period and further provided that the last day of each Interest Period will be a Business Day. If the last day of an Interest Period selected by the Borrower is not a Business Day the Borrower will be deemed to have selected an Interest Period the last day of which is the Business Day next following the last day of the Interest Period otherwise selected unless such next following Business Day falls in the next calendar month in which event the Borrower will be deemed to have selected an Interest Period the last day of which is the Business Day immediately preceding the last day of the Interest Period otherwise selected and further provided that the last Interest Period hereunder must expire on or prior to the Maturity Date.

**"Investment"** in any Person means any direct or indirect (i) acquisition of any shares, partnership interests, participation interests in any arrangement, options or warrants, or any indebtedness, whether or not evidenced by any bond, debenture or other written evidence of such Person, or (ii) acquisition, by purchase or otherwise, of all or substantially all of the business,

assets or stock or other evidence of beneficial ownership of such Person. The amount of any Investment will be the original cost of such Investment, plus the cost of all additions thereto and minus the amount of any portion of such Investment repaid to such Person in cash as a return of capital, or repayment of the principal amount of indebtedness, as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment. In determining the amount of any Investment involving a transfer of any Property other than cash, such Property will be valued at its fair market value at the time of such transfer.

"**Judgment Conversion Date**" has the meaning set out in Section 12.03(1).

"**Judgment Currency**" has the meaning set out in Section 12.03(1).

"**Key Employment Contracts**" means the employment contracts between the Borrower and each of Jason Theofilos, Phil Jones, Phil Yuan, Eric So, Jeff Cordeiro and Matt Frank.

"**Lender's Counsel**" means the firm of McCarthy Tétrault LLP or such other firm of legal counsel as the Lender may from time to time designate.

"**Lending Office**" means the branch of the Lender located at 200 Bay Street, 4th Floor, North Tower, Toronto, Ontario, M5J 2W7, or at such other branch as the Lender may designate in writing.

"**LIBO Rate**" means, for each Interest Period for a LIBO Rate Loan, the interest rate, expressed as a percentage rate *per annum* on the basis of a 360 day year, equal to

(i)     the rate for deposits in U.S. Dollars in the London, England inter-bank market, for a period comparable to such Interest Period, which appears on the "LIBOR01 Page" of the Reuters Money Rates Service (or any successor source from time to time for such rate) as of 11:00 a.m. (London, England time) on the second Business Day preceding the first day of such Interest Period, or

(ii)    if a rate is not determinable pursuant to clause (i) of this definition at the relevant time, the rate of interest, expressed as a rate of interest *per annum* on the basis of a year of 360 days, at which deposits in U.S. Dollars are offered by the principal lending office in London, England of the Lender to prime banks in the London inter-bank market at approximately 11:00 a.m. (London, England time) on the second Business Day preceding the first day of such Interest Period for a period comparable to the Interest Period and in an amount comparable to the amount of the LIBO Rate Loan to be outstanding during such Interest Period.

For greater certainty, if the LIBO Rate would otherwise be less than zero, the LIBO Rate shall instead be deemed for all purposes of this Agreement to be zero.

"**LIBO Rate Loan**" means a Loan in or Conversion into United States Dollars made by the Lender to the Borrower with respect to which the Borrower has specified that interest is to be calculated by reference to the LIBO Rate.

"**LIBO Rate Margin**" means, for any period, the applicable percentage rate *per annum* applicable to that period as set out below the heading "LIBO Rate Margin" in the definition of "Applicable Margin".

"**Liquidity**" means the sum of (i) amount of the Borrower's and its Subsidiaries' Qualified Cash and (ii) undrawn availability under the Revolving Facility.

"**Loan**" means any extension of credit by the Lender under this Agreement, including by way of Prime Rate Loans, Base Rate Loans, BA Rate Loans and LIBO Rate Loans.

"**Loan Documents**" means (i) this Agreement, (ii) the Security, (iii) the Shareholder Subordination Agreement, and (iv) all present and future agreements, documents, certificates and instruments delivered by any Restricted Party to the Lender pursuant to or in respect of this Agreement or the Security, in each case as the same may from time to time be amended, and "**Loan Document**" means any one of the Loan Documents.  For greater certainty, "Loan Documents" does not include any Loan Documents (as such term is defined in the Subordinated Credit Agreement) except for Security to the extent such Security has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as subordinated lender (in which such case, such Security shall constitute a "Loan Document" but only to the extent that such Security applies to the Lender in connection with this Agreement).

"**Luxco Newco**" means Mundo Media (Luxembourg) S.à r.l., a *société à responsabilité limitée* to be incorporated under the laws of Luxembourg, with its registered office at 5-11, avenue Gaston Diederich, L-1420 Luxembourg, Grand Duchy of Luxembourg and to be a wholly-owned subsidiary of 2307521 Ontario Inc.

"**Material Adverse Change**" means, with respect to a Restricted Party, any change having a material adverse effect on the business, assets, liabilities, operations, results of operations or condition (financial or other) of such Restricted Party or the ability of such Restricted Party to carry on its business or a significant part of its business, which would reasonably be expected to result in, or has resulted in, an impairment of the ability of the Borrower or a Guarantor to perform their respective Obligations.

"**Material Contracts**" means, with respect to a particular Restricted Party, the contracts set out under such Restricted Party's name in Schedule 1.01(E) and all other contracts to which such Person is a party or by which it is bound or may hereafter become a party or be bound, the breach or default of which would result in a Material Adverse Change, and "**Material Contract**" means any one thereof.

"**Material Licences**" means all licences, permits or approvals issued by any Governmental Authority to any Restricted Party, and which are at any time on or after the date of this Agreement,

(i)     necessary or material to the business and operations of such Restricted Party or to the listing of its securities, the breach or default of which would result in a Material Adverse Change, or

(ii)     designated by the Lender, in the reasonable discretion of the Lender, as a Material Licence, provided that the Lender has notified the Borrower of such designation.

**"Maturity Date"** means July 26, 2019.

"**New LLC2**" means Mundo Media (US), LLC, a limited liability company formed under the laws of the State of Delaware, which is an indirect wholly owned Subsidiary of the Borrower.

**"Net Income"** means, with respect to any Person for any period, the net income of such Person for such period on a consolidated basis as determined in accordance with GAAP.

**"Net Proceeds"** means, with respect to any Disposition, the aggregate fair market value of proceeds of such Disposition (whether such proceeds are in the form of cash or other Property or part cash and part other Property) net of reasonable, bona fide direct transaction costs and expenses incurred in connection with such Disposition, including (i) reasonable legal fees and disbursements, the customary fees of agents or brokers payable in connection with such Disposition within one year of such Disposition and title and recording expenses payable in connection with such Disposition, and (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Debt that is secured by a Permitted Encumbrance, if any, on any of the Property that is the subject matter of such Disposition ranking in priority to the Encumbrance of the Security and that is required to be repaid under the terms of such Debt as a result of such Disposition.

**"Obligations"** means all present and future indebtedness, liabilities and obligations of the Restricted Parties, or any of them, to the Lender under or in connection with this Agreement or the other Loan Documents, including all debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Restricted Parties, or any of them, to the Lender, in any currency or remaining unpaid by the Restricted Parties, or any of them, to the Lender, under or in connection with this Agreement or the other Loan Documents, whether arising from dealings between the Lender and any of the Restricted Parties or from any other dealings or proceedings by which the Lender may be or become in any manner whatever a creditor of a Restricted Party pursuant to this Agreement or the other Loan Documents, and wherever incurred, and whether incurred by a Restricted Party alone or with another or others and whether as principal or surety, and all interest, fees, legal and other costs, charges and expenses relating thereto.  For greater certainty, "Obligations" does not include any Obligation (as such term is defined in the Subordinated Credit Agreement) except for obligations under any Guarantee which has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as subordinated lender (in which case, such obligations under such Guarantee shall constitute an "Obligation" but only to the extent that such obligations under such Guarantee are obligations to the Lender in connection with this Agreement).

**"Organizational Documents"** means, with respect to any Person, such Person's articles, memorandum, articles of association or other charter documents, partnership agreement, joint venture agreement, declaration of trust, trust agreement, by-laws, unanimous shareholder agreement, or any and all other similar agreements, documents and instruments pursuant to which such Person is constituted, organized or governed.

"**Original Closing Date**" means July 26, 2016.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except for any Luxembourg stamp duty, registration tax or other similar Taxes payable upon a voluntary registration made by the Lender (including any Taxes payable due to the registration by the Lender of a Loan Document with the *Administration de l'Enregistrement et des Domaines* in Luxembourg) if such registration is not necessary to evidence, prove, maintain, enforce, compel or otherwise assert the rights of the Lender or obligations of any Restricted Party under a Loan Document.

"**Overdraft Loans**" means loans made by way of creating or increasing overdrafts in a Borrower's Account.

"**Parent**" means Mundo Inc. (as successor by amalgamation to Customer Acquisition Network (Canada) Inc.), an Ontario corporation, and its successors.

"**Participant**" has the meaning set out in Section 12.07(1).

"**Pension Plan**" means (i) a "pension plan" or "plan" which is a "registered pension plan" as defined in the *Income Tax Act* (Canada) or is subject to the funding requirements of applicable pension benefits legislation in any Canadian jurisdiction and is applicable to employees resident in Canada of a Restricted Party, or (ii) any other pension benefit plan or similar arrangement applicable to employees of a Restricted Party.

"**Permitted Debt**" means:

(i)     Debt under this Agreement and the other Loan Documents;

(ii)    any Guarantee by a Restricted Party of Debt of any other Restricted Party which is permitted hereunder;

(iii)   Subordinated Debt;

(iv)    Debt owing: (a) by the Borrower to a Guarantor, (b) by a Guarantor to another Guarantor or to the Borrower, (c) by a Subsidiary to another Subsidiary provided that if the Subsidiary to which the Debt is owed is not a Guarantor, such Debt is subject to a subordination and postponement agreement satisfactory to the Lender; subject in each case to compliance with the restriction on Investments set out in Section 8.04(5);

(v)     Earn Out Obligations of any Restricted Party in connection with the 36 Labs Group Acquisition; subject to compliance with the restrictions on Earn Out Obligations set out in Section 8.04(21);

(vi)    Debt in respect of Capital Leases incurred by any Restricted Party or Purchase Money Security Interests granted by a Restricted Party in an amount not to exceed $250,000 in the aggregate; and

(vii)   the 2017 Shareholder Loans.

**"Permitted Encumbrances"** means, with respect to any Person, the following:

(i)     liens for Taxes, rates, assessments or other governmental charges or levies not yet due, or for which instalments have been paid based on reasonable estimates pending final assessments, or if due, the validity of which is being contested diligently and in good faith by appropriate proceedings by that Person;

(ii)    undetermined or inchoate liens, rights of distress and charges incidental to current operations that have not at such time been filed or exercised and in respect of which the Lender has not been given notice, or that relate to obligations not due or payable, or if due, the validity of which is being contested diligently and in good faith by appropriate proceedings by that Person;

(iii)   reservations, limitations, provisos and conditions expressed in any original grant from the Crown or other grants of real or immovable property, or interests therein, that do not materially affect the use of the affected land for the purpose for which it is used by that Person;

(iv)    licences, easements, rights-of-way and rights in the nature of easements (including licences, easements, rights-of-way and rights in the nature of easements for railways, sidewalks, public ways, sewers, drains, gas, steam and water mains or electric light and power, or telephone and telegraph conduits, poles, wires and cables) that do not materially impair the use of the affected land for the purpose for which it is used by that Person;

(v)     title defects, irregularities or other matters relating to title that are of a minor nature and that in the aggregate do not materially impair the use of the affected property for the purpose for which it is used by that Person;

(vi)    the right reserved to or vested in any Governmental Authority by the terms of any lease, licence, franchise, grant or permit acquired by that Person or by any statutory provision to terminate any such lease, licence, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof;

(vii)   the Encumbrance resulting from the deposit of cash or securities to an aggregate maximum amount for all Restricted Parties of $100,000 at any time in connection with contracts, tenders or expropriation proceedings, or to secure workmen's compensation, unemployment insurance, surety or appeal bonds, costs of litigation when required by law, liens and claims incidental to current construction, mechanics', warehousemen's, carriers' and other similar liens, and public, statutory and other like obligations incurred in the ordinary course of business;

(viii)  security given to a public utility or any Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of its business;

(ix)    the Encumbrance created by a judgement of a court of competent jurisdiction, as long as the judgement is being contested diligently and in good faith by appropriate proceedings by that Person and does not result in an Event of Default;

(x)    the Security;

(xi)    any Encumbrance securing Permitted Debt (other than Debt set out in clause (vii) of the definition thereof); and

(xii)    such other Encumbrances as are agreed to in writing by the Lender.

"**Permitted Shareholder Loan Payments**" means:

(a)    payments in kind (and not in cash) by the Borrower of interest on the 2017 Shareholder Loans not in excess of ten percent (10.0%) per annum;

(b)    quarterly payments of interest on the 2017 Shareholder Loans not in excess of ten percent (10.0%) per annum; provided that, the Borrower shall have delivered a Compliance Certificate to the Lender confirming that both before and after giving effect to such payment, (i) no Default or Event of Default shall have occurred; (ii) the Borrower will be in *pro forma* compliance with the financial covenants set out in Section 8.02 as of the most recently ended fiscal quarter for which the financial statements required under Section 8.03(1) have been delivered to the Lender; (iii) no payment of interest on the 2017 Shareholder Loans may be made prior to March 31, 2018; and (iv) subject to compliance with clauses (i), (ii) and (iii) of the foregoing, the initial payment of interest on the 2017 Shareholder Loans may be made on and after April 1, 2018 (including for interest accrued and not paid in cash for the period commencing on the Closing Date and ending on March 31, 2018); and

(c)    payments of principal on the 2017 Shareholder Loan  from and after the date on which financial statements have been delivered to the Lender under Section 8.03(3) for the year ending December 31, 2017; provided that, the Borrower shall have delivered a Compliance Certificate to the Lender confirming that both before and after giving effect to such payment, (i) no Default or Event of Default shall have occurred, (ii) the Borrower will be in pro forma compliance with the financial covenants set out in Section  8.02 as of the most recently ended fiscal quarter for which the financial statements have been delivered to the Lender under Section 8.03(1), (iii) the amount of such payments made prior to the date on which the financial statements required under Section 8.03(1) shall have been delivered for the fiscal quarter ending September 30, 2018 shall not exceed $450,000 in aggregate, (iv) for any such payments made prior to September 30, 2018, the Borrower shall have no outstanding Debt under the Revolving Facility, and (v) for any payment made after September 30, 2018, the Borrower shall have Liquidity of not less than $2,500,000.

"**Person**" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Pre-IPO Shareholder Loans**" means, collectively, (i) all of the loans made by the Borrower in favour of certain of the Parent's shareholders in connection with the Parent's stock option plan; (ii) the promissory note, dated June 2, 2017, issued by the Parent in favour of Mansfield International Trade Ltd. in the principal amount $7,500,000; (iii) the promissory note, dated June 2, 2017, issued by the Parent in favour of Customer Acquisition Network LLC in the principal amount $7,500,000; (iv) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Phil Jones in the principal amount $500,000; (v) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Eric So in the principal amount of $500,000; and (vi) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Mitch Richler in the principal amount of $250,000.

"**Prime Rate**" means, on any day, the greater of (i) the variable *per annum* reference rate of interest announced and adjusted by the Lender from time to time for Canadian Dollar loans in Canada, and (ii) the rate of interest *per annum* that is equal to the sum of (A) the rate of the Lender for one month bankers' acceptances that appears on the Reuters Screen CDOR Page at 10:00 a.m. (Toronto time) on that day, and (B) 1.00% *per annum*.

"**Prime Rate Loan**" means a Loan in or a Conversion into Canadian Dollars with respect to which the Borrower has specified that interest is to be calculated by reference to the Prime Rate.

"**Prime Rate Margin**" means, for any period, the applicable percentage rate *per annum* applicable to that period as set out below the heading "Prime Rate Margin" in the definition of "Applicable Margin".

"**Priority Payables**" means, with respect to any Person, any amount payable by such Person which ranks or is capable of ranking prior to or pari passu with the Encumbrances created by the Security in respect of any Eligible Accounts Receivable, including amounts owing for wages, vacation pay, severance pay, employee deductions, *Wage Earner Protection Program Act* (Canada) obligations, sales tax, excise tax, income tax, workers compensation, government royalties, pension fund obligations (including any pension deficit), and other similar statutory claims which rank or is capable of ranking prior to or *pari passu* with the Encumbrances created by the Security in respect of any Eligible Accounts Receivable.

"**Property**" means, with respect to any Person, all or any portion of that Person's undertaking and property, both real and personal.

"**Purchase Money Security Interest**" means an Encumbrance created or incurred by a Restricted Party securing Debt incurred to finance the acquisition of Property (including the cost of installation thereof), provided that (i) such Encumbrance is created substantially simultaneously with the acquisition of such Property, (ii) such Encumbrance does not at any time Encumber any Property other than the Property financed by such Debt, (iii) the amount of Debt secured thereby is not increased subsequent to such acquisition, and (iv) the principal amount of

Debt secured by any such Encumbrance at no time exceeds 100% of the original purchase price of such Property and the cost of installation thereof, and for the purposes of this definition the term "acquisition" includes a Capital Lease.

**"Qualified Cash"** means unrestricted cash held by a Restricted Party in which the Lender has a first priority perfected Encumbrance with such funds being maintained in an account with the Lender and such cash on deposit with the Lender is not subject to any escrow or other restriction.

**"Related Parties"** means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents and advisors of such Person or of such Person's Affiliates.

**"Release"** means any release or discharge of any Hazardous Substance including any discharge, spray, injection, inoculation, abandonment, deposit, spillage, leakage, seepage, pouring, emission, emptying, throwing, dumping, placing, exhausting, escape, leach, migration, dispersal, dispensing or disposal.

**"Relevant Jurisdiction"** means, from time to time, with respect to a Person that is granting Security hereunder, any province or territory of Canada, any state of the United States or any other country or political subdivision thereof in which such Person has its chief executive office or chief place of business or has Property and, for greater certainty, includes the provinces and states set out in Schedule 1.01(F).

**"Repayment Notice"** means the notice substantially in the form set out in Schedule 1.01(G).

**"Requirements of Law"** means, with respect to any Person, the Organizational Documents of such Person and any Applicable Law or any determination of a Governmental Authority, in each case applicable to or binding upon such Person or any of its business or Property or to which such Person or any of its business or Property is subject.

**"Restricted Parties"** means the Parent, the Borrower and their respective Subsidiaries and any person that hereafter becomes a Subsidiary of the Parent, and their respective successors and assigns permitted by this Agreement, and **"Restricted Party"** means any one of them.

**"Revolving Facility"** has the meaning set out in Section 2.01(a).

**"Revolving Facility Commitment"** means $5,500,000 subject to any cancellation or termination thereof pursuant to this Agreement.

**"Revolving Facility Limit"** means the lesser of the Revolving Facility Commitment and the Borrowing Base as set out in the latest Borrowing Base Certificate delivered hereunder.

**"Revolving Period"** means, in relation to the Revolving Facility, the period commencing on the Original Closing Date and ending on the Maturity Date.

**"Rollover"** means the acceptance of a BA Rate Loan in like face amount upon the maturity of a BA Rate Loan or the extension of a LIBO Rate Loan for an additional Interest Period.

**"Rollover Date"** means the date of commencement of a new Interest Period applicable to a BA Rate Loan or LIBO Rate Loan that is being rolled over.

**"Rollover Notice"** means the notice, substantially in the form set out in Schedule 1.01(H), to be given to the Lender by the Borrower in connection with the Rollover of a BA Rate Loan,  or LIBO Rate Loan.

**"Sanctions Law"** means *Special Economic Measures Act* (Canada), the *United Nations Act* (Canada), *the Freezing Assets of Corrupt Foreign Officials Act* (Canada), the *Criminal Code* (Canada) and other similar laws imposing sanctions.

"**Second Amendment**" means the second amending agreement to the Original Credit Agreement, made as of June 2, 2017, between the parties hereto.

**"Security"** means the documents creating an Encumbrance in favour of, or any collateral held from time to time by, the Lender securing or intended to secure repayment of the Obligations, including all Guarantees and security described in Article 9.  For greater certainty, "Security" does not include any Security (as such term is defined in the Subordinated Credit Agreement) except for Security to the extent such Security has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as subordinated lender (in which such case, such Security shall constitute "Security" but only to the extent that such Security applies to the Lender in connection with this Agreement).

**"Senior Debt"** means Total Debt less the Subordinated Debt; provided that, the 2017 Shareholder Loans shall not constitute Senior Debt of the Borrower for purposes of calculating financial covenants in this Agreement.

**"Senior Debt to EBITDA Ratio"** means the ratio of the Borrower's Senior Debt to EBITDA determined on a consolidated basis.

"**Shareholder Subordination Agreement**" means the subordination and postponement agreement, made as of November 21, 2017, between the Borrower, the Lender and each of the holders of the 2017 Shareholder Loans.

**"Software"** means all software relating to the business of the Borrower, including all versions thereof, and all related documentation, manuals, source code and object code, program files, data files, computer related data, field and data definitions and relationships, data definition specifications, data models, program and system logic, interfaces, program modules, routines, sub-routines, algorithms, program architecture, design concepts, system designs, program structure, sequence and organization, screen displays and report layouts, and all other material related to such software.

**"Subordinated Credit Agreement"** means the amended and restated subordinate credit agreement, made as of the date hereof, between the Borrower and Royal Bank of Canada, under which Royal Bank of Canada has committed to provide the Borrower with a subordinated term facility.

"**Subordinated Debt**" means the Debt owing by the Borrower to Royal Bank of Canada under the Subordinated Credit Agreement.  For greater certainty, "Subordinated Debt" does not include any Obligations.

"**Subsidiary**" means, at any time, with respect to any Person, any other Person, if at such time the first mentioned Person (i) owns, directly or indirectly, securities or other ownership interests in such other Person, having ordinary voting power to elect a majority of the board of directors or persons performing similar functions for such other Person, and (ii) directly or indirectly, through the operation of any agreement or otherwise, the ability to elect or cause the election of a majority of the board of directors or other persons performing similar functions for such other Person or otherwise exercise control over the management and policies of such other Person, and in either case will include any other Person in like relationship to a Subsidiary of such first mentioned Person.

"**Tax Expense**" means, for any period, without duplication, the tax expense (including federal, provincial, state, local and foreign income taxes) of a Person, for such period, determined on a consolidated basis in accordance with GAAP.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties applicable thereto or value added taxes.

"**Term Facility**" has the meaning set out in Section 2.01(b).

"**Total Debt**" means the Debt of the Borrower determined on a consolidated basis; provided that, (i) Earn Out Obligations relating to the 36 Labs Group Acquisition, and (ii) the 2017 Shareholder Loans shall not constitute Debt of the Borrower for purposes of calculating financial covenants in this Agreement.

"**Total Debt to EBITDA Ratio**" means the ratio of the Borrower's Total Debt to EBITDA determined on a consolidated basis.

"**Transaction Costs**"  means costs and expenses incurred in connection with the Voom Acquisition and the transaction contemplated by the Original Credit Agreement and the subordinate credit agreement, made as of the Original Closing Date, between the Borrower and Royal Bank of Canada.

"**United States Dollars**", "**U.S. $**" and "**$**" means the lawful money of the United States of America.

"**Vendor Take Back Debenture**" means the secured debenture dated July 20, 2016 executed and delivered by the Parent to and in favour of 2440310 Ontario Inc.

"**Vendor Take Back Obligations**" means all of the debts and obligations under and pursuant to the Vendor Take Back Debenture.

"**Voom Acquisition**" means the acquisition by the Parent from 2440310 Ontario Inc. on or about July 20, 2016 of all of the shares of Voom Media Corp. pursuant to the Voom Acquisition Agreement.

"**Voom Acquisition Agreement**" means the share purchase agreement dated July 20, 2016 between the Parent, 2440310 Ontario Inc. and Voom Media Corp.

1.02      **Extended Meanings**

In this Agreement words importing the singular number include the plural and *vice versa*, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and Governmental Authorities.  The term "including" means "including without limiting the generality of the foregoing" and the term "third party" means any person other than a person a party to this Agreement.

1.03      **Accounting Principles**

(1)      Where the character or amount of any asset or liability or item of revenue or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement or any Loan Document, such determination or calculation will, to the extent applicable and except as otherwise specified herein or as otherwise agreed in writing by the parties, be made in accordance with GAAP.

(2)      All calculations for the purposes of determining compliance with the financial ratios and financial covenants contained in this Agreement will be made on a basis consistent with GAAP as it exists on the date of this Agreement and used in the preparation of the consolidated financial statements of the Borrower for its financial year ended December 31, 2016.  In the event of a change in such GAAP, the Borrower and the Lender will negotiate in good faith to revise (if appropriate) such ratios and covenants to reflect GAAP as then in effect.

1.04      **Interest Calculations and Payments**

Unless otherwise stated, wherever in this Agreement reference is made to a rate of interest "*per annum*" or a similar expression is used, such interest will be calculated on the basis of a calendar year of 365 days or 366 days, as the case may be, and using the nominal rate method of calculation and not the effective rate method of calculation or on any other basis that gives effect to the principle of deemed reinvestment of interest.  Interest will continue to accrue after maturity and default and/or judgment, if any, until payment thereof, and interest will accrue on overdue interest, if any.

1.05      **Interest Act (Canada)**

For the purposes of this Agreement, whenever interest to be paid hereunder is to be calculated on the basis of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year

in which the same is to be ascertained and divided by 360 or such other number of days in such period, as the case may be.

1.06    **Permitted Encumbrances**

The inclusion of reference to Permitted Encumbrances in any Loan Document is not intended to subordinate and will not subordinate, any Encumbrance created by any of the Security to any Permitted Encumbrance.

1.07    **Currency**

Unless otherwise specified in this Agreement, all references to currency (without further description) are to lawful money of the United States of America.

1.08    **Conflicts**

In the event of a conflict between the provisions of this Agreement and the provisions of any other Loan Document, then, unless such Loan Document or an acknowledgement from the Restricted Party and the Lender relative to such Loan Document expressly states that this Section 1.08 is not applicable to such Loan Document, notwithstanding anything else contained in such other Loan Document, the provisions of this Agreement will prevail and the provisions of such other Loan Document will be deemed to be amended to the extent necessary to eliminate such conflict.

1.09    **Schedules**

The following are the Schedules attached hereto and incorporated by reference and deemed to be part hereof:

| | | |
|---|---|---|
| Schedule 1.01(A) | - | Borrowing Base Certificate |
| Schedule 1.01(B) | - | Compliance Certificate |
| Schedule 1.01(C) | - | Conversion Notice |
| Schedule 1.01(D) | - | Drawdown Notice |
| Schedule 1.01(E) | - | Material Contracts |
| Schedule 1.01(F) | - | Relevant Jurisdictions |
| Schedule 1.01(G) | - | Repayment Notice |
| Schedule 1.01(H) | - | Rollover Notice |
| Schedule 7.01(8) | - | Litigation Disclosure |
| Schedule 7.01(12) | - | Ownership Structure |
| Schedule 7.01(16) | - | Intellectual Property Rights |
| Schedule 7.01(22) | - | Bank Accounts |

## ARTICLE 2 - THE CREDIT FACILITIES

2.01        **Credit Facilities**

Subject to the terms and conditions of this Agreement, the Lender establishes in favour of the Borrower:

(a)       a Revolving Facility (the **"Revolving Facility"**) in an amount up to the Revolving Facility Limit or the Equivalent Amount in Canadian Dollars, which facility will be available only during the Revolving Period; and

(b)       a Term Facility (the **"Term Facility"**) in an amount up to $13,500,000, which facility was made available by a single advance on the Original Closing Date. Any amount of the Term Facility not drawn on the Original Closing Date was automatically cancelled.

All amounts owing pursuant to the Original Credit Agreement on the Closing Date shall continue to be owing under this Agreement and all "Loans" (as such term is defined in the Original Credit Agreement) made under the Original Credit Agreement will be deemed for all purposes to be Loans hereunder.

2.02        **Purpose of Credit Facilities**

Loans under the Credit Facilities will only be used for the following respective purposes

(a)       under the Revolving Facility, for working capital requirements in the ordinary course of business of the Borrower (including capital expenditures), and

(b)       under the Term Facility, to fund the permanent repayment of the Vendor Take Back Obligations and all Debt owing to Silicon Valley Bank and related transaction costs.

2.03        **Revolving Facility Limit**

The Revolving Facility Limit shall be adjusted as at the date of each receipt by the Lender of a Borrowing Base Certificate and shall remain in effect until receipt by the Lender of a subsequent Borrowing Base Certificate. The Lender shall have no obligation to make any subsequent Loan under Revolving Facility should a Borrowing Base Certificate not be delivered on or before the date required herein. The Lender shall have no obligation to make any portion of a Loan under the Revolving Facility to the extent that after making such Loan, the outstanding Loans under the Revolving Facility would exceed the Revolving Facility Limit then in effect.

2.04        **Manner of Borrowing**

(1)       The Borrower may (a) in Canadian Dollars, make Drawdowns, Conversions and Rollovers under the Revolving Facility of Prime Rate Loans, BA Rate Loans and Overdraft

Loans, (b) in United States Dollars, make Drawdowns, Conversions and Rollovers of Base Rate Loans, Overdraft Loans and LIBO Rate Loans.

(2)      The Borrower may in United States Dollars, make a single Drawdown and may make Conversions and Rollovers under the Term Facility of Base Rate Loans and LIBO Rate Loans.

2.05      **Revolving Nature of Revolving Facility**

Subject to the terms and conditions hereof, the Borrower may increase or decrease the amount of Obligations outstanding under the Revolving Facility by making Drawdowns, repayments and further Drawdowns.

2.06      **Drawdowns, Conversions and Rollovers**

(1)      Subject to the provisions of this Agreement, the Borrower may (a) make Drawdowns hereunder, (b) convert the whole or any part of any type of Loan into any other type of Loan, or rollover any BA Rate Loan or LIBO Rate Loan on the last day of the applicable Interest Period therefor; by giving the Lender a Drawdown Notice, Conversion Notice or Rollover Notice, as the case may be.

(2)      The Borrower must give the Lender a Drawdown Notice, Conversion Notice or Rollover Notice, as the case may be, three Business Days (in the cases of LIBO Rate Loans) and two Business Days (in the case of BA Rate Loans) and one Business Day (in the case of all other Loans other than Overdraft Loans) prior to the proposed Drawdown Date, Conversion Date or Rollover Date, as the case may be.  A Drawdown Date, Conversion Date and Rollover Date must be a Business Day.

(3)      Each Drawdown Notice, Conversion Notice or Rollover Notice, as the case may be, must be delivered to the Lender by the Borrower on or prior to noon (Toronto time) on a Business Day.

(4)      Each Drawdown, Conversion or Rollover must:

(a)      in the case of Prime Rate Loans, be in a minimum principal amount of Cdn. $100,000 and increments of Cdn. $50,000;

(b)      in the case of Base Rate Loans, be in a minimum principal amount of $100,000 and increments of $50,000;

(c)      in the case of BA Rate Loans, be in a minimum amount of Cdn.$100,000 and increments of Cdn.$50,000; and

(d)      in the case of LIBO Rate Loans, be in a minimum principal amount of $500,000 and increments of $100,000.

(5)      The provisions of this Section 2.06 do not apply to Overdraft Loans.

2.07        **Drawdowns of Overdraft Loans**

The Lender will make Overdraft Loans under the Revolving Facility by honouring cheques drawn by the Borrower in Canadian Dollars or United States Dollars on the appropriate Borrower's Account, up to an aggregate amount of $5,500,000, or the Equivalent Amount in Canadian Dollars.  Overdraft Loans will, for the purpose of determining the rate of interest payable thereon, be deemed to be Prime Rate Loans if made in Canadian Dollars or Base Rate Loans if made in United States Dollars.

2.08        **Irrevocability**

Each Drawdown Notice, Conversion Notice and Rollover Notice given by the Borrower hereunder is irrevocable and will oblige the Borrower to take the action contemplated on the date specified therein.

2.09        **Cancellation or Reduction of Revolving Facility**

The Borrower may, at any time, upon giving at least two Business Days' prior notice to the Lender, cancel in full or, from time to time, reduce in part the Revolving Facility Commitment; provided, however, that any reduction will be in a minimum amount of $100,000 and increments of $50,000.  If as a result of such reduction the aggregate amount of Loans outstanding under the Revolving Facility exceeds the Revolving Facility Commitment of the Lender thereunder, the Borrower will, upon notice from the Lender, repay Loans in an aggregate amount equal to such excess.

2.10        **Account of Record**

The Lender will open and maintain books of account evidencing all Loans and all other amounts owing by the Borrower to the Lender hereunder.  The Lender will enter in the foregoing accounts details of all amounts from time to time owing, paid or repaid by the Borrower hereunder.  The information entered in the foregoing accounts will constitute prima facie evidence of the obligations of the Borrower to the Lender hereunder with respect to all Loans and all other amounts owing by the Borrower to the Lender hereunder.  After a request by the Borrower, the Lender will promptly advise the Borrower of such entries made in the Lender's books of account.

2.11        **Termination of LIBO Rate Loans**

(1)        If at any time the Lender determines, acting reasonably, (which determination will be conclusive and binding on the Borrower) that

(a)        the LIBO Rate for an existing LIBO Rate Loan does not adequately reflect the effective cost to the Lender of maintaining such LIBO Rate Loan, or

(b)        it cannot readily retain funds in the London interbank market in order to maintain any LIBO Rate Loan for the balance of the applicable Interest Period or cannot otherwise perform its obligations hereunder with respect to any LIBO Rate Loan for the balance of the applicable Interest Period,

then the Lender will inform the Lender and upon at least four Business Days' written notice by the Lender to the Borrower, and

(c)       the right of the Borrower to request LIBO Rate Loans for such period shall be and remain suspended until the Lender notifies the Borrower that any condition causing such determination no longer exists; and

(d)       if the Lender is prevented from maintaining a LIBO Rate Loan, the Borrower shall, at its option, either repay the LIBO Rate Loan to the Lender or convert the LIBO Rate Loan into one or more other forms of Loans that are permitted by this Agreement.

## ARTICLE 3 – CONDITIONS PRECEDENT

3.01      **Conditions Precedent to the Effectiveness of this Agreement**

This Agreement shall not be effective and the Closing Date will not occur until the following conditions precedent have been satisfied:

(a)       this Agreement will have been executed and delivered by all parties hereto;

(b)       the Lender will have completed its due diligence with respect to the Restricted Parties and the results of such due diligence will be satisfactory to the Lender in its sole discretion;

(c)       the Lender shall have received all necessary "know your customer" information;

(d)       the Lender shall have received a *pro forma* Compliance Certificate;

(e)       the Lender will have received and be satisfied with the Subordinated Credit Agreement;

(f)       the representations and warranties in Article 7 shall be true and correct and an officer of the Borrower shall have certified as such to the Lender;

(g)       no Default or Event of Default shall have occurred and be continuing on the Closing Date and an officer of the Borrower shall have certified as such to the Lender;

(h)       a Material Adverse Change shall not have occurred and be existing and an officer of the Borrower shall have certified as such to the Lender;

(i)       the Lender will have received an acknowledgement and confirmation agreement from each Restricted Party with respect to, among other things, the continuing effect of the Security (including each Guarantee delivered by a Restricted Party (other than the Borrower)) previously delivered by it;

(j)       the Lender will have received certified copies of the Organizational Documents of the Borrower and the Parent, the resolutions authorizing the execution and

delivery of, and performance of the Borrower's and the Parent's obligations under, the Loan Documents and the transactions contemplated herein, and a certificate as to the incumbency of the officers of the Borrower and the Parent;

(k)     the Lender will have received (i) certified copies of the promissory notes or loan agreements between the Borrower and the holders of the 2017 Shareholder Loans and (ii) the Shareholder Subordination Agreement, each of which shall be on terms satisfactory to the Lender;

(l)     the 2017 Shareholder Loans shall have been advanced to the Borrower;

(m)     certificates of status or comparable certificates for all Relevant Jurisdictions of the Borrower and the Parent will have been delivered to the Lender;

(n)     except as otherwise agreed by the Lender, the Lender will have received certified copies of all shareholder, regulatory, governmental and other approvals required in order for the Borrower to enter into this Agreement and to perform its obligations hereunder;

(o)     no legislation (whether by statute, regulation, order-in-council, notice of ways and means motion, by-law or otherwise) shall have been enacted, introduced or tabled which, in the reasonable opinion of Lender, causes or will likely cause a Material Adverse Change and there shall not exist any prohibition at law, including a cease trade order, injunction or other prohibition or order at law or under Applicable Laws, which seeks to prohibit or enjoin the Credit Facilities or makes consummation of the transactions illegal;

(p)     the Lender will have received payment of all fees and expenses payable to the Lender that are due and payable at such time (including payment of the amendment fee payable to the Lender pursuant to Section 4.06 and the fees and expenses of Lender's Counsel);

(q)     no action, suit or proceeding (except as has been disclosed to the Lender; subject to Lender's satisfaction with such matters) shall have been commenced or threatened by any person, including any governmental authority: (i) to cease trade, enjoin, prohibit, or impose material limitations or conditions on the transactions or the rights of the Borrower to own or exercise full rights of ownership of its tangible or intangible property; (ii) to prohibit the Borrower from effectively controlling in any material respect its business or operations; (iii) which has had, or if successful would reasonably be expected to result in a Material Adverse Change; (iv) that could reasonably be expected to materially adversely affect the ability of the Borrower to perform its obligations under the Loan Documents; or (v) that could reasonably be expected to materially adversely affect the rights and remedies of Lender under the Loan Documents;

(r)     no facts shall have arisen which would render information previously furnished to the Lender to be inaccurate in any material respect;

(s)     a currently dated letter of opinion of Borrower's Counsel as to such matters and in such form as Lender's Counsel deems appropriate addressed to the Lender will have been delivered to the Lender; and

(t)     receipt by the Lender of such other documents, agreements and instruments as may be required by the Lender;

provided that all documents delivered pursuant to this Section 3.01 must be in full force and effect, and in form and substance satisfactory to the Lender, acting reasonably.

3.02    **Conditions Precedent to all Loans**

The obligation of the Lender to make any advance hereunder by way of a Loan is subject to and conditional upon the prior satisfaction of the following additional conditions precedent:

(a)     the Lender will have received a Drawdown Notice as required under Sections 2.06(2) and 2.06(3);

(b)     the representations and warranties deemed to be repeated pursuant to Section 7.02 will continue to be true and correct as of the Drawdown Date;

(c)     no Default will have occurred and be continuing on the Drawdown Date, or would result from making the requested advance; and

(d)     a Material Adverse Change will not have occurred and be existing.

3.03    **Waiver**

The conditions set forth in Sections 3.01 and 3.02 are inserted for the sole benefit of the Lender and may be waived by the Lender, in whole or in part (with or without terms or conditions), in respect of any Drawdown without prejudicing the right of the Lender at any time to assert such conditions in respect of any subsequent Drawdown.

**ARTICLE 4 - PAYMENTS OF INTEREST
AND STANDBY FEES**

4.01    **Interest on Prime Rate Loans**

The Borrower will pay interest on each Prime Rate Loan during each Interest Period applicable thereto in Canadian Dollars at a rate *per annum* equal to the sum of (a) the Prime Rate plus (b) the Prime Rate Margin in effect, in each case, from time to time during such Interest Period. Each determination by the Lender of the Prime Rate and the Prime Rate Margin applicable from time to time during an Interest Period will, in the absence of manifest error, be binding upon the Borrower.  Such interest will be payable in arrears on each Interest Payment Date for such Loan for the period from and including the Drawdown Date, Conversion Date or preceding Interest Payment Date, as the case may be, for such Loan to but excluding such Interest Payment Date (or, if such Interest Payment Date follows the repayment of such Loan or

the Conversion of such Loan, to but excluding the date of such repayment or Conversion) and will be calculated on the principal amount of the Prime Rate Loan outstanding during such period and on the basis of the actual number of days elapsed in a year of 365 days or 366 days, as the case may be.  Changes in the Prime Rate will cause an immediate adjustment of the interest rate applicable to such Loan without the necessity of any notice to the Borrower.

4.02    **Interest on Base Rate Loans**

The Borrower will pay interest on each Base Rate Loan during each Interest Period applicable thereto in United States Dollars at a rate *per annum* equal to the sum of (a) the Base Rate plus (b) the Base Rate Margin in effect, in each case, from time to time during such Interest Period.  Each determination by the Lender of the Base Rate and the Base Rate Margin applicable from time to time during an Interest Period will, in the absence of manifest error, be binding upon the Borrower.  Such interest will be payable in arrears on each Interest Payment Date for such Loan for the period from and including the Drawdown Date, Conversion Date or preceding Interest Payment Date, as the case may be, for such Loan to but excluding such Interest Payment Date (or, if such Interest Payment Date follows the repayment of such Loan or the Conversion of such Loan, to but excluding the date of such repayment or Conversion) and will be calculated on the principal amount of the Base Rate Loan outstanding during such period and on the basis of the actual number of days elapsed divided by 360.  Changes in the Base Rate will cause an immediate adjustment of the interest rate applicable to such Loan without the necessity of any notice to the Borrower.

4.03    **Interest on LIBO Rate Loans**

The Borrower will pay interest on each LIBO Rate Loan during each Interest Period applicable thereto in United States Dollars at a rate *per annum* (expressed on the basis of a 360 day year) equal to the sum of (a) the LIBO Rate plus (b) the LIBO Rate Margin in effect, in each case, from time to time in such Interest Period.  Each determination by the Lender of the LIBO Rate with respect to an Interest Period and the LIBO Rate Margin applicable from time to time during an Interest Period will, in the absence of manifest error, be binding upon the Borrower.  Such interest will be payable in arrears on each Interest Payment Date for such Loan for the period from and including the Drawdown Date, Conversion Date, Rollover Date or preceding Interest Payment Date, as the case may be, for such Loan to but excluding such Interest Payment Date (or, if such Interest Payment Date follows the repayment of such Loan or the Conversion of such Loan, to but excluding the date of such repayment or Conversion) and will be calculated on the principal amount of the LIBO Rate Loan outstanding during such period and on the basis of the actual number of days elapsed divided by 360.

4.04    **Interest on BA Rate Loans**

The Borrower will pay interest on each BA Rate Loan during each Interest Period applicable thereto in Canadian Dollars at a rate *per annum* equal to the sum of (a) the BA Rate plus (b) the BA Rate Margin in effect, in each case, from time to time during such Interest Period.  Each determination by the Lender of the BA Rate and the BA Rate Margin applicable from time to time during an Interest Period will, in the absence of manifest error, be binding upon the Borrower.  Such interest will be payable in arrears on each Interest Payment Date for

such Loan for the period from and including the Drawdown Date, Conversion Date, Rollover Date or preceding Interest Payment Date, as the case may be, for such Loan to but excluding such Interest Payment Date (or, if such Interest Payment Date follows the repayment of such Loan or the Conversion of such Loan, to but excluding the date of such repayment or Conversion) and will be calculated on the principal amount of the BA Rate Loan outstanding during such period and on the basis of the actual number of days elapsed in a year of 365 days or 366 days, as the case may be. Changes in the BA Rate will cause an immediate adjustment of the interest rate applicable to such Loan without the necessity of any notice to the Borrower.

4.05        **Standby Fees**

The Borrower will pay to the Lender a standby fee in Canadian Dollars calculated at the rate *per annum* specified as the applicable "Standby Fee Rate" in the applicable table contained in the definition of "Applicable Margin" on the daily unadvanced portion of the Revolving Facility during each fiscal quarter. The standby fee will be determined daily beginning on the date hereof and will be calculated on the basis of a calendar year of 365 or 366 days, as the case may be, and will be payable by the Borrower quarterly in arrears on the first Business Day following the end of each quarter.

4.06        **Amendment Fee**

In consideration of the Lender agreeing to the amendments to the Original Credit Agreement set forth in this Agreement, the Borrower will pay to the Lender an amendment fee in the amount of $10,000, which will be due and payable on the Closing Date.

4.07        **Maximum Rate of Interest**

Notwithstanding anything contained herein to the contrary, the Borrower will not be obliged to make any payment of interest or other amounts payable to the Lender hereunder in excess of the amount or rate that would be permitted by Applicable Law or would result in the receipt by the Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)). If the making of any payment by the Borrower would result in a payment being made that is in excess of such amount or rate, the Lender will determine the payment or payments that are to be reduced or refunded, as the case may be, so that such result does not occur.

## ARTICLE 5 - REPAYMENT

5.01        **Mandatory Repayment at Maturity- Revolving Facility**

The Borrower will repay in full the outstanding principal amount of all Loans and other Obligations under the Revolving Facility on or before the Maturity Date.

5.02        **Mandatory Repayment at Maturity - Term Facility**

The Borrower will repay the outstanding principal amount of all Loans under the Term Facility (a) by 16 equal quarterly payments of $482,142.86 on the last day of each quarter,

which began on December 31, 2016, and (b) the remaining principal amount of all Loans and all other Obligations in connection with the Term Facility on the Maturity Date.

5.03     **Other Mandatory Repayments**

(1)     In addition to the repayments required under Section 5.02 above,

(i)     if the Borrower, a Guarantor or any of their Subsidiaries receives a payment of net insurance proceeds under or in connection with an insurance policy in connection with:

(A)     the loss, damage or destruction of any property, then on the date which is one hundred and eighty (180) days after receipt of such payment the Borrower shall, at the request of the Lender, prepay the outstanding Loans in an amount equal to the Equivalent Amount in United States Dollars of the portion of such net insurance proceeds that has not been applied to the repair or replacement of such property from which such proceeds were derived; or

(B)     the life of Jason Theofilos, then the net proceeds so received shall, at the request of the Lender, prepay the outstanding Loans in an amount equal to the Equivalent Amount in United States Dollars; it being hereby agreed by the Lender that any net proceeds received by the Lender as beneficiary under any such life insurance policy shall be used to prepay the outstanding Loans in an amount equal to the Equivalent Amount in United States Dollars and the aggregate amount of such net proceeds after all such Loans have been repaid in full shall be delivered promptly to the Borrower in immediately available cash;

(ii)     if the Borrower, a Guarantor or any of their Subsidiaries receives a payment of Net Proceeds in an amount in excess of $250,000 pursuant to or in connection with an Disposition of Property (other than those permitted pursuant to Section 8.04(1)), then, on the date which is one hundred and eighty (180) days after receipt of such payment the Borrower shall prepay the Loans in an amount equal to the Equivalent Amount in United States Dollars of the Net Asset Sale Proceeds that has not been applied to purchase similar or other useful property for the Business; and

(iii)     if the Borrower, a Guarantor or any of their Subsidiaries receives a payment receives a payment of proceeds pursuant to or in connection with the issuance of Debt (other than Debt permitted pursuant to Section 8.04(4)), on the date which is five (5) days after receipt of such payment, the Borrower shall prepay the Loans in an amount equal to the Equivalent Amount in United States Dollars of one hundred percent (100%) of the portion of the net proceeds of such payment.

(2)    Each repayment under this Section 5.03 will be applied (i) first against the repayments of principal required under Section 5.02 in inverse order of maturity, and (ii) then to Loans outstanding under the Revolving Facility which shall not result in a permanent reduction of the Revolving Facility Commitment.

5.04    **Voluntary Prepayments**

(1)    If the Lender has received a Repayment Notice from the Borrower not less than five Business Days prior to the proposed prepayment date, the Borrower may from time to time prepay Loans outstanding under the Term Facility without penalty provided that each such prepayment must be in a minimum amount of $100,000 and in increments of $50,000. Each such prepayment will be applied against the repayments of principal required under Section 5.02 in inverse order of maturity.

(2)    If the Lender has received a Repayment Notice from the Borrower not less than three Business Days prior to the proposed prepayment date, the Borrower may from time to time prepay Loans outstanding under the Revolving Facility without penalty provided that each such prepayment must be in a minimum amount of $100,000 or Cdn.$100,000 and in increments of $50,000 or Cdn.$50,000, as applicable.

5.05    **Excess Over the Maximum Amounts**

If the Lender determines that on any day as a result of currency fluctuations the aggregate of (a) Loans in United States Dollars then outstanding under the Revolving Credit Facility, and (b) the Equivalent Amount in United States Dollars of Loans in Canadian Dollars then outstanding under the Revolving Credit Facility on such day exceeds the Revolving Facility Commitment then in effect, the Lender will notify the Borrower that such an event has occurred, and the Borrower will within three Business Days following receipt of such notice, (i) repay Loans under the Revolving Credit Facility in an amount equal to such excess, or (ii) deposit with the Lender cash or Cash Equivalents in the amount of such excess, provided that if it is determined on any subsequent day that the amount of the deposited amounts exceeds the amount of such excess, the Borrower may withdraw the amount by which such excess has been reduced.

5.06    **Repayment Compensation**

If the Borrower by reason of any repayment hereunder, whether mandatory or voluntary  pays any LIBO Rate Loans or BA Rate Loans prior to the end of the applicable Interest Period, the Borrower will compensate the Lender for any loss or expense that the Lender incurs as a result thereof, including any breakage costs; provided that the Lender shall provide a calculation of such costs to the Borrower and the Lender may, in its discretion, waive such breakage costs.

## ARTICLE 6 - PLACE AND APPLICATION OF PAYMENTS

6.01    **Place of Payment of Principal, Interest and Fees**

All payments of principal, interest, fees and other amounts to be made by the Borrower to the Lender pursuant to this Agreement will be made in the currency in which a Loan

is outstanding for value on the day such amount is due or, if such day is not a Business Day, on the Business Day next following with interest, by deposit or transfer thereof to the account designated from time to time in writing by the Lender at the Lending Office.

## ARTICLE 7 - REPRESENTATIONS AND WARRANTIES

7.01          **Representations and Warranties**

The Borrower represents and warrants to the Lender as follows, and acknowledges and confirms that the Lender is relying upon such representations and warranties:

(1)          Existence and Qualification  Each of the Restricted Parties, (a) that is a corporation or company has been duly incorporated, amalgamated or continued, as the case may be, and is validly subsisting as a corporation or company under the laws of its jurisdiction of incorporation, amalgamation, or continuance, as the case may, (b) that is not a corporation or company has been duly created or established as a partnership or other entity and validly exists under the laws of the jurisdiction in which it has been created or established, and (c) is duly qualified to carry on business in all jurisdictions in which it carries on business and has all Material Licences.

(2)          Power and Authority  Each of the Restricted Parties has the power, authority and right (a) to enter into and deliver, and to exercise its rights and perform its obligations under, the Loan Documents to which it is a party and all other instruments and agreements delivered by it pursuant to any of the Loan Documents, and (b) to own its Property and carry on its business as currently conducted and as currently proposed to be conducted by it.

(3)          Execution, Delivery, Performance and Enforceability of Documents  The execution, delivery and performance of each of the Loan Documents to which a Restricted Party is a party, and every other instrument or agreement delivered by it pursuant to any Loan Document, has been duly authorized by all actions, if any, required on its part and by its shareholders and directors (or where applicable partners, members or managers), and each of the Loan Documents and such other instruments and agreements has been duly executed and delivered and constitutes a valid and legally binding obligation of the particular Restricted Party enforceable against it in accordance with its terms subject to bankruptcy, insolvency, reorganization, arrangement, winding-up, moratorium and other similar laws of general application limiting the enforcement of creditors' rights generally and to general equitable principles.

(4)          Loan Documents Comply with Applicable Laws, Organizational Documents and Contractual Obligations  Neither the entering into nor the delivery of, and neither the consummation of the transactions contemplated in nor compliance with the terms, conditions and provisions of, the Loan Documents by any Restricted Party conflicts with or will conflict with, or results or will result in any breach of, or constitutes a default under or contravention of, any Requirement of Law applicable to it or any of its Organizational Documents (except, in each case, where such conflict, breach, default, or contravention would not, individually or in the aggregate, constitute, or be reasonably likely to result in, a Material Adverse Change), or results

or will result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) upon any of its Property.

(5)      Consents Respecting Loan Documents   Each of the Restricted Parties has obtained, made or taken all consents, approvals, authorizations, declarations, registrations, filings, notices and other actions whatsoever required as to the date hereof in connection with the execution and delivery by it of each of the Loan Documents to which it is a party and the consummation of the transactions contemplated in the Loan Documents, provided that, the registration of any Loan Documents with the registration of any Loan Documents with the *Administration de l'enregistrement et des Domaines* may be requested in case of legal proceedings before a Luxembourg courts or when such Loan Document has to be produced before an official Luxembourg authority.

(6)      Taxes   Each of the Restricted Parties has paid or made adequate provision for the payment of all Taxes levied on it or on its Property or income that are due and payable, including interest and penalties, or has accrued such amounts in its financial statements for the payment of such Taxes except Taxes that are not material in amount, that are not delinquent or if delinquent are being contested, and in respect of which non-payment would not individually or in the aggregate constitute, or be reasonably likely to cause, a Material Adverse Change, and, except as set forth in Schedule 7.01(8), there is no material action, suit, proceeding, investigation, audit or claim now pending, or to its knowledge threatened, by any Governmental Authority regarding any Taxes nor has it agreed to waive or extend any statute of limitations with respect to the payment or collection of Taxes.

(7)      Judgments, Etc.   None of the Restricted Parties is subject to any judgment, order, writ, injunction, decree or award, or to any restriction, rule or regulation (other than customary or ordinary course restrictions, rules and regulations consistent or similar with those imposed on other Persons engaged in similar businesses) that has not been stayed or of which enforcement has not been suspended and that individually or in the aggregate exceeds $250,000 or constitutes, or is reasonably likely to cause, a Material Adverse Change.

(8)      Absence of Litigation   Except as set forth in Schedule 7.01(8), as at the Closing Date, there are no actions, suits or proceedings pending or, to the best of the Borrower's knowledge and belief, after due inquiry and all reasonable investigation, threatened against or affecting any Restricted Party that individually or in the aggregate exceeds $250,000 or are reasonably likely to cause, either separately or in the aggregate, a Material Adverse Change.

(9)      Title to Assets   Each of the Restricted Parties has good title to its Property, free and clear of all Encumbrances except Permitted Encumbrances and no Person has any agreement or right to acquire an interest in such Property other than in the ordinary course of the business of the applicable Restricted Party.

(10)      Compliance with Laws   None of the Restricted Parties is in default under any Applicable Law where such default could reasonably be expected to cause a Material Adverse Change or affect its ability to perform any of its obligations under any Loan Document to which it is a party.  Each Restricted Party is in compliance with Anti-Corruption Laws, AML Laws and Sanctions Laws.

(11)     <u>No Default</u>  No Default or Event of Default has occurred and is continuing.

(12)     <u>Ownership Structure</u>  The ownership structure of the Parent, the Borrower and its Subsidiaries is as set out in Schedule 7.01(12) (including as of the Closing Date), which contains:

(a)     a list of all Restricted Parties; and

(b)     complete and accurate information respecting:

    (i)     each such Restricted Party's name (including any French and English forms of name) and the jurisdiction in which each Restricted Party was formed;

    (ii)    the address of each Restricted Party's chief executive office and chief place of business and, if the same is different, the address at which the books and records of such Restricted Party are located, the address at which senior management of such Restricted Party are located and conduct their deliberations and make their decisions with respect to the business of such Restricted Party and the address from which the invoices and accounts of such Restricted Party are issued; and

    (iii)   the authorized capital of the Parent, the Borrower and each Restricted Party, the number of issued and outstanding shares of each such Person and the beneficial owners thereof.

(13)     <u>Relevant Jurisdictions</u>  The Relevant Jurisdictions for each Restricted Party are set forth on Schedule 1.01(F).

(14)     <u>Security</u>  The Security is effective to create in favour of the Lender, as security for the Obligations described therein, a legal, valid, binding and enforceable security interest in the collateral described therein and proceeds thereof.

(15)     <u>Software</u>  Each of the Restricted Parties owns or has licensed for use all of the material Software necessary to conduct its businesses.

(16)     <u>Intellectual Property Rights</u>  Each of the Restricted Parties has sufficient Intellectual Property Rights reasonably necessary for the conduct of its businesses.  All patents, trade-marks, copyrights or industrial designs (including those which have been either registered or in respect of which a registration application has been filed by a Restricted Party), as at the Closing Date, are listed on Schedule 7.01(16).  To the Borrower's knowledge, none of the Restricted Parties is infringing or is alleged to be infringing the Intellectual Property Rights of any other Person in a manner that could reasonably be expected to cause, or if any allegation is determined adversely could reasonably be expected to cause, a Material Adverse Change other than as disclosed in Schedule 7.01(16).

(17)     <u>Material Contracts and Material Licences</u>  To the best of the Borrower's knowledge, no event has occurred and is continuing that would constitute a breach of or a default

under any Material Contract or Material Licence and each Material Contract to which a Restricted Party is a party is binding upon it and, to the Borrower's knowledge, is a binding agreement of each other Person who is a party thereto.

(18)     Financial Statements   All of the quarterly and annual financial statements that have been furnished to the Lender in connection with this Agreement are complete in all material respects and such financial statements fairly present the consolidated financial position of the Parent as of the dates referred to therein and have been prepared in accordance with GAAP.

(19)     No Material Adverse Change   Since the date of the Borrower's most recent annual audited financial statements provided to the Lender, there has been no condition (financial or otherwise), event or change in any Restricted Party's business, liabilities, operations, results of operations or assets which constitutes, or could reasonably be expected to constitute, or cause, a Material Adverse Change.

(20)     Environmental Matters

(a)     Except to the extent that the non-compliance would not or could not reasonably be expected to cause a Material Adverse Change, the assets of each Restricted Party and its operations are in full compliance in all respects with all material Environmental Laws; the Borrower is not aware of, nor has it received notice of, any past, present or future condition, event, activity, practice or incident that may interfere with or prevent the compliance or continued compliance of it or any other Restricted Party in all material respects with all material Environmental Laws; and each Restricted Party has obtained all licences, permits and approvals that are currently required under all material Environmental Laws and is in full compliance with the provisions of such licences, permits and approvals.

(b)     The Borrower is not aware that any Hazardous Substances exist on, about or within or have been used, generated, stored, transported, disposed of on, or released from any of its Property or the Property of any other Restricted Party other than in material accordance and compliance with all Environmental Laws, except to the extent that the non-compliance would not or could not reasonably be expected to cause a Material Adverse Change.

(21)     Pension Plans   The Restricted Parties do not have or maintain any Pension Plans.

(22)     Bank Accounts   No Restricted Party maintains a bank account other than as set forth on Schedule 7.01(22).  Schedule 7.01(22) contains a list of all bank accounts maintained by the Restricted Parties.

(23)     Pre-IPO Shareholder Loans Each of the Pre-IPO Shareholder Loans have been extinguished on a non-cash basis.

(24)     Full Disclosure   All information provided or to be provided to the Lender in connection with the Credit Facilities is, to the Borrower's knowledge, true and correct and none of the documentation furnished to the Lender by or on behalf of it, to its knowledge, omits or will omit as of such time, a material fact necessary to make the statements contained therein not

misleading in any material way, and all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by it (and any other Person who furnished such material on behalf of it).

7.02      **Survival and Repetition of Representations and Warranties**

The representations and warranties set out in Section 7.01 survive the execution and delivery of this Agreement and all other Loan Documents and will be deemed to be repeated by the Borrower as of each Drawdown Date and as of the date of each Compliance Certificate delivered pursuant to Section 8.03(2).  To the extent that on or prior to such date (a) the Borrower has advised the Lender in writing of a variation in any such representation or warranty, and (b) if such variation, in the opinion of the Lender, acting reasonably, is material to the Property, liabilities, affairs, business, operations or condition (financial or otherwise) of any Restricted Party considered as a whole or could have, or be reasonably likely to result in, a Material Adverse Change, and the Lender has approved such variation, then such representation and warranty will thereafter be deemed to be varied as approved by the Lender.

## ARTICLE 8 - COVENANTS

8.01      **Positive Covenants**

So long as this Agreement is in force and except as otherwise permitted by the prior written consent of the Lender, the Borrower will, and will cause each of the other Restricted Parties to:

(1)      Timely payment  Make due and timely payment of the Obligations required to be paid by it hereunder.

(2)      Conduct of Business, Maintenance of Existence, Compliance with Laws  Carry on and conduct its business and operations in a proper, efficient and businesslike manner, in accordance with good business practice; preserve, renew and keep in full force and effect its existence; and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business and to comply in all material respects with all Material Contracts, Material Licences and Requirements of Law.

(3)      Further Assurances  Use reasonable efforts to provide the Lender with such other documents, opinions, consents, acknowledgments and agreements as are reasonably necessary to implement this Agreement and the other Loan Documents from time to time.

(4)      Access to Information  Promptly provide the Lender with all information reasonably requested by the Lender from time to time concerning its financial condition and Property, and during normal business hours and from time to time upon reasonable notice, permit representatives of the Lender to inspect any of its Property and to examine and take extracts from its financial records, including records stored in computer data banks and computer software systems, and to discuss its financial condition with its senior officers and (in the presence of such of its representatives as it may designate) its auditors, the reasonable expense of all of which will be paid by the Borrower; provided that prior to the occurrence of an Event of Default which is continuing, such costs shall be limited to one such inspection per fiscal year.

(5)    Books and Records.  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.

(6)    Obligations and Taxes  Pay or discharge, or cause to be paid or discharged, before the same will become delinquent (i) all Taxes imposed upon it or upon its income or profits or in respect of its business or Property and file all tax returns in respect thereof, (ii) all lawful claims for labour, materials and supplies, (iii) all required payments under any of its Debt, and (iv) all other obligations; provided, however that it will not be required to pay or discharge or to cause to be paid or discharged any such amount so long as the validity or amount thereof is being contested in good faith by appropriate proceedings and an appropriate financial reserve in accordance with GAAP and satisfactory to the Lender has been established.

(7)    Use of Credit Facilities  Use the proceeds of the Credit Facilities only for the purposes specified in Section 2.02.

(8)    Insurance  Maintain insurance on all its Property (showing the Lender as the loss payee as its interests may appear) with financially sound and reputable insurance companies or associations including all-risk property insurance, comprehensive general liability insurance and business interruption insurance, in amounts and against risks that are determined by it to be appropriate and that are prudent in the circumstances; furnish to the Lender, on written request, but in any event annually, satisfactory evidence of the insurance carried and notify the Lender of any claim it makes under the foregoing insurance policies that is in excess of $250,000.

(9)    Notice of Default  Promptly notify the Lender of the occurrence of any Default or Event of Default.

(10)    Notice of Material Adverse Change  Promptly notify the Lender of any Material Adverse Change that would apply to it of which it becomes aware, using reasonable diligence.

(11)    Notice of Litigation  Promptly notify the Lender on becoming aware of the occurrence of any litigation, dispute, arbitration or other proceeding (commenced by a Governmental Authority or otherwise) the result of which if determined adversely would be a judgement or award against it (a) in excess of $250,000, or (b) would result in a Material Adverse Change to it, and from time to time provide the Lender with all reasonable information requested by the Lender concerning the status of any such proceeding.

(12)    Environmental Compliance  Operate all Property owned, leased or otherwise used by in material compliance with Environmental Law.

(13)    Security  Provide the Lender with the Security required from time to time pursuant to Article 9 in accordance with the provisions of such Article, accompanied by supporting resolutions, certificates and opinions in form and substance satisfactory to the Lender, acting reasonably, and do all such further acts and execute and deliver all such documents and instruments as may from time to time be requested by the Lender, acting reasonably, to ensure that the Security constitutes at all times valid, enforceable, and perfected first priority Encumbrances (subject only to Permitted Encumbrances).

- 43 -

(14)    <u>Maintenance of Property</u>  Keep all Property useful and necessary for its business in good working order and condition, normal wear and tear excepted, and maintain all Intellectual Property necessary to carry on its business, except to the extent that the failure to do so would not individually or in the aggregate be reasonably likely to cause a Material Adverse Change.

(15)    <u>Certain Laws</u>  Comply with, and not use the proceeds of any Loan in contravention of, Anti-Corruption Laws, Sanctions Laws and AML Laws.

(16)    <u>Bank Accounts</u>  Ensure that all bank accounts of the Restricted Parties are maintained with the Lender (or one of its Affiliates or Subsidiaries) at all times. In the event any bank account of a Restricted Party is not held with the Lender (or one of the Lender's Affiliates or Subsidiaries) as the depositary bank for any reason, such Restricted Party shall (a) close such account and deposit, or cause to be deposited, all funds therein to a bank account held with the Lender (or one of the Lender's Affiliates or Subsidiaries) within sixty (60) days of the Closing Date, or (b) shall cause to be executed and delivered to the Lender a blocked account control agreement or a deposit account control agreement, such agreement to be in form and substance satisfactory to the Lender, with respect to such bank account, within sixty (60) days of the Closing Date for any bank account in existence on the date hereof and within thirty (30) days for any bank account opened after the Closing Date.

(17)    <u>Parent Shareholder Agreement</u>  On or before January 31, 2018, deliver to the Lender a certified copy of the executed shareholder agreement in respect of the Parent, substantially in the form of the shareholder agreement of Customer Acquisition Network (Canada) Inc. delivered to the Lender on the Original Closing Date.

(18)    <u>Luxco Newco</u>  On or before January 31, 2018, deliver each of the following documents to the Lender, in each case in form and substance satisfactory to the Lender:

(a)    the Security described in Section 9.01(4);

(b)    a copy of the shareholder register of Luxco Newco evidencing the registration of the pledge of shares by 2307521 Ontario Inc.;

(c)    certified copies of the Organizational Documents of each Restricted Party delivering Loan Documents pursuant to this Section 8.01(18), the resolutions authorizing the execution and delivery of, and performance of each Restricted Party's respective obligations under, the Loan Documents and the transactions contemplated herein, and a certificate as to the incumbency of the officers of the Restricted Parties executing the Loan Documents pursuant to this Section 8.01(18) and any other documents to be provided pursuant to the provisions hereof;

(d)    certificates of status or comparable certificates for all Relevant Jurisdictions of each Restricted Party delivering a Loan Document pursuant to this Section 8.01(18);

(e)     all filings and registrations required by the Lender shall have been made in respect of the Security being delivered pursuant to this Section 8.01(18);

(f)     currently dated letters of opinion for the Borrower, together with letters of opinions of Luxembourg counsel for the Borrower and Luxembourg counsel for the Lender, as to such matters and in such form as Lender's Counsel deems appropriate addressed to the Lender; and

(g)     such additional information and documents as the Lender may reasonably require to complete the transactions contemplated hereby in accordance with the terms and conditions contained herein.

8.02     **Financial Covenants**

So long as this Agreement is in force and except as otherwise permitted by the prior written consent of the Lender, the Borrower will ensure that at all times and tested as at the end of each fiscal quarter:

(1)     <u>Senior Debt to EBITDA Ratio</u>  The Senior Debt to EBITDA Ratio is less than (i) 1.75:1.00 during the period commencing on the Original Closing Date and ending on December 30, 2016, (ii) 1.50:1.00 during the period commencing on December 31, 2016 and ending on December 30, 2017, (iii) 2.00:100 commencing on December 31, 2017 and ending on December 30, 2018, (iv) 1.75:1.00 commencing on December 31, 2018 and ending on December 30, 2019 and (v) 1.50:1.00 commencing on December 31, 2019 and at all times thereafter.

(2)     <u>Total Debt to EBITDA Ratio</u>  The Total Debt to EBITDA Ratio is less than (i) 2.75:1.00 during the period commencing on the Original Closing Date and ending on December 30, 2017, (ii) 3.00:100 commencing on December 31, 2017 and ending on December 30, 2018, (iii) 2.75:1.00 commencing on December 31, 2018 and ending on December 30, 2019 and (iv) 2.50:1.00 commencing on December 31, 2019 and at all times thereafter.

(3)     <u>Minimum Fixed Charge Coverage Ratio</u>  The Fixed Charge Coverage Ratio is not less than 1.25:1.00. For purposes of calculating the Fixed Charge Coverage Ratio, the amendments made to the definitions of "Fixed Charge Coverage Ratio" and "Capital Expenditures" pursuant to this Agreement will be effective on and after June 30, 2017.

(4)     <u>EBITDA of 36 Labs Group</u>  The Borrower and the Lender hereby agree that the EBITDA of 36 Labs Group for each fiscal period ending prior to the completion of the 36 Labs Group Acquisition shall be excluded from the calculation of EBITDA under this Agreement for such fiscal periods.

(5)     <u>Waiver of Financial Covenants</u>  Notwithstanding the foregoing, the Lender hereby waives the Borrower's compliance with Section 8.02(1)(ii) and Section 8.02(2)(i) solely for the fiscal period commencing on July 1, 2017 and ending on September 30, 2017.

8.03     **Reporting Requirements**

So long as this Agreement is in force, the Borrower will deliver to the Lender:

(1)     <u>Monthly Reporting</u>  As soon as available, but not later than 30 days after the end of each fiscal month of each year, (i) a copy of the unaudited consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income, and cash flows of the end of such fiscal month and for the portion of the fiscal year then ended, and certified by a senior officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of the Parent and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures. The statements shall also include a comparison of actual results to budget and management commentary on significant variances from budget; and (ii) a Borrowing Base Certificate together with inventory and accounts receivable summary ageing reports.

(2)     <u>Quarterly Certificate</u>  As soon as available and in any event within 45 days of the end of each of its fiscal quarters (including the fourth quarter), a Compliance Certificate.

(3)     <u>Annual Reports</u>  As soon as available and in any event within 120 days after the end of each of its fiscal years, a copy of the audited consolidated balance sheet of the Parent and its Subsidiaries and the related consolidated statements of income, and cash flows, which will be reviewed by an internationally recognized accounting firm, and will be prepared in accordance with GAAP and certified by a senior officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of the Parent and its Subsidiaries.

(4)     <u>Quarterly Reporting of Parent</u>  As soon as available and in any event within 45 days of the end of each of the Parent's fiscal quarters (including the fourth quarter), unconsolidated unaudited financial statements of the Parent.

(5)     <u>Annual Budget</u> As soon as available and in any event no later than 30 days following the end of each fiscal year, an annual budget and operating plan for the next fiscal year which shall include full financial statements, detailed cash flow schedules and planned Capital Expenditures for the subsequent fiscal year.

(6)     <u>Other Information</u>  Such other information as it may reasonably request respecting the Restricted Parties including information provided to Royal Bank of Canada under the Subordinated Credit Agreement.

(7)     <u>Reporting Currency</u>  Beginning on November 1, 2016, for reporting periods commencing after this date, the Borrower will adhere to reporting (for financial reporting and covenant compliance purposes) in United States Dollars.

8.04     **Negative Covenants**

So long as this Agreement is in force the Borrower will not, and will ensure that each Restricted Party will not:

(1)     <u>Disposition of Property</u>  Dispose of, in one transaction or a series of transactions, all or any part of its Property, whether now owned or hereafter acquired, other than (i) sales of inventory in the ordinary course of business and (ii) sales of worn-out, surplus or obsolete Property in the ordinary course of its business subject to compliance with Section 5.03(1)(ii).

- 46 -

(2)     No Consolidation, Amalgamation, etc.   Consolidate, amalgamate or merge with any other Person, enter into any corporate reorganization or other transaction intended to effect or otherwise permit a change in its existing corporate or capital structure, liquidate, wind-up or dissolve itself, or permit any liquidation, winding up or dissolution; provided that (i) a Guarantor may amalgamate with another Guarantor that is formed under laws of the same jurisdiction and (ii) a Guarantor formed under the laws of the same jurisdiction as the Borrower, may amalgamate with the Borrower; subject in each case to the delivery to the Lender of such confirmations, registrations, opinions and certificates as the Lender may require to ensure the perfection and enforceability of the Loan Documents to which the Borrower and such Guarantor are party.

(3)     No Change of Name   Change its name without providing the Lender with 10 days' prior written notice thereof.

(4)     No Debt   Create, incur, assume or permit any Debt to remain outstanding or to otherwise rank *pari passu* or senior to the Obligations, other than Permitted Debt.

(5)     No Investments   Make, directly or indirectly, any Investment, except for:

(i)      the Voom Acquisition;

(ii)     cash and Cash Equivalents;

(iii)    Investments in the Borrower;

(iv)     Investments by the Parent or the Borrower in Guarantors formed under the laws of Luxembourg, up to $100,000 in the aggregate per fiscal year;

(v)      Investments in Subsidiaries that are not Guarantors not to exceed $50,000 in the aggregate per fiscal year; and

(vi)     the 36 Labs Group Acquisition.

(6)     No Financial Assistance   Provide any Financial Assistance except to the extent that such Financial Assistance constitutes Permitted Debt.

(7)     No Distributions   Make any Distribution except that:

(i)      any Subsidiary of the Borrower may make Distributions to the Borrower or a Guarantor (other than the Parent),

(ii)     the Borrower and its Subsidiaries may make Distributions to the Parent to fund fees and expenses of the board of directors (including fees paid to the chairman thereof) and other operating expenses of the Parent up to an aggregate amount of $500,000 per fiscal year; and

(iii)    Permitted Shareholder Loan Payments.

(8)    <u>No Management Fees</u>  Except for compensation paid to independent directors of the Parent and the chairman of the board of the Parent, pay any management fees to any Affiliate or direct or indirect shareholder of the Borrower or otherwise pay any compensation to an employee that is also a direct or indirect shareholder of the Borrower other as set out in the Key Employment Contracts as in effect on the Original Closing Date.

(9)    <u>No Encumbrances</u>  Create, incur, assume or permit to exist any Encumbrance upon any of its Property except Permitted Encumbrances.

(10)    <u>No Acquisitions</u>  Make any Acquisitions.

(11)    <u>Capital Expenditures</u>  In any fiscal year make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year.

(12)    <u>No Change to Year End or Auditors</u>  Make any change to its fiscal year end from December 31 or change its auditors without the consent of the Lender not to be unreasonably withheld.

(13)    <u>No Continuance</u>  Continue into any other jurisdiction; provided that a Restricted Party formed under the laws of Canada or a province or territory thereof, may continue under the laws of Canada or any other province or territory thereof subject to providing the Lender with such confirmations, registrations, opinions and certificates as the Lender may require to ensure the perfection and enforceability of the Loan Documents to which the Borrower and such Guarantor are party.

(14)    <u>Hedge Arrangements</u>  Enter into or permit to be outstanding at any time any Hedge Arrangement unless:

(a)    such Hedge Arrangement is a rate swap, interest rate option, forward rate transaction, forward foreign exchange transaction or cross currency rate swap transaction;

(b)    the counterparty under such Hedge Arrangement is the Lender or any other counterparty to the extent that such Hedge Arrangement with such other counterparty is unsecured;

(c)    such Hedge Arrangement is designed to protect the Restricted Party against fluctuations in currency exchange rates or interest rates;

(d)    such Hedge Arrangement has been entered into by the Restricted Party bona fide and in good faith in the ordinary course of its business for the purpose of carrying on the same and not for speculative purposes; and

(e)    the term of such Hedge Arrangement does not extend beyond the Maturity Date.

(15)    <u>Location of Assets in Other Jurisdictions</u>  Except for any Property being delivered to a customer in the ordinary course of business of such Restricted Party as part of the

performance of its obligations, or the provision of its services, to such customer under a contract entered into with such customer in the ordinary course of business of such Restricted Party, move any Property from a jurisdiction in which the Encumbrance of the Security over such Property is perfected to a jurisdiction where such Encumbrance is not perfected or where, after a temporary period allowing for registration in such other jurisdiction, such Encumbrance could become unperfected, or suffer or permit in any other manner any of its Property to not be subject to the Encumbrance of the Security or to be or become located in a jurisdiction in which the Encumbrance of the Security over such Property is not perfected, unless the applicable Restricted Party has first (a) given prior written notice thereof to the Lender, and (b) executed and delivered to the Lender all Security and all financing or registration statements in form and substance satisfactory to the Lender that the Lender or its counsel, acting reasonably, from time to time deem necessary or advisable to ensure that the Security at all times constitutes a perfected first priority Encumbrance (subject only to Permitted Encumbrances) over such Property in such jurisdiction together with such supporting certificates, resolutions, opinions and other documents as the Lender, acting reasonably, may deem necessary or desirable in connection with such security and registrations.

(16)   <u>Amendments to Organizational Documents</u>   Amend any of its Organizational Documents in a manner that would be prejudicial to the interests of the Lender under the Loan Documents.

(17)   <u>Amendments to other Documents</u>   Amend, vary or alter in any way, consent to any assignment or transfer of, or waive or surrender any of its rights or entitlements under, any Material Contracts if the result or effect of any such amendment, variance, alteration, consent, transfer, waiver or surrender would be a Material Adverse Change.

(18)   <u>No New Subsidiaries</u>   Create any Subsidiary after the date of this Agreement unless such Subsidiary is formed under the laws of a jurisdiction approved by the Lender and such new Subsidiary provides a Guarantee and Security as set out on the same basis as if it were providing Security on the date of this Agreement.

(19)   <u>Accounts Receivable</u>   No Restricted Party other than the Borrower or a Guarantor shall generate accounts receivable for the provision of services to third party customers.

(20)   <u>Business Limitations</u>

(a)     Engage in any business other than business of the same general type as now conducted by it.

(b)     The Parent shall not (i) engage in any active business other than holding Investments in the Borrower; or (ii) own any material assets other than Investments in the Borrower.

(c)     2538853 shall not (i) engage in any active business other than holding Investments in New LLC2 and M Zone Marketing, Inc.; or (ii) own any material assets other than Investments in New LLC2 and M Zone Marketing, Inc.

- 49 -

(d)     New LLC2 shall not (i) engage in any active business other than holding Investments in 36 Labs Group; or (ii) own any material assets other than Investments in 36 Labs Group.

(21)     <u>Earn Out Payments</u>     Make any payment or permit to be made any payments in respect of Earn Out Obligations (including interest payments in connection with such obligations (other than any interest paid in kind in respect thereof)) except payments owing to the 36 Labs Group Vendors pursuant to the 36 Labs Group Acquisition Agreement; provided that  no payments in respect of Earn Out Obligations (other than any interest paid in kind in respect thereof) shall be made if a Default or Event of Default exists at the time of any such payment or would result immediately thereafter from the making of any such payment unless such payment is funded with the proceeds of the issuance of Equity Interests.  Prior to the making of any such payment that is not funded with the proceeds of the issuance of Equity Interests, the Borrower shall deliver to the Lender a Compliance Certificate demonstrating (a) *pro forma* compliance with the financial covenants contained herein (recomputed for the most recent ended fiscal quarter for which information is available) and (b) after giving effect to such payment, there is Availability of not less than $2,000,000 under the Revolving Facility.

(22)     <u>Limited Liability Company Membership Interests</u>

(a)     Issue any certificate representing any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company, without causing such certificate to be delivered to the Lender within five days of issuance of such certificate, along with a transfer power of attorney executed in blank, or other equivalent instrument of transfer acceptable to the Lender;

(b)     Amend its Organizational Documents or take any other steps to make any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company constitute "securities" for purposes of *Securities Transfer Act, 2006* (Ontario), the Uniform Commercial Code or any similar legislation, without the prior written consent of the Lender; or

(c)     Hold any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company through a securities account (as defined in *Securities Transfer Act, 2006* (Ontario)) without (i) providing 10 days' prior written notice the Lender; and (ii) taking all steps and actions as the Lender reasonably deems necessary or appropriate in order to give the Lender "control" (as defined in *Securities Transfer Act, 2006* (Ontario)) of such securities account, which "control" shall be in such manner as the Lender shall designate acting reasonably.

## <u>ARTICLE 9 – GUARANTEE AND SECURITY</u>

9.01     **<u>Guarantee and Security</u>**

(1)     Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender

in respect of itself and each Subsidiary the following, in each case in form and substance satisfactory to the Lender:

(a)    a full recourse Guarantee from each Subsidiary of the Borrower incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof;

(b)    a general security agreement from each of the Borrower and each of its Subsidiaries (incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof) creating a security interest over all of the present and future Property of the Borrower and each such Subsidiary;

(c)    a pledge of all of the shares of each Subsidiary incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof;

(d)    a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of the Borrower and each of its Subsidiaries; and

(e)    an assignment of the Cdn. $5,000,000 policy of insurance on the life of Jason Theofilos.

(2)    Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of Movil Wave S.à r.l. and Mogenio S.A. the following, in each case in form and substance satisfactory to the Lender and governed by the laws of Luxembourg (unless otherwise indicated):

(a)    a Guarantee (governed by the laws of the Province of Ontario);

(b)    a pledge of bank accounts;

(c)    a pledge of receivables;

(d)    a pledge of all of the shares of each of Movil Wave S.à r.l. and Mogenio S.A.; and

(e)    a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of such Restricted Parties.

(3)    Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of the Parent the following, in each case in form and substance satisfactory to the Lender:

(a)     a full recourse Guarantee;

(b)     a general security agreement creating a security interest over all of the present and future Property of the Parent;

(c)     a pledge of all of the shares of each of the Parent's Subsidiaries; and

(d)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of the Parent.

(4)     On or before January 31, 2018, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of Luxco Newco the following, in each case in form and substance satisfactory to the Lender and governed by the laws of Luxembourg (unless otherwise indicated):

(a)     a joinder agreement (governed by the laws of the Province of Ontario) granted by Luxco Newco in favour of the Lender, pursuant to Section 6.09 of the Guarantee (governed by the laws of the Province of Ontario), made as of Original Closing Date by the Guarantors party thereto in favour of the Lender;

(b)     a pledge of bank accounts;

(c)     a pledge of receivables;

(d)     a pledge of all of the shares of Luxco Newco; and

(e)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of such Restricted Parties.

9.02     **After Acquired Property and Further Assurances**

The Borrower will, and will cause each Guarantor to, from time to time execute and deliver all such further deeds or other instruments of conveyance, assignment, transfer, mortgage, pledge or charge in connection with all Property acquired by such Restricted Party after the date hereof, or as may be required to properly perfect the security interest of the Lender in any Property, including a control agreement.

## ARTICLE 10- DEFAULT

10.01     **Events of Default**

The occurrence of any one or more of the following events (each such event being referred to as an **"Event of Default"**) will constitute a default under this Agreement:

(a)     if the Borrower fails to pay any amount of principal of any Loan when due;

- 52 -

(b)     if the Borrower fails to pay any interest, fees or other Obligations (other than any principal amount) when due and such default continues for 3 Business Days after notice of such default has been given by the Lender to the Borrower;

(c)     if the Borrower breaches any of the covenants in Sections 8.02 or 8.04;

(d)     if any Restricted Party neglects to observe or perform any covenant or obligation herein contained on its part to be observed or performed (other than a covenant or condition whose breach or default in performance is specifically dealt with elsewhere in this Section 10.01) and such Restricted Party fails to remedy such default within 15 days from the earlier of (i) the date such Restricted Party becomes aware of such default, and (ii) the date the Lender delivers written notice of the default to such Restricted Party;

(e)     if any representation or warranty made by any Restricted Party in this Agreement, any Loan Document or in any certificate or other document at any time delivered hereunder to the Lender proves to have been incorrect or misleading in any material respect on and as of the date that it was made or was deemed to have been made;

(f)     if any Restricted Party ceases or threatens to cease to carry on business generally or admits its inability or fails to pay its Debts generally;

(g)     if any Restricted Party (i) fails to make any payment when such payment is due and payable to any Person in relation to any Debt (other than Obligations) that in the aggregate principal amount then outstanding is in excess of $250,000 and any applicable grace period in relation thereto has expired, or (ii) defaults in the observance or performance of any other agreement or condition in relation to any Debt (other than Obligations) to any Person that in the aggregate principal amount then outstanding is in excess of $250,000 or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs or condition exists, the effect of which default or other condition, if not remedied within any applicable grace period, would be to cause, or to permit the holder of such Debt then to declare, such Debt to become due prior to its stated maturity date;

(h)     if any Restricted Party denies, to any material extent, its obligations under any Loan Document or claims any of the Loan Documents to be invalid or withdrawn in whole or in part;

(i)     any of the Loan Documents or any material provision of any of them becomes unlawful or is changed by virtue of legislation or by a Governmental Authority, if any Restricted Party does not, within 15 Business Days of receipt of notice of such Loan Document or material provision becoming unlawful or being changed, replace such Loan Document with a new agreement that is in form and substance satisfactory to the Lender, acting reasonably, or amend such Loan Document to the satisfaction of the Lender, acting reasonably;

(j)   if a decree or order of a court of competent jurisdiction is entered adjudging a Restricted Party a bankrupt or insolvent or approving as properly filed a petition seeking the winding up of a Restricted Party under any Insolvency Law or any other bankruptcy, insolvency or analogous laws or issuing sequestration or process of execution against any substantial part of the assets of a Restricted Party or ordering the winding up or liquidation of its affairs, and any such decree or order continues unstayed and in effect for a period of 10 Business Days;

(k)   if any Restricted Party becomes insolvent, makes any assignment in bankruptcy or makes any other assignment for the benefit of creditors, makes any proposal under any Insolvency Law, is adjudged bankrupt, files a petition or proposal to take advantage of any act of insolvency, consents to or acquiesces in the appointment of a trustee, receiver, receiver and manager, interim receiver, custodian, sequestrator or other Person with similar powers of itself or of all or any substantial portion of its assets, or files a petition or otherwise commences any proceeding seeking any reorganization, arrangement, composition or readjustment under any applicable bankruptcy, insolvency, moratorium, reorganization or other similar law affecting creditors' rights or consents to, or acquiesces in, the filing of such a petition;

(l)   if an Encumbrancer takes possession, by appointment of a receiver, receiver and manager or otherwise, of all or a substantial portion of the Property of any Restricted Party;

(m)   if proceedings are commenced for the dissolution, liquidation or voluntary winding up of any Restricted Party, or for the suspension of the operations of any Restricted Party unless such proceedings are being actively and diligently contested in good faith;

(n)   if a final judgment or decree for the payment of money due has been obtained or entered against the Borrower in an amount in excess of $250,000 or against any other Restricted Party in an amount that, in the reasonable opinion of the Lender, would materially and adversely affect the ability of any such other Restricted Party to fulfil its obligations to the Lender under this Agreement, and such judgment or decree has not been and remained vacated, discharged or stayed pending appeal within the applicable appeal period;

(o)   if any Security ceases to constitute a valid and perfected first priority security interest (subject only to Permitted Encumbrances) and the applicable Restricted Party has failed to remedy such default within 10 days of becoming aware of such fact;

(p)   a Change of Control occurs; or

(q)   a Material Adverse Change occurs.

10.02        **Acceleration and Enforcement**

(1)       If any Event of Default occurs:

(a)       the Lender will have no further obligation to make Loans, and the outstanding principal amount of all Loans and all other Obligations will, at the option of the Lender, become immediately due and payable with interest thereon, at the rate or rates determined as herein provided, to the date of actual payment thereof, all without notice, presentment, protest, demand, notice of dishonour or any other demand or notice whatsoever, all of which are hereby expressly waived by each Restricted Party; provided, if any Event of Default described in Section 10.01(j) or (k) with respect to the Borrower occurs, the Revolving Facility Commitment (if not theretofore terminated) will automatically terminate and the outstanding principal amount of all Loans and all other Obligations will automatically be and become immediately due and payable; and

(b)       the Lender may, in its discretion, exercise any right or recourse and proceed by any action, suit, remedy or proceeding against any Restricted Party authorized or permitted by law for the recovery of all the Obligations to the Lender and, whether or not the Lender has exercised any of its rights under the foregoing clause (a), proceed to exercise any and all rights hereunder and under the Security.

(2)       The Lender is not under any obligation to the Restricted Parties or any other Person to realize upon any collateral or enforce the Security or any part thereof or to allow any of the collateral to be sold, dealt with or otherwise disposed of. The Lender is neither responsible nor liable to the Restricted Parties or any other Person for any loss or damage arising from such realization or enforcement or the failure to do so or for any act or omission on its part or on the part of any director, officer, employee, agent or adviser of the Lender in connection with any of the foregoing.

10.03        **Remedies Cumulative**

For greater certainty, it is expressly understood that the respective rights and remedies of the Lender hereunder or under any other Loan Document or instrument executed pursuant to this Agreement are cumulative and are in addition to and not in substitution for any rights or remedies provided by law or by equity; and any single or partial exercise by the Lender of any right or remedy for a default or breach of any term, covenant, condition or agreement contained in this Agreement or any other Loan Document will not be deemed to be a waiver of or to alter, affect or prejudice any other right or remedy or other rights or remedies to which the Lender may be lawfully entitled in connection with such default or breach.

10.04        **Perform Obligations**

If an Event of Default has occurred and is continuing and if any Restricted Party has failed to perform any of its covenants or agreements in the Loan Documents, the Lender, may, but will be under no obligation to, perform any such covenants or agreements in any manner deemed fit by the Lender without thereby waiving any rights to enforce the Loan

Documents.  The reasonable expenses (including any legal costs) paid by the Lender in respect of the foregoing will be an Obligation and will be secured by the Security.

10.05      **Third Parties**

It is not necessary for any Person dealing with the Lender to inquire whether the Security has become enforceable, or whether the powers that the Lender is purporting to exercise may be exercised, or whether any Obligations remain outstanding upon the security thereof, or as to the necessity or expediency of the stipulations and conditions subject to which any sale is to be made, or otherwise as to the propriety or regularity of any sale or other disposition or any other dealing with the collateral charged by such Security or any part thereof.

10.06      **Application of Payments**

All payments made by the Borrower hereunder following an Event of Default which is continuing or received from proceeds of the enforcement or realization of any Security will be applied to amounts due under the Obligations, as determined by the Lender.

10.07      **Right of Set-off**

If an Event of Default has occurred and is continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, without notice to the Borrower or any other Person, to set-off and apply any and all deposits (general or special, time or demand, matured or unmatured, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Lender or any such Affiliate to or for the credit or the account of any Restricted Party against any and all of the Obligations, irrespective of whether or not the Lender has made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of the Lender or any such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of the Lender and its Affiliates under this Section 10.07 are in addition to other rights and remedies (including other rights of set-off, consolidation of accounts and bankers' lien) that the Lender or its Affiliates may have. The Lender agrees to promptly notify the Borrower after any such set-off and application, but the failure to give such notice will not affect the validity of such set-off and application.

## ARTICLE 11 – CHANGE IN CIRCUMSTANCES AND INDEMNITIES

11.01      **Increased Costs**

(1)      If any Change in Law will:

(a)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(b)      subject the Lender to any Tax of any kind whatsoever with respect to this Agreement, or any Loan, or change the basis of taxation of payments to the Lender in respect thereof, except for Indemnified Taxes or Other Taxes covered

by Section 11.02 and the imposition, or any change in the rate, of any Excluded Tax payable by the Lender; or

(c)     impose on the Lender or any applicable interbank market any other condition, cost or expense affecting this Agreement or Loans made by the Lender;

and the result of any of the foregoing will be to increase the cost to the Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or any other amount), then upon request of the Lender the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(2)     If the Lender determines that any Change in Law affecting the Lender or any lending office of the Lender or the Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement, the Revolving Facility Commitment of the Lender or the Loans made by the Lender, to a level below that which the Lender or its holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of its holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or its holding company for any such reduction suffered.

(3)     A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in Section 11.01(1) or 11.01(2), including reasonable detail of the basis of calculation of the amount or amounts, that is delivered to the Borrower will be conclusive absent manifest error. The Borrower will pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(4)     Failure or delay on the part of the Lender to demand compensation pursuant to this Section 11.01 will not constitute a waiver of the Lender's right to demand such compensation.

11.02     **Taxes**

(1)     If any Restricted Party or the Lender is required by Applicable Law to deduct or pay any Indemnified Taxes (including any Other Taxes) in respect of any payment by or on account of any obligation of a Restricted Party hereunder or under any other Loan Document, then (i) the sum payable will be increased by that Restricted Party when payable as necessary so that after making or allowing for all required deductions and payments (including deductions and payments applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions or payments been required, (ii) the Restricted Party will make any such deductions required to be made by it under Applicable Law and (iii) the Restricted Party will pay when due the full amount required to be deducted to the relevant Governmental Authority in accordance with Applicable Law.

(2)      A payment by a Restricted Party to the Lender shall not be increased under Section 11.02(1) by reason of a deduction on account of the amended Relibi law dated 23 December 2005 introducing a withholding tax on certain payments made to Luxembourg resident individuals.

(3)      Without limiting the provisions of Section 11.02(1), the Borrower will timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(4)      The Borrower will indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender will be conclusive absent manifest error.

(5)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by an Restricted Party to a Governmental Authority, the Restricted Party will deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(6)      If the Lender has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which an Restricted Party has paid additional amounts pursuant to this Section 11.02 or that, because of the payment of such Taxes or Other Taxes, it has benefited from a reduction in Excluded Taxes otherwise payable by it, it will pay to the Borrower or other Restricted Party, as applicable, an amount equal to such refund or reduction (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Restricted Party under this Section with respect to the Taxes or Other Taxes giving rise to such refund or reduction), net of all out-of-pocket expenses of the Lender and without interest (other than any net after-Tax interest paid by the relevant Governmental Authority with respect to such refund).  The Borrower or other Restricted Party as applicable, upon the request of the Lender, agrees to repay the amount paid over to the Borrower or other Restricted Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender if the Lender is required to repay such refund or reduction to such Governmental Authority. This paragraph will not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person, to arrange its affairs in any particular manner or to claim any available refund or reduction.

11.03      **Illegality**

          If the Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for the Lender to make or maintain any Loan (or to maintain its obligation to make any Loan), or to issue, or to determine or charge interest rates based upon any particular rate, then, on notice thereof by the Lender to the

Borrower, any obligation of the Lender with respect to the activity that is unlawful will be suspended until the Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower will, upon demand from the Lender, prepay or, if Conversion would avoid the activity that is unlawful, convert any Loans in order to avoid the activity that is unlawful. Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted.

11.04    **Inability to Determine Rates, Etc.**

(1)    If the Lender determines that for any reason a market for bankers' acceptances does not exist at any time or that adequate and reasonable means do not exist, the Lender will promptly so notify the Borrower. Thereafter, the obligation of the Lender to make or maintain BA Rate Loans will be suspended until the Lender revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending Drawdown Notice as it relates to a Drawdown or Rollover of, or Conversion to, a BA Rate Loan or, failing that, will be deemed to have substituted in such Drawdown Notice a Drawdown of or Conversion to Prime Rate Loans in the amount specified therein; and

(2)    If the Lender determines that for any reason adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or that the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to the Lender of funding such Loan, the Lender will promptly so notify the Borrower. Thereafter, the obligation of the Lender to make or maintain LIBO Rate Loans will be suspended until the Lender revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending Drawdown Notice as it relates to a Drawdown or Rollover of, or Conversion to, a LIBO Rate Loan or, failing that, will be deemed to have substituted in such Drawdown Notice a Drawdown of or Conversion to Base Rate Loans in the amount specified therein.

11.05    **Indemnity by the Borrower**

(1)    The Borrower will indemnify the Lender and each Related Party of any the Lender (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Restricted Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance or non-performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation or non-consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Substance on or from any property owned or operated by any Restricted Party, or any liability under any Environmental Law related in any way to any Restricted Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Restricted Party and regardless of whether any Indemnitee is a party thereto, provided that such indemnity will not, as to any Indemnitee, be available to the

extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Restricted Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Restricted Party has obtained a final and nonappealable judgment in its favour on such claim as determined by a court of competent jurisdiction, nor will an indemnity be available in respect of matters specifically addressed in Sections 11.01, 11.02 or 12.01.

(2)       To the fullest extent permitted by Applicable Law, the Restricted Party will not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for indirect, consequential, punitive, aggravated or exemplary damages (as opposed to direct damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby (or any breach thereof), the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee will be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, other than damages that have resulted from the gross negligence or wilful misconduct of such Indemnitee.

(3)       All amounts due under Section 11.05(1) will be payable promptly after demand therefor.  A certificate of the Lender setting forth the amount or amounts owing to the Lender or Related Party, as the case may be, as specified in Section 11.05(1), including reasonable detail of the basis of calculation of the amount or amounts, that is delivered to the Borrower will be conclusive absent manifest error.

## ARTICLE 12- GENERAL

12.01       **Costs and Expenses**

The Borrower will pay (i) all reasonable out-of-pocket expenses incurred by the Lender, including the reasonable fees, charges and disbursements of Lender's Counsel, in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby will be consummated), and (ii) all reasonable out-of-pocket expenses incurred by the Lender including the reasonable fees, charges and disbursements of Lender's Counsel, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 12.01, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

12.02      **Governing Law, Jurisdiction, Etc.**

(1)      This Agreement and each other Loan Document (unless otherwise specified in such Loan Document) will be governed by, and construed in accordance with, the laws of the Province of Ontario and the laws of Canada applicable therein.

(2)      Each Restricted Party irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the Province of Ontario and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court.  Each Restricted Party hereto agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document will affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Restricted Party or its properties in the courts of any jurisdiction.

(3)      Each Restricted Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 12.02(2).  Each Restricted Party hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

12.03      **Judgment Currency**

(1)      If for the purpose of obtaining or enforcing judgement against a Restricted Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Section 12.03 referred to as the **"Judgment Currency"**) an amount due in Canadian Dollars or United States Dollars under this Agreement, the conversion will be made at the rate of exchange prevailing on the Business Day immediately preceding

(a)      the date of actual payment of the amount due, in the case of any proceeding in the courts of any jurisdiction that will give effect to such conversion being made on such date, or

(b)      the date on which the judgement is given, in the case of any proceeding in the courts of any other jurisdiction (the date as of which such conversion is made pursuant to this Section 12.03(1)(b) being hereinafter in this Section 12.03 referred to as the **"Judgment Conversion Date"**).

(2)      If, in the case of any proceeding in the court of any jurisdiction referred to in Section 12.03(1)(b), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual payment of the amount due, the Borrower or other Restricted Party will pay such additional amount (if any, but in any event not a lesser amount) as

may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of Canadian Dollars or United States Dollars, as the case may be, which could have been purchased with the amount of Judgment Currency stipulated in the judgement or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.

(3)     Any amount due from a Restricted Party under the provisions of Section 12.03(2) will be due as a separate debt and will not be affected by judgement being obtained for any other amounts due under or in respect of this Agreement.

(4)     The term "rate of exchange" in this Section 12.03 means:

(a)     for a conversion of Canadian Dollars to the Judgment Currency, the reciprocal of the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the date in question for the conversion of the Judgment Currency to Canadian Dollars;

(b)     for a conversion of United States Dollars to the Judgment Currency when the Judgment Currency is Canadian Dollars, the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the date in question for the conversion of United States Dollars to Canadian Dollars;

(c)     for a conversion of United States Dollars to the Judgment Currency when the Judgment Currency is not Canadian Dollars, the effective rate obtained when a given amount of United States Dollars is converted to Canadian Dollars at the rate determined pursuant to Section 12.03(4)(b) and the result thereof is then converted to the Judgment Currency pursuant to Section 12.03(4)(a); or

(d)     if a required rate is not so published by the Bank of Canada for any such date, the spot rate quoted by the Lender at approximately noon (Toronto time) on that date in accordance with its normal practice for the applicable currency conversion in the wholesale market.

## 12.04     **Confidentiality**

(1)     The Lender agrees to maintain the confidentiality of the Information (as defined in Section 12.04(2) below), except that Information may be disclosed (a) to its Affiliates and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Applicable Law or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) following an Event of Default which is continuing in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.04(1), to (i) any assignee of or Participant in, or any prospective assignee of or

Participant in, any of its rights or obligations under this Agreement provided as long as no Event of Default has occurred and is continuing, such assignee, Participant, prospective assignee or prospective Participant is not a competitor to or customer of the Borrower or any of its Subsidiaries, or (ii) any actual or prospective counterparty (or its advisors) to any swap, derivative, credit-linked note or similar transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 12.04(1) or (y) becomes available to the Lender on a non-confidential basis from a source other than a Restricted Party or any Subsidiary of a Restricted Party.

(2)     For purposes of this Section, "Information" means all information received in connection with this Agreement from any Restricted Party or any Subsidiary of a Restricted Party relating to any Restricted Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is specifically identified by the Borrower as being available to the Lender on a non-confidential basis prior to such receipt. Any Person required to maintain the confidentiality of Information as provided in Section 12.04(1) will be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

### 12.05     **Benefit and Burden of Agreement**

This Agreement will enure to the benefit of and will be binding upon the Borrower and its successors. This Agreement will enure to the benefit of and will be binding upon the Lender and its successors and assigns.

### 12.06     **No Assignment by the Borrower**

The rights and benefits of the Borrower hereunder may not be assigned by the Borrower.

### 12.07     **Assignment or Participation by Lender**

(1)     The rights, benefits and obligations of the Lender under or in respect of this Agreement (the "**Rights**") may, in whole or in part, be assigned ("**Assign**", "**Assigned**" or an "**Assignment**") or participated ("**Participated**" or a "**Participation**") by the Lender with one or more Persons (each an "**Assignee**" or a "**Participant**", as the case may be), subject to the prior written consent of the Borrower, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Rights may, in whole or in part, be Participated or Assigned by the Lender with one or more Participants or Assignees without notice to or the consent of the Borrower if an Event of Default has occurred and is continuing. An Assignment or Participation hereunder that requires the consent of the Borrower will become effective upon receipt by the Lender of the written consent of the Borrower. An Assignment or Participation that does not require the consent of or notice to the Borrower will become effective upon execution of the applicable documentation by the Lender, as applicable, and the Participant or Assignee, as the case may be. The Borrower will execute all such further documentation as the Lender may reasonably request with respect to any Assignment or Participation permitted hereunder and any

prospective Assignee will execute such documentation as the Borrower may reasonably request for the purpose of ensuring that the Assignee is bound by the terms of this Agreement.

(2)      Any Assignee of Rights will be and be treated in respect of such Rights as if it were the Lender for all purposes of this Agreement, will be entitled to the benefit hereof, and will be subject to the obligations of the Lender in respect of such Rights, to the same extent as if it were an original party in respect of the Rights and the Lender assigning such Rights will be released and discharged from its obligations hereunder in respect of such Rights.  To the extent that the Rights are the subject of a Participation, all references in this Agreement to the Lender will, with respect to such Rights that are subject to the Participation, continue to be construed as a reference to the Lender, and the Borrower will be entitled to deal with the Lender as if it were the sole owner of the Rights and the Lender will not be released from obligations hereunder by virtue of the Participation.  The Borrower acknowledges and agrees that the Lender will be entitled, in its own name, to enforce for the benefit of, or as agent for, any Participants, any and all rights, claims and interests of such Participants, in respect of the Rights and that Participants will not be entitled to demand payment or exercise any other right or remedy pursuant hereto.

(3)      For the purposes of any Assignment or Participation hereunder, the Lender may disclose on a confidential basis to a potential Assignee or Participant such information about the Borrower as the Lender may see fit, provided that such potential Assignee or Participant has executed a confidentiality agreement in favour of the Lender and further provided that, so long as an Event of Default has not occurred or has occurred but is no longer continuing, such assignee, Participant, prospective assignee or prospective Participant is not a competitor to or customer of the Borrower or any of its Subsidiaries.

12.08      **Notices**

Any demand, notice or other communication to be given in connection with this Agreement must be given in writing and will be given by personal delivery, by registered mail or by electronic means of communication addressed to the recipient at the address or telecopier number set forth on the signature pages to this Agreement, or to such other street address, individual or electronic communication number or address as may be designated by notice given by either party to the other.  Any demand, notice or other communication given by personal delivery will be conclusively deemed to have been given on the day of actual delivery thereof or, if given by registered mail, on the third Business Day following the deposit thereof in the mail or, if given by electronic communication, on the day of transmittal thereof if given during the normal business hours of the recipient and on the Business Day during which such normal business hours next occur if not given during such hours on any day.  If the party giving any demand, notice or other communication knows or ought reasonably to know of any difficulties with the postal system that might affect the delivery of mail, any such demand, notice or other communication may not be mailed but must be given by personal delivery or by electronic communication.

12.09      **Effect of Assignment**

For greater certainty, an assignment by the Lender of its rights hereunder will not constitute a repayment, discharge, rescission, extinguishment or novation of any Loan or interest

therein, and the obligations so assigned shall continue to be the same obligations and not new obligations.

12.10 **Survival**

The provisions of Sections 11.05 and 12.01 will survive the repayment of all Loans, whether on account of principal, interest or fees, and the termination of this Agreement, unless a specific release of such provisions by the Lender is delivered to the Borrower.

12.11 **Severability**

If any provision of this Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

12.12 **Further Assurances**

The Borrower will, and will cause each other Restricted Party: (i) to promptly cure any default by it in the execution and delivery of this Agreement, the Loan Documents or any of the agreements provided for hereunder to which it is a party and (ii) at its expense, will promptly execute and deliver to the Lender, upon request by the Lender, all such other and further documents, agreements, opinions, certificates and instruments in compliance with, or accomplishment of the covenants and agreements of such Restricted Party hereunder or more fully to state the obligations of such Restricted Party as set forth herein or to make any recording, file any notice or obtain any consent, all as may be reasonably necessary or appropriate in connection therewith.

12.13 **Entire Agreement; Amendments and Waivers**

(1) This Agreement amends and restates the Original Credit Agreement, and together with all other Loan Documents constitutes the entire agreement between the parties to this Agreement with respect to the Credit Facilities and the other matters contemplated in this Agreement as of the date of this Agreement, and supersedes the Original Credit Agreement and all other negotiations and discussions, whether oral or written, with respect to the Credit Facilities. Nothing in this Agreement shall constitute a release or novation of any indebtedness outstanding under the Original Credit Agreement and all Loans outstanding  under the Original Credit Agreement shall continue as Loans outstanding under this Agreement.

(2) No amendment to this Agreement will be valid or binding unless set forth in writing and duly executed by the Borrower and the Lender.  No waiver of any breach of any provision of this Agreement and no consent required hereunder will be effective or binding unless made in writing and signed by the party purporting to give the same.  Unless otherwise provided, any waiver or consent given hereunder will be limited to the specific breach waived or matter consented to, as the case may be, and may be subject to such conditions as the party giving such waiver or consent considers appropriate.

12.14        **Time of the Essence**

Time is of the essence of this Agreement.

12.15        **Tombstone Marketing**

For the purpose of "tombstone marketing", the Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lender of its name, identifying logo and the Credit Facilities to enable the Lender to publish promotional "tombstones"; provided that the amount of the Credit Facilities shall not be disclosed; provided further, that, the Borrower shall be provided with a copy thereof to review and approve (such approval not to be unreasonably withheld or delayed) prior to such publication.  Subject to the foregoing, the Borrower acknowledges and agrees that the Lender shall be entitled to determine, in its sole discretion, whether to use such information; that no compensation will be payable by the Lender in connection therewith; and that the Lender shall have no liability whatsoever to them or any of their respective employees, officers, directors, affiliates or shareholders in obtaining and using such information as contemplated herein.

12.16        **Anti-Money Laundering Legislation**

(1)        The Borrower acknowledges that, pursuant to AML Laws, the Lender may be required to obtain, verify and record information regarding the Parent, the Borrower and the other Restricted Parties and their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Parent, the Borrower and the other Restricted Parties, and the transactions contemplated hereby. The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by the Lender, or any prospective assignee or participant of the Lender, in order to comply with any applicable AML Laws, whether now or hereafter in existence.

(2)        The Borrower acknowledges and agrees that pursuant to the provisions of the USA Patriot Act (Title III of the Pub. L. 107-56) signed into law October 26, 2001 (the "**Patriot Act**") and other applicable AML Laws, the Lender may be required to obtain, verify and record information with respect to the Restricted Parties and the Borrower hereby agrees to cooperate with the Lender and provide it with all information that may be required in order to fulfil its obligations under the Patriot Act and other applicable AML Laws. Without limiting the generality of the foregoing, the Borrower agrees to use commercially reasonable efforts to obtain the consent of any Restricted Party's officers, directors and employees whose consent to the disclosure of any such information is required under applicable privacy legislation.

**[Signature pages follow]**

IN WITNESS WHEREOF the parties have executed this Agreement.

**BORROWER:**

| | | |
|---|---|---|
| Address: | 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario L4B 4V1 | **MUNDO MEDIA LTD.** |
| Attention: | Jason Theofilos | |
| Facsimile No.: | 1-855-437-4095 | By: |

By: _____
Name: Jason Theofilos
Title: C.E.O.

By: _____
Name:
Title:

[SIGNATURE PAGE TO AMENDED AND RESTATED SENIOR CREDIT AGREEMENT]

**LENDER:**

Address:    200 Bay Street, 4th
Floor, North Tower
Toronto, Ontario,
M5J 2W7
Attention:    Hogan Mak
Facsimile No.:    (416) 842 4090

**ROYAL BANK OF CANADA**

By: _____
Name:   Hogan Mak
Title:   Director

By: _____
Name:
Title:

[SIGNATURE PAGE TO AMENDED AND RESTATED SENIOR CREDIT AGREEMENT]

**Schedule 1.01(A)**

**<u>Borrowing Base Certificate</u>**

See Attached

## 1.01(A)

## BORROWING BASE CERTIFICATE

I, _____, representing the Borrower hereby certify as of                 :

1.  I am familiar with and have examined the provisions of the Amended and Restated Credit Agreement made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") between Mundo Media Ltd., as Borrower, and Royal Bank of Canada, as the Lender and have made reasonable investigations of corporate records and inquiries of other officers and senior personnel of the Borrower. Terms defined in the Credit Agreement have the same meanings where used in this certificate.

2.  The Borrowing Base is $ AMOUNT, calculated as follows:

| | | | | |
|---|---|---|---|---|
| Total accounts receivable | | | | $_____ |
| Less: | a) | accounts that do not arise from a bona fide fully-completed transaction consisting of provision of services to an account debtor | $_____ | |
| | b) | accounts not subject to a valid security interest in favour of the Lender | $_____ | |
| | c) | accounts subject to prior encumbrances (other than Permitted Encumbrances) | $_____ | |
| | d) | accounts owing by an account debtor located outside of the United States of America or Canada which is not supported by a letter of credit in form and substance acceptable to the Lender | $_____ | |
| | e) | accounts due from affiliates | $_____ | |
| | f) | accounts owing by a Governmental Authority unless specified exceptions are applicable | | |
| | g) | accounts, any portion of which exceeds 91 days | $_____ | |
| | h) | accounts owed by an account debtor that is insolvent or subject to any proceeding under insolvency laws | $_____ | |
| | i) | accounts subject to dispute, holdbacks, contra-accounts or rights of set-off | $_____ | |
| | j) | accounts included elsewhere in the Borrowing Base calculation | $_____ | |
| | k) | accounts for an account debtor who (or who, together with its Affiliates) has outstanding accounts which are more than ninety one (91) days from the date of the invoice, with respect to 10% or more of the total accounts owed to the Borrower and Guarantors by such account debtor and its Affiliates | $_____ | |
| : | l) | other ineligible accounts | $_____ | |

| | | | |
|---|---|---|---|
| Eligible Accounts Receivable | | A | $_____ |
| Marginable Eligible Accounts Receivable at 75% of A | | B | $_____ |
| | | | |
| Total EDC Accounts Receivable Private Insured Accounts Receivable | | | $_____ |

| | | | | |
|---|---|---|---|---|
| Less: | a) | accounts that do not arise from a bona fide fully-completed transaction consisting of provision of services to an account debtor | | $_____ |
| | b) | accounts not subject to a valid security interest in favour of the Lender | | $_____ |
| | c) | accounts subject to prior encumbrances (other than Permitted Encumbrances) | | $_____ |
| | d) | accounts due from affiliates | | $_____ |
| | e) | accounts owing by a Governmental Authority unless specified exceptions are applicable | | |
| | f) | accounts owed by an account debtor that is insolvent or subject to any proceeding under insolvency laws | | $_____ |
| | g) | accounts subject to dispute, holdbacks, contra-accounts or rights of set-off | | $_____ |
| | h) | accounts included elsewhere in the Borrowing Base calculation | | $_____ |
| | i) | other ineligible accounts | | $_____ |

Eligible Accounts Receivable insured by Export Development Corporation (Canada) or another insurer satisfactory to the Lender                C  $_____

Marginable Eligible Accounts Receivable insured by Export Development Corporation (Canada) or another insurer satisfactory to the Lender at 85% of C                D  $_____

**Less**:                Priority Payables while not limited to these include:

| | | |
|---|---|---|
| Sales tax, Excise & GST | | $_____ |
| Employee source deductions such as E.I., CPP, Income Tax | | $_____ |
| Workers Compensation Board | | $_____ |
| Wages, Commissions, Vacation Pay | | $_____ |
| Unpaid Pension Plan Contributions | | $_____ |
| Overdue Rent, Property & Business Tax and potential claims from third parties such as subcontractors | | $_____ |
| Other | | $_____ |
| Total Priority Payables | R | $_____ |
| Borrowing Base (B+D-R) | | $_____ |
| | | $_____ |
| Less:                Revolving Facility Borrowings | | |
| Margin Surplus (Deficit) | | $_____ |

3.  Annexed hereto are the following reports in respect of the Borrower:
    a)  aged list of accounts receivable,
    b)  aged list of accounts payable,
    c)  aged list of EDC Accounts Receivable indicating country of origin for each receivable and most recent credit approval listing from EDC supported by Direction to Pay on EDC form E6,
    d)  aged list of Private Insured Accounts Receivable indicating country of origin for each receivable and most recent credit approval listing from the insurer supported by a loss payable endorsement  to or assignment of the applicable insurance policy,
    e)  status of inventory, and
    f)  listing of Priority Payables.

4.  The reports and information provided herewith are accurate and complete in all respects and all amounts certified as Priority Payables are current amounts owing and not in arrears.

5.  In the event that there is any inconsistency between the calculations for the Borrowing Base above and the provisions of the Credit Agreement then, despite anything contained in this Borrowing Base Certificate, the provisions of the Credit Agreement will prevail and the provisions of this Borrowing Base Certificate will be deemed to be amended to the extent necessary to eliminate the conflict.

Dated this _____ day of _____, 20_____.

Per:            _____

Name:           _____

Title:          _____

**Schedule 1.01(B)**

**Compliance Certificate**

TO:        Royal Bank of Canada
           200 Bay Street, 4th Floor, North Tower
           Toronto, Ontario, M5J 2W7

FROM:      Mundo Media Ltd. (the **"Borrower"**)

DATE:          ●

This Compliance Certificate is delivered to you pursuant to Section 8.03(2) of the amended and restated credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All terms used in this Compliance Certificate that are defined in the Credit Agreement have the same meanings herein.

I, [name], the [title] of the Borrower, certify for and on behalf of the Borrower, and not in my personal capacity and without personal liability, that:

1.     Representations and Warranties  All of the representations and warranties of the Borrower contained in Section 7.01 of the Credit Agreement are true and correct on and as of the date hereof as though made on and as of the date hereof unless varied as contemplated in Section 7.02.

2.     Terms, Covenants and Conditions  All of the terms, covenants and conditions of the Credit Agreement and each of the other Loan Documents to be performed or complied with by the Borrower at or prior to the date hereof have been performed or complied with.

3.     Default  No Default has occurred and is continuing on the date hereof.

4.     Financial Covenant Compliance

   **A.     Total Debt to EBITDA Ratio**

| Quarter Ending | Maximum Permitted Ratio | Actual Ratio |
|---|---|---|
| ● | ● | ● |

   **B.     Senior Debt to EBITDA Ratio**

- 2 -

|  | Quarter Ending | Maximum Permitted Ratio | Actual Ratio |
|---|---|---|---|
|  | ● | ● | ● |

**C.    Fixed Charge Coverage Ratio**

|  | Quarter Ending | Minimum Permitted Ratio | Actual Ratio |
|---|---|---|---|
|  | ● | ● | ● |

5.    Attached hereto as Exhibit A are detailed calculations of the financial covenants set out in Section 4 above.

6.    As of the date of this Compliance Certificate, $● has been spent on Capital Expenditures this fiscal year.[1]

_____
Name:

---

[1] Pursuant to Section 8.04(11) of the Credit Agreement, the Restricted Parties have agreed not to make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year.

**Schedule 1.01 (C)**

**Conversion Notice**

TO:             Royal Bank of Canada
                  200 Bay Street, 4th Floor, North Tower
                  Toronto, Ontario, M5J 2W7

FROM:        Mundo Media Ltd. (the **"Borrower"**)

DATE:          ●

1.      This Conversion Notice is delivered pursuant to the amended and restated credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All terms used in this Conversion Notice that are defined in the Credit Agreement have the same meanings herein.

2.      The Borrower hereby requests a Conversion under the [Revolving][ Term] Facility as follows:

      (a)     Type and amount of each Loan to be converted (check appropriate boxes):

|  |  | Amount |
|---|---|---|
| ( ) | Prime Rate Loan: | Cdn. $ _____ |
| ( ) | Base Rate Loan: | U.S. $ _____ |

( )     BA Rate Loan:

| | Amount | Interest Period | Rollover Amount |
|---|---|---|---|
| Cdn. $ | _____ | _____ | Cdn. $ _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

( )     LIBO Rate Loan:

| | Amount | Interest Period |
|---|---|---|
| U.S. $ | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |

_____    _____

(b)    Type and amount of each Loan resulting from Conversion (check appropriate boxes):

<u>Amount</u>

( )    Prime Rate Loan:         Cdn. $    _____
( )    Base Rate Loan:          U.S. $    _____

( )    BA Rate Loan:

| <u>Amount</u> | <u>Interest Period</u> | <u>Rollover Amount</u> |
|---|---|---|
| Cdn. $ _____ | _____ | Cdn. $ _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

( )    LIBO Rate Loan:

| <u>Amount</u> | <u>Interest Period</u> |
|---|---|
| U.S. $ _____ | _____ |
| _____ | _____ |
| _____ | _____ |

3.    No Default has occurred and is continuing or will have occurred and be continuing on the date of the above Conversion(s), or will result from the above Conversion(s).

**MUNDO MEDIA LTD.**

By: _____

        Name:
        Title:

**Schedule 1.01(D)**

**Drawdown Notice**

TO:        Royal Bank of Canada
               200 Bay Street, 4th Floor, North Tower
               Toronto, Ontario, M5J 2W7

FROM:     Mundo Media Ltd. (the **"Borrower"**)

DATE:      ●

1.      This Drawdown Notice is delivered pursuant to the amended and restated credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All terms used in this Drawdown Notice that are defined in the Credit Agreement have the same meanings herein.

2.      The Borrower hereby requests the following Loan(s):

      (a)     Drawdown Date: _____

      (b)     Type of Credit Facility:

            [ ] Revolving Facility
            or
            [ ] Term Facility

      (c)     Type and Amount of each Loan (check appropriate boxes)

|  |  | Amount |
| --- | --- | --- |
| ( ) | Prime Rate Loan: | Cdn. $ _____ |
| ( ) | Base Rate Loan: | U.S. $ _____ |
| ( ) | BA Rate Loan: |  |

| | Amount | Interest Period | Maturity Date |
| --- | --- | --- | --- |
| Cdn. $ | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

- 2 -

( )    LIBO Rate Loan:

| | Amount | Interest Period | Maturity Date |
|---|---|---|---|
| U.S. $ | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | |

Total Cdn. $ _____
Total U.S. $ _____

3.    <u>Representations and Warranties</u>  All of the representations and warranties of the Borrower contained in Section 7.01 of the Credit Agreement are true and correct on and as of the date hereof as though made on and as of the date hereof unless varied as contemplated in Section 7.02.

4.    All of the conditions precedent to the Loan(s) requested hereby that have not been properly waived in writing by the Lender has been satisfied.

5.    No Default has occurred and is continuing or will have occurred and be continuing on the Drawdown Date, or will result from the Loan(s) requested hereby.

**MUNDO MEDIA LTD.**

By: _____
       Name:
       Title:

**Schedule 1.01(E)**

**Material Contracts**

1.    Subordinated Credit Agreement

2.    Customer Contract with Mindspark Inc. which generates annual revenue to the Restricted Parties as at the Closing Date of in excess of $10,000,000.

3.    Maintenance and Support Agreement with STACK Media with effective date of July 1, 2017.

**Schedule 1.01(F)**

**<u>Relevant Jurisdictions</u>**

- Parent
  - ○ Jurisdiction:  Ontario, Canada
- Borrower
  - ○ Jurisdiction:  Ontario, Canada
- 2581769 Ontario Inc.
  - ○ Jurisdiction:  Ontario, Canada
- MEG Technologies Limited:
  - ○ Jurisdiction:  Hong Kong
- Mundo (Beijing) Limited:
  - ○ Jurisdiction:  China
- 2307521 Ontario Inc.
  - ○ Jurisdiction:  Ontario, Canada
- 2538853 Ontario Ltd.
  - ○ Jurisdiction:  Ontario, Canada
- 36 Labs, LLC.
  - ○ Jurisdiction: Delaware, United States of America
- Active Signal Marketing, LLC
  - ○ Jurisdiction: Delaware, United States of America
- Find Click Engage, LLC
  - ○ Jurisdiction: Delaware, United States of America
- Fli Digital, Inc.
  - ○ Jurisdiction: New York, United States of America
- Mundo Media (US), LLC
  - ○ Jurisdiction: Delaware, United States of America
- M Zone Marketing Inc.
  - ○ Jurisdiction: Delaware, United States of America
- Movil Wave S.à r.l.
  - ○ Jurisdiction: Luxembourg
- Mogenio S.A.
  - ○ Jurisdiction: Luxembourg
- Downloadius S.à r.l.
  - ○ Jurisdiction: Luxembourg
- Mob1 S.à r.l.
  - ○ Jurisdiction: Luxembourg

**Schedule 1.01(G)**

**Repayment Notice**

TO:        Royal Bank of Canada
                200 Bay Street, 4th Floor, North Tower
                Toronto, Ontario, M5J 2W7

FROM:     Mundo Media Ltd. (the **"Borrower"**)

DATE:        ●

1.      This Repayment Notice is delivered pursuant to Section 5.04 of the amended and restated credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All terms used in this Repayment Notice that are defined in the Credit Agreement have the same meanings herein.

2.      The Borrower hereby gives you notice that it intends to repay [Cdn. $●] or [U.S. $●] under the [Revolving Facility/Term Facility], on [DATE].

3.      The amount of such repayment will, subject to the provisions of the Credit Agreement, be used to repay Loans of the following type:

| Loan Type | Principal Amount |
|-----------|------------------|
| ● | ● |

**MUNDO MEDIA LTD.**

By:    _____
           Name:
           Title:

**Schedule 1.01(H)**

**Rollover Notice**

TO:           Royal Bank of Canada
                    200 Bay Street, 4th Floor, North Tower
                    Toronto, Ontario, M5J 2W7

FROM:        Mundo Media Ltd. (the **"Borrower"**)

DATE:        ●

1.      This Rollover Notice is delivered pursuant to amended and restated credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All capitalized terms used in this Rollover Notice that are defined in the Credit Agreement have the same meanings herein.

2.      The Borrower hereby requests the Rollover of the following Loan(s):

      (a)      Rollover Date: _____

      (b)      Type of Credit Facility:

            [ ] Revolving Facility
            or
            [ ] Term Facility

      (c)      Type and Amount of each Loan (check appropriate boxes)

      (  )      BA Rate Loans:

| | Amount | Interest Period | Maturity Date |
|---|---|---|---|
| Cdn. $ | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

- 2 -

( )    LIBO Rate Loans:

|  | Amount | Interest Period |
|---|---|---|
| U.S. $ | _____ | _____ |
|  | _____ | _____ |
|  | _____ | _____ |

**MUNDO MEDIA LTD.**

By: _____

     Name:
     Title:

**Schedule 7.01(8)**

**<u>Litigation Disclosure</u>**

1.      The Borrower received an inbound telephone call stating that the Canada Revenue
        Agency may conduct a review of Mundo Media Ltd.'s income tax filings for the period
        of 2013 and 2014.

2.      The State of Texas v. Mobile Messenger US., Inc., et al.;
        a.      Cause No. D-1-GV-13-001256
        b.      345111 Judicial District Court, Travis County, TX

**Schedule 7.01(12)**

**<u>Ownership Structure</u>**
**<u>(including as of the Closing Date)</u>**

See Attached

# Mundo Inc.
## Corporate Structure



Mundo Inc. - Company and Shareholder Information

| | |
|---|---|
| Company Name | Mundo Inc. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of Class B common shares and an unlimited number of preferred shares, issuable in series |
| Issued/Outstanding Shares | 20,391,821 shares (1,656,250 Common Shares / 18,735,571 Class B Shares) |
| Beneficial Shareholders | See Appendix "A" |
| Jurisdiction | Ontario, Canada |
| Company Name | Mundo Media Ltd. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares, an unlimited number of Class A common shares, an unlimited number of Class B common shares,  an unlimited number of Class C common shares, and unlimited number of Class D common shares, an unlimited number of Class E common shares, an unlimited number of Class F common shares, an unlimited number of Class G common shares, an unlimited number of Class H common shares, and unlimited number of Class A preferred shares, an unlimited number of Class B preferred shares, an unlimited number of Class C preferred shares, an unlimited number of Class D preferred shares, an unlimited number of Class E preferred shares, an unlimited number of Class F preferred shares, an unlimited number of Class G preferred shares. |
| Issued/Outstanding Shares | 64,419 shares (57,137 Class C Common shares / 7,282 Class B Preferred shares) |
| Beneficial Shareholders | Mundo Inc.  - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | 2538853 Ontario Ltd. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares and an unlimted number of preferred shares. |
| Issued/Outstanding Shares | 100 common shares |
| Beneficial Shareholders | Mundo Media Ltd.  - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | M Zone Marketing Inc. |
| Address | 548 Market Street #77068, San Francisco, California 94014, United States; 161 Bay Street, Suite 4310, Toronto, ON M5J 2S1 |
| Authorized Capital | 5,000 Common Shares at $0.001 par value per share |
| Issued/Outstanding Shares | 100 Common Shares |
| Beneficial Shareholders | 2538853 Ontario Ltd. - 100% |
| Jurisdiction | Delaware, U.S.A |
| Company Name | Mundo Media (US), LLC |
| Address | 300 Delaware Avenue, Suite 210, Wilmington, DE 19801, United States; Dorsey & Whitney LLP, 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | 2538853 Ontario Ltd. |
| Beneficial Owners | 2538853 Ontario Ltd. -  100% Membership |
| Jurdisdiction | Delaware, U.S.A |
| Company Name | Active Signal Marketing, LLC |
| Address | 337 Garden Oaks Blvd. #50564, Houston, TX 77018, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | Find Click Engage, LLC |
| Address | 9450 SW Gemini Drive #87125, Beaverton, OR 97008, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | 36 Labs, LLC |
| Address | 548 Market Street #77068, San Francisco, CA 94104, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | FLI Digital, Inc. |

| | |
|---|---|
| Address | 9450 SW Gemini Drive, #77068, Beaverton, Oregon 97008, United States; 161 Bay Street, Suite 4310, Toronto, ON M5J 2S1 |
| Authorized Capital | 200 common shares without par value |
| Issued/Outstanding Shares | 100 common shares |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% |
| Jurisdiction | New York, U.S.A. |
| Company Name | 2518769 Ontario Ltd. |
| Address | 1 Yonge Street, Suite 1801, Toronto, ON M5E 1W7 , Canada |
| Authorized Capital | An unlimited number of common shares |
| Issued/Outstanding Shares | 10,100 common shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | MEG Technologies Limited |
| Address | 2F., Jonsim Place, No. 228 Queen's Road East, Wanchai, Hong Kong |
| Authorized Capital | 10,000 shares of $1.00 HK each |
| Issued/Outstanding Shares | 100 shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Hong Kong |
| Company Name | Mundo (Beijing) Limited |
| Address | Room 0908, Tower 1 B Area, Wanjing Soho, Chao Yang District, Beijing, China. Zip code 100000 |
| Authorized Capital | USD35,000 |
| Issued/Outstanding Shares | N/A |
| Beneficial Shareholders | MEG Technologies Limited - 100% |
| Jurisdiction | China |
| Company Name | 2307521 Ontario Inc. |
| Address | 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON  L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares and unlimited number of preferred shares. |
| Issued/Outstanding Shares | 150 common shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | Movil Wave S.à.r.l |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | 2307521 Ontario Inc. - 100% |
| Jurisdiction | Luxembourg |
| Company Name | Mogenio S.A. |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 31,000 ordinary shares with a par value of 1.00 EUR each |
| Issued/Outstanding Shares | 31,000 shares |
| Beneficial Shareholders | Movil Wave S.á.r.l - 100% |
| Jurisdiction | Luxembourg |
| Company Name | Mob 1 S.à.r. l |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | Mogenio S.A. - 100% |
| Jurisdiction | Luxembourg |
| Company Name | Downloadius S.à.r.l. |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | Mogenio S.A. - 100% |
| Jurisdiction | Luxembourg |
| Company Name | Mundo Media (Luxembourg) S.à.r.l. (Pending Incorporation - details to be determined) |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 20,000 ordinanry shares at $1.00 USD per share - To be determined |
| Issued/Outstanding Shares | To be determined |
| Beneficial Shareholders | 2307521 Ontario Inc. - 100%, to be determined |
| Jurisdiction | Luxembourg |

**Mundo Inc**

| Stockholder | Common Shares | Class B Shares | Total Shares | Beneficial Owner/Controlling Shareholder |
|---|---|---|---|---|
| 2441519 Ontario Inc (Angelo Pollastrone Holdco) | 500,000 | 106,072 | 606,072 | Angelo Pollastrone |
| 2441518 Ontario Inc (Duncan Yuen Holdco) | 500,000 | 106,072 | 606,072 | Duncan Yuen |
| 2441516 Ontario Inc (Jason Theofilos Holdco) | 500,000 | 106,072 | 606,072 | Jason Theofilos |
| Mansfield International Trade Ltd | | 6,969,837 | 6,969,837 | (1) Jakub Malczewski: 100% of voting shares (2) Ahaka Acquisition Inc. (controlled by David Baazov): 100% of non-voting shares |
| Theofilos Family Trust 1 | | 577,166 | 577,166 | Elaine Theofilos; Victoria Theofilos; Tom Anastasios Tsetsenis; Angelo Pollastrone; Duncan Yuen; Brooke Gosselin; Noah Theofilos; Chloe Theofilos |
| Theofilos Family Trust 2 | | 3,867,367 | 3,867,367 | Brooke Gosselin; Jason Theofilos; Noah Theofilos; Chloe Theofilos; Maria Avgousti-Tsetsenis; Vasilios Tsetsenis; Gregory Tsetsenis; Maria Tsetsenis |
| Jason Theofilos | | 1 | 1 | |
| Customer Acquisition Network, LLC | - | | - | |
| Barry Honig | | 1,930,703 | 1,930,703 | |
| Four Kids Investment Fund LLC | | 2,162,387 | 2,162,387 | Johathon Honig |
| Jonathan Honig | | 193,071 | 193,071 | |
| Stetson Capital Management LLC | | 656,439 | 656,439 | John Stetson |
| Melechdavid Inc | | 579,211 | 579,211 | Mark Groussman |
| Melechdavid Inc Retirement Plan | | 193,071 | 193,071 | Mark Groussman |
| ATG Capital LLC | | 386,141 | 386,141 | John O'Rourke |
| John S Lemak IRA | | 77,228 | 77,228 | John Lemak |
| JSL Kids Partners | | 19,307 | 19,307 | John Lemak |
| Horberg Enterprises LP | | 154,456 | 154,456 | Todd Horberg |
| Edward Karr | | 19,307 | 19,307 | |
| Oberal International Inc | | 154,457 | 154,457 | Tal Schibler |
| Rich Mollinsky | | 38,614 | 38,614 | |
| Corey O'Rourke | | 57,921 | 57,921 | |
| John O'Rourke Sr. | | 38,614 | 38,614 | |
| Millenium Trust Co LLC, Custodian FBO Robert S. Colman Tradtional IRA | | 77,228 | 77,228 | Bob Colman |
| Mark Groussman C/F Alivia Groussman UTMA/FL | | 38,614 | 38,614 | Mark Groussman |
| Mark Groussman C/F Asher Groussman UTMA/FL | | 38,614 | 38,614 | Mark Groussman |
| Paradox Capital Partners LLC | | 154,456 | 154,456 | Harvey Kesner |
| Ross Levinsohn | 156,250 | 33,147 | 189,397 | |
| **Total** | **1,656,250** | **18,735,571** | **20,391,821** | |

**Schedule 7.01(16)**

**Intellectual Property Rights**

*Canadian Trademark Applications*

| Entity | Trademark | Application No. | Goods/Services | Claims |
|---|---|---|---|---|
| Mundo Media Ltd. | MUNDO | 1,839,933 | Goods: (1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising. (2) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising. Services: (1) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space. (2) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading | Used in CANADA since at least as early as December 2010 on goods (1) and on services (1), (3); November 07, 2011 on goods (2) and on services (2), (4). |

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| | | | services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space.<br>(3) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising.<br>(4) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | |
| Mundo Media Ltd. | MUNDOMEDIA | 1,839,936 | Services:<br>(1) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of | Used in CANADA since at least as early as December 2010 on services (1), (3); November 07, 2011 on services (2),(4). |

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| | | | advertising space for others; Providing commercial information about access to advertising space.<br>(2) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space.<br>(3) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising.<br>(4) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | |

- 4 -

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| Mundo Media Ltd. | MUNDOTRACK | 1,839,931 | Goods:<br>(1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>(2) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising. | Used in CANADA since at least as early as December 2010 on goods (1); November 07, 2011 on goods (2). |
| Mundo Media Ltd. | MUNDOCORE | 1,839,934 | Goods:<br>(1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>Services:<br>(1) Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | Proposed Use in CANADA on goods and on services. |

*Common Law Trademarks/Trade Names*

| Entity | Trade/Business Names | Trademarks: Word Marks (Domestic/Foreign) | Trademarks: Designs/Logos |
|--------|----------------------|--------------------------------------------|----------------------------|
| Mundo Media Ltd. | Mundomedia<br>Mundo Media<br>Media Pro Services | MUNDO<br>MUNDOMEDIA<br>MUNDOTRACK |  |

| Movil Wave S.ar.l. | Media Pro Services | N/A |  |
| MEG Technologies Limited | N/A | N/A |  |
| Network Marketing Solutions Inc. | N/A | N/A |  |

*Domain Names*

| | |
|---|---|
| mpxxtrk.com | helloadz.com |
| mpmotrk.com | theonlinewealthsecret.com |
| pixeltrack66.com | jerrygetsripped.com |
| mmmediabuy.com | mattshollywoodworkout.com |
| amazing-bidz.com | miracleskintreatment.com |
| consumerreviewdaily.com | mundomedia.com |
| mobilemarketserver3.com | sweetorsexy.com |
| liveme.ca | mundotrk.com |
| purelywhitespro.com | hellomessaging.com |
| nuytopia.ca | themundogroup.com |
| vuytopia.ca | mundocompliance.com |
| biytopia.ca | mundogroups.com |
| buyropia.ca | mundoengine.com |
| buytipia.ca | mmp3g.com |
| buytooia.ca | commonfilescdn.com |
| buytopua.ca | mobile-cdn-server.com |
| buytopoa.ca | yourcompliance.com |
| buytopis.ca | earnfreegames.com |
| buytopiq.ca | mundotraks.com |
| buytopiz.ca | mundodatabase.com |
| taembuy.ca | mundotrack.com |
| mundostarmotors.com | ad-optimize.com |
| thevalidatecheck.com | spellingbchallenge.com |
| liposomformen.com | prevalidate.com |
| thecellspy.com | mlinktracker.com |
| sebcotrk.com | mmtracking.com |

| | |
|---|---|
| sofcotrk.com | mobileexchangeplatform.com |
| chlcotrk.com | meetmebook.com |
| suscotrk.com | newtyp3.com |
| mm-tracking.com | mundomediainc.com |
| mmtrksw.com | mundoleads.com |
| mmtrksg.com | sitemanager2.com |
| mmtrkms.com | linktrack66.com |
| mmtrkpy.com | mmtrktw.org |
| mmtrkjy.com | mmtrkva.org |
| mmtrkyv.com | mmtrkvc.org |
| mmtrktl.com | mmtrkvk.org |
| mmtrkdb.com | mmtrkyv.org |
| mmtrktw.com | mmtrkam.com |
| mmtrkva.com | miihub.com |
| mmtrkvk.com | mundomediacorp.com |
| mmtrkgs.com | newlaboratories.com |
| mmtrkvc.com | ukonnochikara.com |
| mmtrkbb.com | xbids.ca |
| mmtrksk.com | livingfeal.ca |
| mmtrkpd.com | livindeal.ca |
| mmtrkmc.com | wwwlivingdeal.ca |
| mmtrktc.com | livngdeal.ca |
| liveprofutebolscores.com | ivigdeal.ca |
| bitcoin-gift-cards.com | kivingdeal.ca |
| bitcoingift-cards.com | livimgdeal.ca |
| bitcoingift-card.com | ivingdeal.ca |
| bitcoingiftexchange.com | factsopedia.com |
| bitcoingiftcardexchange.com | prohibitionpeter.com |
| smdcargo.com | online-friends-episodes.com |
| mrtrck.com | styletrendweb.com |
| 0x24.co | getalarmsystems.com |
| 0x25.co | getanyrecipe.com |
| 36labs.com | getcouponsnow.com |
| activesignalmarketing.com | getdirectionsmaps.com |
| allproductmanuals.com | gethealthtipsdaily.com |
| anydrivingdirections.com | gethomepros.com |
| anytransitguides.com | getmapsfast.com |
| boostmypcspeed.com | getonlineforms.com |
| cashclaims.org | getweatherfast.com |
| checkanyemail.com | inboxsetup.email |
| checkemailsfast.com | insidersportstips.com |

| | |
|---|---|
| checkmyemails.co | internetspeednow.com |
| checkyouremail.co | livelocalweather.com |
| clktrcker.com | local-weather.co |
| dailyjobfeed.com | localweatherapp.co |
| dailylocalweather.com | loginemailnow.com |
| driving-maps.co | loweryourmortgage.co |
| drivingmaps.co | movetosolar.org |
| easyancestrysearch.com | mydirectionsmaps.com |
| easyonlinecalendar.com | myfastmaps.com |
| easypeoplefinder.com | myinternetspeed.co |
| easyphonefinder.com | onlinedetective.co |
| easyrefinance.co | onlinepackagetracker.com |
| easytaxes.co | packagetracker.co |
| easytransitguide.com | plananytrip.com |
| easytransitguides.com | playfantasysports.co |
| emailanytime.co | popularnow.co |
| everypassword.com | radioanytime.com |
| fastaudioconverter.com | rength.com |
| fastdrivingdirections.com | searcheveryjob.com |
| fastdrivingmaps.co | secured-verified.com |
| fastmaps.co | somanyfunapps.com |
| fastmapsdirections.com | speedytaxes.co |
| fastmapsnow.com | stdcheckuponline.com |
| fastphotoeditor.com | themortgagecalculator.co |
| fasttransitguides.com | thepackagetracker.com |
| fdtrkr.com | thetransitguide.com |
| findclassifiedads.co | todaysnewslive.com |
| findclickengage.com | trackanyflight.com |
| finddirectionsnow.com | trackanypackage.com |
| finddrivingmaps.com | trackmypackage.co |
| findfastmaps.com | trackpackagesfast.com |
| findformsnow.com | trkclck.com |
| findformsonline.com | trkpltfrm.com |
| findlocalclassifieds.com | twoweektech.com |
| findmapsfast.com | updateddrivers.co |
| findtattoosonline.com | watchanygame.com |
| findunclaimedmoney.org | weather-forecast.co |
| fontstyles.co | |

*Software*

- 8 -

- CORE is a marketing optimization platform, with features geared at efficient testing, reporting, and flexibility.

- FEED is an advertising server, currently configured to serve emails to iOS Profile created inboxes.

- MundoTrack/MundoCore is a proprietary cloud-based platform which uses predictive software algorithms to drive user engagement by optimally paring publisher traffic with advertiser campaigns.

*Essociates Patent License*

License to United States Patent No. 6,804,660 and any and all other patents and patent applications in all countries of the world corresponding thereto or having priority derived therefrom; all divisional, continuation and continuation-in-part applications derived therefrom; and any applications claiming priority thereto including, but not limited to, any and all reissues and reexaminations.

**Licenses**

*Master Business Licenses*

| Business Name | Legal Name | Business Information | Number | Effective Date | Expiry Date |
|---|---|---|---|---|---|
| Media Pro Services | Mundo Media LTD. | Business Name Registration Incorporated (Ontario) | 230758740 001958484 | 07/29/2013 07/26/2016 | 07/27/2023 |
| Mundo Media | Mundo Media LTD. | Business Name Registration Incorporated (Ontario) | 270044738 001958484 | 01/12/2017 07/26/2016 | 01/11/2022 |
| Mundomedia | Mundo Media LTD. | Business Name Registration Incorporated (Ontario) | 220900401 001958484 | 8/29/2012 07/26/2016 | 08/27/2022 |

**Schedule 7.01(22)**

**Bank Accounts**

| Bank Account Number | Restricted Party | Financial Institution |
|---|---|---|
| 06032-1083245 | Mundo Inc. | Royal Bank of Canada |
| 06032-4013744 | Mundo Inc. | Royal Bank of Canada |
| 06032-1012749 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4015657 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4004636 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4015640 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-1014182 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-1061720 | Mundo Media Ltd. | Royal Bank of Canada |
| 3300868481 | Mundo Media Ltd. | Silicon Valley Bank |
| 0018335000 | Mundo Media Ltd. | Silicon Valley Bank |
| 3300868538 | Mundo Media Ltd. | Silicon Valley Bank |
| LU03 0141 6438 5832 0000 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU80 0141 4438 5830 0000 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU62 0141 6438 5830 3030 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU75 0141 2438 5830 3010 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| 3301036420 | Movil Wave S.à r.l. | Silicon Valley Bank |
| LU12 0141 2438 5840 3860 | Mogenio S.A | Internationale Nederlanden Groep |
| LU19 0141 8438 5842 0000 | Mogenio S.A | Internationale Nederlanden Groep |
| LU96 0141 6438 5840 0000 | Mogenio S.A | Internationale Nederlanden Groep |
| LU78 0141 8438 5840 3030 | Mogenio S.A | Internationale Nederlanden Groep |
| LU91 0141 4438 5840 3010 | Mogenio S.A | Internationale Nederlanden Groep |

- 2 -

| Bank Account Number | Restricted Party | Financial Institution |
| --- | --- | --- |
| 3300897583 | Mogenio S.A | Silicon Valley Bank |
| LU72 0141 8441 1150 0000 | Mob1 S.à r.l. | Internationale Nederlanden Groep |
| LU80 0141 0441 1160 0000 | Downloadius S.à r.l | Internationale Nederlanden Groep |
| LU83 0141 8441 1160 3010 | Downloadius S.à r.l | Internationale Nederlanden Groep |
| LU40 0141 7445 0090 0000 | 2307521 Ontario Inc. | Internationale Nederlanden Groep |
| 36800910261 | MEG Technologies Limited | Standard Chartered Bank |
| 32477810 | 36 Labs, LLC | Bank of America |
| 59589550 | Active Signal Marketing, LLC | Bank of America |
| 52802960 | Find Click Engage, LLC | Bank of America |
| 52803040 | Find Click Engage, LLC | Bank of America |
| 19483442 | Fli Digital, Inc. | Bank of America |
| 3302207114 | M Zone Marketing, Inc. | Silicon Valley Bank |
| 3302138111 | Active Signal Marketing, LLC | Silicon Valley Bank |
| 3302138126 | Find Click Engage, LLC | Silicon Valley Bank |
| 3302138130 | Fli Digital, Inc. | Silicon Valley Bank |
| 3302138099 | Mundo Media (US), LLC | Silicon Valley Bank |

**THIS FIRST AMENDING AGREEMENT** made as of the 2nd day of March, 2018

**BETWEEN:**

> **MUNDO MEDIA LTD.**
>
> (hereinafter called the "**Borrower**")
>
> - and -
>
> **ROYAL BANK OF CANADA**
>
> (hereinafter called the "**Lender**").

**WHEREAS** the Borrower and the Lender entered into an amended and restated credit agreement dated as of December 21, 2017 (the "**Credit Agreement**");

**AND WHEREAS** pursuant to Section 8.04(11) of the Credit Agreement, the Restricted Parties are not permitted to make Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) in any fiscal year;

**AND WHEREAS** the Borrower has advised the Lender that Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) were made in the 2017 fiscal year and as a result the Borrower has requested that the Lender waive compliance by the Borrower with Section 8.04(11) of the Credit Agreement solely for the fiscal period commencing on January 1, 2017 and ending on December 31, 2017 (the "**CapEx Covenant Default**");

**AND WHEREAS** the Lender is agreeable to provide the Borrower with a waiver of the CapEx Covenant Default in accordance with the terms hereof;

**AND WHEREAS** the parties wish to amend Section 8.04(11) of the Credit Agreement to increase the limit on Capital Expenditures to $1,500,000 (or the Equivalent Amount in Canadian Dollars) in accordance with the terms hereof.

**NOW THEREFORE THIS AGREEMENT WITNESSES THAT** in consideration of the covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Credit Agreement as provided herein:

**Section 1  <u>General</u>**

In this First Amending Agreement (including the recitals) unless otherwise defined or the context otherwise requires, all capitalized terms shall have the respective meanings specified in the Credit Agreement (including as amended by this First Amending Agreement). In addition, the term "**Second Closing Date**" means the date on which the conditions precedent set forth in Section 6 of this First Amending Agreement have been satisfied or waived.

**Section 2**  **To be Read with Credit Agreement**

This First Amending Agreement is an amendment to the Credit Agreement.  Unless the context of this First Amending Agreement otherwise requires, the Credit Agreement and this First Amending Agreement shall be read together and shall have effect as if the provisions of the Credit Agreement and this First Amending Agreement were contained in one agreement as of the Second Closing Date.  The term "Agreement" when used in the Credit Agreement means the Credit Agreement as amended, supplemented or modified from time to time (including as amended by this First Amending Agreement).

**Section 3**  **Amendment**

Section 8.04(11) of the Credit Agreement is deleted in its entirety and replaced with the following:

"(11)    Capital Expenditures In any fiscal year make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,500,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year."

**Section 4**  **Waiver**

The Lender hereby waives the CapEx Covenant Default solely for the fiscal period commencing on January 1, 2017 and ending on December 31, 2017.  The Lender's waiver contained herein is subject to and conditional upon satisfaction of the conditions precedent set forth in Section 6 of this First Amending Agreement.

**Section 5**  **Representations and Warranties**

In order to induce the Lender to enter into this First Amending Agreement, the Borrower represents and warrants to the Lender as follows, which representations and warranties shall survive the execution and delivery hereof:

(a)    the representations and warranties set forth in Article 7 of the Credit Agreement continue to be true and correct as of the date hereof with reference to facts subsisting on the date hereof, except for those representations and warranties which speak to a specific date which are true and correct as of such date;

(b)    the Restricted Parties are in compliance on the date hereof with the covenants contained in Article 8 of the Credit Agreement;

(c)    all necessary action, corporate or otherwise, has been taken to authorize the execution, delivery and performance of this First Amending Agreement by the Borrower.  The Borrower has duly executed and delivered this First Amending Agreement. This First Amending Agreement is a legal, valid and binding obligation of the Borrower enforceable against it by the Lender in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization and other laws of general

application limiting the enforcement of creditor's rights generally and the fact that the courts may deny the granting or enforcement of equitable remedies;

(d)     as of the date hereof and after giving full force and effect to the amendments to the Credit Agreement provided for in this First Amending Agreement, no Default or Event of Default exists; and

(e)     no Material Adverse Change has occurred since December 21, 2017.

## Section 6   Conditions Precedent

This First Amending Agreement shall not be effective and the Second Closing Date will not occur until satisfaction of the following conditions precedent, each to the satisfaction of the Lender:

(a)     this First Amending Agreement shall have been executed and delivered by the Borrower and the Lender;

(b)     the Lender shall have received an acknowledgement and confirmation from each Restricted Party that has previously delivered a Guarantee and Security as to the continued effectiveness of its Guarantee and Security, notwithstanding this First Amending Agreement;

(c)     the Lender shall have received and be satisfied with the first amending agreement to the Subordinate Credit Agreement between the Borrower and Royal Bank of Canada; and

(d)     the Lender shall have received such additional information and documents as it may reasonably require to complete the transactions contemplated hereby in accordance with the terms and conditions contained herein.

## Section 7   Expenses

The Borrower shall pay all reasonable out-of-pocket fees and expenses incurred by the Lender in connection with the preparation, negotiation, completion, execution, delivery and review of this First Amending Agreement and all other documents and instruments arising therefrom and/or executed in connection therewith.

## Section 8   Continuance of Credit Agreement and Security

The Credit Agreement, as changed, altered, amended or modified by this First Amending Agreement, shall be and continue in full force and effect and is hereby confirmed and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein.   The Borrower acknowledges, confirms and agrees that, notwithstanding this First Amending Agreement, (a) all Security granted by it continues in full force and effect, enforceable in accordance with its terms, and secures payment and performance by it of the Obligations, (b) the Security to which it is a party constitutes a legal, valid and binding obligation of the Borrower enforceable against it in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium,

reorganization and other laws of general application limiting the enforcement of creditor's rights generally and the fact that the courts may deny the granting or enforcement of equitable remedies, and (c) the Security to which it is a party is hereby ratified and confirmed.

**Section 9** **Counterparts**

This First Amending Agreement may be executed in any number of separate counterparts and by facsimile or pdf copy, each of which shall be deemed an original and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 10** **Severability**

If any provision of this First Amending Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this First Amending Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

**Section 11** **Governing Law**

This First Amending Agreement shall be construed and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein and each of the parties hereto irrevocably attorns to the jurisdiction of the courts of the Province of Ontario.

**[Signature pages follow]**

**IN WITNESS WHEREOF** the parties hereto have executed this First Amending Agreement.

**BORROWER:**                    **MUNDO MEDIA LTD.**

By: _____
    Name: Philip Jones
    Title: CFO.

By: _____
    Name:
    Title:

**LENDER:**

ROYAL BANK OF CANADA

By: _____

    Name:  Hogan Mak
    Title:  Director

By: _____

    Name:
    Title:

[SIGNATURE PAGE TO THE FIRST AMENDING AGREEMENT (SENIOR)]

**Execution Version**

**AMENDED AND RESTATED SUBORDINATE CREDIT AGREEMENT**

**BETWEEN**

**MUNDO MEDIA LTD.,**
**as Borrower**

**AND**

**ROYAL BANK OF CANADA,**
**as Lender**

**MADE AS OF**

**December 21, 2017**

**McCarthy Tétrault LLP**

# TABLE OF CONTENTS

**ARTICLE 1 - INTERPRETATION**.................................................................................. 1

    1.01    Definitions ....................................................................................................... 1
    1.02    Extended Meanings ....................................................................................... 20
    1.03    Accounting Principles .................................................................................. 20
    1.04    Interest Calculations and Payments .............................................................. 21
    1.05    Permitted Encumbrances ............................................................................... 21
    1.06    Currency ........................................................................................................ 21
    1.07    Conflicts ........................................................................................................ 21
    1.08    Schedules ....................................................................................................... 21

**ARTICLE 2 - THE LOAN** ............................................................................................ 22

    2.01    Establishment of the Loan ............................................................................ 22
    2.02    Purpose of the Loan ...................................................................................... 22

**ARTICLE 3 – CONDITIONS PRECEDENT** .......................................................... 22

    3.01    Conditions Precedent to the Effectiveness of this Agreement ..................... 22

**ARTICLE 4 – GENERAL CONDITIONS** ............................................................... 24

    4.01    Interest on the Loan ...................................................................................... 24
    4.02    Payment in Kind (PIK) ................................................................................. 24
    4.03    Matters Relating to Interest .......................................................................... 25
    4.04    Account of Record ........................................................................................ 25
    4.05    Maximum Rate of Interest ............................................................................ 26
    4.06    Place of Payment of Principal, Interest and Fees ......................................... 26
    4.07    Observer Rights of the Lender ...................................................................... 26

**ARTICLE 5 - REPAYMENT** ...................................................................................... 27

    5.01    Mandatory Repayment at Maturity ............................................................... 27
    5.02    Mandatory Repayments upon Certain Events .............................................. 27
    5.03    Other Mandatory Repayments ...................................................................... 27
    5.04    Voluntary Prepayments ................................................................................ 28
    5.05    Prepayment Premium .................................................................................... 29

**ARTICLE 6 - REPRESENTATIONS AND WARRANTIES** .............................. 29

    6.01    Representations and Warranties ................................................................... 29
    6.02    Survival and Repetition of Representations and Warranties ........................ 33

**ARTICLE 7 - COVENANTS** ....................................................................................... 33

    7.01    Positive Covenants ....................................................................................... 33

7.02    Financial Covenants ............................................................................... 36
7.03    Reporting Requirements ........................................................................... 37
7.04    Negative Covenants ................................................................................. 38

**ARTICLE 8 – GUARANTEE AND SECURITY** ..................................................... **42**

8.01    Guarantee and Security ............................................................................ 42
8.02    After Acquired Property and Further Assurances .................................... 44

**ARTICLE 9 - DEFAULT** .............................................................................................. **44**

9.01    Events of Default ...................................................................................... 44
9.02    Acceleration and Enforcement ................................................................. 46
9.03    Remedies Cumulative ............................................................................... 47
9.04    Perform Obligations ................................................................................. 47
9.05    Third Parties ............................................................................................. 47
9.06    Application of Payments ........................................................................... 47
9.07    Right of Set-off ......................................................................................... 48

**ARTICLE 10 – CHANGE IN CIRCUMSTANCES AND INDEMNITIES** ........................ **48**

10.01    Increased Costs ....................................................................................... 48
10.02    Taxes ....................................................................................................... 49
10.03    Illegality .................................................................................................. 50
10.04    Indemnity by the Borrower ..................................................................... 50

**ARTICLE 11 - GENERAL** ......................................................................................... **51**

11.01    Costs and Expenses ................................................................................ 51
11.02    Governing Law, Jurisdiction, Etc. .......................................................... 52
11.03    Judgment Currency .................................................................................. 52
11.04    Confidentiality ......................................................................................... 53
11.05    Benefit and Burden of Agreement .......................................................... 54
11.06    No Assignment by the Borrower ............................................................. 54
11.07    Assignment or Participation by Lender ................................................... 54
11.08    Notices ..................................................................................................... 55
11.09    Effect of Assignment ............................................................................... 56
11.10    Survival .................................................................................................... 56
11.11    Severability .............................................................................................. 56
11.12    Further Assurances ................................................................................. 56
11.13    Entire Agreement; Amendments and Waivers ....................................... 56
11.14    Time of the Essence ................................................................................ 57
11.15    Tombstone Marketing .............................................................................. 57
11.16    Anti-Money Laundering Legislation ....................................................... 57

## AMENDED AND RESTATED SUBORDINATE CREDIT AGREEMENT

THIS AGREEMENT is made as of December 21, 2017

BETWEEN

> MUNDO MEDIA LTD., a corporation amalgamated under the
> laws of the Province of Ontario (the **"Borrower"**),

> - and -

> ROYAL BANK OF CANADA, a Canadian chartered bank (the
> **"Lender"**).

WHEREAS the Borrower and the Lender are parties to a subordinate credit agreement made as of July 26, 2016 (as amended by the first amending agreement made as of October 13, 2016 and the second amending agreement made as of June 2, 2017, the "**Original Credit Agreement**");

AND WHEREAS the Borrower has requested the Loan and the Lender agreed to provide the Loan to the Borrower upon and subject to the terms and conditions set out in the Original Credit Agreement;

AND WHEREAS the Borrower and the Lender wish to amend and restate the Original Credit Agreement as set out herein;

NOW THEREFORE, in consideration of the covenants and agreements herein contained, the parties agree as follows:

## ARTICLE 1 - INTERPRETATION

1.01    **Definitions**

In this Agreement, unless something in the subject matter or context is inconsistent therewith:

"**2017 Shareholder Loans**" means, collectively, (i) the loan in the principal amount of $733,333.40 made by The Theofilos Family Trust to the Borrower on or about November 21, 2017, paid partially in cash in the amount of $533,333.35 and partially through a release of employment salary owed to Jason Theofilos in the amount of $199,999.99; (ii) the loan in the principal amount of $733,333.40 made by Mansfield International Trade Ltd. to the Borrower on November 21, 2017, paid in cash, and (iii) the loan in the principal amount of $733,333.40 made by Customer Acquisition Network, LLC to the Borrower on November 21, 2017, paid in cash.

"**2017 Transaction Costs**" means costs incurred by the Parent and its Subsidiaries in connection with (i) the reorganization transactions consented to by the Lender under the Second Amendment, (ii) the unconsummated initial public offering by the Parent of its common Equity

Interests, (iii) the Second Amendment, this Agreement and the Senior Credit Agreement, and (iv) the incorporation of Luxco Newco and delivery of the documentation required by Section 7.01(19).

"**2538853**" means 2538853 Ontario Ltd., a corporation incorporated under the laws of the Province of Ontario, which is a direct wholly-owned Subsidiary of the Borrower.

"**36 Labs Group**" means, collectively, 36 Labs, LLC., Active Signal Marketing, LLC, Find Click Engage, LLC, Fli Digital Inc. and 36 Group, LLC.

"**36 Labs Group Acquisition**" means the acquisition of all of the shares, units, membership interests and other Equity Interests of 36 Group, LLC (which will directly own 36 Labs, LLC., Active Signal Marketing, LLC, Find Click Engage, LLC and Fli Digital Inc.) and includes the merger transaction in which 36 Group, LLC is merged into New LLC2.

"**36 Labs Group Acquisition Agreement**" means the share purchase agreement, made as of October 13, 2016 between the 36 Labs Group Vendors and New LLC2.

"**36 Labs Group Vendors**" means, collectively, Nick Griffith, Thomas Massaro, Ryan Stevens and Scott Teger.

"**Acquisition**" means, with respect to any Person, any purchase or other acquisition, regardless of how accomplished or effected (including any such purchase or other acquisition effected by way of amalgamation, merger, arrangement, business combination or other form of corporate reorganization or by way of purchase, lease or other acquisition arrangements), of (i) any other Person (including any purchase or acquisition of such number of the issued and outstanding securities of, or such portion of an Equity Interest in, such other Person that such other Person becomes a Subsidiary of the purchaser or of any of its Affiliates) or of all or substantially all of the Property of any other Person, or (ii) any division, business, operation or undertaking of any other Person or of all or substantially all of the Property of any division, business, operation or undertaking of any other Person.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agreement**" means this amended and restated subordinate credit agreement, including its recitals and schedules.

"**Amendment Fee**" has the meaning set out in Section 4.02.

"**Anti-Corruption Laws**" means the *Corruption of Foreign Officials Act* (Canada) and all other similar Applicable Law with respect to the prevention of corruption and bribery.

"**AML Laws**" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and all other Applicable Laws with respect to anti-terrorist financing, anti-money laundering, government sanction and "know your client" laws, including any guidelines or orders thereunder.

"**Applicable Law**" means:

(i)     any domestic or foreign statute, law (including common and civil law), treaty, code, ordinance, rule, regulation, restriction or by-law (zoning or otherwise);

(ii)    any judgement, order, writ, injunction, decision, ruling, decree or award;

(iii)   any regulatory policy, practice, guideline or directive; or

(iv)    any franchise, licence, qualification, authorization, consent, exemption, waiver, right, permit or other approval of any Governmental Authority, binding on or affecting the Person referred to in the context in which the term is used or binding on or affecting the property of such Person, in each case whether or not having the force of law.

"**Assignment**" has the meaning set out in Section 11.07(1).

"**Borrower**" means Mundo Media Ltd. (as successor by amalgamation to Voom Media Corp.), an Ontario corporation.

"**Borrower's Accounts**" means the accounts maintained from time to time by the Borrower with the Lender.

"**Borrower's Counsel**" means Gowling WLG (Canada) LLP or such other firm of legal counsel as the Borrower may from time to time designate and that is acceptable to the Lender.

"**Business Day**" shall mean any day other than a Saturday or a Sunday on which banks generally are open for business in Toronto, Ontario and New York, New York.

"**Canadian Dollars**" and "**Cdn.$**" mean the lawful money of Canada.

"**Capital Expenditures**" means, for any particular period, with respect to any particular Person, any expenditure made by such Person during such period that is required in accordance with GAAP to be capitalized on the balance sheet of such Person, including without limitation any expenditure in connection with the acquisition, development, improvement or maintenance of any capital or fixed asset of such Person.

"**Capital Lease**" means a capital lease or a lease that should be treated as a capital lease under GAAP.

"**Cash Equivalents**" means:

(i)     marketable direct obligations issued by, or unconditionally guaranteed by, the Government of Canada or the Government of the United States or any agency or instrumentality of either of them, and backed by the full faith and credit of Canada or the United States, as the case may be, in each case maturing within one year from the date of acquisition;

(ii)    term deposits, certificates of deposit or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of Canada or the United States or any state thereof having combined capital and surplus of not less than Cdn.$300,000,000; and

(iii)    commercial paper of an issuer rated at least A-1+ or the equivalent thereof by Standard & Poor's Ratings Services or at least P-1 or the equivalent thereof by Moody's Investor Service Inc. or at least R-1 (High) or the equivalent thereof by Dominion Bond Rating Service Limited, and in each case maturing within six months from the date of acquisition.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:

(i)    the adoption or taking effect of any Applicable Law;

(ii)    any change in any Applicable Law or in the administration, interpretation or application thereof by any Governmental Authority; or

(iii)    the making or issuance of any Applicable Law by any Governmental Authority.

Notwithstanding anything contained in this Agreement, (i) the Dodd-Frank Wall Street Reform and *Consumer Protection Act* (United States) and all requests, rules, regulations, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, regulations, guidelines or directives whether concerning capital adequacy or liquidity promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed a "Change in Law" regardless of the date enacted, adopted, applied or issued.

"**Change of Control**" means (i) if anyone other than Jason Theofilos or Barry Honig (or corporations or trusts controlled by them) acquires directly or indirectly 45% or more of the voting or non-voting Equity Interests of the Parent or otherwise acquires the ability, directly or indirectly, to appoint a majority of the directors of the Parent, (ii) the Parent ceases to own 100% of the Equity Interests of the Borrower or (iii) the Borrower ceases to own 100% of its Subsidiaries.

"**Closing Date**" means December 21, 2017.

"**Compliance Certificate**" means the certificate required pursuant to Section 7.03(2), substantially in the form attached as Schedule 1.01(A), signed by a senior officer of the Borrower.

"**Contingent Obligation**" means, with respect to any Person, any obligation, whether secured or unsecured, of such Person guaranteeing or indemnifying, or in effect guaranteeing or indemnifying, any indebtedness, leases, dividends, letters of credit or other monetary obligations (the "**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person as an account party in

respect of a letter of credit or letter of guarantee issued to assure payment by the primary obligor of any such primary obligation and any obligations of such Person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds for the purchase or payment of any such primary obligation or to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the obligee under any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (iv) otherwise to assure or hold harmless the obligee under such primary obligation against loss in respect of such primary obligation; provided, however, that the term Contingent Obligation does not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have corresponding meanings.

"**Debt**" means, with respect to any Person, all obligations that, in accordance with GAAP, would then be classified as a liability of such Person, and, without duplication, includes, with respect to such Person,

(i)     an obligation in respect of borrowed money or for the deferred purchase price of Property (excluding, for greater certainty, trade accounts payable in the ordinary course of business) or services or an obligation that is evidenced by a note, bond, debenture or any other similar instrument;

(ii)    a transfer with recourse or with an obligation to repurchase, to the extent of the liability of such Person with respect thereto;

(iii)   obligations under a Capital Lease;

(iv)    a reimbursement obligation or other obligation in connection with a bankers' acceptance or any similar instrument, or letter of credit or letter of guarantee issued by or for the account of such Person;

(v)     a Contingent Obligation to the extent that the primary obligation so guaranteed would be classified as "Debt" (within the meaning of this definition) of such Person;

(vi)    the aggregate amount at which any shares of such Person that are redeemable or retractable at the option of the holder of such shares (except where the holder is such Person) may be redeemed or retracted prior to the Maturity Date for cash or obligations constituting Debt or any combination thereof; or

(vii)   Earn Out Obligations.

"**Default**" means any event or condition that would constitute an Event of Default except for satisfaction of any condition subsequent required to make the event or condition an Event of Default, including giving of any notice, passage of time, or both.

- 6 -

"**Depreciation Expense**" means, for any period with respect to any Person, depreciation, amortization, depletion and other like reductions to income of such Person for such period not involving any outlay of cash determined on a consolidated basis in accordance with GAAP, including, without limitation, amortization of deferred financing costs associated with raising Debt.

"**Disposition**" means, with respect to a Person, any sale, assignment, transfer, conveyance, lease, licence or other disposition of any nature or kind whatsoever of any Property or of any right, title or interest in or to any Property that is out of the ordinary course of business of such Person, and the verb "**Dispose**" has a corresponding meaning.

"**Distribution**" means (i) any payment, declaration of dividend or other distribution, whether in cash or Property, (but expressly excluding any distribution by way of the payment of dividends by the issuance of equity securities of an issuer) to any holder of shares of any class of the Borrower or any other Restricted Party, or (ii) any repurchase, redemption, retraction or other retirement or purchase for cancellation of shares of the Borrower or any other Restricted Party, or of any options, warrants or other rights to acquire any of such shares, or (iii) any payment in cash of interest or principal on the 2017 Shareholder Loans or any purchase or redemption of all or any part thereof.

"**Earn Out Obligation**" means any earn out obligations, similar performance payments or similar obligations of any Restricted Party to any one or more sellers of the applicable assets or Equity Interests arising out of or in connection with an acquisition.

"**EBITDA**" means, with respect to any Person for any period, the Net Income of such Person for such period,

plus, without duplication and to the extent deducted in determining the Net Income of such Person:

(i)      Interest Expense;

(ii)     Tax Expense;

(iii)    Depreciation Expense;

(iv)     Transaction Costs not to exceed $2,000,000 in the aggregate;

(v)      unrealized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries;

(vi)     any non-cash expense or loss resulting from any increase in the expected liability amount of Earn Out Obligations relating to the acquisition of the 36 Labs Group including accretion expense on the Earn Out Obligations as determined under GAAP;

(vii)    non-cash expenses including stock option and restricted stock unit expenses, provided that the terms of such stock or stock options or any related plan, do not obligate the Borrower to redeem such options or units for cash;

(viii)    costs associated with (a) the terminated agreement and plan of reorganization by and among the Parent, Harmony Merger Corp., Harmony Merger Sub (Canada) Inc. and the shareholders of the Parent, the 36 Labs Group Acquisition, and the preparation for an initial public offering by the Parent, in the aggregate amounts of $1,244,786 in the fourth fiscal quarter of 2016 and $1,387,699 in the first fiscal quarter of 2017, (b) $1,461,985 in respect of 2017 Transaction Costs for the second fiscal quarter of 2017, (c) $668,737 in respect of 2017 Transaction Costs for the third fiscal quarter of 2017, and (d) up to the aggregate amount of $300,000 in respect of 2017 Transaction Costs for the fourth fiscal quarter of 2017 and the first fiscal quarter of 2018;

(ix)    such other amounts as the Lender may approve;

less, without duplication and to the extent included in determining the Net Income of such Person:

(i)    any income or gains resulting from transactions or events that are not expected to re-occur, or do not typify normal business activities (determined in accordance with GAAP);

(ii)    unrealized non-cash foreign exchange gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries;

(iii)    any non-cash gain or income resulting from any decrease in the expected liability of the amount of the Earn Out Obligations relating the acquisition of the 36 Labs Group;

(iv)    the amount which is the greater of the following: (a) amounts accrued for Earn Out Obligations relating to the 36 Labs Group Acquisition paid by a Restricted Party to the 36 Labs Group Vendors during such period; and (b) the minimum payment amount required to be paid by a Restricted Party to the 36 Labs Group Vendors in connection with Earn Out Obligations under the 36 Labs Group Acquisition Agreement; and

(v)    such other amounts as the Lender and the Borrower may agree.

For the purposes of calculating the financial covenants in Section 7.02: (a) for the period ending December 31, 2016, all Debt denominated in United Stated Dollars will be converted to Canadian Dollars based on the official closing rate of exchange published by the Bank of Canada on the Original Closing Date and (b) the EBITDA of the Borrower shall be deemed to be the following:

(i)    Cdn.$2,569,600 (or the Equivalent Amount in United States Dollars being $1,924,946) for the fiscal quarter ending December 31, 2015;

(ii)    Cdn.$2,711,879 (or the Equivalent Amount in United States Dollars being $1,973,504) for the fiscal quarter ending March 31, 2016, and

(iii)    Cdn.$3,957,335 (or the Equivalent Amount in United States Dollars being $3,059,131) for the fiscal quarter ending June 30, 2016.

"**Encumbrance**" means, with respect to any Person, any mortgage, debenture, pledge, hypothec, lien, charge, assignment by way of security, hypothecation or security interest granted or permitted by such Person or arising by operation of law, in respect of any of such Person's Property, or any consignment by way of security or Capital Lease of Property by such Person as consignee or lessee, as the case may be, or any other security agreement, trust or arrangement having the effect of security for the payment of any debt, liability or other obligation, and "**Encumbrances**", "**Encumbrancer**", "**Encumber**" and "**Encumbered**" have corresponding meanings.

"**Environmental Law**" means any Applicable Law relating to the environment including those pertaining to

(i)    reporting, licensing, permitting, investigating, remediating and cleaning up in connection with any presence or Release, or the threat of the same, of Hazardous Substances, and

(ii)    the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling and the like of Hazardous Substances, including those pertaining to occupational health and safety.

"**Equity Interest**" means:  (i) in the case of any corporation, all capital stock and any securities exchangeable for or convertible into capital stock; (ii) in the case of an association or business entity, any and all shares, interests, participation rights or other equivalents of corporate stock (however designated) in or to such association or entity; (iii) in the case of a partnership, limited liability company or unlimited liability company, partnership or membership interests (whether general or limited), as applicable; and (iv) any other ownership interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing Person, and including, in all of the foregoing cases described in clauses (i), (ii), (iii) or (iv), any warrants, rights or other options to purchase or otherwise acquire any of the interests described in any of the foregoing cases.

"**Equivalent Amount**" means, on any day, the equivalent amount in Canadian Dollars or United States Dollars, as the case may be, after giving effect to a conversion of a specified amount of United States Dollars to Canadian Dollars or of Canadian Dollars to United States Dollars , as the case may be, at the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the day in question for the conversion of United States Dollars to Canadian Dollars or at the rate that is the reciprocal thereof for the conversion of Canadian Dollars to United States Dollars, as the case may be, or, if such rate is not so published by the Bank of Canada for any such day, then at the spot rate quoted by the Lender at approximately noon (Toronto time) on that day in accordance with its normal practice for the applicable currency conversion in the wholesale market.

"**Event of Default**" has the meaning set out in Section 9.01.

"**Excluded Taxes**" means, with respect to the Lender, (i) taxes imposed on or measured by its net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which its lending office is located, and (ii) any branch profits taxes or any similar tax imposed by any jurisdiction in which the Lender is located; (iii) any deduction or withholding from a payment under a Loan Document required by FATCA; and (iv) for any Luxembourg stamp duty, registration tax or other similar Taxes payable upon a voluntary registration made by the Lender (including any Taxes payable due to the registration by the Lender of a Loan Document with the *Administration de l'Enregistrement et des Domaines* in Luxembourg) if such registration is not necessary to evidence, prove, maintain, enforce, compel or otherwise assert the rights of the Lender or obligations of any Party under a Loan Document.

"**FATCA**" means (i) Sections 1471 through 1474 of the Internal Revenue Code of 1986, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, (ii) any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the United States and any other jurisdiction with the purpose (in either case) of facilitating the implementation of (i) above, or (iii) any agreement pursuant to the implementation of paragraphs (i) or (ii) above with the United States Internal Revenue Service, the United States government or any governmental or taxation authority in the United States.

"**Financial Assistance**" means, without duplication and with respect to any Person, all loans granted by that Person and guarantees or Contingent Obligations incurred by that Person for the purpose of or having the effect of providing financial assistance to another Person or Persons, including letters of guarantee, letters of credit, legally binding comfort letters or indemnities issued in connection therewith, endorsements of bills of exchange (other than for collection or deposit in the ordinary course of business), obligations to purchase assets regardless of the delivery or non-delivery thereof and obligations to make advances or otherwise provide financial assistance to any other Person.

"**Fixed Charge Coverage Ratio**" means, with respect to the Borrower on a consolidated basis, the ratio of (i) EBITDA for the most recently completed four fiscal quarters, less the amount of all Capital Expenditures of such Person actually paid in cash to the extent not funded by Debt (excluding advances made under the revolving facility of the Senior Credit Agreement) less current Tax Expense, less Distributions (other than any Distributions made in respect of interest payments made in cash on the 2017 Shareholder Loans) to (ii) Fixed Charges of the Borrower, for the same period.

"**Fixed Charges**" means, with respect to any Person for any period and on a consolidated basis, the sum of (without duplication) (i) Interest Expense paid in cash (including, for greater certainty, payments made in cash on account of interest which was paid in kind or capitalized in a prior fiscal period), and (ii) scheduled principal payments of Debt; provided that Fixed Charges for the 12-month period ending on each of the first three fiscal quarters following the Original Closing Date shall be deemed to the Fixed Charges incurred during the period commencing on the Original Closing Date and ending on such fiscal quarter end (the "**Stub Period**") multiplied

by a fraction, the numerator of which is 365 and the denominator of which is the number of days in such Stub Period.

"**GAAP**" means (i) for any period of time prior to December 31, 2016, the Accounting Standards for Private Enterprises as approved by the Accounting Standards Board of Canada or its successor, applied on a basis consistent; and (ii) for any period of time after December 31, 2016, the International Financial Reporting Standards as approved by the Accounting Standards Board of Canada or its successor, applied on a basis consistent.

"**Governmental Authority**" means the government of Canada or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including any supra-national bodies such as the European Union or the European Central Bank and including a Minister of the Crown, the Superintendent of Financial Institutions or other comparable authority or agency.

"**Guarantee**" means a guarantee in form and substance satisfactory to the Lender.

"**Guarantors**" means each Person who has executed a Guarantee and Security in favour of the Lender as of the Closing Date and each other Subsidiary of the Parent that may from time to time deliver a Guarantee to the Lender in accordance with Section 7.04(18) and their successors and assigns, and "**Guarantor**" means any one of them.

"**Hazardous Substance**" means any substance or material that is prohibited, controlled or regulated by any Governmental Authority pursuant to Environmental Laws, including pollutants, contaminants, dangerous goods or substances, toxic or hazardous substances or materials, wastes (including solid non-hazardous wastes and subject wastes), petroleum and its derivatives and by-products and other hydrocarbons, all as defined in or pursuant to any Environmental Law.

"**Hedge Arrangement**" means, with respect to any Person, any arrangement or transaction between such Person and any other Person (other than another Restricted Party) that is a rate swap transaction, basis swap, forward rate transaction, commodity swap, interest rate option, forward foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of such transactions or arrangements) designed to protect or mitigate against risks in interest, currency exchange or commodity price fluctuations.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Insolvency Law**" means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes for greater certainty the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada), the *Bankruptcy Code* (United States), the restructuring provisions of applicable corporate statutes, each as now and hereafter in effect, any successors to such statutes and any other applicable insolvency or other similar law of any jurisdiction, including any law of

any jurisdiction permitting a debtor to obtain a stay or a compromise of the claims of its creditors against it.

"**Intellectual Property**" means any and all intellectual and industrial property, whether recorded or not and regardless of form or method of recording, including all works in which copyright subsists or may subsist (such as computer software), data bases (whether or not protected by copyright), designs, documentation, manuals, specifications, industrial designs, trade secrets, confidential information, ideas, concepts, know-how, trademarks, service marks, trade names, domain names, discoveries, inventions, formulae, recipes, product formulations, processes and processing methods, technology and techniques, improvements and modifications, integrated circuit topographies and mask works.

"**Intellectual Property Rights**" includes all intellectual and industrial and other proprietary rights in any Intellectual Property.

"**Intercreditor Agreement**" means the intercreditor agreement, made as of July 26, 2016, between the Lender and the Senior Lender.

"**Interest Expense**" means, with respect to any Person for any period, without duplication, the aggregate amount of interest and other financing charges expensed by such Person on account of such period with respect to Debt, including interest, discount financing fees, commissions, discounts, the interest or time value of money component of costs related to factoring or securitizing receivables or monetizing inventory and other fees and charges payable with respect to letters of credit, letters of guarantee and bankers' acceptance financing, standby fees, the interest component of Capital Leases and net payments (if any) pursuant to Hedge Arrangements involving interest, but excluding any amount, such as amortization of debt discount and expenses, that would qualify as Depreciation Expense and the amount reflected in Net Income for such period in respect of gains (or losses) attributable to translation of Debt from one currency to another currency, all as determined on a consolidated basis in accordance with GAAP.

"**Interest Payment Date**" means shall mean the date upon which a Monthly Interest Payment is made pursuant to Section 4.03(1).

"**Interest Rate**" means the rate of interest equal to fifteen percent (15.0%) per annum.

"**Investment**" in any Person means any direct or indirect (i) acquisition of any shares, partnership interests, participation interests in any arrangement, options or warrants, or any indebtedness, whether or not evidenced by any bond, debenture or other written evidence of such Person, or (ii) acquisition, by purchase or otherwise, of all or substantially all of the business, assets or stock or other evidence of beneficial ownership of such Person.  The amount of any Investment will be the original cost of such Investment, plus the cost of all additions thereto and minus the amount of any portion of such Investment repaid to such Person in cash as a return of capital, or repayment of the principal amount of indebtedness, as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  In determining the amount of any Investment involving a

transfer of any Property other than cash, such Property will be valued at its fair market value at the time of such transfer.

"**Judgment Conversion Date**" has the meaning set out in Section 11.03(1).

"**Judgment Currency**" has the meaning set out in Section 11.03(1).

"**Key Employment Contracts**" means the employment contracts between the Borrower and each of Jason Theofilos, Phil Jones, Phil Yuan, Eric So, Jeff Cordeiro and Matt Frank.

"**Lender's Counsel**" means the firm of McCarthy Tétrault LLP or such other firm of legal counsel as the Lender may from time to time designate.

"**Lending Office**" means the branch of the Lender located at 200 Bay Street, 4th Floor, North Tower, Toronto, Ontario, M5J 2W7, or at such other branch as the Lender may designate in writing.

"**Liquidity**" means the sum of (i) amount of the Borrower's and its Subsidiaries' Qualified Cash and (ii) undrawn availability under the "Revolving Facility" as defined in the Senior Credit Agreement.

"**Loan**" means the one time advance in the principal amount of $10,500,000 made by the Lender to the Borrower on the Original Closing Date as such amount may decrease following the Original Closing Date by virtue of principal repayments or increase by virtue of the capitalizing of interest in accordance with this Agreement.

"**Loan Documents**" means (i) this Agreement, (ii) the Security, (iii) the Shareholder Subordination Agreement, and (iv) all present and future agreements, documents, certificates and instruments delivered by any Restricted Party to the Lender pursuant to or in respect of this Agreement or the Security, in each case as the same may from time to time be amended, and "**Loan Document**" means any one of the Loan Documents.  For greater certainty, "Loan Documents" does not include any Loan Documents (as such term is defined in the Senior Credit Agreement) except for Security to the extent such Security has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as Senior Lender (in which such case, such Security shall constitute a "Loan Document" but only to the extent that such Security applies to the Lender in connection with this Agreement).

"**Luxco Newco**" means Mundo Media (Luxembourg) S.à r.l., a *société à responsabilité limitée* to be incorporated under the laws of Luxembourg, with its registered office at 5-11, avenue Gaston Diederich, L-1420 Luxembourg, Grand Duchy of Luxembourg and to be a wholly-owned subsidiary of 2307521 Ontario Inc.

"**Material Adverse Change**" means, with respect to a Restricted Party, any change having a material adverse effect on the business, assets, liabilities, operations, results of operations or condition (financial or other) of such Restricted Party or the ability of such Restricted Party to carry on its business or a significant part of its business, which would reasonably be expected to result in, or has resulted in, an impairment of the ability of the Borrower or a Guarantor to perform their respective Obligations.

"**Material Contracts**" means, with respect to a particular Restricted Party, the contracts set out under such Restricted Party's name in Schedule 1.01(B) and all other contracts to which such Person is a party or by which it is bound or may hereafter become a party or be bound, the breach or default of which would result in a Material Adverse Change, and "**Material Contract**" means any one thereof.

"**Material Licences**" means all licences, permits or approvals issued by any Governmental Authority to any Restricted Party, and which are at any time on or after the date of this Agreement,

(i)     necessary or material to the business and operations of such Restricted Party or to the listing of its securities, the breach or default of which would result in a Material Adverse Change, or

(ii)    designated by the Lender, in the reasonable discretion of the Lender, as a Material Licence, provided that the Lender has notified the Borrower of such designation.

"**Maturity Date**" means July 26, 2021.

"**Monthly Interest Payment**" means a payment of interest made in respect of the Outstanding Amount, each such payment to be made in arrears on each Interest Payment Date for the period from and including an Interest Payment Date to but excluding the following Interest Payment Date.

"**New LLC2**" means Mundo Media (US), LLC, a limited liability company formed under the laws of the State of Delaware, which is an indirect wholly owned Subsidiary of the Borrower.

"**Net Income**" means, with respect to any Person for any period, the net income of such Person for such period on a consolidated basis as determined in accordance with GAAP.

"**Net Proceeds**" means, with respect to any Disposition, the aggregate fair market value of proceeds of such Disposition (whether such proceeds are in the form of cash or other Property or part cash and part other Property) net of reasonable, bona fide direct transaction costs and expenses incurred in connection with such Disposition, including (i) reasonable legal fees and disbursements, the customary fees of agents or brokers payable in connection with such Disposition within one year of such Disposition and title and recording expenses payable in connection with such Disposition, and (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Debt that is secured by a Permitted Encumbrance, if any, on any of the Property that is the subject matter of such Disposition ranking in priority to the Encumbrance of the Security and that is required to be repaid under the terms of such Debt as a result of such Disposition.

"**Obligations**" means all present and future indebtedness, liabilities and obligations of the Restricted Parties, or any of them, to the Lender under or in connection with this Agreement or the other Loan Documents, including all debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Restricted Parties, or any of them, to the Lender, in any currency or remaining unpaid by the Restricted Parties, or any of them, to the Lender, under or in connection with this Agreement or the other Loan Documents,

whether arising from dealings between the Lender and any of the Restricted Parties or from any other dealings or proceedings by which the Lender may be or become in any manner whatever a creditor of a Restricted Party pursuant to this Agreement or the other Loan Documents, and wherever incurred, and whether incurred by a Restricted Party alone or with another or others and whether as principal or surety, and all interest, fees, legal and other costs, charges and expenses relating thereto.  For greater certainty, "Obligations" does not include any Obligation (as such term is defined in the Senior Credit Agreement) except for obligations under any Guarantee which has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as Senior Lender (in which such case, such obligations under such Guarantee shall constitute an "Obligation" but only to the extent that such obligations under such Guarantee are obligations to the Lender in connection with this Agreement).

"**Organizational Documents**" means, with respect to any Person, such Person's articles, memorandum, articles of association or other charter documents, partnership agreement, joint venture agreement, declaration of trust, trust agreement, by-laws, unanimous shareholder agreement, or any and all other similar agreements, documents and instruments pursuant to which such Person is constituted, organized or governed.

"**Original Closing Date**" means July 26, 2016.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except for any Luxembourg stamp duty, registration tax or other similar Taxes payable upon a voluntary registration made by the Lender (including any Taxes payable due to the registration by the Lender of a Loan Document with the *Administration de l'Enregistrement et des Domaines* in Luxembourg) if such registration is not necessary to evidence, prove, maintain, enforce, compel or otherwise assert the rights of the Lender or obligations of any Restricted Party under a Loan Document.

"**Outstanding Amount**" means, at any time, the sum of the principal amount of the Loan as the same may be increased from time to time due to the payment in kind provisions under Section 4.02 owing to the Lender or decreased from time to time due to repayment or prepayments made by the Borrower in accordance with the terms of this Agreement.

"**Parent**" means Mundo Inc. (as successor by amalgamation to Customer Acquisition Network (Canada) Inc.), an Ontario corporation, and its successors.

"**Participant**" has the meaning set out in Section 11.07(1).

"**Pension Plan**" means (i) a "pension plan" or "plan" which is a "registered pension plan" as defined in the *Income Tax Act* (Canada) or is subject to the funding requirements of applicable pension benefits legislation in any Canadian jurisdiction and is applicable to employees resident in Canada of a Restricted Party, or (ii) any other pension benefit plan or similar arrangement applicable to employees of a Restricted Party.

"**Permitted Debt**" means:

(i)  Debt under this Agreement and the other Loan Documents;

(ii)  any Guarantee by a Restricted Party of Debt of any other Restricted Party which is permitted hereunder;

(iii)  RBC Senior Debt;

(iv)  Debt owing: (a) by the Borrower to a Guarantor, (b) by a Guarantor to another Guarantor or to the Borrower, (c) by a Subsidiary to another Subsidiary provided that if the Subsidiary to which the Debt is owed is not a Guarantor, such Debt is subject to a subordination and postponement agreement satisfactory to the Lender; subject in each case to compliance with the restriction on Investments set out in Section 7.04(5);

(v)  Earn Out Obligations of any Restricted Party in connection with the 36 Labs Group Acquisition; subject to compliance with the restrictions on Earn Out Obligations set out in Section 7.04(21);

(vi)  Debt in respect of Capital Leases incurred by any Restricted Party or Purchase Money Security Interests granted by a Restricted Party in an amount not to exceed $250,000 in the aggregate; and

(vii)  the 2017 Shareholder Loans.

"**Permitted Encumbrances**" means, with respect to any Person, the following:

(i)  liens for Taxes, rates, assessments or other governmental charges or levies not yet due, or for which instalments have been paid based on reasonable estimates pending final assessments, or if due, the validity of which is being contested diligently and in good faith by appropriate proceedings by that Person;

(ii)  undetermined or inchoate liens, rights of distress and charges incidental to current operations that have not at such time been filed or exercised and in respect of which the Lender has not been given notice, or that relate to obligations not due or payable, or if due, the validity of which is being contested diligently and in good faith by appropriate proceedings by that Person;

(iii)  reservations, limitations, provisos and conditions expressed in any original grant from the Crown or other grants of real or immovable property, or interests therein, that do not materially affect the use of the affected land for the purpose for which it is used by that Person;

(iv)  licences, easements, rights-of-way and rights in the nature of easements (including licences, easements, rights-of-way and rights in the nature of easements for railways, sidewalks, public ways, sewers, drains, gas, steam and water mains or electric light and power, or telephone and telegraph conduits, poles, wires and cables) that do not materially impair the use of the affected land for the purpose for which it is used by that Person;

(v)    title defects, irregularities or other matters relating to title that are of a minor nature and that in the aggregate do not materially impair the use of the affected property for the purpose for which it is used by that Person;

(vi)    the right reserved to or vested in any Governmental Authority by the terms of any lease, licence, franchise, grant or permit acquired by that Person or by any statutory provision to terminate any such lease, licence, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof;

(vii)    the Encumbrance resulting from the deposit of cash or securities to an aggregate maximum amount for all Restricted Parties of $100,000 at any time in connection with contracts, tenders or expropriation proceedings, or to secure workmen's compensation, unemployment insurance, surety or appeal bonds, costs of litigation when required by law, liens and claims incidental to current construction, mechanics', warehousemen's, carriers' and other similar liens, and public, statutory and other like obligations incurred in the ordinary course of business;

(viii)    security given to a public utility or any Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of its business;

(ix)    the Encumbrance created by a judgement of a court of competent jurisdiction, as long as the judgement is being contested diligently and in good faith by appropriate proceedings by that Person and does not result in an Event of Default;

(x)    the Security;

(xi)    any Encumbrance securing Permitted Debt (other than Debt set out in clause (vii) of the definition thereof); and

(xii)    such other Encumbrances as are agreed to in writing by the Lender.

"**Permitted Shareholder Loan Payments**" means:

(a)    payments in kind (and not in cash) by the Borrower of interest on the 2017 Shareholder Loans not in excess of ten percent (10.0%) per annum;

(b)    quarterly payments of interest on the 2017 Shareholder Loans not in excess of ten percent (10.0%) per annum; provided that, the Borrower shall have delivered a Compliance Certificate to the Lender confirming that both before and after giving effect to such payment, (i) no Default or Event of Default shall have occurred; (ii) the Borrower will be in *pro forma* compliance with the financial covenants set out in Section 7.02 as of the most recently ended fiscal quarter for which the financial statements required under Section 7.03(1) have been delivered to the Lender; (iii) no payment of interest on the 2017 Shareholder Loans may be made prior to March 31, 2018; and (iv) subject to compliance with clauses (i), (ii) and (iii) of the foregoing, the initial payment of interest on the 2017 Shareholder Loans may be made on and after April 1, 2018 (including for interest accrued and not paid in

cash for the period commencing on the Closing Date and ending on March 31, 2018); and

(c) payments of principal on the 2017 Shareholder Loan  from and after the date on which financial statements have been delivered to the Lender under Section 7.03(3) for the year ending December 31, 2017; provided that, the Borrower shall have delivered a Compliance Certificate to the Lender confirming that both before and after giving effect to such payment, (i) no Default or Event of Default shall have occurred, (ii) the Borrower will be in *pro forma* compliance with the financial covenants set out in Section 7.02 as of the most recently ended fiscal quarter for which the financial statements have been delivered to the Lender under Section 7.03(1), (iii) the amount of such payments made prior to the date on which the financial statements required under Section 7.03(1) shall have been delivered for the fiscal quarter ending September 30, 2018 shall not exceed $450,000 in aggregate, (iv) for any such payments made prior to September 30, 2018, the Borrower shall have no outstanding Debt under the "Revolving Facility" as defined in the Senior Credit Agreement, and (v) for any payment made after September 30, 2018, the Borrower shall have prepaid the Outstanding Amount by the amount of the Amendment Fee and shall have Liquidity of not less than $2,500,000.

"**Person**" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Pre-IPO Shareholder Loans**" means, collectively, (i) all of the loans made by the Borrower in favour of certain of the Parent's shareholders in connection with the Parent's stock option plan; (ii) the promissory note, dated June 2, 2017, issued by the Parent in favour of Mansfield International Trade Ltd. in the principal amount $7,500,000; (iii) the promissory note, dated June 2, 2017, issued by the Parent in favour of Customer Acquisition Network LLC in the principal amount $7,500,000; (iv) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Phil Jones in the principal amount $500,000; (v) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Eric So in the principal amount of $500,000; and (vi) the non-interest bearing demand promissory note, dated June 2, 2017, issued by the Parent in favour of Mitch Richler in the principal amount of $250,000.

"**Prepayment Premium**" has the meaning set out in Section 5.05.

"**Property**" means, with respect to any Person, all or any portion of that Person's undertaking and property, both real and personal.

"**Purchase Money Security Interest**" means an Encumbrance created or incurred by a Restricted Party securing Debt incurred to finance the acquisition of Property (including the cost of installation thereof), provided that (i) such Encumbrance is created substantially simultaneously with the acquisition of such Property, (ii) such Encumbrance does not at any time Encumber any Property other than the Property financed by such Debt, (iii) the amount of Debt

secured thereby is not increased subsequent to such acquisition, and (iv) the principal amount of Debt secured by any such Encumbrance at no time exceeds 100% of the original purchase price of such Property and the cost of installation thereof, and for the purposes of this definition the term "acquisition" includes a Capital Lease.

"**Qualified Cash**" means unrestricted cash held by a Restricted Party in which the Lender has a first priority perfected Encumbrance with such funds being maintained in an account with the Lender and such cash on deposit with the Lender is not subject to any escrow or other restriction.

"**RBC Senior Debt**" means the Debt owing by the Borrower to the Senior Lender under the Senior Credit Agreement.  For greater certainty, "RBC Senior Debt" does not include any Obligations.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents and advisors of such Person or of such Person's Affiliates.

"**Release**" means any release or discharge of any Hazardous Substance including any discharge, spray, injection, inoculation, abandonment, deposit, spillage, leakage, seepage, pouring, emission, emptying, throwing, dumping, placing, exhausting, escape, leach, migration, dispersal, dispensing or disposal.

"**Relevant Jurisdiction**" means, from time to time, with respect to a Person that is granting Security hereunder, any province or territory of Canada, any state of the United States or any other country or political subdivision thereof in which such Person has its chief executive office or chief place of business or has Property and, for greater certainty, includes the provinces and states set out in Schedule 1.01(C).

"**Repayment**" means a repayment by the Borrower on account of the Outstanding Amount.

"**Repayment Date**" has the meaning set out in Section 5.02.

"**Repayment Notice**" means the notice substantially in the form set out in Schedule 1.01(D).

"**Requirements of Law**" means, with respect to any Person, the Organizational Documents of such Person and any Applicable Law or any determination of a Governmental Authority, in each case applicable to or binding upon such Person or any of its business or Property or to which such Person or any of its business or Property is subject.

"**Restricted Parties**" means the Parent, the Borrower and their respective Subsidiaries and any person that hereafter becomes a Subsidiary of the Parent, and their respective successors and assigns permitted by this Agreement, and "**Restricted Party**" means any one of them.

"**Sanctions Law**" means *Special Economic Measures Act* (Canada), the *United Nations Act* (Canada)*, the Freezing Assets of Corrupt Foreign Officials Act* (Canada), the *Criminal Code* (Canada) and other similar laws imposing sanctions.

"**Second Amendment**" means the second amending agreement to the Original Credit Agreement, made as of June 2, 2017, between the parties hereto.

"**Security**" means the documents creating an Encumbrance in favour of, or any collateral held from time to time by, the Lender securing or intended to secure repayment of the Obligations, including all Guarantees and security described in Article 8. For greater certainty, "Security" does not include any Security (as such term is defined in the Senior Credit Agreement) except for Security to the extent such Security has been executed and delivered to and in favour of both the Lender and Royal Bank of Canada, as Senior Lender (in which such case, such Security shall constitute "Security" but only to the extent that such Security applies to the Lender in connection with this Agreement).

"**Senior Credit Agreement**" means the amended and restated credit agreement, made as of the date hereof, between the Borrower and the Senior Lender, under which the Senior Lender has committed to provide the Borrower with the credit facilities described therein.

"**Senior Debt**" means Total Debt less the Obligations; provided that, the 2017 Shareholder Loans shall not constitute Senior Debt of the Borrower for purposes of calculating financial covenants in this Agreement.

"**Senior Debt to EBITDA Ratio**" means the ratio of the Borrower's Senior Debt to EBITDA determined on a consolidated basis.

"**Senior Lender**" means Royal Bank of Canada and its successors as lender under the Senior Credit Agreement.

"**Shareholder Subordination Agreement**" means the subordination and postponement agreement, made as of November 21, 2017, between the Borrower, the Lender and each of the holders of the 2017 Shareholder Loans.

"**Software**" means all software relating to the business of the Borrower, including all versions thereof, and all related documentation, manuals, source code and object code, program files, data files, computer related data, field and data definitions and relationships, data definition specifications, data models, program and system logic, interfaces, program modules, routines, sub-routines, algorithms, program architecture, design concepts, system designs, program structure, sequence and organization, screen displays and report layouts, and all other material related to such software.

"**Subsidiary**" means, at any time, with respect to any Person, any other Person, if at such time the first mentioned Person (i) owns, directly or indirectly, securities or other ownership interests in such other Person, having ordinary voting power to elect a majority of the board of directors or persons performing similar functions for such other Person, and (ii) directly or indirectly, through the operation of any agreement or otherwise, the ability to elect or cause the election of a majority of the board of directors or other persons performing similar functions for such other Person or otherwise exercise control over the management and policies of such other Person, and in either case will include any other Person in like relationship to a Subsidiary of such first mentioned Person.

"**Tax Expense**" means, for any period, without duplication, the tax expense (including federal, provincial, state, local and foreign income taxes) of a Person, for such period, determined on a consolidated basis in accordance with GAAP.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties applicable thereto or value added taxes.

"**Total Debt**" means the Debt of the Borrower determined on a consolidated basis; provided that, (i) Earn Out Obligations relating to the 36 Labs Group Acquisition, and (ii) the 2017 Shareholder Loans shall not constitute Debt of the Borrower for purposes of calculating financial covenants in this Agreement.

"**Total Debt to EBITDA Ratio**" means the ratio of the Borrower's Total Debt to EBITDA determined on a consolidated basis.

"**Transaction Costs**" means costs and expenses incurred in connection with the Voom Acquisition and the transaction contemplated by the Original Credit Agreement and credit agreement, made as of the Original Closing Date, between the Borrower and the Senior Lender.

"**United States Dollars**", "**U.S.$**" and "**$**" means the lawful money of the United States of America.

"**Vendor Take Back Debenture**" means the secured debenture dated July 20, 2016 executed and delivered by the Parent to and in favour of 2440310 Ontario Inc.

"**Vendor Take Back Obligations**" means all of the debts and obligations under and pursuant to the Vendor Take Back Debenture.

"**Voom Acquisition**" means the acquisition by the Parent from 2440310 Ontario Inc. on or about July 20, 2016 of all of the shares of Voom Media Corp. pursuant to the Voom Acquisition Agreement.

"**Voom Acquisition Agreement**" means the share purchase agreement dated July 20, 2016 between the Parent, 2440310 Ontario Inc. and Voom Media Corp.

1.02      **Extended Meanings**

In this Agreement words importing the singular number include the plural and *vice versa*, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and Governmental Authorities.  The term "including" means "including without limiting the generality of the foregoing" and the term "third party" means any person other than a person a party to this Agreement.

1.03      **Accounting Principles**

(1)      Where the character or amount of any asset or liability or item of revenue or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement or any Loan Document, such

determination or calculation will, to the extent applicable and except as otherwise specified herein or as otherwise agreed in writing by the parties, be made in accordance with GAAP.

(2)      All calculations for the purposes of determining compliance with the financial ratios and financial covenants contained in this Agreement will be made on a basis consistent with GAAP as it exists on the date of this Agreement and used in the preparation of the consolidated financial statements of the Borrower for its financial year ended December 31, 2016.  In the event of a change in such GAAP, the Borrower and the Lender will negotiate in good faith to revise (if appropriate) such ratios and covenants to reflect GAAP as then in effect.

1.04      **Interest Calculations and Payments**

Unless otherwise stated, wherever in this Agreement reference is made to a rate of interest "*per annum*" or a similar expression is used, such interest will be calculated on the basis of a calendar year of 365 days or 366 days, as the case may be, and using the nominal rate method of calculation and not the effective rate method of calculation or on any other basis that gives effect to the principle of deemed reinvestment of interest.  Interest will continue to accrue after maturity and default and/or judgment, if any, until payment thereof, and interest will accrue on overdue interest, if any.

1.05      **Permitted Encumbrances**

The inclusion of reference to Permitted Encumbrances in any Loan Document is not intended to subordinate and will not subordinate, any Encumbrance created by any of the Security to any Permitted Encumbrance.

1.06      **Currency**

Unless otherwise specified in this Agreement, all references to currency (without further description) are to lawful money of the United States of America.

1.07      **Conflicts**

In the event of a conflict between the provisions of this Agreement and the provisions of any other Loan Document, then, unless such Loan Document or an acknowledgement from the Restricted Party and the Lender relative to such Loan Document expressly states that this Section 1.07 is not applicable to such Loan Document, notwithstanding anything else contained in such other Loan Document, the provisions of this Agreement will prevail and the provisions of such other Loan Document will be deemed to be amended to the extent necessary to eliminate such conflict.

1.08      **Schedules**

The following are the Schedules attached hereto and incorporated by reference and deemed to be part hereof:

| | | |
|---|---|---|
| Schedule 1.01(A) | - | Compliance Certificate |
| Schedule 1.01(B) | - | Material Contracts |

| Schedule 1.01(C) | - | Relevant Jurisdictions |
| Schedule 1.01(D) | - | Repayment Notice |
| Schedule 6.01(8) | - | Litigation Disclosure |
| Schedule 6.01(12) | - | Ownership Structure |
| Schedule 6.01(16) | - | Intellectual Property Rights |
| Schedule 6.01(22) | - | Bank Accounts |

## ARTICLE 2 - THE LOAN

2.01      **Establishment of the Loan**

(1)      Subject to the terms and conditions of this Agreement, the Lender establishes in favour of the Borrower the Loan, which was made available by way of a single advance on the Original Closing Date. Any amount of the Loan not drawn on the Original Closing Date was automatically cancelled. The Loan was advanced on a non-revolving term basis. Any Repayment made on account of the Outstanding Amount may not be reborrowed.

(2)      All amounts owing pursuant to the Original Credit Agreement on the Closing Date shall continue to be owing under this Agreement.

2.02      **Purpose of the Loan**

The Loan will only be used to fund the permanent repayment of the Vendor Take Back Obligations and all Debt owing to Silicon Valley Bank and related transaction costs.

## ARTICLE 3 – CONDITIONS PRECEDENT

3.01      **Conditions Precedent to the Effectiveness of this Agreement**

This Agreement shall not be effective and the Closing Date will not occur until the following conditions precedent have been satisfied:

(a)      this Agreement will have been executed and delivered by all parties hereto;

(b)      the Lender will have completed its due diligence with respect to the Restricted Parties and the results of such due diligence will be satisfactory to the Lender in its sole discretion;

(c)      the Lender shall have received all necessary "know your customer" information;

(d)      the Lender shall have received a *pro forma* Compliance Certificate;

(e)      the Lender will have received and be satisfied with the Senior Credit Agreement;

(f)      the representations and warranties in Article 6 shall be true and correct and an officer of the Borrower shall have certified as such to the Lender;

(g)      no Default or Event of Default shall have occurred and be continuing on the Closing Date and an officer of the Borrower shall have certified as such to the Lender;

(h)      a Material Adverse Change shall not have occurred and be existing and an officer of the Borrower shall have certified as such to the Lender;

(i)      the Lender will have received an acknowledgement and confirmation agreement from each Restricted Party with respect to, among other things, the continuing effect of the Security (including each Guarantee delivered by a Restricted Party (other than the Borrower)) previously delivered by it;

(j)      the Lender will have received certified copies of the Organizational Documents of the Borrower and the Parent, the resolutions authorizing the execution and delivery of, and performance of the Borrower's and the Parent's obligations under, the Loan Documents and the transactions contemplated herein, and a certificate as to the incumbency of the officers of the Borrower and the Parent;

(k)      the Lender will have received (i) certified copies of the promissory notes or loan agreements between the Borrower and the holders of the 2017 Shareholder Loans and (ii) the Shareholder Subordination Agreement, each of which shall be on terms satisfactory to the Lender;

(l)      the 2017 Shareholder Loans shall have been advanced to the Borrower;

(m)      certificates of status or comparable certificates for all Relevant Jurisdictions of the Borrower and the Parent will have been delivered to the Lender;

(n)      except as otherwise agreed by the Lender, the Lender will have received certified copies of all shareholder, regulatory, governmental and other approvals required in order for the Borrower to enter into this Agreement and to perform its obligations hereunder;

(o)      no legislation (whether by statute, regulation, order-in-council, notice of ways and means motion, by-law or otherwise) shall have been enacted, introduced or tabled which, in the reasonable opinion of Lender, causes or will likely cause a Material Adverse Change and there shall not exist any prohibition at law, including a cease trade order, injunction or other prohibition or order at law or under Applicable Laws, which seeks to prohibit or enjoin the Loan or makes consummation of the transactions illegal;

(p)      the Lender will have received payment of all fees and expenses payable to the Lender that are due and payable at such time (including payment of the fees and expenses of Lender's Counsel);

(q)      no action, suit or proceeding (except as has been disclosed to the Lender; subject to Lender's satisfaction with such matters) shall have been commenced or threatened by any person, including any governmental authority: (i) to cease

trade, enjoin, prohibit, or impose material limitations or conditions on the transactions or the rights of the Borrower to own or exercise full rights of ownership of its tangible or intangible property; (ii) to prohibit the Borrower from effectively controlling in any material respect its business or operations; (iii) which has had, or if successful would reasonably be expected to result in a Material Adverse Change; (iv) that could reasonably be expected to materially adversely affect the ability of the Borrower to perform its obligations under the Loan Documents; or (v) that could reasonably be expected to materially adversely affect the rights and remedies of Lender under the Loan Documents;

(r)     no facts shall have arisen which would render information previously furnished to the Lender to be inaccurate in any material respect;

(s)     a currently dated letter of opinion of Borrower's Counsel as to such matters and in such form as Lender's Counsel deems appropriate addressed to the Lender will have been delivered to the Lender; and

(t)     receipt by the Lender of such other documents, agreements and instruments as may be required by the Lender;

provided that all documents delivered pursuant to this Section 3.01 must be in full force and effect, and in form and substance satisfactory to the Lender, acting reasonably.

## ARTICLE 4 – GENERAL CONDITIONS

4.01     **Interest on the Loan**

(1)     Interest shall accrue and the Borrower agrees to be liable for and pay interest on the Outstanding Amount at the Interest Rate. Interest in respect of the Outstanding Amount shall be payable by way of Monthly Interest Payments on each and every Interest Payment Date during which the Outstanding Amount remains outstanding and on the Maturity Date and each Repayment Date, as applicable, in accordance with Section 4.03.

(2)     Notwithstanding the foregoing, upon the occurrence of an Event of Default which is continuing, the Borrower shall pay interest on the Outstanding Amount from the date of the occurrence of such Event of Default and for so long as such Event of Default continues at a rate per annum of eighteen percent (18.0%).

4.02     **Payment in Kind (PIK)**

Provided that there is not then existing a Default or an Event of Default which is continuing, the Borrower may, upon providing at least three (3) Business Days' prior written notice ("**PIK Notice**") to the Lender, elect to pay all or any portion of a Monthly Interest Payment in kind (and not in cash) up to a maximum rate of interest of five percent (5.0%) per annum and the amount so paid in kind shall be added to the Outstanding Amount on the applicable Interest Payment Date.  Accordingly, when the Borrower so elects, interest at the applicable interest rate set out in the PIK Notice delivered by the Borrower shall be paid in cash at a rate that is not less than ten percent (10.0%) per annum (provided, for greater certainty, that

the total annual rate of interest, whether such interest is paid in cash or paid in cash and in kind, shall not exceed fifteen percent (15.0%) per annum, except when the default rate of interest is in effect in accordance with Section 4.01) and the balance of the interest payable hereunder shall accrue in accordance with the provisions of this Section 4.02. The PIK Notice shall be in writing and shall set out the applicable Monthly Interest Payment and shall indicate the percentages (expressed as an annual percentage) and applicable amounts to be paid in cash and in kind. For greater certainty, interest shall accrue and be payable on interest capitalized hereunder in the same manner and form and at the same time as any other amount of principal hereunder, no matter how it may arise.

In addition, the Borrower and the Lender agree that the Borrower has paid to the Lender a fee in the amount of $100,000 on the Closing Date (the "**Amendment Fee**") which payment has been made in kind by increasing the Outstanding Amount by the amount of the Amendment Fee effective as of the Closing Date.

4.03      **Matters Relating to Interest**

(1)      Unless otherwise indicated and subject to Section 4.03(2), interest on any Outstanding Amount shall be calculated daily and shall be payable monthly in arrears on the last day of each and every month commencing on August 31, 2016. If the last day of a month is not a Business Day, the interest payment due on such day shall be made on the next Business Day, and interest shall continue to accrue on the said Outstanding Amount but interest to be collected for such interest period shall not be adjusted for the additional days. Interest on those additional days shall be paid on the next Interest Payment Date. Interest shall accrue from and including the Closing Date, and ending on but excluding the day on which the Loan is repaid.

(2)      Unless otherwise stated, in this Agreement if reference is made to a rate of interest, fee or other amount "per annum" or a similar expression is used, such interest, fee or other amount shall be calculated on the basis of a year of three hundred and sixty-five (365) or three hundred and sixty-six (366) days, as the case may be. If the amount of any interest, fee or other amount is determined or expressed on the basis of a period of less than one year of three hundred and sixty-five (365) or three hundred and sixty-six (366) days, as the case may be, the equivalent yearly rate is equal to the rate so determined or expressed, divided by the number of days in the said period, and multiplied by the actual number of days in that calendar year.

4.04      **Account of Record**

The Lender will open and maintain books of account evidencing the Loan and all other amounts owing by the Borrower to the Lender hereunder. The Lender will enter in the foregoing accounts details of all amounts from time to time owing, paid or repaid by the Borrower hereunder. The information entered in the foregoing accounts will constitute prima facie evidence of the obligations of the Borrower to the Lender hereunder with respect to the Loan and all other amounts owing by the Borrower to the Lender hereunder. After a request by the Borrower, the Lender will promptly advise the Borrower of such entries made in the Lender's books of account.

4.05 **Maximum Rate of Interest**

Notwithstanding anything contained herein to the contrary, the Borrower will not be obliged to make any payment of interest or other amounts payable to the Lender hereunder in excess of the amount or rate that would be permitted by Applicable Law or would result in the receipt by the Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)). If the making of any payment by the Borrower would result in a payment being made that is in excess of such amount or rate, the Lender will determine the payment or payments that are to be reduced or refunded, as the case may be, so that such result does not occur.

4.06 **Place of Payment of Principal, Interest and Fees**

All payments of principal, interest, fees and other amounts to be made by the Borrower to the Lender pursuant to this Agreement will be made in the currency in which the Loan is outstanding for value on the day such amount is due or, if such day is not a Business Day, on the Business Day next following with interest, by deposit or transfer thereof to the account designated from time to time in writing by the Lender at the Lending Office.

4.07 **Observer Rights of the Lender**

(1) The Lender shall be entitled to have two observers present at all meetings of the board of directors of the Parent, the Borrower and its Subsidiaries and any sub-committee thereof. Notwithstanding the foregoing, the observers of the Lender may be excluded from any such meetings (or any portion thereof), solely to the extent that the board of directors determines in good faith that (i) such meetings will involve discussions regarding the Loan or the RBC Senior Debt, or any alternatives thereto, of the Parent, the Borrower or its Subsidiaries, (ii) such exclusion is required to preserve attorney-client privilege or (iii) such exclusion is required to avoid a conflict of interest between the interests of the Parent, the Borrower or its Subsidiaries on the one hand, and the interests of the Lender on the other hand. The Borrower shall reimburse the Lender for all reasonable out of pocket travel and other incidental expenses of such observers.

(2) The Borrower shall ensure that all information provided to the board of directors of the Parent, the Borrower and its Subsidiaries from time to time in connection with a meeting or vote taken by written consent is concurrently provided to the Lender. Notwithstanding the foregoing, the Borrower may refrain from providing such information (or any portion thereof) to the Lender, or such information may be redacted, solely to the extent that the board of directors of the Borrower determines in good faith that (i) such information concerns the Loan or the RBC Senior Debt, or any alternatives thereto, of the Borrower or its Subsidiaries, (ii) such exclusion or redaction, as the case may be, is required to preserve attorney-client privilege or (iii) such exclusion or redaction, as the case may be, is required to avoid a conflict of interest between the interests of the Borrower or its Subsidiaries on the one hand, and the interests of the Lender on the other hand.

## ARTICLE 5 - REPAYMENT

5.01      **Mandatory Repayment at Maturity**

The Borrower will repay in full the outstanding principal amount of the Loan and other Obligations under this Agreement on or before the Maturity Date.

5.02      **Mandatory Repayments upon Certain Events**

The Outstanding Amount plus all other fees and reasonable out-of-pocket expenses and other amounts due hereunder including the Prepayment Premium, if any, shall, at the Lender's option, be paid in full on the date which is the earliest of the following (the "**Repayment Date**"):

    (a)    the date on which all or substantially all of the assets of the Borrower and its Subsidiaries are sold or transferred to a Person other than a Restricted Party;

    (b)    the date on which any Restricted Party completes an initial public offering of its Equity Interests;

    (c)    the date on which a Change of Control occurs; or

    (d)    the date on which Jason Theofilos ceases to: (i) hold the position of chief executive officer of either the Parent or the Borrower for any reason other than due to death or illness; or (ii) own, directly or indirectly, at least 20% of the voting capital stock of the Borrower.

All amounts repaid by the Borrower on the Repayment Date as aforesaid shall be made payable by the Borrower to the Lender. Any mandatory repayments made pursuant to this Section 5.02 shall be accompanied by all accrued and unpaid interest on such prepaid portion of the Loan, and, if applicable, the Prepayment Premium (in the manner as set forth in Section 5.05).

Each amount payable by the Borrower pursuant to Section 5.02 shall be reduced by the amount that the Borrower is required to repay the RBC Senior Debt under the terms of the Senior Credit Agreement and shall be subject to the Intercreditor Agreement and the prior rights of the Senior Lender.

5.03      **Other Mandatory Repayments**

(1)      In addition to the repayments required under Section 5.01 and Section 5.02 above, and subject to Section 5.03(2):

    (i)    if the Borrower, a Guarantor or any of their Subsidiaries receives a payment of net insurance proceeds under or in connection with an insurance policy in connection with:

(A)     the loss, damage or destruction of any property, then on the date which is one hundred and eighty (180) days after receipt of such payment the Borrower shall, at the request of the Lender, prepay the Loan in an amount equal to the Equivalent Amount in United States Dollars of the portion of such net insurance proceeds that has not been applied to the repair or replacement of such property from which such proceeds were derived; or

(B)     the life of Jason Theofilos, then the net proceeds so received shall, at the request of the Lender, prepay the Loan in an amount equal to the Equivalent Amount in United States Dollars; it being hereby agreed by the Lender that any net proceeds received by the Lender as beneficiary under any such life insurance policy shall be used to prepay the Loan in an amount equal to the Equivalent Amount in United States Dollars (subject to the prior rights of the Senior Lender to repayment from the proceeds thereof) and the aggregate amount of such net proceeds after the Loan has been repaid in full shall be delivered promptly to the Borrower in immediately available cash;

(ii)     if the Borrower, a Guarantor or any of their Subsidiaries receives a payment of Net Proceeds in an amount in excess of $250,000 pursuant to or in connection with an Disposition of Property (other than those permitted pursuant to Section 7.04(1)), then, on the date which is one hundred and eighty (180) days after receipt of such payment the Borrower shall prepay the Loan in an amount equal to the Equivalent Amount in United States Dollars of the Net Asset Sale Proceeds that has not been applied to purchase similar or other useful property for the Business; and

(iii)     if the Borrower, a Guarantor or any of their Subsidiaries receives a payment receives a payment of proceeds pursuant to or in connection with the issuance of Debt (other than Debt permitted pursuant to Section 7.04(4)), on the date which is five (5) days after receipt of such payment, the Borrower shall prepay the Loan in an amount equal to the Equivalent Amount in United States Dollars of one hundred percent (100%) of the portion of the net proceeds of such payment.

(2)     Each amount payable by the Borrower pursuant to Section 5.03(1) shall be reduced by the amount that the Borrower is required to repay the RBC Senior Debt under the terms of the Senior Credit Agreement and shall be subject to the Intercreditor Agreement and the prior rights of the Senior Lender.

5.04     **Voluntary Prepayments**

If the Lender has received a Repayment Notice from the Borrower not less than five Business Days prior to the proposed prepayment date, subject to the terms of the Intercreditor Agreement and the prior rights of the Senior Lender, the Borrower may from time

to time prepay all or any part of the Loan provided that each such prepayment must be in a minimum amount of $500,000 and in increments of $50,000.  Any voluntary prepayments made pursuant to this Section 5.04 shall be accompanied by all accrued and unpaid interest on such prepaid portion of the Loan, and, if applicable, the Prepayment Premium (in the manner as set forth in Section 5.05).

5.05        **Prepayment Premium**

            If the Borrower makes a Repayment (whether voluntary or mandatory except for any Repayment pursuant to Section 5.03(1)(i) or a repayment of the Outstanding Amount equal to the Amendment Fee) of all or any portion of the Outstanding Amount owing by it during the first 24 months following the Original Closing Date, the Borrower shall pay to the Lender, in addition to that portion of the Outstanding Amount repaid on the applicable Repayment Date, an amount equal to 24 months' interest on such repaid portion of the Outstanding Amount less the amount of interest paid or accrued or owing on such repaid portion of the Outstanding Amount up to such date of Repayment (the "**Prepayment Premium**"). Any such Repayment shall be accompanied by all accrued and unpaid and owing interest on that portion of the Outstanding Amount so repaid.

## ARTICLE 6 - REPRESENTATIONS AND WARRANTIES

6.01        **Representations and Warranties**

            The Borrower represents and warrants to the Lender as follows, and acknowledges and confirms that the Lender is relying upon such representations and warranties:

            (1)        Existence and Qualification  Each of the Restricted Parties, (a) that is a corporation or company has been duly incorporated, amalgamated or continued, as the case may be, and is validly subsisting as a corporation or company under the laws of its jurisdiction of incorporation, amalgamation, or continuance, as the case may, (b) that is not a corporation or company has been duly created or established as a partnership or other entity and validly exists under the laws of the jurisdiction in which it has been created or established, and (c) is duly qualified to carry on business in all jurisdictions in which it carries on business and has all Material Licences.

            (2)        Power and Authority  Each of the Restricted Parties has the power, authority and right (a) to enter into and deliver, and to exercise its rights and perform its obligations under, the Loan Documents to which it is a party and all other instruments and agreements delivered by it pursuant to any of the Loan Documents, and (b) to own its Property and carry on its business as currently conducted and as currently proposed to be conducted by it.

            (3)        Execution, Delivery, Performance and Enforceability of Documents  The execution, delivery and performance of each of the Loan Documents to which a Restricted Party is a party, and every other instrument or agreement delivered by it pursuant to any Loan Document, has been duly authorized by all actions, if any, required on its part and by its shareholders and directors (or where applicable partners, members or managers), and each of the Loan Documents and such other instruments and agreements has been duly executed and delivered and constitutes a valid and legally binding obligation of the particular Restricted Party

enforceable against it in accordance with its terms subject to bankruptcy, insolvency, reorganization, arrangement, winding-up, moratorium and other similar laws of general application limiting the enforcement of creditors' rights generally and to general equitable principles.

(4)     <u>Loan Documents Comply with Applicable Laws, Organizational Documents and Contractual Obligations</u>  Neither the entering into nor the delivery of, and neither the consummation of the transactions contemplated in nor compliance with the terms, conditions and provisions of, the Loan Documents by any Restricted Party conflicts with or will conflict with, or results or will result in any breach of, or constitutes a default under or contravention of, any Requirement of Law applicable to it or any of its Organizational Documents (except, in each case, where such conflict, breach, default, or contravention would not, individually or in the aggregate, constitute, or be reasonably likely to result in, a Material Adverse Change), or results or will result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) upon any of its Property.

(5)     <u>Consents Respecting Loan Documents</u>  Each of the Restricted Parties has obtained, made or taken all consents, approvals, authorizations, declarations, registrations, filings, notices and other actions whatsoever required as to the date hereof in connection with the execution and delivery by it of each of the Loan Documents to which it is a party and the consummation of the transactions contemplated in the Loan Documents, provided that, the registration of any Loan Documents with the registration of any Loan Documents with the *Administration de l'enregistrement et des Domaines* may be requested in case of legal proceedings before a Luxembourg courts or when such Loan Document has to be produced before an official Luxembourg authority.

(6)     <u>Taxes</u>  Each of the Restricted Parties has paid or made adequate provision for the payment of all Taxes levied on it or on its Property or income that are due and payable, including interest and penalties, or has accrued such amounts in its financial statements for the payment of such Taxes except Taxes that are not material in amount, that are not delinquent or if delinquent are being contested, and in respect of which non-payment would not individually or in the aggregate constitute, or be reasonably likely to cause, a Material Adverse Change, and, except as set forth in Schedule 6.01(8), there is no material action, suit, proceeding, investigation, audit or claim now pending, or to its knowledge threatened, by any Governmental Authority regarding any Taxes nor has it agreed to waive or extend any statute of limitations with respect to the payment or collection of Taxes.

(7)     <u>Judgments, Etc.</u>  None of the Restricted Parties is subject to any judgment, order, writ, injunction, decree or award, or to any restriction, rule or regulation (other than customary or ordinary course restrictions, rules and regulations consistent or similar with those imposed on other Persons engaged in similar businesses) that has not been stayed or of which enforcement has not been suspended and that individually or in the aggregate exceeds $250,000 or constitutes, or is reasonably likely to cause, a Material Adverse Change.

(8)     <u>Absence of Litigation</u>  Except as set forth in Schedule 6.01(8), as at the Closing Date, there are no actions, suits or proceedings pending or, to the best of the Borrower's knowledge and belief, after due inquiry and all reasonable investigation, threatened against or

affecting any Restricted Party that individually or in the aggregate exceeds $250,000 or are reasonably likely to cause, either separately or in the aggregate, a Material Adverse Change.

(9)      Title to Assets  Each of the Restricted Parties has good title to its Property, free and clear of all Encumbrances except Permitted Encumbrances and no Person has any agreement or right to acquire an interest in such Property other than in the ordinary course of the business of the applicable Restricted Party.

(10)      Compliance with Laws  None of the Restricted Parties is in default under any Applicable Law where such default could reasonably be expected to cause a Material Adverse Change or affect its ability to perform any of its obligations under any Loan Document to which it is a party.  Each Restricted Party is in compliance with Anti-Corruption Laws, AML Laws and Sanctions Laws.

(11)      No Default  No Default or Event of Default has occurred and is continuing.

(12)      Ownership Structure  The ownership structure of the Parent, the Borrower and its Subsidiaries is as set out in Schedule 6.01(12) (including as of the Closing Date), which contains:

(a)      a list of all Restricted Parties; and

(b)      complete and accurate information respecting:

(i)      each such Restricted Party's name (including any French and English forms of name) and the jurisdiction in which each Restricted Party was formed;

(ii)      the address of each Restricted Party's chief executive office and chief place of business and, if the same is different, the address at which the books and records of such Restricted Party are located, the address at which senior management of such Restricted Party are located and conduct their deliberations and make their decisions with respect to the business of such Restricted Party and the address from which the invoices and accounts of such Restricted Party are issued; and

(iii)      the authorized capital of the Parent, the Borrower and each Restricted Party, the number of issued and outstanding shares of each such Person and the beneficial owners thereof.

(13)      Relevant Jurisdictions  The Relevant Jurisdictions for each Restricted Party are set forth on Schedule 1.01(C).

(14)      Security  The Security is effective to create in favour of the Lender, as security for the Obligations described therein, a legal, valid, binding and enforceable security interest in the collateral described therein and proceeds thereof.

(15)     <u>Software</u>  Each of the Restricted Parties owns or has licensed for use all of the material Software necessary to conduct its businesses.

(16)     <u>Intellectual Property Rights</u>  Each of the Restricted Parties has sufficient Intellectual Property Rights reasonably necessary for the conduct of its businesses.  All patents, trade-marks, copyrights or industrial designs (including those which have been either registered or in respect of which a registration application has been filed by a Restricted Party), as at the Closing Date, are listed on Schedule 6.01(16).To the Borrower's knowledge, none of the Restricted Parties is infringing or is alleged to be infringing the Intellectual Property Rights of any other Person in a manner that could reasonably be expected to cause, or if any allegation is determined adversely could reasonably be expected to cause, a Material Adverse Change other than as disclosed in Schedule 6.01(16).

(17)     <u>Material Contracts and Material Licences</u>  To the best of the Borrower's knowledge, no event has occurred and is continuing that would constitute a breach of or a default under any Material Contract or Material Licence and each Material Contract to which a Restricted Party is a party is binding upon it and, to the Borrower's knowledge, is a binding agreement of each other Person who is a party thereto.

(18)     <u>Financial Statements</u>  All of the quarterly and annual financial statements that have been furnished to the Lender in connection with this Agreement are complete in all material respects and such financial statements fairly present the consolidated financial position of the Parent as of the dates referred to therein and have been prepared in accordance with GAAP.

(19)     <u>No Material Adverse Change</u>  Since the date of the Borrower's most recent annual audited financial statements provided to the Lender, there has been no condition (financial or otherwise), event or change in any Restricted Party's business, liabilities, operations, results of operations or assets which constitutes, or could reasonably be expected to constitute, or cause, a Material Adverse Change.

(20)     <u>Environmental Matters</u>

(a)     Except to the extent that the non-compliance would not or could not reasonably be expected to cause a Material Adverse Change, the assets of each Restricted Party and its operations are in full compliance in all respects with all material Environmental Laws; the Borrower is not aware of, nor has it received notice of, any past, present or future condition, event, activity, practice or incident that may interfere with or prevent the compliance or continued compliance of it or any other Restricted Party in all material respects with all material Environmental Laws; and each Restricted Party has obtained all licences, permits and approvals that are currently required under all material Environmental Laws and is in full compliance with the provisions of such licences, permits and approvals.

(b)     The Borrower is not aware that any Hazardous Substances exist on, about or within or have been used, generated, stored, transported, disposed of on, or released from any of its Property or the Property of any other Restricted Party other than in material accordance and compliance with all Environmental Laws,

except to the extent that the non-compliance would not or could not reasonably be expected to cause a Material Adverse Change.

(21)     <u>Pension Plans</u>  The Restricted Parties do not have or maintain any Pension Plans.

(22)     <u>Bank Accounts</u>  No Restricted Party maintains a bank account other than as set forth on Schedule 6.01(22).  Schedule 6.01(22) contains a list of all bank accounts maintained by the Restricted Parties.

(23)     <u>Pre-IPO Shareholder Loans</u>  Each of the Pre-IPO Shareholder Loans have been extinguished on a non-cash basis.

(24)     <u>Full Disclosure</u>  All information provided or to be provided to the Lender in connection with the Loan is, to the Borrower's knowledge, true and correct and none of the documentation furnished to the Lender by or on behalf of it, to its knowledge, omits or will omit as of such time, a material fact necessary to make the statements contained therein not misleading in any material way, and all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by it (and any other Person who furnished such material on behalf of it).

6.02     <u>**Survival and Repetition of Representations and Warranties**</u>

The representations and warranties set out in Section 6.01 survive the execution and delivery of this Agreement and all other Loan Documents and will be deemed to be repeated by the Borrower as of the date of each Compliance Certificate delivered pursuant to Section 7.03(2).  To the extent that on or prior to such date (a) the Borrower has advised the Lender in writing of a variation in any such representation or warranty, and (b) if such variation, in the opinion of the Lender, acting reasonably, is material to the Property, liabilities, affairs, business, operations or condition (financial or otherwise) of any Restricted Party considered as a whole or could have, or be reasonably likely to result in, a Material Adverse Change, and the Lender has approved such variation, then such representation and warranty will thereafter be deemed to be varied as approved by the Lender.

<u>**ARTICLE 7 - COVENANTS**</u>

7.01     <u>**Positive Covenants**</u>

So long as this Agreement is in force and except as otherwise permitted by the prior written consent of the Lender, the Borrower will, and will cause each of the other Restricted Parties to:

(1)     <u>Timely payment</u>  Make due and timely payment of the Obligations required to be paid by it hereunder.

(2)     <u>Conduct of Business, Maintenance of Existence, Compliance with Laws</u>  Carry on and conduct its business and operations in a proper, efficient and businesslike manner, in accordance with good business practice; preserve, renew and keep in full force and effect its existence; and take all reasonable action to maintain all rights, privileges and franchises

necessary in the normal conduct of its business and to comply in all material respects with all Material Contracts, Material Licences and Requirements of Law.

(3)     <u>Further Assurances</u>  Use reasonable efforts to provide the Lender with such other documents, opinions, consents, acknowledgments and agreements as are reasonably necessary to implement this Agreement and the other Loan Documents from time to time.

(4)     <u>Access to Information</u>  Promptly provide the Lender with all information reasonably requested by the Lender from time to time concerning its financial condition and Property, and during normal business hours and from time to time upon reasonable notice, permit representatives of the Lender to inspect any of its Property and to examine and take extracts from its financial records, including records stored in computer data banks and computer software systems, and to discuss its financial condition with its senior officers and (in the presence of such of its representatives as it may designate) its auditors, the reasonable expense of all of which will be paid by the Borrower; provided that prior to the occurrence of an Event of Default which is continuing, such costs shall be limited to one such inspection per fiscal year.

(5)     <u>Books and Records</u>.  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.

(6)     <u>Obligations and Taxes</u>  Pay or discharge, or cause to be paid or discharged, before the same will become delinquent (i) all Taxes imposed upon it or upon its income or profits or in respect of its business or Property and file all tax returns in respect thereof, (ii) all lawful claims for labour, materials and supplies, (iii) all required payments under any of its Debt, and (iv) all other obligations; provided, however that it will not be required to pay or discharge or to cause to be paid or discharged any such amount so long as the validity or amount thereof is being contested in good faith by appropriate proceedings and an appropriate financial reserve in accordance with GAAP and satisfactory to the Lender has been established.

(7)     <u>Use of the Loan</u>  Use the proceeds of the Loan only for the purposes specified in Section 2.02.

(8)     <u>Insurance</u>  Maintain insurance on all its Property (showing the Lender as the loss payee as its interests may appear) with financially sound and reputable insurance companies or associations including all-risk property insurance, comprehensive general liability insurance and business interruption insurance, in amounts and against risks that are determined by it to be appropriate and that are prudent in the circumstances; furnish to the Lender, on written request, but in any event annually, satisfactory evidence of the insurance carried and notify the Lender of any claim it makes under the foregoing insurance policies that is in excess of $250,000.

(9)     <u>Notice of Default</u>  Promptly notify the Lender of the occurrence of any Default or Event of Default.

(10)     <u>Notice of Material Adverse Change</u>  Promptly notify the Lender of any Material Adverse Change that would apply to it of which it becomes aware, using reasonable diligence.

(11)     Notice of Litigation   Promptly notify the Lender on becoming aware of the occurrence of any litigation, dispute, arbitration or other proceeding (commenced by a Governmental Authority or otherwise) the result of which if determined adversely would be a judgement or award against it (a) in excess of $250,000, or (b) would result in a Material Adverse Change to it, and from time to time provide the Lender with all reasonable information requested by the Lender concerning the status of any such proceeding.

(12)     Environmental Compliance   Operate all Property owned, leased or otherwise used by in material compliance with Environmental Law.

(13)     Security   Provide the Lender with the Security required from time to time pursuant to Article 8 in accordance with the provisions of such Article, accompanied by supporting resolutions, certificates and opinions in form and substance satisfactory to the Lender, acting reasonably, and do all such further acts and execute and deliver all such documents and instruments as may from time to time be requested by the Lender, acting reasonably, to ensure that the Security constitutes at all times valid, enforceable, and perfected first priority Encumbrances (subject only to Permitted Encumbrances).

(14)     Maintenance of Property   Keep all Property useful and necessary for its business in good working order and condition, normal wear and tear excepted, and maintain all Intellectual Property necessary to carry on its business, except to the extent that the failure to do so would not individually or in the aggregate be reasonably likely to cause a Material Adverse Change.

(15)     Certain Laws   Comply with, and not use the proceeds of the Loan in contravention of, Anti-Corruption Laws, Sanctions Laws and AML Laws.

(16)     Quarterly Meetings   Meet with the Lender to review the financial statements and discuss business matters not less than once per Fiscal Quarter.  The Borrower agrees to pay all reasonable expenses incurred by the Lender in connection with such meetings.

(17)     Bank Accounts   Ensure that all bank accounts of the Restricted Parties are maintained with the Lender (or one of its Affiliates or Subsidiaries) at all times. In the event any bank account of a Restricted Party is not held with the Lender (or one of the Lender's Affiliates or Subsidiaries) as the depositary bank for any reason, such Restricted Party shall (a) close such account and deposit, or cause to be deposited, all funds therein to a bank account held with the Lender (or one of the Lender's Affiliates or Subsidiaries) within sixty (60) days of the Closing Date, or (b) shall cause to be executed and delivered to the Lender a blocked account control agreement or a deposit account control agreement, such agreement to be in form and substance satisfactory to the Lender, with respect to such bank account, within sixty (60) days of the Closing Date for any bank account in existence on the date hereof and within thirty (30) days for any bank account opened after the Closing Date.

(18)     Parent Shareholder Agreement   On or before January 31, 2018, deliver to the Lender a certified copy of the executed shareholder agreement in respect of the Parent, substantially in the form of the shareholder agreement of Customer Acquisition Network (Canada) Inc. delivered to the Lender on the Original Closing Date.

(19)    <u>Luxco Newco</u>  On or before January 31, 2018, deliver each of the following documents to the Lender, in each case in form and substance satisfactory to the Lender:

(a)    the Security described in Section 8.01(4);

(b)    a copy of the shareholder register of Luxco Newco evidencing the registration of the pledge of shares by 2307521 Ontario Inc.;

(c)    certified copies of the Organizational Documents of each Restricted Party delivering Loan Documents pursuant to this Section 7.01(19), the resolutions authorizing the execution and delivery of, and performance of each Restricted Party's respective obligations under, the Loan Documents and the transactions contemplated herein, and a certificate as to the incumbency of the officers of the Restricted Parties executing the Loan Documents pursuant to this Section 7.01(19) and any other documents to be provided pursuant to the provisions hereof;

(d)    certificates of status or comparable certificates for all Relevant Jurisdictions of each Restricted Party delivering a Loan Document pursuant to this Section 7.01(19);

(e)    all filings and registrations required by the Lender shall have been made in respect of the Security being delivered pursuant to this Section 7.01(19);

(f)    currently dated letters of opinion for the Borrower, together with letters of opinions of Luxembourg counsel for the Borrower and Luxembourg counsel for the Lender, as to such matters and in such form as Lender's Counsel deems appropriate addressed to the Lender; and

(g)    such additional information and documents as the Lender may reasonably require to complete the transactions contemplated hereby in accordance with the terms and conditions contained herein.

7.02    **Financial Covenants**

So long as this Agreement is in force and except as otherwise permitted by the prior written consent of the Lender, the Borrower will ensure that at all times and tested as at the end of each fiscal quarter:

(1)    <u>Senior Debt to EBITDA Ratio</u>  The Senior Debt to EBITDA Ratio is less than (i) 1.75:1.00 during the period commencing on the Original Closing Date and ending on December 30, 2016, (ii) 1.50:1.00 during the period commencing on December 31, 2016 and ending on December 30, 2017, (iii) 2.00:100 commencing on December 31, 2017 and ending on December 30, 2018, (iv) 1.75:1.00 commencing on December 31, 2018 and ending on December 30, 2019 and (v) 1.50:1.00 commencing on December 31, 2019 and at all times thereafter.

(2)    <u>Total Debt to EBITDA Ratio</u>  The Total Debt to EBITDA Ratio is less than (i) 2.75:1.00 during the period commencing on the Original Closing Date and ending on December

30, 2017, (ii) 3.00:100 commencing on December 31, 2017 and ending on December 30, 2018, (iii) 2.75:1.00 commencing on December 31, 2018 and ending on December 30, 2019 and (iv) 2.50:1.00 commencing on December 31, 2019 and at all times thereafter.

(3)    <u>Minimum Fixed Charge Coverage Ratio</u>   The Fixed Charge Coverage Ratio is not less than 1.25:1.00. For purposes of calculating the Fixed Charge Coverage Ratio, the amendments made to the definitions of "Fixed Charge Coverage Ratio" and "Capital Expenditures" pursuant to this Agreement will be effective on and after June 30, 2017.

(4)    <u>EBITDA of 36 Labs Group</u>   The Borrower and the Lender hereby agree that the EBITDA of 36 Labs Group for each fiscal period ending prior to the completion of the 36 Labs Group Acquisition shall be excluded from the calculation of EBITDA under this Agreement for such fiscal periods.

(5)    <u>Waiver of Financial Covenants</u>   Notwithstanding the foregoing, the Lender hereby waives the Borrower's compliance with Section 7.02(1)(ii) and Section 7.02(2)(i) solely for the fiscal period commencing on July 1, 2017 and ending on September 30, 2017.

7.03    **Reporting Requirements**

So long as this Agreement is in force, the Borrower will deliver to the Lender:

(1)    <u>Monthly Reporting</u>   As soon as available, but not later than 30 days after the end of each fiscal month of each year, (i) a copy of the unaudited consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income, and cash flows of the end of such fiscal month and for the portion of the fiscal year then ended, and certified by a senior officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of the Parent and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures. The statements shall also include a comparison of actual results to budget and management commentary on significant variances from budget; and (ii) a Borrowing Base Certificate (as such term is defined in the Senior Credit Agreement) together with inventory and accounts receivable summary ageing reports.

(2)    <u>Quarterly Certificate</u>   As soon as available and in any event within 45 days of the end of each of its fiscal quarters (including the fourth quarter), a Compliance Certificate.

(3)    <u>Annual Reports</u>   As soon as available and in any event within 120 days after the end of each of its fiscal years, a copy of the audited consolidated balance sheet of the Parent and its Subsidiaries and the related consolidated statements of income, and cash flows, which will be reviewed by an internationally recognized accounting firm, and will be prepared in accordance with GAAP and certified by a senior officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of the Parent and its Subsidiaries.

(4)    <u>Quarterly Reporting of Parent</u>   As soon as available and in any event within 45 days of the end of each of the Parent's fiscal quarters (including the fourth quarter), unconsolidated unaudited financial statements of the Parent.

(5)      Annual Budget As soon as available and in any event no later than 30 days following the end of each fiscal year, an annual budget and operating plan for the next fiscal year which shall include full financial statements, detailed cash flow schedules and planned Capital Expenditures for the subsequent fiscal year.

(6)      Senior Credit Agreement  Copies of all requests for additional funding from the Senior Lender or for changes to, modifications of, or relief from, the terms and conditions of the Senior Credit Agreement.

(7)      Other Information  Such other information as it may reasonably request respecting the Restricted Parties including information provided to Royal Bank of Canada under the Senior Credit Agreement.

(8)      Reporting Currency  Beginning on November 1, 2016, for reporting periods commencing after this date, the Borrower will adhere to reporting (for financial reporting and covenant compliance purposes) in United States Dollars.

7.04      **Negative Covenants**

So long as this Agreement is in force the Borrower will not, and will ensure that each Restricted Party will not:

(1)      Disposition of Property  Dispose of, in one transaction or a series of transactions, all or any part of its Property, whether now owned or hereafter acquired, other than (i) sales of inventory in the ordinary course of business and (ii) sales of worn-out, surplus or obsolete Property in the ordinary course of its business subject to compliance with Section 5.03(1)(ii).

(2)      No Consolidation, Amalgamation, etc.  Consolidate, amalgamate or merge with any other Person, enter into any corporate reorganization or other transaction intended to effect or otherwise permit a change in its existing corporate or capital structure, liquidate, wind-up or dissolve itself, or permit any liquidation, winding up or dissolution; provided that (i) a Guarantor may amalgamate with another Guarantor that is formed under laws of the same jurisdiction and (ii) a Guarantor formed under the laws of the same jurisdiction as the Borrower, may amalgamate with the Borrower; subject in each case to the delivery to the Lender of such confirmations, registrations, opinions and certificates as the Lender may require to ensure the perfection and enforceability of the Loan Documents to which the Borrower and such Guarantor are party.

(3)      No Change of Name  Change its name without providing the Lender with 10 days' prior written notice thereof.

(4)      No Debt  Create, incur, assume or permit any Debt to remain outstanding, other than Permitted Debt.

(5)      No Investments  Make, directly or indirectly, any Investment, except for:

(i)      the Voom Acquisition;

(ii)    cash and Cash Equivalents;

(iii)    Investments in the Borrower;

(iv)    Investments by the Parent or the Borrower in Guarantors formed under the laws of Luxembourg, up to $100,000 in the aggregate per fiscal year;

(v)    Investments in Subsidiaries that are not Guarantors not to exceed $50,000 in the aggregate per fiscal year; and

(vi)    the 36 Labs Group Acquisition.

(6)    <u>No Financial Assistance</u>  Provide any Financial Assistance except to the extent that such Financial Assistance constitutes Permitted Debt.

(7)    <u>No Distributions</u>  Make any Distribution except that :

(i)    any Subsidiary of the Borrower may make Distributions to the Borrower or a Guarantor (other than the Parent),

(ii)    the Borrower and its Subsidiaries may make Distributions to the Parent to fund fees and expenses of the board of directors (including fees paid to the chairman thereof) and other operating expenses of the Parent up to an aggregate amount of $500,000 per fiscal year; and

(iii)    Permitted Shareholder Loan Payments.

(8)    <u>No Management Fees</u>  Except for compensation paid to independent directors of the Parent and the chairman of the board of the Parent, pay any management fees to any Affiliate or direct or indirect shareholder of the Borrower or otherwise pay any compensation to an employee that is also a direct or indirect shareholder of the Borrower other as set out in the Key Employment Contracts as in effect on the Original Closing Date.

(9)    <u>No Encumbrances</u>  Create, incur, assume or permit to exist any Encumbrance upon any of its Property except Permitted Encumbrances.

(10)    <u>No Acquisitions</u>  Make any Acquisitions.

(11)    <u>Capital Expenditures</u>  In any fiscal year make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year.

(12)    <u>No Change to Year End or Auditors</u>  Make any change to its fiscal year end from December 31 or change its auditors without the consent of the Lender not to be unreasonably withheld.

(13)    <u>No Continuance</u>  Continue into any other jurisdiction; provided that a Restricted Party formed under the laws of Canada or a province or territory thereof, may continue under the

laws of Canada or any other province or territory thereof subject to providing the Lender with such confirmations, registrations, opinions and certificates as the Lender may require to ensure the perfection and enforceability of the Loan Documents to which the Borrower and such Guarantor are party.

(14)   <u>Hedge Arrangements</u>   Enter into or permit to be outstanding at any time any Hedge Arrangement unless:

(a)   such Hedge Arrangement is a rate swap, interest rate option, forward rate transaction, forward foreign exchange transaction or cross currency rate swap transaction;

(b)   the counterparty under such Hedge Arrangement is the Lender or any other counterparty to the extent that such Hedge Arrangement with such other counterparty is unsecured;

(c)   such Hedge Arrangement is designed to protect the Restricted Party against fluctuations in currency exchange rates or interest rates;

(d)   such Hedge Arrangement has been entered into by the Restricted Party bona fide and in good faith in the ordinary course of its business for the purpose of carrying on the same and not for speculative purposes; and

(e)   the term of such Hedge Arrangement does not extend beyond the Maturity Date.

(15)   <u>Location of Assets in Other Jurisdictions</u>   Except for any Property being delivered to a customer in the ordinary course of business of such Restricted Party as part of the performance of its obligations, or the provision of its services, to such customer under a contract entered into with such customer in the ordinary course of business of such Restricted Party, move any Property from a jurisdiction in which the Encumbrance of the Security over such Property is perfected to a jurisdiction where such Encumbrance is not perfected or where, after a temporary period allowing for registration in such other jurisdiction, such Encumbrance could become unperfected, or suffer or permit in any other manner any of its Property to not be subject to the Encumbrance of the Security or to be or become located in a jurisdiction in which the Encumbrance of the Security over such Property is not perfected, unless the applicable Restricted Party has first (a) given prior written notice thereof to the Lender, and (b) executed and delivered to the Lender all Security and all financing or registration statements in form and substance satisfactory to the Lender that the Lender or its counsel, acting reasonably, from time to time deem necessary or advisable to ensure that the Security at all times constitutes a perfected first priority Encumbrance (subject only to Permitted Encumbrances) over such Property in such jurisdiction together with such supporting certificates, resolutions, opinions and other documents as the Lender, acting reasonably, may deem necessary or desirable in connection with such security and registrations.

(16)   <u>Amendments to Organizational Documents</u>   Amend any of its Organizational Documents in a manner that would be prejudicial to the interests of the Lender under the Loan Documents.

(17)    <u>Amendments to other Documents</u>  Amend, vary or alter in any way, consent to any assignment or transfer of, or waive or surrender any of its rights or entitlements under, any Material Contracts if the result or effect of any such amendment, variance, alteration, consent, transfer, waiver or surrender would be a Material Adverse Change.

(18)    <u>No New Subsidiaries</u>  Create any Subsidiary after the date of this Agreement unless such Subsidiary is formed under the laws of a jurisdiction approved by the Lender and such new Subsidiary provides a Guarantee and Security as set out on the same basis as if it were providing Security on the date of this Agreement.

(19)    <u>Accounts Receivable</u>  No Restricted Party other than the Borrower or a Guarantor shall generate accounts receivable for the provision of services to third party customers.

(20)    <u>Business Limitations</u>

(a)    Engage in any business other than business of the same general type as now conducted by it.

(b)    The Parent shall not (i) engage in any active business other than holding Investments in the Borrower; or (ii) own any material assets other than Investments in the Borrower.

(c)    2538853 shall not (i) engage in any active business other than holding Investments in New LLC2 and M Zone Marketing, Inc.; or (ii) own any material assets other than Investments in New LLC2 and M Zone Marketing, Inc.

(d)    New LLC2 shall not (i) engage in any active business other than holding Investments in 36 Labs Group; or (ii) own any material assets other than Investments in 36 Labs Group.

(21)    <u>Earn Out Payments</u>    Make any payment or permit to be made any payments in respect of Earn Out Obligations (including interest payments in connection with such obligations (other than any interest paid in kind in respect thereof)) except payments owing to the 36 Labs Group Vendors pursuant to the 36 Labs Group Acquisition Agreement; provided that no payments in respect of Earn Out Obligations (other than any interest paid in kind in respect thereof) shall be made if a Default or Event of Default exists at the time of any such payment or would result immediately thereafter from the making of any such payment unless such payment is funded with the proceeds of the issuance of Equity Interests.  Prior to the making of any such payment that is not funded with the proceeds of the issuance of Equity Interests, the Borrower shall deliver to the Lender a Compliance Certificate demonstrating (a) *pro forma* compliance with the financial covenants contained herein (recomputed for the most recent ended fiscal quarter for which information is available) and (b) after giving effect to such payment, there is Availability (as such term is defined in the Senior Credit Agreement) of not less than $2,000,000 under the revolving facility of the Senior Credit Agreement.

(22)    <u>Limited Liability Company Membership Interests</u>

(a)     Issue any certificate representing any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company, without causing such certificate to be delivered to the Lender within five days of issuance of such certificate, along with a transfer power of attorney executed in blank, or other equivalent instrument of transfer acceptable to the Lender;

(b)     Amend its Organizational Documents or take any other steps to make any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company constitute "securities" for purposes of Securities Transfer Act, 2006 (Ontario), the Uniform Commercial Code or any similar legislation, without the prior written consent of the Lender; or

(c)     Hold any membership interest, Equity Interest or other ownership interest of any Restricted Party that is a limited liability company through a securities account (as defined in *Securities Transfer Act, 2006* (Ontario)) without (i) providing 10 days' prior written notice the Lender; and (ii) taking all steps and actions as the Lender reasonably deems necessary or appropriate in order to give the Lender "control" (as defined in *Securities Transfer Act, 2006* (Ontario)) of such securities account, which "control" shall be in such manner as the Lender shall designate acting reasonably.

## ARTICLE 8 – GUARANTEE AND SECURITY

8.01     **Guarantee and Security**

(1)     Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of itself and each Subsidiary the following, in each case in form and substance satisfactory to the Lender:

(a)     a full recourse Guarantee from each Subsidiary of the Borrower incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof;

(b)     a general security agreement from each of the Borrower and each of its Subsidiaries (incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof) creating a security interest over all of the present and future Property of the Borrower and each such Subsidiary;

(c)     a pledge of all of the shares of each Subsidiary incorporated or formed under the laws of Canada or the United States of America or any province, territory or state thereof;

(d)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of the Borrower and each of its Subsidiaries; and

(e)     an assignment of the Cdn. $5,000,000 policy of insurance on the life of Jason Theofilos.

(2)     Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of Movil Wave S.à r.l. and Mogenio S.A. the following, in each case in form and substance satisfactory to the Lender and governed by the laws of Luxembourg (unless otherwise indicated):

(a)     a Guarantee (governed by the laws of the Province of Ontario);

(b)     a pledge of bank accounts;

(c)     a pledge of receivables;

(d)     a pledge of all of the shares of each of Movil Wave S.à r.l. and Mogenio S.A.; and

(e)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of such Restricted Parties.

(3)     Prior to the Closing Date, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of the Parent the following, in each case in form and substance satisfactory to the Lender:

(a)     a full recourse Guarantee;

(b)     a general security agreement creating a security interest over all of the present and future Property of the Parent;

(c)     a pledge of all of the shares of each of the Parent's Subsidiaries; and

(d)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of the Parent.

(4)     On or before January 31, 2018, as general and continuing security for the payment and performance of the Obligations, the Borrower will deliver, or cause to be delivered, to the Lender in respect of Luxco Newco the following, in each case in form and substance satisfactory to the Lender and governed by the laws of Luxembourg (unless otherwise indicated):

- 44 -

(a)     a joinder agreement (governed by the laws of the Province of Ontario) granted by Luxco Newco in favour of the Lender, pursuant to Section 6.09 of the Guarantee (governed by the laws of the Province of Ontario), made as of Original Closing Date by the Guarantors party thereto in favour of the Lender;

(b)     a pledge of bank accounts;

(c)     a pledge of receivables;

(d)     a pledge of all of the shares of Luxco Newco; and

(e)     a certificate of insurance confirming that the Lender is named as first loss payee, with a standard mortgage clause endorsement, and an additional insured as applicable, in respect of all insurance policies of such Restricted Parties.

8.02     **After Acquired Property and Further Assurances**

The Borrower will, and will cause each Guarantor to, from time to time execute and deliver all such further deeds or other instruments of conveyance, assignment, transfer, mortgage, pledge or charge in connection with all Property acquired by such Restricted Party after the date hereof, or as may be required to properly perfect the security interest of the Lender in any Property, including a control agreement.

## ARTICLE 9- DEFAULT

9.01     **Events of Default**

The occurrence of any one or more of the following events (each such event being referred to as an "**Event of Default**") will constitute a default under this Agreement:

(a)     if the Borrower fails to pay any amount of principal of the Loan when due;

(b)     if the Borrower fails to pay any interest, fees or other Obligations (other than any principal amount) when due and such default continues for 3 Business Days after notice of such default has been given by the Lender to the Borrower;

(c)     if the Borrower breaches any of the covenants in Sections 7.02 or 7.04;

(d)     if any Restricted Party neglects to observe or perform any covenant or obligation herein contained on its part to be observed or performed (other than a covenant or condition whose breach or default in performance is specifically dealt with elsewhere in this Section 9.01) and such Restricted Party fails to remedy such default within 15 days from the earlier of (i) the date such Restricted Party becomes aware of such default, and (ii) the date the Lender delivers written notice of the default to such Restricted Party;

(e)     if any representation or warranty made by any Restricted Party in this Agreement, any Loan Document or in any certificate or other document at any time delivered

hereunder to the Lender proves to have been incorrect or misleading in any material respect on and as of the date that it was made or was deemed to have been made;

(f)     if any Restricted Party ceases or threatens to cease to carry on business generally or admits its inability or fails to pay its Debts generally;

(g)     if any Restricted Party (i) fails to make any payment when such payment is due and payable to any Person in relation to any Debt (other than Obligations) that in the aggregate principal amount then outstanding is in excess of $250,000 and any applicable grace period in relation thereto has expired, or (ii) defaults in the observance or performance of any other agreement or condition in relation to any Debt (other than Obligations) to any Person that in the aggregate principal amount then outstanding is in excess of $250,000 or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs or condition exists, the effect of which default or other condition, if not remedied within any applicable grace period, would be to cause, or to permit the holder of such Debt then to declare, such Debt to become due prior to its stated maturity date;

(h)     if any Restricted Party denies, to any material extent, its obligations under any Loan Document or claims any of the Loan Documents to be invalid or withdrawn in whole or in part;

(i)     any of the Loan Documents or any material provision of any of them becomes unlawful or is changed by virtue of legislation or by a Governmental Authority, if any Restricted Party does not, within 15 Business Days of receipt of notice of such Loan Document or material provision becoming unlawful or being changed, replace such Loan Document with a new agreement that is in form and substance satisfactory to the Lender, acting reasonably, or amend such Loan Document to the satisfaction of the Lender, acting reasonably;

(j)     if a decree or order of a court of competent jurisdiction is entered adjudging a Restricted Party a bankrupt or insolvent or approving as properly filed a petition seeking the winding up of a Restricted Party under any Insolvency Law or any other bankruptcy, insolvency or analogous laws or issuing sequestration or process of execution against any substantial part of the assets of a Restricted Party or ordering the winding up or liquidation of its affairs, and any such decree or order continues unstayed and in effect for a period of 10 Business Days;

(k)     if any Restricted Party becomes insolvent, makes any assignment in bankruptcy or makes any other assignment for the benefit of creditors, makes any proposal under any Insolvency Law, is adjudged bankrupt, files a petition or proposal to take advantage of any act of insolvency, consents to or acquiesces in the appointment of a trustee, receiver, receiver and manager, interim receiver, custodian, sequestrator or other Person with similar powers of itself or of all or any substantial portion of its assets, or files a petition or otherwise commences

any proceeding seeking any reorganization, arrangement, composition or readjustment under any applicable bankruptcy, insolvency, moratorium, reorganization or other similar law affecting creditors' rights or consents to, or acquiesces in, the filing of such a petition;

(l)   if an Encumbrancer takes possession, by appointment of a receiver, receiver and manager or otherwise, of all or a substantial portion of the Property of any Restricted Party;

(m)   if proceedings are commenced for the dissolution, liquidation or voluntary winding up of any Restricted Party, or for the suspension of the operations of any Restricted Party unless such proceedings are being actively and diligently contested in good faith;

(n)   if a final judgment or decree for the payment of money due has been obtained or entered against the Borrower in an amount in excess of $250,000 or against any other Restricted Party in an amount that, in the reasonable opinion of the Lender, would materially and adversely affect the ability of any such other Restricted Party to fulfil its obligations to the Lender under this Agreement, and such judgment or decree has not been and remained vacated, discharged or stayed pending appeal within the applicable appeal period;

(o)   if any Security ceases to constitute a valid and perfected first priority security interest (subject only to Permitted Encumbrances) and the applicable Restricted Party has failed to remedy such default within 10 days of becoming aware of such fact;

(p)   a Change of Control occurs; or

(q)   a Material Adverse Change occurs.

9.02   **Acceleration and Enforcement**

(1)   If any Event of Default occurs:

(a)   the outstanding principal amount of the Loan and all other Obligations will, at the option of the Lender, become immediately due and payable with interest thereon, at the rate or rates determined as herein provided, to the date of actual payment thereof, all without notice, presentment, protest, demand, notice of dishonour or any other demand or notice whatsoever, all of which are hereby expressly waived by each Restricted Party; provided, if any Event of Default described in Section 9.01(j) or (k) with respect to the Borrower occurs, the outstanding principal amount of the Loan and all other Obligations will automatically be and become immediately due and payable; and

(b)   the Lender may, in its discretion, exercise any right or recourse and proceed by any action, suit, remedy or proceeding against any Restricted Party authorized or permitted by law for the recovery of all the Obligations to the Lender and,

whether or not the Lender has exercised any of its rights under the foregoing clause (a), proceed to exercise any and all rights hereunder and under the Security.

(2)    The Lender is not under any obligation to the Restricted Parties or any other Person to realize upon any collateral or enforce the Security or any part thereof or to allow any of the collateral to be sold, dealt with or otherwise disposed of.  The Lender is neither responsible nor liable to the Restricted Parties or any other Person for any loss or damage arising from such realization or enforcement or the failure to do so or for any act or omission on its part or on the part of any director, officer, employee, agent or adviser of the Lender in connection with any of the foregoing.

9.03    **Remedies Cumulative**

For greater certainty, it is expressly understood that the respective rights and remedies of the Lender hereunder or under any other Loan Document or instrument executed pursuant to this Agreement are cumulative and are in addition to and not in substitution for any rights or remedies provided by law or by equity; and any single or partial exercise by the Lender of any right or remedy for a default or breach of any term, covenant, condition or agreement contained in this Agreement or any other Loan Document will not be deemed to be a waiver of or to alter, affect or prejudice any other right or remedy or other rights or remedies to which the Lender may be lawfully entitled in connection with such default or breach.

9.04    **Perform Obligations**

If an Event of Default has occurred and is continuing and if any Restricted Party has failed to perform any of its covenants or agreements in the Loan Documents, the Lender, may, but will be under no obligation to, perform any such covenants or agreements in any manner deemed fit by the Lender without thereby waiving any rights to enforce the Loan Documents.  The reasonable expenses (including any legal costs) paid by the Lender in respect of the foregoing will be an Obligation and will be secured by the Security.

9.05    **Third Parties**

It is not necessary for any Person dealing with the Lender to inquire whether the Security has become enforceable, or whether the powers that the Lender is purporting to exercise may be exercised, or whether any Obligations remain outstanding upon the security thereof, or as to the necessity or expediency of the stipulations and conditions subject to which any sale is to be made, or otherwise as to the propriety or regularity of any sale or other disposition or any other dealing with the collateral charged by such Security or any part thereof.

9.06    **Application of Payments**

All payments made by the Borrower hereunder following an Event of Default which is continuing or received from proceeds of the enforcement or realization of any Security will be applied to amounts due under the Obligations, as determined by the Lender.

9.07       **Right of Set-off**

If an Event of Default has occurred and is continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, without notice to the Borrower or any other Person, to set-off and apply any and all deposits (general or special, time or demand, matured or unmatured, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Lender or any such Affiliate to or for the credit or the account of any Restricted Party against any and all of the Obligations, irrespective of whether or not the Lender has made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of the Lender or any such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of the Lender and its Affiliates under this Section 9.07 are in addition to other rights and remedies (including other rights of set-off, consolidation of accounts and bankers' lien) that the Lender or its Affiliates may have. The Lender agrees to promptly notify the Borrower after any such set-off and application, but the failure to give such notice will not affect the validity of such set-off and application.

## ARTICLE 10 – CHANGE IN CIRCUMSTANCES AND INDEMNITIES

10.01      **Increased Costs**

(1)       If any Change in Law will:

(a)       impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(b)       subject the Lender to any Tax of any kind whatsoever with respect to this Agreement, or the Loan, or change the basis of taxation of payments to the Lender in respect thereof, except for Indemnified Taxes or Other Taxes covered by Section 10.02 and the imposition, or any change in the rate, of any Excluded Tax payable by the Lender; or

(c)       impose on the Lender or any applicable interbank market any other condition, cost or expense affecting this Agreement or the Loan made by the Lender;

and the result of any of the foregoing will be to increase the cost to the Lender of making or maintaining the Loan (or of maintaining its obligation to make the Loan), or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or any other amount), then upon request of the Lender the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(2)       If the Lender determines that any Change in Law affecting the Lender or any lending office of the Lender or the Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement or the Loan made by the Lender, to a level below that which the Lender or its holding company

could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of its holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or its holding company for any such reduction suffered.

(3)    A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in Section 10.01(1) or 10.01(2), including reasonable detail of the basis of calculation of the amount or amounts, that is delivered to the Borrower will be conclusive absent manifest error. The Borrower will pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(4)    Failure or delay on the part of the Lender to demand compensation pursuant to this Section 10.01 will not constitute a waiver of the Lender's right to demand such compensation.

10.02    **Taxes**

(1)    If any Restricted Party or the Lender is required by Applicable Law to deduct or pay any Indemnified Taxes (including any Other Taxes) in respect of any payment by or on account of any obligation of a Restricted Party hereunder or under any other Loan Document, then (i) the sum payable will be increased by that Restricted Party when payable as necessary so that after making or allowing for all required deductions and payments (including deductions and payments applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions or payments been required, (ii) the Restricted Party will make any such deductions required to be made by it under Applicable Law and (iii) the Restricted Party will pay when due the full amount required to be deducted to the relevant Governmental Authority in accordance with Applicable Law.

(2)    A payment by a Restricted Party to the Lender shall not be increased under Section 10.02(1) by reason of a deduction on account of the amended Relibi law dated 23 December 2005 introducing a withholding tax on certain payments made to Luxembourg resident individuals.

(3)    Without limiting the provisions of Section 10.02(1), the Borrower will timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(4)    The Borrower will indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender will be conclusive absent manifest error.

(5)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by an Restricted Party to a Governmental Authority, the Restricted Party will deliver to the Lender

the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(6)     If the Lender has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which an Restricted Party has paid additional amounts pursuant to this Section 10.02 or that, because of the payment of such Taxes or Other Taxes, it has benefited from a reduction in Excluded Taxes otherwise payable by it, it will pay to the Borrower or other Restricted Party, as applicable, an amount equal to such refund or reduction (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Restricted Party under this Section with respect to the Taxes or Other Taxes giving rise to such refund or reduction), net of all out-of-pocket expenses of the Lender and without interest (other than any net after-Tax interest paid by the relevant Governmental Authority with respect to such refund).  The Borrower or other Restricted Party as applicable, upon the request of the Lender, agrees to repay the amount paid over to the Borrower or other Restricted Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender if the Lender is required to repay such refund or reduction to such Governmental Authority. This paragraph will not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person, to arrange its affairs in any particular manner or to claim any available refund or reduction.

10.03     **Illegality**

If the Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for the Lender to make or maintain the Loan (or to maintain its obligation to make the Loan), or to issue, or to determine or charge interest rates based upon any particular rate, then, on notice thereof by the Lender to the Borrower, any obligation of the Lender with respect to the activity that is unlawful will be suspended until the Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower will, upon demand from the Lender, prepay or, if Conversion would avoid the activity that is unlawful, convert the Loan in order to avoid the activity that is unlawful.  Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted.

10.04     **Indemnity by the Borrower**

(1)     The Borrower will indemnify the Lender and each Related Party of any the Lender (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Restricted Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance or non-performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation or non-consummation of the transactions contemplated hereby or thereby, (ii) the Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged

presence or Release of Hazardous Substance on or from any property owned or operated by any Restricted Party, or any liability under any Environmental Law related in any way to any Restricted Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Restricted Party and regardless of whether any Indemnitee is a party thereto, provided that such indemnity will not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Restricted Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Restricted Party has obtained a final and nonappealable judgment in its favour on such claim as determined by a court of competent jurisdiction, nor will an indemnity be available in respect of matters specifically addressed in Sections 10.01, 10.02 or 11.01.

(2)     To the fullest extent permitted by Applicable Law, the Restricted Party will not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for indirect, consequential, punitive, aggravated or exemplary damages (as opposed to direct damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby (or any breach thereof), the transactions contemplated hereby or thereby, the Loan or the use of the proceeds thereof.  No Indemnitee will be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, other than damages that have resulted from the gross negligence or wilful misconduct of such Indemnitee.

(3)     All amounts due under Section 10.04(1) will be payable promptly after demand therefor.  A certificate of the Lender setting forth the amount or amounts owing to the Lender or Related Party, as the case may be, as specified in Section 10.04(1), including reasonable detail of the basis of calculation of the amount or amounts, that is delivered to the Borrower will be conclusive absent manifest error.

## ARTICLE 11- GENERAL

11.01     **Costs and Expenses**

The Borrower will pay (i) all reasonable out-of-pocket expenses incurred by the Lender, including the reasonable fees, charges and disbursements of Lender's Counsel, in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby will be consummated), and (ii) all reasonable out-of-pocket expenses incurred by the Lender including the reasonable fees, charges and disbursements of Lender's Counsel, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 11.01, or in connection with the Loan

made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan.

11.02    **Governing Law, Jurisdiction, Etc.**

(1)    This Agreement and each other Loan Document (unless otherwise specified in such Loan Document) will be governed by, and construed in accordance with, the laws of the Province of Ontario and the laws of Canada applicable therein.

(2)    Each Restricted Party irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the Province of Ontario and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court.  Each Restricted Party hereto agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document will affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Restricted Party or its properties in the courts of any jurisdiction.

(3)    Each Restricted Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 11.02(2).  Each Restricted Party hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.03    **Judgment Currency**

(1)    If for the purpose of obtaining or enforcing judgement against a Restricted Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Section 11.03 referred to as the "**Judgment Currency**") an amount due in Canadian Dollars or United States Dollars under this Agreement, the conversion will be made at the rate of exchange prevailing on the Business Day immediately preceding

(a)    the date of actual payment of the amount due, in the case of any proceeding in the courts of any jurisdiction that will give effect to such conversion being made on such date, or

(b)    the date on which the judgement is given, in the case of any proceeding in the courts of any other jurisdiction (the date as of which such conversion is made pursuant to this Section 11.03(1)(b) being hereinafter in this Section 11.03 referred to as the "**Judgment Conversion Date**").

(2)     If, in the case of any proceeding in the court of any jurisdiction referred to in Section 11.03(1)(b), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual payment of the amount due, the Borrower or other Restricted Party will pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of Canadian Dollars or United States Dollars, as the case may be, which could have been purchased with the amount of Judgment Currency stipulated in the judgement or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.

(3)     Any amount due from a Restricted Party under the provisions of Section 11.03(2) will be due as a separate debt and will not be affected by judgement being obtained for any other amounts due under or in respect of this Agreement.

(4)     The term "rate of exchange" in this Section 11.03 means:

(a)     for a conversion of Canadian Dollars to the Judgment Currency, the reciprocal of the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the date in question for the conversion of the Judgment Currency to Canadian Dollars;

(b)     for a conversion of United States Dollars to the Judgment Currency when the Judgment Currency is Canadian Dollars, the official rate of exchange published by the Bank of Canada at approximately 4:30 p.m. (Toronto time) for the date in question for the conversion of United States Dollars to Canadian Dollars;

(c)     for a conversion of United States Dollars to the Judgment Currency when the Judgment Currency is not Canadian Dollars, the effective rate obtained when a given amount of United States Dollars is converted to Canadian Dollars at the rate determined pursuant to Section 11.03(4)(b) and the result thereof is then converted to the Judgment Currency pursuant to Section 11.03(4)(a); or

(d)     if a required rate is not so published by the Bank of Canada for any such date, the spot rate quoted by the Lender at approximately noon (Toronto time) on that date in accordance with its normal practice for the applicable currency conversion in the wholesale market.

## 11.04     **Confidentiality**

(1)     The Lender agrees to maintain the confidentiality of the Information (as defined in Section 11.04(2) below), except that Information may be disclosed (a) to its Affiliates and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Applicable Law or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) following an Event of Default which is continuing in connection with the exercise of any

remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 11.04(1), to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement provided as long as no Event of Default has occurred and is continuing, such assignee, Participant, prospective assignee or prospective Participant is not a competitor to or customer of the Borrower or any of its Subsidiaries, or (ii) any actual or prospective counterparty (or its advisors) to any swap, derivative, credit-linked note or similar transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 11.04(1) or (y) becomes available to the Lender on a non-confidential basis from a source other than a Restricted Party or any Subsidiary of a Restricted Party.

(2)     For purposes of this Section, "Information" means all information received in connection with this Agreement from any Restricted Party or any Subsidiary of a Restricted Party relating to any Restricted Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is specifically identified by the Borrower as being available to the Lender on a non-confidential basis prior to such receipt. Any Person required to maintain the confidentiality of Information as provided in Section 11.04(1) will be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

11.05     **Benefit and Burden of Agreement**

This Agreement will enure to the benefit of and will be binding upon the Borrower and its successors. This Agreement will enure to the benefit of and will be binding upon the Lender and its successors and assigns.

11.06     **No Assignment by the Borrower**

The rights and benefits of the Borrower hereunder may not be assigned by the Borrower.

11.07     **Assignment or Participation by Lender**

(1)     The rights, benefits and obligations of the Lender under or in respect of this Agreement (the "**Rights**") may, in whole or in part, be assigned ("**Assign**", "**Assigned**" or an "**Assignment**") or participated ("**Participated**" or a "**Participation**") by the Lender with one or more Persons (each an "**Assignee**" or a "**Participant**", as the case may be), subject to the prior written consent of the Borrower, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Rights may, in whole or in part, be Participated or Assigned by the Lender with one or more Participants or Assignees without notice to or the consent of the Borrower if an Event of Default has occurred and is continuing. An Assignment or Participation hereunder that requires the consent of the Borrower will become effective upon receipt by the Lender of the written consent of the Borrower. An Assignment or Participation that does not

require the consent of or notice to the Borrower will become effective upon execution of the applicable documentation by the Lender, as applicable, and the Participant or Assignee, as the case may be.  The Borrower will execute all such further documentation as the Lender may reasonably request with respect to any Assignment or Participation permitted hereunder and any prospective Assignee will execute such documentation as the Borrower may reasonably request for the purpose of ensuring that the Assignee is bound by the terms of this Agreement.

(2)     Any Assignee of Rights will be and be treated in respect of such Rights as if it were the Lender for all purposes of this Agreement, will be entitled to the benefit hereof, and will be subject to the obligations of the Lender in respect of such Rights, to the same extent as if it were an original party in respect of the Rights and the Lender assigning such Rights will be released and discharged from its obligations hereunder in respect of such Rights.  To the extent that the Rights are the subject of a Participation, all references in this Agreement to the Lender will, with respect to such Rights that are subject to the Participation, continue to be construed as a reference to the Lender, and the Borrower will be entitled to deal with the Lender as if it were the sole owner of the Rights and the Lender will not be released from obligations hereunder by virtue of the Participation.  The Borrower acknowledges and agrees that the Lender will be entitled, in its own name, to enforce for the benefit of, or as agent for, any Participants, any and all rights, claims and interests of such Participants, in respect of the Rights and that Participants will not be entitled to demand payment or exercise any other right or remedy pursuant hereto.

(3)     For the purposes of any Assignment or Participation hereunder, the Lender may disclose on a confidential basis to a potential Assignee or Participant such information about the Borrower as the Lender may see fit, provided that such potential Assignee or Participant has executed a confidentiality agreement in favour of the Lender and further provided that, so long as an Event of Default has not occurred or has occurred but is no longer continuing, such assignee, Participant, prospective assignee or prospective Participant is not a competitor to or customer of the Borrower or any of its Subsidiaries.

11.08     **Notices**

Any demand, notice or other communication to be given in connection with this Agreement must be given in writing and will be given by personal delivery, by registered mail or by electronic means of communication addressed to the recipient at the address or telecopier number set forth on the signature pages to this Agreement, or to such other street address, individual or electronic communication number or address as may be designated by notice given by either party to the other.  Any demand, notice or other communication given by personal delivery will be conclusively deemed to have been given on the day of actual delivery thereof or, if given by registered mail, on the third Business Day following the deposit thereof in the mail or, if given by electronic communication, on the day of transmittal thereof if given during the normal business hours of the recipient and on the Business Day during which such normal business hours next occur if not given during such hours on any day.  If the party giving any demand, notice or other communication knows or ought reasonably to know of any difficulties with the postal system that might affect the delivery of mail, any such demand, notice or other communication may not be mailed but must be given by personal delivery or by electronic communication.

11.09        **Effect of Assignment**

For greater certainty, an assignment by the Lender of its rights hereunder will not constitute a repayment, discharge, rescission, extinguishment or novation of the Loan or interest therein, and the obligations so assigned shall continue to be the same obligations and not new obligations.

11.10        **Survival**

The provisions of Sections 10.04 and 11.01 will survive the repayment of the Loan, whether on account of principal, interest or fees, and the termination of this Agreement, unless a specific release of such provisions by the Lender is delivered to the Borrower.

11.11        **Severability**

If any provision of this Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

11.12        **Further Assurances**

The Borrower will, and will cause each other Restricted Party: (i) to promptly cure any default by it in the execution and delivery of this Agreement, the Loan Documents or any of the agreements provided for hereunder to which it is a party and (ii) at its expense, will promptly execute and deliver to the Lender, upon request by the Lender, all such other and further documents, agreements, opinions, certificates and instruments in compliance with, or accomplishment of the covenants and agreements of such Restricted Party hereunder or more fully to state the obligations of such Restricted Party as set forth herein or to make any recording, file any notice or obtain any consent, all as may be reasonably necessary or appropriate in connection therewith.

11.13        **Entire Agreement; Amendments and Waivers**

(1)        This Agreement amends and restates the Original Credit Agreement, and together with all other Loan Documents constitutes the entire agreement between the parties to this Agreement with respect to the Loan and the other matters contemplated in this Agreement as of the date of this Agreement, and supersedes the Original Credit Agreement and all other negotiations and discussions, whether oral or written, with respect to the Loan. Nothing in this Agreement shall constitute a release or novation of any indebtedness outstanding under the Original Credit Agreement and the Loan and the Outstanding Amount under the Original Credit Agreement shall continue as the Loan and the Outstanding Amount under this Agreement.

(2)        No amendment to this Agreement will be valid or binding unless set forth in writing and duly executed by the Borrower and the Lender.  No waiver of any breach of any provision of this Agreement and no consent required hereunder will be effective or binding unless made in writing and signed by the party purporting to give the same.  Unless otherwise

provided, any waiver or consent given hereunder will be limited to the specific breach waived or matter consented to, as the case may be, and may be subject to such conditions as the party giving such waiver or consent considers appropriate.

11.14      **Time of the Essence**

Time is of the essence of this Agreement.

11.15      **Tombstone Marketing**

For the purpose of "tombstone marketing", the Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lender of its name, identifying logo and the Loan to enable the Lender to publish promotional "tombstones"; provided that the amount of the Loan shall not be disclosed; provided further, that, the Borrower shall be provided with a copy thereof to review and approve (such approval not to be unreasonably withheld or delayed) prior to such publication.  Subject to the foregoing, the Borrower acknowledges and agrees that the Lender shall be entitled to determine, in its sole discretion, whether to use such information; that no compensation will be payable by the Lender in connection therewith; and that the Lender shall have no liability whatsoever to them or any of their respective employees, officers, directors, affiliates or shareholders in obtaining and using such information as contemplated herein.

11.16      **Anti-Money Laundering Legislation**

(1)      The Borrower acknowledges that, pursuant to AML Laws, the Lender may be required to obtain, verify and record information regarding the Parent, the Borrower and the other Restricted Parties and their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Parent, the Borrower and the other Restricted Parties, and the transactions contemplated hereby. The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by the Lender, or any prospective assignee or participant of the Lender, in order to comply with any applicable AML Laws, whether now or hereafter in existence.

(2)      The Borrower acknowledges and agrees that pursuant to the provisions of the USA Patriot Act (Title III of the Pub. L. 107-56) signed into law October 26, 2001 (the "**Patriot Act**") and other applicable AML Laws, the Lender may be required to obtain, verify and record information with respect to the Restricted Parties and the Borrower hereby agrees to cooperate with the Lender and provide it with all information that may be required in order to fulfil its obligations under the Patriot Act and other applicable AML Laws. Without limiting the generality of the foregoing, the Borrower agrees to use commercially reasonable efforts to obtain the consent of any Restricted Party's officers, directors and employees whose consent to the disclosure of any such information is required under applicable privacy legislation.

**[Signature pages follow]**

IN WITNESS WHEREOF the parties have executed this Agreement.

**BORROWER:**

| | |
|---|---|
| Address: | 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, L4B 4V1 |
| Attention: | Jason Theofilos |
| Facsimile No.: | 1-855-437-4095 |

**MUNDO MEDIA LTD.**



By: _____
  Name: Jason Theofilos
  Title: C.E.O.

By: _____
  Name:
  Title:

**LENDER:**

Address:        200 Bay Street, 4th     **ROYAL BANK OF CANADA**
                 Floor, North Tower
                 Toronto, Ontario,
                 M5J 2W7
Attention:     Joe Rodrigues
Facsimile No.:  (416) 842-5199    By: _____

                                   Name: Joe Rodrigues
                                   Title: Director

                           By: _____

                                   Name: Kirsten Jakobsen
                                   Title: Vice President

[SIGNATURE PAGE TO AMENDED AND RESTATED SUBORDINATE CREDIT AGREEMENT]

**Schedule 1.01(A)**

**Compliance Certificate**

TO:          Royal Bank of Canada
                  200 Bay Street, 4th Floor, North Tower
                  Toronto, Ontario, M5J 2W7

FROM:        Mundo Media Ltd.
                  (the "**Borrower**")

DATE:          ●

This Compliance Certificate is delivered to you pursuant to Section 7.03(2) of the amended and restated subordinate credit agreement made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") between the Borrower and you, as Lender. All terms used in this Compliance Certificate that are defined in the Credit Agreement have the same meanings herein.

I, [name], the [title] of the Borrower, certify for and on behalf of the Borrower, and not in my personal capacity and without personal liability, that:

1.    <u>Representations and Warranties</u>  All of the representations and warranties of the Borrower contained in Section 6.01 of the Credit Agreement are true and correct on and as of the date hereof as though made on and as of the date hereof unless varied as contemplated in Section 6.02.

2.    <u>Terms, Covenants and Conditions</u>  All of the terms, covenants and conditions of the Credit Agreement and each of the other Loan Documents to be performed or complied with by the Borrower at or prior to the date hereof have been performed or complied with.

3.    <u>Default</u>  No Default has occurred and is continuing on the date hereof.

4.    <u>Financial Covenant Compliance</u>

        **A.**    **Total Debt to EBITDA Ratio**

| <u>Quarter Ending</u> | <u>Maximum Permitted Ratio</u> | <u>Actual Ratio</u> |
|---|---|---|
| ● | ● | ● |

- 2 -

**B.**     **Senior Debt to EBITDA Ratio**

| Quarter Ending | Maximum Permitted Ratio | Actual Ratio |
|:---:|:---:|:---:|
| ● | ● | ● |

**C.**     **Fixed Charge Coverage Ratio**

| Quarter Ending | Minimum Permitted Ratio | Actual Ratio |
|:---:|:---:|:---:|
| ● | ● | ● |

5.     Attached hereto as Exhibit A are detailed calculations of the financial covenants set out in Section 4 above.

6.     As of the date of this Compliance Certificate, $● has been spent on Capital Expenditures this fiscal year.[1]

_____

Name:

_____

[1] Pursuant to Section 7.04(10)of the Credit Agreement, the Restricted Parties have agreed not to make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year.

**Schedule 1.01(B)**

**<u>Material Contracts</u>**

1.      Senior Credit Agreement

2.      Customer Contract with Mindspark Inc. which generates annual revenue to the Restricted
Parties as at the Closing Date of in excess of $10,000,000.

3.      Maintenance and Support Agreement with STACK Media with effective date of July 1,
2017.

**Schedule 1.01(C)**

**Relevant Jurisdictions**

- Parent
  - Jurisdiction:  Ontario, Canada
- Borrower
  - Jurisdiction:  Ontario, Canada
- 2581769 Ontario Inc
  - Jurisdiction:  Ontario, Canada
- MEG Technologies Limited:
  - Jurisdiction:  Hong Kong
- Mundo (Beijing) Limited:
  - Jurisdiction:  China
- 2307521 Ontario Inc.
  - Jurisdiction:  Ontario, Canada
- 2538853 Ontario Ltd.
  - Jurisdiction:  Ontario, Canada
- 36 Labs, LLC.
  - Jurisdiction: Delaware, United States of America
- Active Signal Marketing, LLC
  - Jurisdiction: Delaware, United States of America
- Find Click Engage, LLC
  - Jurisdiction: Delaware, United States of America
- Fli Digital, Inc.
  - Jurisdiction: New York, United States of America
- Mundo Media (US), LLC
  - Jurisdiction: Delaware, United States of America
- M Zone Marketing, Inc.
  - Jurisdiction: Delaware, United States of America
- Movil Wave S.à r.l.
  - Jurisdiction: Luxembourg
- Mogenio S.A.
  - Jurisdiction: Luxembourg
- Downloadius S.à r.l.
  - Jurisdiction: Luxembourg
- Mob1 S.à r.l.
  - Jurisdiction: Luxembourg

**Schedule 1.01(D)**

**Repayment Notice**

TO:           Royal Bank of Canada
                    200 Bay Street, 4th Floor, North Tower
                    Toronto, Ontario, M5J 2W7

FROM:        Mundo Media Ltd.
                    (the "**Borrower**")

DATE:         ●

1.      This Repayment Notice is delivered pursuant to Section 5.04 of the amended and restated subordinate credit agreement, made as of December 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between the Borrower and you, as Lender.  All terms used in this Repayment Notice that are defined in the Credit Agreement have the same meanings herein.

2.      The Borrower hereby gives you notice that it intends to repay $● of the Loan, on [DATE].

3.      The amount of such repayment will, subject to the provisions of the Credit Agreement, be used to repay the Loan in the principal amount of $●.

                                        **MUNDO MEDIA LTD.**

                          By: _____
                                   Name:
                                   Title:

**Schedule 6.01(8)**

**Litigation Disclosure**

1.      The Borrower received an inbound telephone call stating that the Canada Revenue Agency may conduct a review of Mundo Media Ltd.'s income tax filings for the period of 2013 and 2014.

2.      The State of Texas v. Mobile Messenger US., Inc., et al.;
   a.      Cause No. D-1-GV-13-001256
   b.      345111 Judicial District Court, Travis County, TX

**Schedule 6.01(12)**

**<u>Ownership Structure</u>**
**<u>(including as of the Closing Date)</u>**

See Attached

# Mundo Inc.
## Corporate Structure



Mundo Inc. - Company and Shareholder Information

| | |
|---|---|
| Company Name | Mundo Inc. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of Class B common shares and an unlimited number of preferred shares, issuable in series |
| Issued/Outstanding Shares | 20,391,821 shares (1,656,250 Common Shares / 18,735,571 Class B Shares) |
| Beneficial Shareholders | See Appendix "A" |
| Jurisdiction | Ontario, Canada |
| Company Name | Mundo Media Ltd. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares, an unlimited number of Class A common shares, an unlimited number of Class B common shares,  an unlimited number of Class C common shares, and unlimited number of Class D common shares, an unlimited number of Class E common shares, an unlimited number of Class F common shares, an unlimited number of Class G common shares, an unlimited number of Class H common shares, and unlimited number of Class A preferred shares, an unlimited number of Class B preferred shares, an unlimited number of Class C preferred shares, an unlimited number of Class D preferred shares, an unlimited number of Class E preferred shares, an unlimited number of Class F preferred shares, an unlimited number of Class G preferred shares. |
| Issued/Outstanding Shares | 64,419 shares (57,137 Class C Common shares / 7,282 Class B Preferred shares) |
| Beneficial Shareholders | Mundo Inc.  - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | 2538853 Ontario Ltd. |
| Address | 120 East Beaver Creek Road, Richmond Hill, ON, L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares and an unlimted number of preferred shares. |
| Issued/Outstanding Shares | 100 common shares |
| Beneficial Shareholders | Mundo Media Ltd.  - 100% |
| Jurisdiction | Ontario, Canada |
| Company Name | M Zone Marketing Inc. |
| Address | 548 Market Street #77068, San Francisco, California 94014, United States; 161 Bay Street, Suite 4310, Toronto, ON M5J 2S1 |
| Authorized Capital | 5,000 Common Shares at $0.001 par value per share |
| Issued/Outstanding Shares | 100 Common Shares |
| Beneficial Shareholders | 2538853 Ontario Ltd. - 100% |
| Jurisdiction | Delaware, U.S.A |
| Company Name | Mundo Media (US), LLC |
| Address | 300 Delaware Avenue, Suite 210, Wilmington, DE 19801, United States; Dorsey & Whitney LLP, 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | 2538853 Ontario Ltd. |
| Beneficial Owners | 2538853 Ontario Ltd. -  100% Membership |
| Jurdisdiction | Delaware, U.S.A |
| Company Name | Active Signal Marketing, LLC |
| Address | 337 Garden Oaks Blvd. #50564, Houston, TX 77018, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | Find Click Engage, LLC |
| Address | 9450 SW Gemini Drive #87125, Beaverton, OR 97008, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | 36 Labs, LLC |
| Address | 548 Market Street #77068, San Francisco, CA 94104, United States; 161 Bay Street, Suite 4310, Toronto, ON  M5J 2S1 |
| Membership | Mundo Media (US), LLC |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% Membership |
| Jurisdiction | Delaware, U.S.A |
| Company Name | FLI Digital, Inc. |

| Address | 9450 SW Gemini Drive, #77068, Beaverton, Oregon 97008, United States; 161 Bay Street, Suite 4310, Toronto, ON M5J 2S1 |
|---|---|
| Authorized Capital | 200 common shares without par value |
| Issued/Outstanding Shares | 100 common shares |
| Beneficial Shareholders | Mundo Media (US), LLC - 100% |
| Jurisdiction | New York, U.S.A. |
| **Company Name** | **2518769 Ontario Ltd.** |
| Address | 1 Yonge Street, Suite 1801, Toronto, ON M5E 1W7 , Canada |
| Authorized Capital | An unlimited number of common shares |
| Issued/Outstanding Shares | 10,100 common shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Ontario, Canada |
| **Company Name** | **MEG Technologies Limited** |
| Address | 2F., Jonsim Place, No. 228 Queen's Road East, Wanchai, Hong Kong |
| Authorized Capital | 10,000 shares of $1.00 HK each |
| Issued/Outstanding Shares | 100 shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Hong Kong |
| **Company Name** | **Mundo (Beijing) Limited** |
| Address | Room 0908, Tower 1 B Area, Wanjing Soho, Chao Yang District, Beijing, China. Zip code 100000 |
| Authorized Capital | USD35,000 |
| Issued/Outstanding Shares | N/A |
| Beneficial Shareholders | MEG Technologies Limited - 100% |
| Jurisdiction | China |
| **Company Name** | **2307521 Ontario Inc.** |
| Address | 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON  L4B 4V1, Canada |
| Authorized Capital | An unlimited number of common shares and unlimited number of preferred shares. |
| Issued/Outstanding Shares | 150 common shares |
| Beneficial Shareholders | Mundo Media Ltd. - 100% |
| Jurisdiction | Ontario, Canada |
| **Company Name** | **Movil Wave S.à.r.l** |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | 2307521 Ontario Inc. - 100% |
| Jurisdiction | Luxembourg |
| **Company Name** | **Mogenio S.A.** |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 31,000 ordinary shares with a par value of 1.00 EUR each |
| Issued/Outstanding Shares | 31,000 shares |
| Beneficial Shareholders | Movil Wave S.à.r.l - 100% |
| Jurisdiction | Luxembourg |
| **Company Name** | **Mob 1 S.à.r. l** |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | Mogenio S.A. - 100% |
| Jurisdiction | Luxembourg |
| **Company Name** | **Downloadius S.à.r.l.** |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 125 shares at 100 EUR each |
| Issued/Outstanding Shares | 125 shares |
| Beneficial Shareholders | Mogenio S.A. - 100% |
| Jurisdiction | Luxembourg |
| **Company Name** | **Mundo Media (Luxembourg) S.à.r.l. (Pending Incorporation - details to be determined)** |
| Address | 5-11, avenue Gaston Diderich, L-1420 Luxembourg, Luxembourg |
| Authorized Capital | 20,000 ordianry shares at $1.00 USD per share - **To be determined** |
| Issued/Outstanding Shares | **To be determined** |
| Beneficial Shareholders | 2307521 Ontario Inc. - 100%, **to be determined** |
| Jurisdiction | Luxembourg |

**Mundo Inc**

| Stockholder | Common Shares | Class B Shares | Total Shares | Beneficial Owner/Controlling Shareholder |
|---|---|---|---|---|
| 2441519 Ontario Inc (Angelo Pollastrone Holdco) | 500,000 | 106,072 | 606,072 | Angelo Pollastrone |
| 2441518 Ontario Inc (Duncan Yuen Holdco) | 500,000 | 106,072 | 606,072 | Duncan Yuen |
| 2441516 Ontario Inc (Jason Theofilos Holdco) | 500,000 | 106,072 | 606,072 | Jason Theofilos |
| Mansfield International Trade Ltd | | 6,969,837 | 6,969,837 | (1) Jakub Malczewski: 100% of voting shares (2) Ahaka Acquisition Inc. (controlled by David Baazov): 100% of non-voting shares |
| Theofilos Family Trust 1 | | 577,166 | 577,166 | Elaine Theofilos; Victoria Theofilos; Tom Anastasios Tsetsenis; Angelo Pollastrone; Duncan Yuen; Brooke Gosselin; Noah Theofilos; Chloe Theofilos |
| Theofilos Family Trust 2 | | 3,867,367 | 3,867,367 | Brooke Gosselin; Jason Theofilos; Noah Theofilos; Chloe Theofilos; Maria Avgousti-Tsetsenis; Vasilios Tsetsenis; Gregory Tsetsenis; Maria Tsetsenis |
| Jason Theofilos | | 1 | 1 | |
| Customer Acquisition Network, LLC | - | | - | |
| Barry Honig | | 1,930,703 | 1,930,703 | |
| Four Kids Investment Fund LLC | | 2,162,387 | 2,162,387 | Johathon Honig |
| Jonathan Honig | | 193,071 | 193,071 | |
| Stetson Capital Management LLC | | 656,439 | 656,439 | John Stetson |
| Melechdavid Inc | | 579,211 | 579,211 | Mark Groussman |
| Melechdavid Inc Retirement Plan | | 193,071 | 193,071 | Mark Groussman |
| ATG Capital LLC | | 386,141 | 386,141 | John O'Rourke |
| John S Lemak IRA | | 77,228 | 77,228 | John Lemak |
| JSL Kids Partners | | 19,307 | 19,307 | John Lemak |
| Horberg Enterprises LP | | 154,456 | 154,456 | Todd Horberg |
| Edward Karr | | 19,307 | 19,307 | |
| Oberal International Inc | | 154,457 | 154,457 | Tal Schibler |
| Rich Mollinsky | | 38,614 | 38,614 | |
| Corey O'Rourke | | 57,921 | 57,921 | |
| John O'Rourke Sr. | | 38,614 | 38,614 | |
| Millenium Trust Co LLC, Custodian FBO Robert S. Colman Traditional IRA | | 77,228 | 77,228 | Bob Colman |
| Mark Groussman C/F Alivia Groussman UTMA/FL | | 38,614 | 38,614 | Mark Groussman |
| Mark Groussman C/F Asher Groussman UTMA/FL | | 38,614 | 38,614 | Mark Groussman |
| Paradox Capital Partners LLC | | 154,456 | 154,456 | Harvey Kesner |
| Ross Levinsohn | 156,250 | 33,147 | 189,397 | |
| | | | | |
| **Total** | **1,656,250** | **18,735,571** | **20,391,821** | |

## Schedule 6.01(16)

## Intellectual Property Rights

*Canadian Trademark Applications*

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| Mundo Media Ltd. | MUNDO | 1,839,933 | Goods:<br>(1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>(2) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>Services:<br>(1) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space.<br>(2) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading | Used in CANADA since at least as early as December 2010 on goods (1) and on services (1), (3); November 07, 2011 on goods (2) and on services (2), (4). |

| Entity | Trademark | Application No. | Goods/Services | Claims |
|---|---|---|---|---|
| | | | services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space.<br>(3) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising.<br>(4) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | |
| Mundo Media Ltd. | MUNDOMEDIA | 1,839,936 | Services:<br>(1) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of | Used in CANADA since at least as early as December 2010 on services (1), (3); November 07, 2011 on services (2),(4). |

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| | | | advertising space for others; Providing commercial information about access to advertising space.<br>(2) Advertising agency services; Advertising and business management consultancy; Advertising consultancy, namely the impact of advertising on electronic communication networks; Advertising management and research services to track and analyze consumer data, demographics, consumer behavioral information, number of consumer views, computer network use, computer network users, and consumer responses to advertisements and promotional materials of others; Advertising the goods and services of others using location-based advertisements via electronic media and specifically the internet; Advertising the goods and services of others using targeted advertisements via electronic media and specifically the internet; Advertising the goods and services of others via electronic media and specifically the internet; Analysis of market research data; Business marketing consulting services; Consulting in the field of advertisements and the placement of advertisements online; Consumer research; Dissemination of advertising for others via an on-line communications network on the internet; Market analysis and research services; Marketing services in the field of placement of advertisements; Mediation of advertising for others; On-line trading services, for buying and selling advertising; On-line advertising the goods and services of others on computer communications networks; Operation of a computer database containing consumer data; Rental and purchase of advertising space for others; Providing commercial information about access to advertising space.<br>(3) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising.<br>(4) Design and development of computer software; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | |

| Entity | Trademark | Application No. | Goods/Services | Claims |
|--------|-----------|-----------------|----------------|--------|
| Mundo Media Ltd. | MUNDOTRACK | 1,839,931 | Goods:<br>(1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>(2) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising. | Used in CANADA since at least as early as December 2010 on goods (1); November 07, 2011 on goods (2). |
| Mundo Media Ltd. | MUNDOCORE | 1,839,934 | Goods:<br>(1) Business analysis software for advertising and marketing purposes; Software to track, manage, and optimize advertising and promotional campaigns; Software to calculate return on investment of advertising and promotional campaigns; Software to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Software to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Software to create, monitor and manage creative strategies for marketing and advertising.<br>Services:<br>(1) Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track, manage, and optimize advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to calculate return on investment of advertising and promotional campaigns; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to track website traffic, e-commerce activity, customer loyalty information, and sales conversion rates; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to allow users to manage, collect, monitor and analyze web, blog and other online site traffic, user preferences and links in real time; Providing online non-downloadable software for mobile phones, tablet computers, handheld computers, laptop computers, desktop computers and web-based devices to create, monitor and manage creative strategies for marketing and advertising. | Proposed Use in CANADA on goods and on services. |

*Common Law Trademarks/Trade Names*

| Entity | Trade/Business Names | Trademarks: Word Marks (Domestic/Foreign) | Trademarks: Designs/Logos |
|--------|----------------------|--------------------------------------------|----------------------------|
| Mundo Media Ltd. | Mundomedia<br>Mundo Media<br>Media Pro Services | MUNDO<br>MUNDOMEDIA<br>MUNDOTRACK |  |

| Entity | Trade/Business Names | Trademarks: Word Marks (Domestic/Foreign) | Trademarks: Designs/Logos |
|--------|---------------------|-------------------------------------------|---------------------------|
| Movil Wave S.ar.l. | Media Pro Services | N/A |  |
| MEG Technologies Limited | N/A | N/A |  |
| Network Marketing Solutions Inc. | N/A | N/A |  |

*Domain Names*

| | |
|---|---|
| mpxxtrk.com | helloadz.com |
| mpmotrk.com | theonlinewealthsecret.com |
| pixeltrack66.com | jerrygetsripped.com |
| mmmediabuy.com | mattshollywoodworkout.com |
| amazing-bidz.com | miracleskintreatment.com |
| consumerreviewdaily.com | mundomedia.com |
| mobilemarketserver3.com | sweetorsexy.com |
| liveme.ca | mundotrk.com |
| purelywhitespro.com | hellomessaging.com |
| nuytopia.ca | themundogroup.com |
| vuytopia.ca | mundocompliance.com |
| biytopia.ca | mundogroups.com |
| buyropia.ca | mundoengine.com |
| buytipia.ca | mmp3g.com |
| buytooia.ca | commonfilescdn.com |
| buytopua.ca | mobile-cdn-server.com |
| buytopoa.ca | yourcompliance.com |
| buytopis.ca | earnfreegames.com |
| buytopiq.ca | mundotraks.com |
| buytopiz.ca | mundodatabase.com |
| taembuy.ca | mundotrack.com |
| mundostarmotors.com | ad-optimize.com |
| thevalidatecheck.com | spellingbchallenge.com |
| liposomformen.com | prevalidate.com |

| | |
|---|---|
| thecellspy.com | mlinktracker.com |
| sebcotrk.com | mmtracking.com |
| sofcotrk.com | mobileexchangeplatform.com |
| chlcotrk.com | meetmebook.com |
| suscotrk.com | newtyp3.com |
| mm-tracking.com | mundomediainc.com |
| mmtrksw.com | mundoleads.com |
| mmtrksg.com | sitemanager2.com |
| mmtrkms.com | linktrack66.com |
| mmtrkpy.com | mmtrktw.org |
| mmtrkjy.com | mmtrkva.org |
| mmtrkyv.com | mmtrkvc.org |
| mmtrktl.com | mmtrkvk.org |
| mmtrkdb.com | mmtrkyv.org |
| mmtrktw.com | mmtrkam.com |
| mmtrkva.com | miihub.com |
| mmtrkvk.com | mundomediacorp.com |
| mmtrkgs.com | newlaboratories.com |
| mmtrkvc.com | ukonnochikara.com |
| mmtrkbb.com | xbids.ca |
| mmtrksk.com | livingfeal.ca |
| mmtrkpd.com | livindeal.ca |
| mmtrkmc.com | wwwlivingdeal.ca |
| mmtrktc.com | livngdeal.ca |
| liveprofutebolscores.com | ivigdeal.ca |
| bitcoin-gift-cards.com | kivingdeal.ca |
| bitcoingift-cards.com | livimgdeal.ca |
| bitcoingift-card.com | ivingdeal.ca |
| bitcoingiftexchange.com | factsopedia.com |
| bitcoingiftcardexchange.com | prohibitionpeter.com |
| smdcargo.com | online-friends-episodes.com |
| mrtrck.com | styletrendweb.com |
| 0x24.co | getalarmsystems.com |
| 0x25.co | getanyrecipe.com |
| 36labs.com | getcouponsnow.com |
| activesignalmarketing.com | getdirectionsmaps.com |
| allproductmanuals.com | gethealthtipsdaily.com |
| anydrivingdirections.com | gethomepros.com |
| anytransitguides.com | getmapsfast.com |
| boostmypcspeed.com | getonlineforms.com |
| cashclaims.org | getweatherfast.com |

| | |
|---|---|
| checkanyemail.com | inboxsetup.email |
| checkemailsfast.com | insidersportstips.com |
| checkmyemails.co | internetspeednow.com |
| checkyouremail.co | livelocalweather.co |
| clktrcker.com | local-weather.co |
| dailyjobfeed.com | localweatherapp.co |
| dailylocalweather.com | loginemailnow.com |
| driving-maps.co | loweryourmortgage.co |
| drivingmaps.co | movetosolar.org |
| easyancestrysearch.com | mydirectionsmaps.com |
| easyonlinecalendar.com | myfastmaps.com |
| easypeoplefinder.com | myinternetspeed.co |
| easyphonefinder.com | onlinedetective.co |
| easyrefinance.co | onlinepackagetracker.com |
| easytaxes.co | packagetracker.co |
| easytransitguide.com | plananytrip.com |
| easytransitguides.com | playfantasysports.co |
| emailanytime.co | popularnow.co |
| everypassword.com | radioanytime.com |
| fastaudioconverter.com | rength.com |
| fastdrivingdirections.com | searcheveryjob.com |
| fastdrivingmaps.co | secured-verified.com |
| fastmaps.co | somanyfunapps.com |
| fastmapsdirections.com | speedytaxes.co |
| fastmapsnow.com | stdcheckuponline.com |
| fastphotoeditor.co | themortgagecalculator.co |
| fasttransitguides.com | thepackagetracker.com |
| fdtrkr.com | thetransitguide.com |
| findclassifiedads.co | todaysnewslive.com |
| findclickengage.com | trackanyflight.com |
| finddirectionsnow.com | trackanypackage.com |
| finddrivingmaps.com | trackmypackage.co |
| findfastmaps.com | trackpackagesfast.com |
| findformsnow.com | trkclck.com |
| findformsonline.com | trkpltfrm.com |
| findlocalclassifieds.com | twoweektech.com |
| findmapsfast.com | updatedrivers.co |
| findtattoosonline.com | watchanygame.com |
| findunclaimedmoney.org | weather-forecast.co |
| fontstyles.co | |

*Software*

- CORE is a marketing optimization platform, with features geared at efficient testing, reporting, and flexibility.

- FEED is an advertising server, currently configured to serve emails to iOS Profile created inboxes.

- MundoTrack/MundoCore is a proprietary cloud-based platform which uses predictive software algorithms to drive user engagement by optimally paring publisher traffic with advertiser campaigns.

*Essociates Patent License*

License to United States Patent No. 6,804,660 and any and all other patents and patent applications in all countries of the world corresponding thereto or having priority derived therefrom; all divisional, continuation and continuation-in-part applications derived therefrom; and any applications claiming priority thereto including, but not limited to, any and all reissues and reexaminations.

**Licenses**

*Master Business Licenses*

| Business Name | Legal Name | Business Information | Number | Effective Date | Expiry Date |
|---|---|---|---|---|---|
| Media Pro Services | Mundo Media LTD. | Business Name Registration<br>Incorporated (Ontario) | 230758740<br>001958484 | 07/29/2013<br>07/26/2016 | 07/27/2023 |
| Mundo Media | Mundo Media LTD. | Business Name Registration<br>Incorporated (Ontario) | 270044738<br>001958484 | 01/12/2017<br>07/26/2016 | 01/11/2022 |
| Mundomedia | Mundo Media LTD. | Business Name Registration<br>Incorporated (Ontario) | 220900401<br>001958484 | 8/29/2012<br>07/26/2016 | 08/27/2022 |

**Schedule 6.01(22)**

**Bank Accounts**

| Bank Account Number | Restricted Party | Financial Institution |
|---|---|---|
| 06032-1083245 | Mundo Inc. | Royal Bank of Canada |
| 06032-4013744 | Mundo Inc. | Royal Bank of Canada |
| 06032-1012749 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4015657 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4004636 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-4015640 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-1014182 | Mundo Media Ltd. | Royal Bank of Canada |
| 06032-1061720 | Mundo Media Ltd. | Royal Bank of Canada |
| 3300868481 | Mundo Media Ltd. | Silicon Valley Bank |
| 0018335000 | Mundo Media Ltd. | Silicon Valley Bank |
| 3300868538 | Mundo Media Ltd. | Silicon Valley Bank |
| LU03 0141 6438 5832 0000 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU80 0141 4438 5830 0000 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU62 0141 6438 5830 3030 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| LU75 0141 2438 5830 3010 | Movil Wave S.à r.l. | Internationale Nederlanden Groep |
| 3301036420 | Movil Wave S.à r.l. | Silicon Valley Bank |
| LU12 0141 2438 5840 3860 | Mogenio S.A | Internationale Nederlanden Groep |
| LU19 0141 8438 5842 0000 | Mogenio S.A | Internationale Nederlanden Groep |
| LU96 0141 6438 5840 0000 | Mogenio S.A | Internationale Nederlanden Groep |
| LU78 0141 8438 5840 3030 | Mogenio S.A | Internationale Nederlanden Groep |
| LU91 0141 4438 5840 3010 | Mogenio S.A | Internationale Nederlanden Groep |

- 2 -

| Bank Account Number | Restricted Party | Financial Institution |
|---|---|---|
| 3300897583 | Mogenio S.A | Silicon Valley Bank |
| LU72 0141 8441 1150 0000 | Mob1 S.à r.l. | Internationale Nederlanden Groep |
| LU80 0141 0441 1160 0000 | Downloadius S.à r.l | Internationale Nederlanden Groep |
| LU83 0141 8441 1160 3010 | Downloadius S.à r.l | Internationale Nederlanden Groep |
| LU40 0141 7445 0090 0000 | 2307521 Ontario Inc. | Internationale Nederlanden Groep |
| 36800910261 | MEG Technologies Limited | Standard Chartered Bank |
| 32477810 | 36 Labs, LLC | Bank of America |
| 59589550 | Active Signal Marketing, LLC | Bank of America |
| 52802960 | Find Click Engage, LLC | Bank of America |
| 52803040 | Find Click Engage, LLC | Bank of America |
| 19483442 | Fli Digital, Inc. | Bank of America |
| 3302207114 | M Zone Marketing, Inc. | Silicon Valley Bank |
| 3302138111 | Active Signal Marketing, LLC | Silicon Valley Bank |
| 3302138126 | Find Click Engage, LLC | Silicon Valley Bank |
| 3302138130 | Fli Digital, Inc. | Silicon Valley Bank |
| 3302138099 | Mundo Media (US), LLC | Silicon Valley Bank |

**THIS FIRST AMENDING AGREEMENT** made as of the 2nd day of March, 2018

**BETWEEN:**

> **MUNDO MEDIA LTD.**
>
> (hereinafter called the "**Borrower**")
>
> - and -
>
> **ROYAL BANK OF CANADA**
>
> (hereinafter called the "**Lender**").

**WHEREAS** the Borrower and the Lender entered into an amended and restated subordinate credit agreement dated as of December 21, 2017 (the "**Credit Agreement**");

**AND WHEREAS** pursuant to Section 7.04(11) of the Credit Agreement, the Restricted Parties are not permitted to make Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) in any fiscal year;

**AND WHEREAS** the Borrower has advised the Lender that Capital Expenditures in excess of $1,000,000 (or the Equivalent Amount in Canadian Dollars) were made in the 2017 fiscal year and as a result the Borrower has requested that the Lender waive compliance by the Borrower with Section 7.04(11) of the Credit Agreement solely for the fiscal period commencing on January 1, 2017 and ending on December 31, 2017 (the "**CapEx Covenant Default**");

**AND WHEREAS** the Lender is agreeable to provide the Borrower with a waiver of the CapEx Covenant Default in accordance with the terms hereof;

**AND WHEREAS** the parties wish to amend Section 7.04(11) of the Credit Agreement to increase the limit on Capital Expenditures to $1,500,000 (or the Equivalent Amount in Canadian Dollars) in accordance with the terms hereof.

**NOW THEREFORE THIS AGREEMENT WITNESSES THAT** in consideration of the covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Credit Agreement as provided herein:

**Section 1   General**

In this First Amending Agreement (including the recitals) unless otherwise defined or the context otherwise requires, all capitalized terms shall have the respective meanings specified in the Credit Agreement (including as amended by this First Amending Agreement). In addition, the term "**Second Closing Date**" means the date on which the conditions precedent set forth in Section 6 of this First Amending Agreement have been satisfied or waived.

### Section 2  To be Read with Credit Agreement

This First Amending Agreement is an amendment to the Credit Agreement.  Unless the context of this First Amending Agreement otherwise requires, the Credit Agreement and this First Amending Agreement shall be read together and shall have effect as if the provisions of the Credit Agreement and this First Amending Agreement were contained in one agreement as of the Second Closing Date.  The term "Agreement" when used in the Credit Agreement means the Credit Agreement as amended, supplemented or modified from time to time (including as amended by this First Amending Agreement).

### Section 3  Amendment

Section 7.04(11) of the Credit Agreement is deleted in its entirety and replaced with the following:

"(11)    Capital Expenditures  In any fiscal year make, or enter into any agreement which would require it to make, any Capital Expenditures in excess of $1,500,000 (or the Equivalent Amount in Canadian Dollars) per fiscal year."

### Section 4  Waiver

The Lender hereby waives the CapEx Covenant Default solely for the fiscal period commencing on January 1, 2017 and ending on December 31, 2017.  The Lender's waiver contained herein is subject to and conditional upon satisfaction of the conditions precedent set forth in Section 6 of this First Amending Agreement.

### Section 5  Representations and Warranties

In order to induce the Lender to enter into this First Amending Agreement, the Borrower represents and warrants to the Lender as follows, which representations and warranties shall survive the execution and delivery hereof:

(a)    the representations and warranties set forth in Article 6 of the Credit Agreement continue to be true and correct as of the date hereof with reference to facts subsisting on the date hereof, except for those representations and warranties which speak to a specific date which are true and correct as of such date;

(b)    the Restricted Parties are in compliance on the date hereof with the covenants contained in Article 7 of the Credit Agreement;

(c)    all necessary action, corporate or otherwise, has been taken to authorize the execution, delivery and performance of this First Amending Agreement by the Borrower.  The Borrower has duly executed and delivered this First Amending Agreement.  This First Amending Agreement is a legal, valid and binding obligation of the Borrower enforceable against it by the Lender in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization and other laws of general

application limiting the enforcement of creditor's rights generally and the fact that the courts may deny the granting or enforcement of equitable remedies;

(d)     as of the date hereof and after giving full force and effect to the amendments to the Credit Agreement provided for in this First Amending Agreement, no Default or Event of Default exists; and

(e)     no Material Adverse Change has occurred since December 21, 2017.

## Section 6   Conditions Precedent

This First Amending Agreement shall not be effective and the Second Closing Date will not occur until satisfaction of the following conditions precedent, each to the satisfaction of the Lender:

(a)     this First Amending Agreement shall have been executed and delivered by the Borrower and the Lender;

(b)     the Lender shall have received an acknowledgement and confirmation from each Restricted Party that has previously delivered a Guarantee and Security as to the continued effectiveness of its Guarantee and Security, notwithstanding this First Amending Agreement;

(c)     the Lender shall have received and be satisfied with the first amending agreement to the Senior Credit Agreement between the Borrower and Royal Bank of Canada; and

(d)     the Lender shall have received such additional information and documents as it may reasonably require to complete the transactions contemplated hereby in accordance with the terms and conditions contained herein.

## Section 7   Expenses

The Borrower shall pay all reasonable out-of-pocket fees and expenses incurred by the Lender in connection with the preparation, negotiation, completion, execution, delivery and review of this First Amending Agreement and all other documents and instruments arising therefrom and/or executed in connection therewith.

## Section 8   Continuance of Credit Agreement and Security

The Credit Agreement, as changed, altered, amended or modified by this First Amending Agreement, shall be and continue in full force and effect and is hereby confirmed and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein.   The Borrower acknowledges, confirms and agrees that, notwithstanding this First Amending Agreement, (a) all Security granted by it continues in full force and effect, enforceable in accordance with its terms, and secures payment and performance by it of the Obligations, (b) the Security to which it is a party constitutes a legal, valid and binding obligation of the Borrower enforceable against it in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization and other laws of general application limiting the enforcement of creditor's rights

generally and the fact that the courts may deny the granting or enforcement of equitable remedies, and (c) the Security to which it is a party is hereby ratified and confirmed.

**Section 9    Counterparts**

This First Amending Agreement may be executed in any number of separate counterparts and by facsimile or pdf copy, each of which shall be deemed an original and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 10 Severability**

If any provision of this First Amending Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this First Amending Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

**Section 11 Governing Law**

This First Amending Agreement shall be construed and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein and each of the parties hereto irrevocably attorns to the jurisdiction of the courts of the Province of Ontario.

**[Signature pages follow]**

**IN WITNESS WHEREOF** the parties hereto have executed this First Amending Agreement.

BORROWER:                                    MUNDO MEDIA LTD.

By: _____

Name: Philip Jones

Title: CFO

By: _____

Name:

Title:

**LENDER:**

ROYAL BANK OF CANADA

By: _____

Name: PATRICK TRAINOR

Title: managing director

By: _____

Name: Kirsten Jakobsen

Title: Vice President

This is **Exhibit "G"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

## GUARANTEE

**THIS GUARANTEE** is made as of July 26, 2016.

**WHEREAS** each of the parties signatory hereto or that hereafter becomes a party hereto pursuant to Section 6.09 (each, a "**Guarantor**", and collectively, the "**Guarantors**") has agreed to provide **ROYAL BANK OF CANADA** (the "**Lender**") with a guarantee of the Obligations (as hereinafter defined) of **VOOM MEDIA CORP.** (together with all successors, by amalgamation or otherwise, the "**Obligor**"; which term shall include, without limitation, Mundo Media Ltd. following the Mundo Amalgamation);

**AND WHEREAS** each Guarantor has agreed that if the guarantee is not enforceable, such Guarantor will indemnify the Lender or be liable as primary obligor;

**AND WHEREAS** in this instrument, unless something in the subject matter or context is inconsistent therewith, "**Guarantee**" means this instrument including its recitals as amended from time to time;

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor agrees with the Lender as follows:

## ARTICLE 1 - INTERPRETATION

1.01        **Definitions**

Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein which are not otherwise defined herein shall have the meanings provided in the Credit Agreements.  In this Guarantee, unless something in the subject matter or context is inconsistent therewith,

"**Credit Agreements**" means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

"**Credit Event**" means any accelerated demand for payment made by the Lender in respect of the Obligations following an Event of Default which is continuing.

"**Obligations**" has the meaning ascribed thereto in Section 2.01.

"**Senior Credit Agreement**" means the credit agreement made as of July 26, 2016 between the Obligor and the Lender.

"**Subordinate Credit Agreement**" the subordinate credit agreement made as of July 26, 2016 between the Obligor and the Lender.

1.02        **Headings**

The division of this Guarantee into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Guarantee.  The terms "hereof", "hereunder" and similar expressions refer to this Guarantee and not to any particular Article, Section or other portion hereof.  Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Guarantee.

1.03        **Extended Meanings**

In this Guarantee words importing the singular number only include the plural and vice versa, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities.  The term "including" means "including without limiting the generality of the foregoing". A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GUARANTEE

2.01        **Guarantee**

Each Guarantor hereby unconditionally and irrevocably guarantees payment of all the debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Obligor to the Lender or remaining unpaid by the Obligor to the Lender pursuant to each Credit Agreement, including the amount of any judgment or award made against the Obligor for the benefit of the Lender in connection with either Credit Agreement (collectively, the **"Obligations"**).

2.02        **Indemnity**

If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 for any reason whatsoever, each Guarantor will, as a separate and distinct obligation, indemnify and save harmless the Lender from and against all losses resulting from the failure of the Obligor to pay such Obligation.

2.03        **Primary Obligation**

If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 or the Lender is not indemnified under Section 2.02, in each case, for any reason whatsoever, such Obligation will, as a separate and distinct obligation, be paid by and be recoverable from each Guarantor as primary obligor.

2.04        **Obligations Absolute**

The liability of each Guarantor hereunder will be for the full amount of the Obligations without apportionment, limitation or restriction of any kind, will be continuing, absolute and unconditional and will not be affected by any law, regulation or other event, condition or circumstance or any other act, delay, abstention or omission to act of any kind by the Obligor, the Lender or any other person, that might constitute a legal or equitable defence to or a discharge, limitation or reduction of any Guarantor's Obligations hereunder, other than as a result of the indefeasible payment or extinguishment in full of the Obligations, including:

(a)    the invalidity, illegality or lack of enforceability of the Obligations or any part thereof or of any agreement between the Obligor and the Lender;

(b)    any impossibility, impracticability, frustration of purpose, illegality, *force majeure* or act of government;

(c)    the bankruptcy, winding-up, liquidation, dissolution, moratorium, readjustment of debt or insolvency of the Obligor or any other person, including any discharge or bar against collection of any of the Obligations, or the amalgamation of or any change in the existence, structure, name, status, function, control, constitution or ownership of the Obligor, any Guarantor, the Lender or any other person;

(d)    any lack or limitation of power, incapacity or disability on the part of the Obligor or of the directors, partners or agents thereof or any other irregularity, defect or informality on the part of the Obligor in its obligations to the Lender;

(e)    any limitation, postponement, prohibition, subordination or other restriction on the right of the Lender to payment of the Obligations; or

(f)    any interest of the Lender in any property whether as owner thereof or as holder of a security interest therein or thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment of any right or recourse to collateral,

and each of the foregoing is hereby waived by each Guarantor to the fullest extent permitted under applicable law.  The foregoing provisions apply and the foregoing waivers will be effective to the fullest extent permitted under applicable law even if the effect of any action or failure to take action by the Lender is to destroy or diminish any Guarantor's subrogation rights, any Guarantor's right to proceed against the Obligor for reimbursement, any Guarantor's right to recover contribution from any other person or any other right or remedy of any Guarantor.

2.05        **Luxembourg Guarantee Limitation**

(1) Notwithstanding anything to the contrary in this Guarantee, the aggregate obligations and exposure of any Guarantor incorporated in Luxembourg (a "**Luxembourg Guarantor**") in respect of the aggregate amount of its guarantee obligations under this Guarantee for the Obligations of the Obligor, unless such Obligor is or becomes the direct or indirect subsidiary of any Luxembourg Guarantor, will be:

(a)     80 per cent. of such Luxembourg Guarantor's net assets (*capitaux propres*) as referred to in annex I ("**Annex I"**) to the grand-ducal regulation dated 18 December 2015 determining the form and content of the presentation of balance sheet and profit and loss account implementing Articles 34, 35, 46 and 47 of the Luxembourg law dated 19 December 2002 concerning the trade and companies register and the accounting and annual accounts of undertakings, as amended, (the "**Regulation"**) and the subordinated debt (*dettes subordonnées*) owed by such Luxembourg Guarantor (excluding however any amounts advanced to such Luxembourg Guarantor as per paragraph (b) below) (the "**Luxembourg Subordinated Debt"**) at the date of this Guarantee; and

(b)     80 per cent. of such Luxembourg Guarantor's net assets (*capitaux propres*) as referred to in Annex I of the Regulation and the Luxembourg Subordinated Debt at the time of the enforcement of the Guarantee.

(2) The above limitation shall not apply to any amounts (if any) borrowed by the Obligor under the Credit Agreements where the borrowed amounts have been directly or indirectly lent or otherwise made available by such Obligor to a Luxembourg Guarantor or to any direct or indirect subsidiary of a Luxembourg Guarantor.

## ARTICLE 3 - DEALINGS WITH OBLIGOR AND OTHERS

3.01     **No Release**

The liability of each Guarantor hereunder will not be released, discharged, limited or in any way affected by anything done, suffered, permitted or omitted to be done by the Lender in connection with any duties or liabilities of the Obligor to the Lender or any security therefor including any loss of or in respect of any security received by the Lender from the Obligor or others. Without limiting the generality of the foregoing and without releasing, discharging, limiting or otherwise affecting, in whole or in part, each Guarantor's liability hereunder, the Lender may, without obtaining the consent of or giving notice to any Guarantor:

(a)     discontinue, reduce, increase or otherwise vary the credit of the Obligor in any manner whatsoever;

(b)     make any change in the time, manner or place of payment under, or in any other term of, any agreement between the Obligor and the Lender or waive, in whole or in part and with or without conditions, the failure on the part of the Obligor to carry out any of its obligations under any such agreement;

(c)     grant time, renewals, extensions, indulgences, releases and discharges to the Obligor or any other person;

(d)     release or substitute, in whole or in part, any Guarantor of the Obligations or obtain a new guarantee of any of the Obligations from any other person;

(e)     subordinate, release, take or enforce, refrain from taking or enforcing or omit to take or enforce security or collateral from the Obligor or any other person or perfect,

refrain from perfecting or omit to perfect security or collateral of the Obligor or any other person, whether occasioned by the fault of the Lender or otherwise;

(f)     to the extent permitted under applicable law, give or refrain from giving to the Obligor, any Guarantor or any other person notice of any sale or other disposition of any property securing any of the Obligations or any other guarantee thereof, or any notice that may be given in connection with any sale or other disposition of any such property;

(g)     accept compromises from the Obligor or any other person;

(h)     marshal, refrain from marshalling or omit to marshal assets;

(i)     apply all money or other property at any time received from the Obligor or from its security upon such part of the Obligations as the Lender may see fit or vary any such application in whole or in part from time to time as the Lender may see fit; and

(j)     otherwise deal, delay or refrain from dealing or omit to deal with the Obligor, each Guarantor and all other persons and security as the Lender may see fit and do, delay or refrain from doing or omit to do any other act or thing that under applicable law might otherwise have the effect, directly or indirectly, of releasing, discharging, limiting or otherwise affecting in whole or in part any Guarantor's liability hereunder.

3.02     **No Exhaustion of Remedies**

The Lender will not be bound or obligated to exhaust its recourse against the Obligor or other persons or any security or collateral it may hold or take any other action before being entitled to demand payment from any Guarantor hereunder.

3.03     **Prima Facie Evidence**

Any account settled or stated in writing by or between the Lender and the Obligor in respect of any Obligation will be *prima facie* evidence that the balance or amount thereof appearing due to the Lender is so due.

3.04     **No Set-off**

In any claim by the Lender against any Guarantor, no Guarantor may claim or assert any set-off, counterclaim, claim or other right that either such Guarantor or the Obligor may have against the Lender or any other person.

3.05     **Continuing Guarantee**

The obligations of each Guarantor hereunder will constitute and be continuing obligations and will apply to and secure any ultimate balance due or remaining due to the Lender and will not be considered as wholly or partially satisfied by the payment or liquidation at any time of any sum of money for the time being due or remaining unpaid to the Lender.  This Guarantee will

continue to be effective even if at any time any payment of any of the Obligations is rendered unenforceable or is rescinded or must otherwise be returned by the Lender upon the occurrence of any action or event including the insolvency, bankruptcy or reorganization of the Obligor or any Guarantor or otherwise, all as though such payment had not been made.

## ARTICLE 4 - DEMAND

4.01     **Demand**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Lender will be entitled to make demand upon any one or more of the Guarantors for payment of all Obligations.  Each such Guarantor will pay to the Lender the total amount guaranteed hereunder forthwith after demand therefor is made to such Guarantor.  In addition, each such Guarantor will pay to the Lender forthwith upon demand all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, including legal fees and disbursements on a full indemnity basis.

4.02     **Stay of Acceleration**

If acceleration of the time for payment of any amount payable by the Obligor in respect of the Obligations is stayed upon the insolvency, bankruptcy, arrangement or reorganization of the Obligor or any moratorium affecting the payment of the Obligations, all such amounts that would otherwise be subject to acceleration will nonetheless be payable by each Guarantor hereunder forthwith on the demand by the Lender.

4.03     **Interest**

Without duplication of interest accruing on the Obligations, each Guarantor will pay interest to the Lender at the rate or rates provided in the Credit Agreements for such Obligations, or, in the event no such rate is provided for therein, at a rate *per annum* equal to the Prime Rate of the Lender, on the unpaid portion of all amounts payable by such Guarantor under this Guarantee, including all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, such interest to accrue from and including the date of demand by the Lender on such Guarantor to but excluding the date of payment thereof by such Guarantor.  For the purposes of this Guarantee **"Prime Rate of the Lender"** means the rate of interest *per annum* established from time to time by the Lender as the reference rate of interest for the determination of interest rates that the Lender charges customers of varying degrees of credit worthiness in Canada for Canadian dollar demand loans.

## ARTICLE 5 - ASSIGNMENT, POSTPONEMENT AND SUBROGATION

5.01     **Assignment and Postponement**

All debts and liabilities, present and future, of the Obligor to each Guarantor (except for any debts and liabilities to the extent otherwise the subject matter of Security (governed by the laws of Luxembourg) granted by a Guarantor incorporated or formed under the laws of Luxembourg) are hereby assigned to the Lender and postponed to the Obligations (other than to the

extent set forth in either Credit Agreement), and, following a Credit Event, all money received by any Guarantor in respect thereof will be held in trust for the Lender and forthwith upon receipt will be paid over to the Lender, the whole without in any way lessening or limiting the liability of such Guarantor hereunder and this assignment and postponement is independent of the guarantee, indemnity and primary obligor obligations contained in this Guarantee and will remain in full force and effect until, in the case of the assignment, the liability of such Guarantor under this Guarantee has been discharged or terminated and, in the case of the postponement, until all Obligations are performed and indefeasibly paid in full.

5.02        **Subrogation**

No Guarantor will be entitled to subrogation until (a) each Guarantor performs or makes indefeasible payment to the Lender of all amounts owing by such Guarantor to the Lender under this Guarantee, (b) the Obligations are performed and indefeasibly paid in full and (c) the Lender has no further liability to advance money to, or incur any liability on behalf of, the Obligor. Thereafter, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation and warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Obligations and any security held therefor resulting from such performance or payment by such Guarantor.

## ARTICLE 6 - GENERAL

6.01        **Waiver of Notices**

Each Guarantor hereby waives promptness, diligence, presentment, demand of payment, notice of acceptance and any other notice with respect to this Guarantee and the Obligations guaranteed hereunder, except for the demand pursuant to Section 4.01.

6.02        **Joint and Several Obligations**

Each obligation of a Guarantor hereunder is both several and joint with each other Guarantor.

6.03        **Binding Effect of the Guarantee**

This Guarantee will be binding upon the successors of each Guarantor and will enure to the benefit of the Lender and its successors and assigns.

6.04        **Foreign Currency Obligations**

Each Guarantor will make payment relative to each Obligation in the currency (the "**original currency**") in which the Obligor is required to pay such Obligation, in each case, in accordance with the provisions of the related Credit Agreement.

If a Guarantor makes payment relative to any Obligation to the Lender in a currency (the "**other currency**") other than the original currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of such Guarantor hereunder in respect of such Obligation only to the extent of the amount

of the original currency that the Lender is able to purchase with the amount of the other currency it receives on the date of receipt, as determined by the Lender in accordance with its normal practice. If the amount of the original currency that the Lender is able to purchase is less than the amount of such currency originally due in respect of the relevant Obligation, such Guarantor will indemnify and save the Lender harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Lender and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.  A certificate of the Lender as to any such loss or damage will constitute prima facie evidence thereof, in the absence of manifest error.

6.05        **Taxes and Gross-Up by Guarantors**

All payments by each Guarantor under this Guarantee, whether in respect of principal, interest, interest on overdue and unpaid interest, fees or any other Obligations, will be made in full without any deduction or withholding (whether in respect of duties, taxes, charges or other similar amounts) unless such Guarantor is prohibited by applicable laws from doing so, in which event such Guarantor will:

(a)        ensure that the deduction or withholding does not exceed the minimum amount legally required;

(b)        increase the sum paid by it to the Lender as necessary so that after making or allowing for all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been required;

(c)        pay to the relevant taxation or other authorities, within the period for payment required by applicable laws, the full amount of the deduction or withholding (including the full amount of any deduction or withholding applicable to any additional sums payable under this Section); and

(d)        furnish to the Lender promptly, as soon as available, an official receipt of the relevant taxation or other authorities involved for all amounts deducted or withheld as aforesaid.

6.06        **Entire Agreement**

This Guarantee constitutes the entire agreement between each Guarantor and the Lender with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between such parties with respect thereto.  There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the parties except as expressly set forth herein.  The Lender will not be bound by any representations or promises made by the Obligor to any Guarantor and possession of this Guarantee by the Lender will be conclusive evidence against each Guarantor that this Guarantee was not delivered in escrow or pursuant to any agreement that it should not be effective until any condition precedent or subsequent

has been complied with and this Guarantee will be operative and binding against each Guarantor notwithstanding the non-execution thereof by any other proposed signatory.

6.07        **Financial Condition of the Obligor**

Each Guarantor acknowledges that it is fully aware of the financial condition of the Obligor and that it will receive a benefit from the Lender entering into the Credit Agreements**.** So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed of the financial condition of the Obligor and of all circumstances bearing upon the nature, scope and extent of the risk that such Guarantor assumes or incurs hereunder and the Lender will not have a duty to advise any Guarantor of information known to the Lender regarding such circumstances or risks.

6.08        **Acknowledgements**

(1) Each Guarantor acknowledges receipt of a true and complete copy of each Credit Agreement and all of the terms and conditions thereof. So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed, and requesting and obtaining copies from the Obligor or otherwise, of all amendments, modifications, supplements, restatements and replacements of either Credit Agreement and the Lender will not have a duty to advise or provide copies to any Guarantor of any such amendments, modifications, supplements, restatements and replacements.

(2) Each Guarantor acknowledges and agrees that this Guarantee has been executed and delivered to and in favour of the Lender, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

6.09        **Additional Guarantors**

If, at the option of the Obligor or as required pursuant to either Credit Agreement, any party that is not a Guarantor becomes a Guarantor hereunder, such party shall execute and deliver to the Lender a Joinder Agreement substantially in the form of Schedule A and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Guarantor party hereto on the Closing Date.

6.10        **Amendments and Waivers**

No amendment to this Guarantee will be valid or binding unless set forth in writing and duly executed by each Guarantor and the Lender. No waiver of any breach of any provision of this Guarantee will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided in the written waiver, will be limited to the specific breach waived.

6.11        **Severability**

If any provision of this Guarantee is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Guarantee and the remaining provisions will continue in full force and effect so long as the economic or legal substance

of the transactions contemplated hereby is not affected in any manner materially adverse to either the Lender or the Guarantors.

6.12    **Notices**

      Any demand, notice or other communication to be given under this Guarantee to any Guarantor or the Lender shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Guarantor and the Lender may change their respective address for notices in accordance with the said provisions.

6.13    **Discharge**

      Unless all obligations of a Guarantor hereunder have been indefeasibly paid or performed, such Guarantor will not be discharged from any of its obligations hereunder except by a release or discharge signed in writing by the Lender.

6.14    **Remedies Cumulative**

      The rights and remedies of the Lender hereunder are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise.  No single or partial exercise by the Lender of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Lender may be entitled.

6.15    **Governing Law**

      This Guarantee is governed by and will be construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

6.16    **Attornment**

      For the purpose of all legal proceedings this Guarantee will be deemed to have been performed in the Province of Ontario and the courts of the Province of Ontario will have jurisdiction to entertain any action arising under this Guarantee.  Each Guarantor and the Lender each hereby attorns to the jurisdiction of the courts of the Province of Ontario.

6.17    **Interest Calculations and Payments**

      Unless otherwise stated, wherever in this Guarantee reference is made to a rate of interest "per annum" or a similar expression is used, such interest will be calculated on the basis of a calendar year of 365 days or 366 days, as the case may be, and using the nominal rate method of calculation and not the effective rate method of calculation or on any other basis that gives effect to the principle of deemed reinvestment of interest.  Interest will continue to accrue after maturity and default and/or judgment, if any, until payment thereof, and interest will accrue on overdue interest, if any.

6.18    **Interest Act (Canada)**

For the purposes of this Guarantee, whenever interest to be paid hereunder is to be calculated on the basis of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or such other number of days in such period, as the case may be.

6.19      **Conflict**

In the event of a conflict in or between the provisions of this Guarantee and the provisions of either Credit Agreement then, despite anything contained in this Guarantee, the provisions of the applicable Credit Agreement will prevail and the provisions of this Guarantee will be deemed to be amended to the extent necessary to eliminate the conflict.

6.20      **Executed Copy**

Each Guarantor acknowledges receipt of a fully executed copy of this Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF each Guarantor has signed, sealed and delivered this Guarantee.

GUARANTORS:

**MUNDO MEDIA LTD.**

Per: _____
       Name:
       Title:

Per: _____
       Name:
       Title:

**2518769 ONTARIO LTD.**

Per: _____
       Name:
       Title:

Per: _____
       Name:
       Title:

**2307521 ONTARIO INC.**

Per: _____
       Name:
       Title:

Per: _____
       Name:
       Title:

**MOVIL WAVE S.À R.L.**
Registered address: 5-11, avenue Gaston
Diderich
L-1420 Luxembourg
RCS Luxembourg: B 165.409
Share capital: EUR 12,500

Per:

Name: Romain Dattu

Title: Authorized signatory

Per:

Name: **Frank Pletsch**

Title: Authorized signatory

**MOGENIO S.A.**
Registered address: 5-11, avenue Gaston
Diderich
L-1420 Luxembourg
RCS Luxembourg: B 166.420

Per:

Name: Romain Dattu

Title: Authorized signatory

Per:

Name: **Frank Pletsch**

Title: Authorized signatory

## SCHEDULE A

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT, dated as of ●, 20●, is delivered pursuant to Section 6.09 of the Guarantee, dated as of July 26, 2016, by MUNDO MEDIA LTD., 2518769 ONTARIO LTD., 2307521 ONTARIO INC., MOVIL WAVE S.À R.L. and MOGENIO S.A. (the "**Guarantors**") in favour of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").  Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR          [NAME OF ADDITIONAL GUARANTOR]

Per:  _____

      Name:
      Title:

Per:  _____

      Name:
      Title:

**Execution Version**

## JOINDER AGREEMENT

THIS JOINDER AGREEMENT, dated as of October 13, 2016, is delivered pursuant to Section 6.09 of the Guarantee, dated as of July 26, 2016, by MUNDO MEDIA LTD., 2518769 ONTARIO LTD., 2307521 ONTARIO INC., MOVIL WAVE S.À R.L. and MOGENIO S.A. (the "**Guarantors**") in favour of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").  Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 6.09 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR                **2538853 ONTARIO LTD.**

Per: _____
       Name:   Jason Theofilos
       Title:    Director

Per: _____
       Name:
       Title:

**[SIGNATURE PAGE TO JOINDER TO GUARANTEE]**

## JOINDER AGREEMENT
## (ONTARIO LAW GOVERNED GUARANTEE)

**THIS JOINDER AGREEMENT**, dated as of January 31, 2018, is delivered pursuant to Section 6.09 of the Guarantee, dated as of July 26, 2016, by **MUNDO MEDIA LTD., 2518769 ONTARIO LTD., 2307521 ONTARIO INC., MOVIL WAVE S.À R.L., MOGENIO S.A.** and the other Persons from time to time party thereto as Guarantors (collectively, the "**Guarantors**") in favour of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").

Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned Mundo Media (Luxembourg) S.à r.l. (the "New Guarantor") as provided in Section 6.09 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the New Guarantor hereby agrees that this Joinder Agreement may be attached to the Guarantee.

This Joinder Agreement is governed by and will be construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

For the purpose of all legal proceedings under the Guarantee (including this Joinder Agreement) will be deemed to have been performed in the Province of Ontario and the courts of the Province of Ontario will have jurisdiction to entertain any action arising under the Guarantee (including this Joinder Agreement).

The New Guarantor hereby attorns to the jurisdiction of the courts of the Province of Ontario.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR          **MUNDO MEDIA (LUXEMBOURG) S.À R.L.**

Per: _____

Name:
Title:

Sinan Sar
Manager

Per: _____

Name:
Title:

Frank PLETSCH
Manager

**JOINDER AGREEMENT**
**(GUARANTEE)**

       **THIS JOINDER AGREEMENT**, dated as of June 2, 2017, is delivered pursuant to Section 6.09 of the Guarantee, dated as of July 26, 2016, by **MUNDO MEDIA LTD., 2518769 ONTARIO LTD., 2307521 ONTARIO INC., MOVIL WAVE S.À R.L. and MOGENIO S.A.** (the "**Guarantors**") in favour of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**"). Capitalized terms used herein without definition are used as defined in the Guarantee.

       By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 6.09 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

       By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR          **MUNDO INC.**

Per: _____
Name: _Jason   Theofilos_
Title: _C.E.O._

Per: _____
Name: _____
Title: _____

**[SIGNATURE PAGE TO JOINDER TO GUARANTEE]**

This is **Exhibit "H"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Execution Version**

## GUARANTEE

**THIS GUARANTEE** is made as of October 13, 2016.

**WHEREAS** each of the parties signatory hereto or that hereafter becomes a party hereto pursuant to Section 6.10 (each, a "**Guarantor**", and collectively, the "**Guarantors**") has agreed to provide **ROYAL BANK OF CANADA** (the "**Lender**") with a guarantee of the Obligations (as hereinafter defined) of **MUNDO MEDIA LTD.** (together with all successors, by amalgamation or otherwise, the "**Obligor**");

**AND WHEREAS** each Guarantor has agreed that if the guarantee is not enforceable, such Guarantor will indemnify the Lender or be liable as primary obligor;

**AND WHEREAS** in this instrument, unless something in the subject matter or context is inconsistent therewith, "**Guarantee**" means this instrument including its recitals as amended from time to time;

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor agrees with the Lender as follows:

## ARTICLE 1 - INTERPRETATION

1.01      **Definitions**

Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein which are not otherwise defined herein shall have the meanings provided in the Credit Agreements.  In this Guarantee, unless something in the subject matter or context is inconsistent therewith,

"**Bankruptcy Code**" means title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"**Credit Agreements**" means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

"**Credit Event**" means any accelerated demand for payment made by the Lender in respect of the Obligations following an Event of Default which is continuing.

"**Obligations**" has the meaning ascribed thereto in Section 2.01.

"**Senior Credit Agreement**" means the credit agreement made as of July 26, 2016 between the Obligor and the Lender, as amended by first amending agreement dated as of the date hereof.

"**Subordinate Credit Agreement**" the subordinate credit agreement made as of July 26, 2016 between the Obligor and the Lender, as amended by first amending agreement dated as of the date hereof.

1.02        **Headings**

The division of this Guarantee into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Guarantee.  The terms "hereof", "hereunder" and similar expressions refer to this Guarantee and not to any particular Article, Section or other portion hereof.  Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Guarantee.

1.03        **Extended Meanings**

In this Guarantee words importing the singular number only include the plural and vice versa, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities.  The term "including" means "including without limiting the generality of the foregoing".  A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GUARANTEE

2.01        **Guarantee**

Each Guarantor hereby unconditionally and irrevocably guarantees payment of all the debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Obligor to the Lender or remaining unpaid by the Obligor to the Lender pursuant to each Credit Agreement, including the amount of any judgment or award made against the Obligor for the benefit of the Lender in connection with either Credit Agreement (collectively, the **"Obligations"**).

2.02        **Indemnity**

If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 for any reason whatsoever, each Guarantor will, as a separate and distinct obligation, indemnify and save harmless the Lender from and against all losses resulting from the failure of the Obligor to pay such Obligation.

2.03        **Primary Obligation**

If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 or the Lender is not indemnified under Section 2.02, in each case, for any reason whatsoever, such Obligation will, as a separate and distinct obligation, be paid by and be recoverable from each Guarantor as primary obligor.

2.04        **Obligations Absolute**

The liability of each Guarantor hereunder will be for the full amount of the Obligations without apportionment, limitation or restriction of any kind, will be continuing, absolute and unconditional and will not be affected by any law, regulation or other event, condition or circumstance or any other act, delay, abstention or omission to act of any kind by the Obligor, the Lender or any other person, that might constitute a legal or equitable defence to or a discharge, limitation or reduction of any Guarantor's Obligations hereunder, other than as a result of the indefeasible payment or extinguishment in full of the Obligations, including:

(a)     the invalidity, illegality or lack of enforceability of the Obligations or any part thereof or of any agreement between the Obligor and the Lender;

(b)     any impossibility, impracticability, frustration of purpose, illegality, *force majeure* or act of government;

(c)     the bankruptcy, winding-up, liquidation, dissolution, moratorium, readjustment of debt or insolvency of the Obligor or any other person, including any discharge or bar against collection of any of the Obligations, or the amalgamation of or any change in the existence, structure, name, status, function, control, constitution or ownership of the Obligor, any Guarantor, the Lender or any other person;

(d)     any lack or limitation of power, incapacity or disability on the part of the Obligor or of the directors, partners or agents thereof or any other irregularity, defect or informality on the part of the Obligor in its obligations to the Lender;

(e)     any limitation, postponement, prohibition, subordination or other restriction on the right of the Lender to payment of the Obligations; or

(f)     any interest of the Lender in any property whether as owner thereof or as holder of a security interest therein or thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment of any right or recourse to collateral,

and each of the foregoing is hereby waived by each Guarantor to the fullest extent permitted under applicable law. The foregoing provisions apply and the foregoing waivers will be effective to the fullest extent permitted under applicable law even if the effect of any action or failure to take action by the Lender is to destroy or diminish any Guarantor's subrogation rights, any Guarantor's right to proceed against the Obligor for reimbursement, any Guarantor's right to recover contribution from any other person or any other right or remedy of any Guarantor.

## ARTICLE 3 - DEALINGS WITH OBLIGOR AND OTHERS

3.01        **No Release**

The liability of each Guarantor hereunder will not be released, discharged, limited or in any way affected by anything done, suffered, permitted or omitted to be done by the Lender in connection with any duties or liabilities of the Obligor to the Lender or any security therefor

- 4 -

including any loss of or in respect of any security received by the Lender from the Obligor or others. Without limiting the generality of the foregoing and without releasing, discharging, limiting or otherwise affecting, in whole or in part, each Guarantor's liability hereunder, the Lender may, without obtaining the consent of or giving notice to any Guarantor:

(a)     discontinue, reduce, increase or otherwise vary the credit of the Obligor in any manner whatsoever;

(b)     make any change in the time, manner or place of payment under, or in any other term of, any agreement between the Obligor and the Lender or waive, in whole or in part and with or without conditions, the failure on the part of the Obligor to carry out any of its obligations under any such agreement;

(c)     grant time, renewals, extensions, indulgences, releases and discharges to the Obligor or any other person;

(d)     release or substitute, in whole or in part, any Guarantor of the Obligations or obtain a new guarantee of any of the Obligations from any other person;

(e)     subordinate, release, take or enforce, refrain from taking or enforcing or omit to take or enforce security or collateral from the Obligor or any other person or perfect, refrain from perfecting or omit to perfect security or collateral of the Obligor or any other person, whether occasioned by the fault of the Lender or otherwise;

(f)     to the extent permitted under applicable law, give or refrain from giving to the Obligor, any Guarantor or any other person notice of any sale or other disposition of any property securing any of the Obligations or any other guarantee thereof, or any notice that may be given in connection with any sale or other disposition of any such property;

(g)     accept compromises from the Obligor or any other person;

(h)     marshal, refrain from marshalling or omit to marshal assets;

(i)     apply all money or other property at any time received from the Obligor or from its security upon such part of the Obligations as the Lender may see fit or vary any such application in whole or in part from time to time as the Lender may see fit; and

(j)     otherwise deal, delay or refrain from dealing or omit to deal with the Obligor, each Guarantor and all other persons and security as the Lender may see fit and do, delay or refrain from doing or omit to do any other act or thing that under applicable law might otherwise have the effect, directly or indirectly, of releasing, discharging, limiting or otherwise affecting in whole or in part any Guarantor's liability hereunder.

3.02        **No Exhaustion of Remedies**

The Lender will not be bound or obligated to exhaust its recourse against the Obligor or other persons or any security or collateral it may hold or take any other action before being entitled to demand payment from any Guarantor hereunder.

3.03        **Prima Facie Evidence**

Any account settled or stated in writing by or between the Lender and the Obligor in respect of any Obligation will be *prima facie* evidence that the balance or amount thereof appearing due to the Lender is so due.

3.04        **No Set-off**

In any claim by the Lender against any Guarantor, no Guarantor may claim or assert any set-off, counterclaim, claim or other right that either such Guarantor or the Obligor may have against the Lender or any other person.

3.05        **Continuing Guarantee**

The obligations of each Guarantor hereunder will constitute and be continuing obligations and will apply to and secure any ultimate balance due or remaining due to the Lender and will not be considered as wholly or partially satisfied by the payment or liquidation at any time of any sum of money for the time being due or remaining unpaid to the Lender. This Guarantee will continue to be effective even if at any time any payment of any of the Obligations is rendered unenforceable or is rescinded or must otherwise be returned by the Lender upon the occurrence of any action or event including the insolvency, bankruptcy or reorganization of the Obligor or any Guarantor or otherwise, all as though such payment had not been made.

## ARTICLE 4 - DEMAND

4.01        **Demand**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Lender will be entitled to make demand upon any one or more of the Guarantors for payment of all Obligations. Each such Guarantor will pay to the Lender the total amount guaranteed hereunder forthwith after demand therefor is made to such Guarantor. In addition, each such Guarantor will pay to the Lender forthwith upon demand all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, including legal fees and disbursements on a full indemnity basis.

4.02        **Stay of Acceleration**

If acceleration of the time for payment of any amount payable by the Obligor in respect of the Obligations is stayed upon the insolvency, bankruptcy, arrangement or reorganization of the Obligor or any moratorium affecting the payment of the Obligations, all such amounts that

would otherwise be subject to acceleration will nonetheless be payable by each Guarantor hereunder forthwith on the demand by the Lender.

4.03        **Interest**

Without duplication of interest accruing on the Obligations, each Guarantor will pay interest to the Lender at the rate or rates provided in the Credit Agreements for such Obligations, or, in the event no such rate is provided for therein, at a rate *per annum* equal to the Prime Rate of the Lender, on the unpaid portion of all amounts payable by such Guarantor under this Guarantee, including all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, such interest to accrue from and including the date of demand by the Lender on such Guarantor to but excluding the date of payment thereof by such Guarantor.  For the purposes of this Guarantee **"Prime Rate of the Lender"** means the rate of interest *per annum* established from time to time by the Lender as the reference rate of interest for the determination of interest rates that the Lender charges customers of varying degrees of credit worthiness in Canada for Canadian dollar demand loans.

## ARTICLE 5 - ASSIGNMENT, POSTPONEMENT AND SUBROGATION

5.01        **Assignment and Postponement**

All debts and liabilities, present and future, of the Obligor to each Guarantor are hereby assigned to the Lender and postponed to the Obligations (other than to the extent set forth in either Credit Agreement), and, following a Credit Event, all money received by any Guarantor in respect thereof will be held in trust for the Lender and forthwith upon receipt will be paid over to the Lender, the whole without in any way lessening or limiting the liability of such Guarantor hereunder and this assignment and postponement is independent of the guarantee, indemnity and primary obligor obligations contained in this Guarantee and will remain in full force and effect until, in the case of the assignment, the liability of such Guarantor under this Guarantee has been discharged or terminated and, in the case of the postponement, until all Obligations are performed and indefeasibly paid in full.

5.02        **Subrogation**

No Guarantor will be entitled to subrogation until (a) each Guarantor performs or makes indefeasible payment to the Lender of all amounts owing by such Guarantor to the Lender under this Guarantee, (b) the Obligations are performed and indefeasibly paid in full and (c) the Lender has no further liability to advance money to, or incur any liability on behalf of, the Obligor. Thereafter, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation and warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Obligations and any security held therefor resulting from such performance or payment by such Guarantor.

## ARTICLE 6 - GENERAL

6.01        **Waiver of Notices**

Each Guarantor hereby waives promptness, diligence, presentment, demand of payment, notice of acceptance and any other notice with respect to this Guarantee and the Obligations guaranteed hereunder, except for the demand pursuant to Section 4.01.

6.02        **Joint and Several Obligations**

Each obligation of a Guarantor hereunder is both several and joint with each other Guarantor.

6.03        **Binding Effect of the Guarantee**

This Guarantee will be binding upon the successors of each Guarantor and will enure to the benefit of the Lender and its successors and assigns.

6.04        **Foreign Currency Obligations**

Each Guarantor will make payment relative to each Obligation in the currency (the "**original currency**") in which the Obligor is required to pay such Obligation, in each case, in accordance with the provisions of the related Credit Agreement.

If a Guarantor makes payment relative to any Obligation to the Lender in a currency (the "**other currency**") other than the original currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of such Guarantor hereunder in respect of such Obligation only to the extent of the amount of the original currency that the Lender is able to purchase with the amount of the other currency it receives on the date of receipt, as determined by the Lender in accordance with its normal practice.  If the amount of the original currency that the Lender is able to purchase is less than the amount of such currency originally due in respect of the relevant Obligation, such Guarantor will indemnify and save the Lender harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Lender and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.  A certificate of the Lender as to any such loss or damage will constitute prima facie evidence thereof, in the absence of manifest error.

6.05        **Taxes and Gross-Up by Guarantors**

All payments by each Guarantor under this Guarantee, whether in respect of principal, interest, interest on overdue and unpaid interest, fees or any other Obligations, will be made in full without any deduction or withholding (whether in respect of duties, taxes, charges or other similar amounts) unless such Guarantor is prohibited by applicable laws from doing so, in which event such Guarantor will:

- 8 -

(a)    ensure that the deduction or withholding does not exceed the minimum amount legally required;

(b)    increase the sum paid by it to the Lender as necessary so that after making or allowing for all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been required;

(c)    pay to the relevant taxation or other authorities, within the period for payment required by applicable laws, the full amount of the deduction or withholding (including the full amount of any deduction or withholding applicable to any additional sums payable under this Section); and

(d)    furnish to the Lender promptly, as soon as available, an official receipt of the relevant taxation or other authorities involved for all amounts deducted or withheld as aforesaid.

6.06    **General Limitations on Guaranteed Liabilities**

Each Guarantor, and by its acceptance of this Guarantee, the Lender, hereby confirms that it is the intention of all such Persons that this Guarantee and the obligations of each such Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guarantee and the obligations of each such Guarantor hereunder. To effectuate the foregoing intention, the Lender and each Guarantor hereby irrevocably agree that the obligations of each Guarantor under this Guarantee at any time shall be limited to the maximum amount as will result in the obligations of each Guarantor under this Guarantee not constituting a fraudulent transfer or conveyance. Each Guarantor further agrees to contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender under or in respect of the Loan Documents.

6.07    **Entire Agreement**

This Guarantee constitutes the entire agreement between each Guarantor and the Lender with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between such parties with respect thereto. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the parties except as expressly set forth herein. The Lender will not be bound by any representations or promises made by the Obligor to any Guarantor and possession of this Guarantee by the Lender will be conclusive evidence against each Guarantor that this Guarantee was not delivered in escrow or pursuant to any agreement that it should not be effective until any condition precedent or subsequent has been complied with and this Guarantee will be operative and binding against each Guarantor notwithstanding the non-execution thereof by any other proposed signatory.

6.08        **Financial Condition of the Obligor**

Each Guarantor acknowledges that it is fully aware of the financial condition of the Obligor and that it will receive a benefit from the Lender entering into the Credit Agreements**.**  So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed of the financial condition of the Obligor and of all circumstances bearing upon the nature, scope and extent of the risk that such Guarantor assumes or incurs hereunder and the Lender will not have a duty to advise any Guarantor of information known to the Lender regarding such circumstances or risks.

6.09        **Acknowledgements**

(1) Each Guarantor acknowledges receipt of a true and complete copy of each Credit Agreement and all of the terms and conditions thereof.  So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed, and requesting and obtaining copies from the Obligor or otherwise, of all amendments, modifications, supplements, restatements and replacements of either Credit Agreement and the Lender will not have a duty to advise or provide copies to any Guarantor of any such amendments, modifications, supplements, restatements and replacements.

(2) Each Guarantor acknowledges and agrees that this Guarantee has been executed and delivered to and in favor of the Lender, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

6.10        **Additional Guarantors**

If, at the option of the Obligor or as required pursuant to either Credit Agreement, any party that is not a Guarantor becomes a Guarantor hereunder, such party shall execute and deliver to the Lender a Joinder Agreement substantially in the form of Schedule A and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Guarantor party hereto on the Closing Date.

6.11        **Amendments and Waivers**

No amendment to this Guarantee will be valid or binding unless set forth in writing and duly executed by each Guarantor and the Lender.  No waiver of any breach of any provision of this Guarantee will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided in the written waiver, will be limited to the specific breach waived.

6.12        **Severability**

If any provision of this Guarantee is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Guarantee and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either the Lender or the Guarantors.

6.13        **Notices**

Any demand, notice or other communication to be given under this Guarantee to any Guarantor or the Lender shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Guarantor and the Lender may change their respective address for notices in accordance with the said provisions.

6.14        **Discharge**

Unless all obligations of a Guarantor hereunder have been indefeasibly paid or performed, such Guarantor will not be discharged from any of its obligations hereunder except by a release or discharge signed in writing by the Lender.

6.15        **Remedies Cumulative**

The rights and remedies of the Lender hereunder are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise.  No single or partial exercise by the Lender of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Lender may be entitled.

6.16        **Governing Law**

This Guarantee is governed by the laws of the State of New York (without reference to its choice of law rules).  Any litigation based hereon, or arising out of, under, or in connection with, this Guarantee, or any course of conduct, course of dealing, statements (whether oral or written) or actions of the Lender or any Guarantor in respect of this Guarantee shall be brought and maintained exclusively in the courts of the State of New York or in any federal court sitting in New York County; provided, however, that any suit seeking enforcement against any collateral or other property may be brought, at the option of the Lender, in the courts of any jurisdiction where such collateral or other property may be found. Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guarantee, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto irrevocably agrees to be bound by any final, non-appealable judgment rendered in such court and such judgment may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in the Loan Documents shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to any Loan Documents against any Guarantor or its properties in the courts of any jurisdiction.

6.17        **Venue, Forum**

Each Guarantor hereby expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation

has been brought in an inconvenient forum. To the extent that a Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, to the fullest extent permitted by law, such Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Guarantee.

6.18    **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

6.19    **Interest Calculations and Payments**

Unless otherwise stated, wherever in this Guarantee reference is made to a rate of interest "per annum" or a similar expression is used, such interest will be calculated on the basis of a calendar year of 365 days or 366 days, as the case may be, and using the nominal rate method of calculation and not the effective rate method of calculation or on any other basis that gives effect to the principle of deemed reinvestment of interest. Interest will continue to accrue after maturity and default and/or judgment, if any, until payment thereof, and interest will accrue on overdue interest, if any.

6.20    **Interest; Rates**

For the purposes of this Guarantee, whenever interest to be paid hereunder is to be calculated on the basis of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or such other number of days in such period, as the case may be.

6.21    **Conflict**

In the event of a conflict in or between the provisions of this Guarantee and the provisions of either Credit Agreement then, despite anything contained in this Guarantee, the provisions of the applicable Credit Agreement will prevail and the provisions of this Guarantee will be deemed to be amended to the extent necessary to eliminate the conflict.

6.22    **Executed Copy**

- 12 -

Each Guarantor acknowledges receipt of a fully executed copy of this Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF each Guarantor has signed, sealed and delivered this Guarantee.

GUARANTORS:                          **MUNDO MEDIA (US) LLC**

Per: _____

Name:  Jason Theofilos

Title:    President

Per: _____

Name:

Title:

## SCHEDULE A

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT, dated as of ●, 20●, is delivered pursuant to Section 6.10 of the Guarantee, dated as of October 13, 2016, by MUNDO MEDIA (US), LLC (the "**Guarantor**") in favor of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").  Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 6.10 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR          [NAME OF ADDITIONAL GUARANTOR]

Per:  _____
          Name:
          Title:

Per:  _____
          Name:
          Title:

**Executed Version**

## JOINDER AGREEMENT
## (NEW YORK LAW GOVERNED GUARANTEE)

**THIS JOINDER AGREEMENT**, dated as of November 14, 2017, is delivered pursuant to Section 6.10 of the Guarantee, dated as of October 13, 2016, by **MUNDO MEDIA (US), LLC** and others which are from time to time party thereto as Guarantors in favor of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**"). Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 6.10 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR                **M ZONE MARKETING INC.**

Per: _____

Name: Mitchell Richler
Title:  President

Per: _____

Name:
Title:

**Execution Version**

## JOINDER AGREEMENT

THIS JOINDER AGREEMENT, dated as of  December 1, 2016, is delivered pursuant to Section 6.10 of the Guarantee, dated as of October 13, 2016, by MUNDO MEDIA (US), LLC in favor of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").  Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, each of the undersigned, as provided in Section 6.10 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, each of the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR

**ACTIVE SIGNAL MARKETING, LLC**

Per: _____

Name: Jason   Theofilos

Title: President

Per: _____

Name:

Title:

ADDITIONAL GUARANTOR

**FIND CLICK ENGAGE, LLC**

Per: _____

Name: Jason   Theofilos

Title: President

Per: _____

Name:

Title:

ADDITIONAL GUARANTOR **FLI DIGITAL, INC.**

Per: _____

Name: Jason Theofilos
Title: President

Per: _____

Name:
Title:

ADDITIONAL GUARANTOR **36 LABS, LLC**

Per: _____

Name: Jason Theofilos
Title: President

Per: _____

Name:
Title:

This is **Exhibit "I"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Execution Version**

## GUARANTEE

**THIS GUARANTEE** is made as of February 5, 2019.

**WHEREAS** each of the parties signatory hereto or that hereafter becomes a party hereto pursuant to Section 6.10 (each, a "**Guarantor**", and collectively, the "**Guarantors**") has agreed to provide **ROYAL BANK OF CANADA** (the "**Lender**") with a guarantee of the Obligations (as hereinafter defined) of **MUNDO MEDIA LTD.** (together with all successors, by amalgamation or otherwise, the "**Obligor**");

**AND WHEREAS** each Guarantor has agreed that if the guarantee is not enforceable, such Guarantor will indemnify the Lender or be liable as primary obligor;

**AND WHEREAS** in this instrument, unless something in the subject matter or context is inconsistent therewith, "**Guarantee**" means this instrument including its recitals as amended from time to time;

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor agrees with the Lender as follows:

## ARTICLE 1 - INTERPRETATION

1.01    **Definitions**

Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein which are not otherwise defined herein shall have the meanings provided in the Credit Agreements.  In this Guarantee, unless something in the subject matter or context is inconsistent therewith,

"**Bankruptcy Code**" means title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"**Credit Agreements**" means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

"**Credit Event**" means any accelerated demand for payment made by the Lender in respect of the Obligations following an Event of Default which is continuing.

"**Obligations**" has the meaning ascribed thereto in Section 2.01.

"**Senior Credit Agreement**" means the amended and restated credit agreement made as of December 21, 2017 between the Obligor and the Lender.

"**Subordinate Credit Agreement**" means the amended and restated subordinate credit agreement made as of December 21, 2017 between the Obligor and the Lender.

1.02        **Headings**

      The division of this Guarantee into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Guarantee.  The terms "hereof", "hereunder" and similar expressions refer to this Guarantee and not to any particular Article, Section or other portion hereof.  Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Guarantee.

1.03        **Extended Meanings**

      In this Guarantee words importing the singular number only include the plural and vice versa, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities.  The term "including" means "including without limiting the generality of the foregoing". A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GUARANTEE

2.01        **Guarantee**

      Each Guarantor hereby unconditionally and irrevocably guarantees payment of all the debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Obligor to the Lender or remaining unpaid by the Obligor to the Lender pursuant to each Credit Agreement, including the amount of any judgment or award made against the Obligor for the benefit of the Lender in connection with either Credit Agreement (collectively, the **"Obligations"**).

2.02        **Indemnity**

      If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 for any reason whatsoever, each Guarantor will, as a separate and distinct obligation, indemnify and save harmless the Lender from and against all losses resulting from the failure of the Obligor to pay such Obligation.

2.03        **Primary Obligation**

      If any Obligation is not duly paid by the Obligor and is not recoverable under Section 2.01 or the Lender is not indemnified under Section 2.02, in each case, for any reason whatsoever, such Obligation will, as a separate and distinct obligation, be paid by and be recoverable from each Guarantor as primary obligor.

2.04          **Obligations Absolute**

The liability of each Guarantor hereunder will be for the full amount of the Obligations without apportionment, limitation or restriction of any kind, will be continuing, absolute and unconditional and will not be affected by any law, regulation or other event, condition or circumstance or any other act, delay, abstention or omission to act of any kind by the Obligor, the Lender or any other person, that might constitute a legal or equitable defence to or a discharge, limitation or reduction of any Guarantor's Obligations hereunder, other than as a result of the indefeasible payment or extinguishment in full of the Obligations, including:

(a)     the invalidity, illegality or lack of enforceability of the Obligations or any part thereof or of any agreement between the Obligor and the Lender;

(b)     any impossibility, impracticability, frustration of purpose, illegality, *force majeure* or act of government;

(c)     the bankruptcy, winding-up, liquidation, dissolution, moratorium, readjustment of debt or insolvency of the Obligor or any other person, including any discharge or bar against collection of any of the Obligations, or the amalgamation of or any change in the existence, structure, name, status, function, control, constitution or ownership of the Obligor, any Guarantor, the Lender or any other person;

(d)     any lack or limitation of power, incapacity or disability on the part of the Obligor or of the directors, partners or agents thereof or any other irregularity, defect or informality on the part of the Obligor in its obligations to the Lender;

(e)     any limitation, postponement, prohibition, subordination or other restriction on the right of the Lender to payment of the Obligations; or

(f)     any interest of the Lender in any property whether as owner thereof or as holder of a security interest therein or thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment of any right or recourse to collateral,

and each of the foregoing is hereby waived by each Guarantor to the fullest extent permitted under applicable law.  The foregoing provisions apply and the foregoing waivers will be effective to the fullest extent permitted under applicable law even if the effect of any action or failure to take action by the Lender is to destroy or diminish any Guarantor's subrogation rights, any Guarantor's right to proceed against the Obligor for reimbursement, any Guarantor's right to recover contribution from any other person or any other right or remedy of any Guarantor.

## ARTICLE 3 - DEALINGS WITH OBLIGOR AND OTHERS

3.01          **No Release**

The liability of each Guarantor hereunder will not be released, discharged, limited or in any way affected by anything done, suffered, permitted or omitted to be done by the Lender in connection with any duties or liabilities of the Obligor to the Lender or any security therefor

- 4 -

including any loss of or in respect of any security received by the Lender from the Obligor or others. Without limiting the generality of the foregoing and without releasing, discharging, limiting or otherwise affecting, in whole or in part, each Guarantor's liability hereunder, the Lender may, without obtaining the consent of or giving notice to any Guarantor:

(a)     discontinue, reduce, increase or otherwise vary the credit of the Obligor in any manner whatsoever;

(b)     make any change in the time, manner or place of payment under, or in any other term of, any agreement between the Obligor and the Lender or waive, in whole or in part and with or without conditions, the failure on the part of the Obligor to carry out any of its obligations under any such agreement;

(c)     grant time, renewals, extensions, indulgences, releases and discharges to the Obligor or any other person;

(d)     release or substitute, in whole or in part, any Guarantor of the Obligations or obtain a new guarantee of any of the Obligations from any other person;

(e)     subordinate, release, take or enforce, refrain from taking or enforcing or omit to take or enforce security or collateral from the Obligor or any other person or perfect, refrain from perfecting or omit to perfect security or collateral of the Obligor or any other person, whether occasioned by the fault of the Lender or otherwise;

(f)     to the extent permitted under applicable law, give or refrain from giving to the Obligor, any Guarantor or any other person notice of any sale or other disposition of any property securing any of the Obligations or any other guarantee thereof, or any notice that may be given in connection with any sale or other disposition of any such property;

(g)     accept compromises from the Obligor or any other person;

(h)     marshal, refrain from marshalling or omit to marshal assets;

(i)     apply all money or other property at any time received from the Obligor or from its security upon such part of the Obligations as the Lender may see fit or vary any such application in whole or in part from time to time as the Lender may see fit; and

(j)     otherwise deal, delay or refrain from dealing or omit to deal with the Obligor, each Guarantor and all other persons and security as the Lender may see fit and do, delay or refrain from doing or omit to do any other act or thing that under applicable law might otherwise have the effect, directly or indirectly, of releasing, discharging, limiting or otherwise affecting in whole or in part any Guarantor's liability hereunder.

3.02      **No Exhaustion of Remedies**

The Lender will not be bound or obligated to exhaust its recourse against the Obligor or other persons or any security or collateral it may hold or take any other action before being entitled to demand payment from any Guarantor hereunder.

3.03      **Prima Facie Evidence**

Any account settled or stated in writing by or between the Lender and the Obligor in respect of any Obligation will be *prima facie* evidence that the balance or amount thereof appearing due to the Lender is so due.

3.04      **No Set-off**

In any claim by the Lender against any Guarantor, no Guarantor may claim or assert any set-off, counterclaim, claim or other right that either such Guarantor or the Obligor may have against the Lender or any other person.

3.05      **Continuing Guarantee**

The obligations of each Guarantor hereunder will constitute and be continuing obligations and will apply to and secure any ultimate balance due or remaining due to the Lender and will not be considered as wholly or partially satisfied by the payment or liquidation at any time of any sum of money for the time being due or remaining unpaid to the Lender. This Guarantee will continue to be effective even if at any time any payment of any of the Obligations is rendered unenforceable or is rescinded or must otherwise be returned by the Lender upon the occurrence of any action or event including the insolvency, bankruptcy or reorganization of the Obligor or any Guarantor or otherwise, all as though such payment had not been made.

## ARTICLE 4 - DEMAND

4.01      **Demand**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Lender will be entitled to make demand upon any one or more of the Guarantors for payment of all Obligations. Each such Guarantor will pay to the Lender the total amount guaranteed hereunder forthwith after demand therefor is made to such Guarantor. In addition, each such Guarantor will pay to the Lender forthwith upon demand all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, including legal fees and disbursements on a full indemnity basis.

4.02      **Stay of Acceleration**

If acceleration of the time for payment of any amount payable by the Obligor in respect of the Obligations is stayed upon the insolvency, bankruptcy, arrangement or reorganization of the Obligor or any moratorium affecting the payment of the Obligations, all such amounts that

would otherwise be subject to acceleration will nonetheless be payable by each Guarantor hereunder forthwith on the demand by the Lender.

4.03        **Interest**

Without duplication of interest accruing on the Obligations, each Guarantor will pay interest to the Lender at the rate or rates provided in the Credit Agreements for such Obligations, or, in the event no such rate is provided for therein, at a rate *per annum* equal to the Prime Rate of the Lender, on the unpaid portion of all amounts payable by such Guarantor under this Guarantee, including all costs and expenses incurred by the Lender in collecting and enforcing the Obligations and in enforcing this Guarantee, such interest to accrue from and including the date of demand by the Lender on such Guarantor to but excluding the date of payment thereof by such Guarantor.  For the purposes of this Guarantee **"Prime Rate of the Lender"** means the rate of interest *per annum* established from time to time by the Lender as the reference rate of interest for the determination of interest rates that the Lender charges customers of varying degrees of credit worthiness in Canada for Canadian dollar demand loans.

## ARTICLE 5 - ASSIGNMENT, POSTPONEMENT AND SUBROGATION

5.01        **Assignment and Postponement**

All debts and liabilities, present and future, of the Obligor to each Guarantor are hereby assigned to the Lender and postponed to the Obligations (other than to the extent set forth in either Credit Agreement), and, following a Credit Event, all money received by any Guarantor in respect thereof will be held in trust for the Lender and forthwith upon receipt will be paid over to the Lender, the whole without in any way lessening or limiting the liability of such Guarantor hereunder and this assignment and postponement is independent of the guarantee, indemnity and primary obligor obligations contained in this Guarantee and will remain in full force and effect until, in the case of the assignment, the liability of such Guarantor under this Guarantee has been discharged or terminated and, in the case of the postponement, until all Obligations are performed and indefeasibly paid in full.

5.02        **Subrogation**

No Guarantor will be entitled to subrogation until (a) each Guarantor performs or makes indefeasible payment to the Lender of all amounts owing by such Guarantor to the Lender under this Guarantee, (b) the Obligations are performed and indefeasibly paid in full and (c) the Lender has no further liability to advance money to, or incur any liability on behalf of, the Obligor. Thereafter, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation and warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Obligations and any security held therefor resulting from such performance or payment by such Guarantor.

## ARTICLE 6 - GENERAL

6.01        **Waiver of Notices**

Each Guarantor hereby waives promptness, diligence, presentment, demand of payment, notice of acceptance and any other notice with respect to this Guarantee and the Obligations guaranteed hereunder, except for the demand pursuant to Section 4.01.

6.02        **Joint and Several Obligations**

Each obligation of a Guarantor hereunder is both several and joint with each other Guarantor.

6.03        **Binding Effect of the Guarantee**

This Guarantee will be binding upon the successors of each Guarantor and will enure to the benefit of the Lender and its successors and assigns.

6.04        **Foreign Currency Obligations**

Each Guarantor will make payment relative to each Obligation in the currency (the "**original currency**") in which the Obligor is required to pay such Obligation, in each case, in accordance with the provisions of the related Credit Agreement.

If a Guarantor makes payment relative to any Obligation to the Lender in a currency (the "**other currency**") other than the original currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of such Guarantor hereunder in respect of such Obligation only to the extent of the amount of the original currency that the Lender is able to purchase with the amount of the other currency it receives on the date of receipt, as determined by the Lender in accordance with its normal practice.  If the amount of the original currency that the Lender is able to purchase is less than the amount of such currency originally due in respect of the relevant Obligation, such Guarantor will indemnify and save the Lender harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Lender and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.  A certificate of the Lender as to any such loss or damage will constitute prima facie evidence thereof, in the absence of manifest error.

6.05        **Taxes and Gross-Up by Guarantors**

All payments by each Guarantor under this Guarantee, whether in respect of principal, interest, interest on overdue and unpaid interest, fees or any other Obligations, will be made in full without any deduction or withholding (whether in respect of duties, taxes, charges or other similar amounts) unless such Guarantor is prohibited by applicable laws from doing so, in which event such Guarantor will:

(a)    ensure that the deduction or withholding does not exceed the minimum amount legally required;

(b)    increase the sum paid by it to the Lender as necessary so that after making or allowing for all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been required;

(c)    pay to the relevant taxation or other authorities, within the period for payment required by applicable laws, the full amount of the deduction or withholding (including the full amount of any deduction or withholding applicable to any additional sums payable under this Section); and

(d)    furnish to the Lender promptly, as soon as available, an official receipt of the relevant taxation or other authorities involved for all amounts deducted or withheld as aforesaid.

6.06    **General Limitations on Guaranteed Liabilities**

Each Guarantor, and by its acceptance of this Guarantee, the Lender, hereby confirms that it is the intention of all such Persons that this Guarantee and the obligations of each such Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guarantee and the obligations of each such Guarantor hereunder.  To effectuate the foregoing intention, the Lender and each Guarantor hereby irrevocably agree that the obligations of each Guarantor under this Guarantee at any time shall be limited to the maximum amount as will result in the obligations of each Guarantor under this Guarantee not constituting a fraudulent transfer or conveyance.  Each Guarantor further agrees to contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender under or in respect of the Loan Documents.

6.07    **Entire Agreement**

This Guarantee constitutes the entire agreement between each Guarantor and the Lender with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between such parties with respect thereto.  There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the parties except as expressly set forth herein.  The Lender will not be bound by any representations or promises made by the Obligor to any Guarantor and possession of this Guarantee by the Lender will be conclusive evidence against each Guarantor that this Guarantee was not delivered in escrow or pursuant to any agreement that it should not be effective until any condition precedent or subsequent has been complied with and this Guarantee will be operative and binding against each Guarantor notwithstanding the non-execution thereof by any other proposed signatory.

6.08      **Financial Condition of the Obligor**

Each Guarantor acknowledges that it is fully aware of the financial condition of the Obligor and that it will receive a benefit from the Lender entering into the Credit Agreements**.** So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed of the financial condition of the Obligor and of all circumstances bearing upon the nature, scope and extent of the risk that such Guarantor assumes or incurs hereunder and the Lender will not have a duty to advise any Guarantor of information known to the Lender regarding such circumstances or risks.

6.09      **Acknowledgements**

(1) Each Guarantor acknowledges receipt of a true and complete copy of each Credit Agreement and all of the terms and conditions thereof. So long as any Guarantor's obligations hereunder remain undischarged, such Guarantor will assume sole responsibility for keeping itself informed, and requesting and obtaining copies from the Obligor or otherwise, of all amendments, modifications, supplements, restatements and replacements of either Credit Agreement and the Lender will not have a duty to advise or provide copies to any Guarantor of any such amendments, modifications, supplements, restatements and replacements.

(2) Each Guarantor acknowledges and agrees that this Guarantee has been executed and delivered to and in favor of the Lender, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

6.10      **Additional Guarantors**

If, at the option of the Obligor or as required pursuant to either Credit Agreement, any party that is not a Guarantor becomes a Guarantor hereunder, such party shall execute and deliver to the Lender a Joinder Agreement substantially in the form of Schedule A and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Guarantor party hereto on the Closing Date.

6.11      **Amendments and Waivers**

No amendment to this Guarantee will be valid or binding unless set forth in writing and duly executed by each Guarantor and the Lender. No waiver of any breach of any provision of this Guarantee will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided in the written waiver, will be limited to the specific breach waived.

6.12      **Severability**

If any provision of this Guarantee is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Guarantee and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either the Lender or the Guarantors.

6.13        **Notices**

Any demand, notice or other communication to be given under this Guarantee to any Guarantor or the Lender shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Guarantor and the Lender may change their respective address for notices in accordance with the said provisions.

6.14        **Discharge**

Unless all obligations of a Guarantor hereunder have been indefeasibly paid or performed, such Guarantor will not be discharged from any of its obligations hereunder except by a release or discharge signed in writing by the Lender.

6.15        **Remedies Cumulative**

The rights and remedies of the Lender hereunder are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise. No single or partial exercise by the Lender of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Lender may be entitled.

6.16        **Governing Law**

This Guarantee is governed by the laws of the State of New York (without reference to its choice of law rules). Any litigation based hereon, or arising out of, under, or in connection with, this Guarantee, or any course of conduct, course of dealing, statements (whether oral or written) or actions of the Lender or any Guarantor in respect of this Guarantee shall be brought and maintained exclusively in the courts of the State of New York or in any federal court sitting in New York County; provided, however, that any suit seeking enforcement against any collateral or other property may be brought, at the option of the Lender, in the courts of any jurisdiction where such collateral or other property may be found. Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guarantee, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto irrevocably agrees to be bound by any final, non-appealable judgment rendered in such court and such judgment may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in the Loan Documents shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to any Loan Documents against any Guarantor or its properties in the courts of any jurisdiction.

6.17        **Venue, Forum**

Each Guarantor hereby expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation

has been brought in an inconvenient forum.  To the extent that a Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, to the fullest extent permitted by law, such Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Guarantee.

6.18    **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

6.19    **Interest Calculations and Payments**

Unless otherwise stated, wherever in this Guarantee reference is made to a rate of interest "per annum" or a similar expression is used, such interest will be calculated on the basis of a calendar year of 365 days or 366 days, as the case may be, and using the nominal rate method of calculation and not the effective rate method of calculation or on any other basis that gives effect to the principle of deemed reinvestment of interest.  Interest will continue to accrue after maturity and default and/or judgment, if any, until payment thereof, and interest will accrue on overdue interest, if any.

6.20    **Interest; Rates**

For the purposes of this Guarantee, whenever interest to be paid hereunder is to be calculated on the basis of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or such other number of days in such period, as the case may be.

6.21    **Conflict**

In the event of a conflict in or between the provisions of this Guarantee and the provisions of either Credit Agreement then, despite anything contained in this Guarantee, the provisions of the applicable Credit Agreement will prevail and the provisions of this Guarantee will be deemed to be amended to the extent necessary to eliminate the conflict.

6.22    **Executed Copy**

- 12 -

Each Guarantor acknowledges receipt of a fully executed copy of this Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the Guarantor has signed, sealed and delivered this Guarantee.

GUARANTOR:                              **APPTHIS HOLDINGS, INC.**

Per:   _____
       Name: _Angelo Ballattrone_
       Title: _Director_

Per:   _____
       Name:
       Title:

## SCHEDULE A

### FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT, dated as of ●, 20●, is delivered pursuant to Section 6.10 of the Guarantee, dated as of February 5 , 2019, by APPTHIS HOLDINGS, INC. and the other Persons party thereto as guarantors from time to time (collectively, the "**Guarantors**") in favor of ROYAL BANK OF CANADA (as amended, restated, supplemented or otherwise modified from time to time, the "**Guarantee**").  Capitalized terms used herein without definition are used as defined in the Guarantee.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 6.10 of the Guarantee, hereby becomes a party to the Guarantee as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, hereby unconditionally and irrevocably guarantees payment of all the Obligations.

By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the Guarantee.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL GUARANTOR   [NAME OF ADDITIONAL GUARANTOR]

Per: _____

   Name:

   Title:

Per: _____

   Name:

   Title:

This is **Exhibit "J"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Execution Version**

# GENERAL SECURITY AGREEMENT

**THIS AGREEMENT** is made as of July 26, 2016

**BETWEEN**

> **VOOM MEDIA CORP.**, a corporation incorporated under the laws of the Province of Ontario (together with all successors, by amalgamation or otherwise, the **"Borrower"**; which term shall include, without limitation, Mundo Media Ltd. following the Mundo Amalgamation and a **"Debtor"**),

> - and -

> each of the Restricted Parties signatory hereto or that becomes a party hereto pursuant to Section 7.04 (each a **"Debtor"**, and together with the Borrower, the "**Debtors**"),

> - and -

> **ROYAL BANK OF CANADA**, a Canadian chartered bank (together with all successors, the **"Secured Party"**).

**WHEREAS** the Borrower has entered into certain Credit Agreements with the Secured Party pursuant to which certain credit facilities will be extended to the Borrower;

**AND WHEREAS** each Debtor (other than the Borrower) has entered into the Guarantee in favour of the Secured Party pursuant to which each Debtor (other than the Borrower) has guaranteed the Obligations of the Borrower;

**AND WHEREAS** each Debtor has agreed to grant a security interest and assignment, mortgage and charge in the Collateral to the Secured Party in order to secure the performance of the Obligations;

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1 - INTERPRETATION

1.01        **Interpretation**

In this Agreement, unless something in the subject matter or context is inconsistent therewith,

**"Agreement"** means this general security agreement, including its recitals and schedules, as amended from time to time.

"**Business Day**" means any day other than a Saturday or Sunday on which banks generally are open for business in Toronto, Ontario.

"**Collateral**" has the meaning set out in Section 2.01.

"**Credit Agreements**" means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

"**Credit Event**" means any accelerated demand for payment made by the Secured Party in respect of the Obligations following an Event of Default which is continuing.

"**Event of Default**" means any of the events described as "Events of Default" in either Credit Agreement and, in the case of any Debtor (other than the Borrower), a failure on the part of any Debtor to pay, when required, any amount due to the Secured Party pursuant to the Guarantee.

"**Guarantee**" means the guarantee of the Debtors (other than the Borrower) made as of July 26, 2016 in favour of the Secured Party.

"**Material Event of Default**" means (a) any of the events described in Sections 10.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Senior Credit Agreement; (b) any of the events described in Sections 9.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Subordinate Credit Agreement; (c) the breach of any of the covenants in Section 8.02 of the Senior Credit Agreement; or (d) the breach of any of the covenants in Section 7.02 of the Subordinate Credit Agreement.

"**Obligations**" means (a) in the case of the Borrower, the Obligations as defined in each Credit Agreement, and (b) in the case of a Debtor, the Obligations (as defined in the Guarantee).

"**Permitted Encumbrances**" has the meaning given to such term in the Credit Agreements.

"**Policy**" has the meaning set out in Section 4.01(2).

"**Senior Credit Agreement**" means the credit agreement made as of July 26, 2016 between the Borrower and the Secured Party.

"**Subordinate Credit Agreement**" the subordinate credit agreement made as of July 26, 2016 between the Borrower and the Secured Party.

The terms "accessions", "accounts", "chattel paper", "documents of title", "goods", "instruments", "intangibles", "inventory", "money", "proceeds" and "securities" whenever used herein have the meanings given to those terms in the *Personal Property Security Act* currently in effect in the province referred to in Section 7.17 below.

1.02    **Headings**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Agreement. The terms "hereof", "hereunder" and similar expressions refer to this Agreement and not to any particular Article, Section or other portion hereof. Unless something in the subject

matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Agreement.

1.03      **Extended Meanings**

In this Agreement words importing the singular number only include the plural and *vice versa*, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities.  The term "including" means "including without limiting the generality of the foregoing". A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GRANT OF SECURITY INTEREST

2.01      **Security Interest**

As general and continuing security for the payment and performance of all Obligations, each Debtor hereby grants to the Secured Party a security interest in, and, as further general and continuing security for the payment and performance of the Obligations, each Debtor hereby also assigns (other than with respect to trademarks) to the Secured Party and mortgages and charges as and by way of a fixed and specific mortgage and charge to the Secured Party, all right, title and interest that such Debtor now has or may hereafter have or acquire, in any manner whatsoever, (including by way of amalgamation) in the following property (collectively, the **"Collateral"**):

(a)      <u>Receivables</u>:  all debts, accounts, claims and choses in action for monetary amounts (collectively, the **"Receivables"**);

(b)      <u>Inventory</u>:  all inventory of whatever kind and wherever situated (collectively, the **"Inventory"**);

(c)      <u>Equipment</u>:  all machinery, equipment, fixtures, furniture, plant, vehicles and other tangible personal property that are not Inventory (collectively, the **"Equipment"**);

(d)      <u>Chattel Paper</u>:  all chattel paper;

(e)      <u>Documents of Title</u>:  all warehouse receipts, bills of lading and other documents of title, whether negotiable or not;

(f)      <u>Securities</u>:  all shares, bonds, debentures, and other securities (collectively, the **"Securities"**);

(g)      <u>Intangibles</u>:  all intangibles not otherwise described in this Section 2.01 including all goodwill, patents, trademarks, copyrights and other intellectual property;

- 4 -

    (h)    <u>Instruments and Money</u>: all bills, notes, cheques and other instruments and all coins or bills or other medium of exchange adopted for use as part of the currency of Canada or of any foreign government;

    (i)    <u>Books, Records, Etc.</u>: all books, invoices, documents and other records in any form evidencing or relating to the Collateral;

    (j)    <u>Real Property</u>: all real and immovable property, both freehold and leasehold, together with all buildings and fixtures (collectively, the **"Real Property"**), and all rights under any lease or agreement relating to Real Property;

    (k)    <u>Substitutions, Etc.</u>: all replacements of, substitutions for and increases, additions and accessions to any of the property described in this Section 2.01; and

    (l)    <u>Proceeds</u>: all proceeds of any Collateral in any form derived directly or indirectly from any dealing with the Collateral or that indemnifies or compensates for the loss of or damage to the Collateral;

provided that the said grant of a security interest, assignment, mortgage and charge will not render the Secured Party liable to observe or perform any term, covenant or condition of any agreement, document or instrument to which such Debtor is a party or by which it is bound.

2.02    **Attachment of Security Interest**

    Each Debtor acknowledges that value has been given and agrees that the security interest granted hereby attaches upon the execution of this Agreement by such Debtor (or, in the case of any after-acquired property, at the time of acquisition by such Debtor of any rights therein).

2.03    **Exception for Contractual Rights**

    The security interest granted hereby does not and will not extend to, and Collateral will not include any agreement, right, franchise, licence or permit (the "contractual rights") to which any Debtor is a party or of which any Debtor has the benefit, to the extent that the creation of the security interest herein would constitute a breach of the terms of or permit any person to terminate the contractual rights, but such Debtor must hold its interest therein in trust for the Secured Party and will assign such contractual rights to the Secured Party forthwith upon obtaining the consent of the other party thereto. Each Debtor agrees that it will, upon the request of the Secured Party, use all commercially reasonable efforts to obtain any consent required to permit any contractual rights to be subjected to the security interest.

2.04    **Real Property**

    (1)    With respect to (and only to) Real Property, the security granted hereby is constituted by way of floating charge, but will become a fixed charge upon the earlier of (i) the Obligations becoming immediately payable, and (ii) the occurrence of any other event that by operation of law would result in such floating charge becoming a fixed charge.

(2)      The assignment, mortgage and charge granted hereby will not extend to the last day of the term of any lease or agreement relating to Real Property, but each Debtor will hold such last day in trust for the Secured Party and, upon the enforcement by the Secured Party of its security, will assign such last day as directed by the Secured Party.

2.05          **Intellectual Property**

Nothing in Section 2.01 is to be construed as constituting an absolute transfer or assignment of any present or future intellectual property rights, but that Section is to be construed as granting to the Secured Party a security interest in and a charge on all present and after-acquired intellectual property rights.

**ARTICLE 3 - REPRESENTATIONS,
WARRANTIES AND COVENANTS OF THE DEBTORS**

3.01          **Representations and Warranties**

Each Debtor hereby represents and warrants to the Secured Party that:

(a)      such Debtor is a corporation duly incorporated, organized and subsisting under the laws of its jurisdiction of incorporation, with the corporate power to enter into this Agreement; this Agreement has been duly authorized by all necessary corporate action on the part of such Debtor and constitutes a valid and legally binding agreement enforceable against such Debtor in accordance with its terms; the making and performance of this Agreement will not contravene, result in a breach of, constitute a default under or result in the creation of any lien, charge, security interest, encumbrance or any other rights of others upon any property of such Debtor pursuant to, any agreement, indenture or other instrument to which such Debtor is a party or by which such Debtor or any of its property may be bound or affected;

(b)      except for Permitted Encumbrances and except as otherwise provided herein or disclosed in a schedule hereto, all of the Collateral is the sole property of such Debtor free from any liens, charges, security interests, encumbrances or any rights of others that rank prior to or *pari passu* with the security interest, assignment and mortgage and charge granted hereby;

(c)      the chief executive office and the registered office of such Debtor, and the office where such Debtor keeps its books & records relating to Receivables, are located at the addresses specified in Schedule 3.01; and

(d)      the Inventory, Equipment and Securities of such Debtor are located at the addresses specified in Schedule 3.01, except for goods in transit or on lease or consignment.

3.02          **Covenants**

Each Debtor covenants with the Secured Party that such Debtor will:

- 6 -

(a)    ensure that the representations and warranties of such Debtor set forth in Section 3.01 and, where applicable, in the Credit Agreements will be true and correct at all times;

(b)    maintain, use and operate the Collateral and carry on and conduct its business in a lawful and business-like manner;

(c)    not permit the Collateral to be affixed to real or personal property so as to become a fixture or accession without the prior written consent of the Secured Party;

(d)    defend the Collateral against all claims and demands respecting the Collateral made by all persons at any time and, except as otherwise provided herein, keep the Collateral free and clear of all security interests, mortgages, charges, liens and other encumbrances except for Permitted Encumbrances and those disclosed in a schedule hereto or hereafter approved in writing by the Secured Party prior to their creation or assumption;

(e)    not change its chief executive office, the registered office or the location of the office where it keeps its records respecting the Receivables, or move any of the Inventory, Securities or Equipment from the locations specified in any schedule hereto, without the prior written consent of the Secured Party;

(f)    pay all rents, taxes, levies, assessments and government fees or dues lawfully levied, assessed or imposed in respect of the Collateral or any part thereof as and when the same become due and payable, and exhibit to the Secured Party, when required, the receipts and vouchers establishing such payment;

(g)    (i) keep proper books of account in accordance with sound accounting practice, (ii) furnish to the Secured Party in writing such financial information and statements and all such information and statements relating to the Collateral as the Secured Party may from time to time require, (iii) permit the Secured Party or its authorized agents at any time at the expense of such Debtor to examine the books of account and other financial records and reports relating to the Collateral and to make copies thereof and take extracts therefrom;

(h)    not change its name or, if such Debtor is a corporation, not amalgamate with any other corporation without first giving notice to the Secured Party of its new name and the names of all amalgamating corporations and the date when such new name or amalgamation is to become effective; and

(i)    pay to the Secured Party forthwith upon demand all reasonable costs, fees and expenses (including all legal, Receiver's, consulting and accounting fees and expenses) incurred by or on behalf of the Secured Party in connection with the preparation, execution, perfection, administration and discharge of this Agreement and the security granted hereby and the preservation and exercise of the rights, powers and remedies of the Secured Party, and all such costs, fees and expenses will bear interest at the highest rate borne by any of the Obligations and will form part of the Obligations.

## ARTICLE 4 - INSURANCE

4.01        **Insurance**

(1)        A Debtor must obtain and maintain, at its own expense, insurance against loss or damage to the Collateral including loss by fire (including so-called extended coverage), theft, collision and such other risks as are customarily insured against for each type of Collateral, in an amount not less than the full replacement value thereof, in such form and with such insurers as are reasonably satisfactory to the Secured Party.

(2)        If any policy of insurance referred to in Section 4.01(1) (a **"Policy"**) contains a co-insurance clause, such Debtor will either cause any such co-insurance clause to be waived or maintain at all times a sufficient amount of insurance to meet the requirements of any such co-insurance clause so as to prevent such Debtor from becoming a co-insurer under the terms of any such policy.

(3)        All Policies must name the Secured Party as an additional insured and loss payee thereof, as the Secured Party's interests may appear, and must provide that the insurer will give the Secured Party at least 15 days written notice of intended cancellation or non-renewal.

(4)        At the Secured Party's request, a Debtor must furnish the Secured Party with evidence satisfactory to the Secured Party that the required insurance coverage is in effect.

(5)        A Debtor must give the Secured Party notice of any damage to, or loss of, the Collateral forthwith upon the occurrence of any such damage or loss.

(6)        Should a Debtor fail to make any payment or perform any other obligation provided in this Section, the Secured Party will have the right, but not the obligation, without notice or demand upon such Debtor and without releasing such Debtor from any obligation hereunder or waiving any rights to enforce this Agreement, to perform any or all of such obligations. The amount of all such payments made and all costs, fees and expenses incurred by the Secured Party in performing such obligations will be immediately due and payable by such Debtor.

## ARTICLE 5 - DEALING WITH COLLATERAL

5.01        **Dealing with Collateral by the Debtors**

A Debtor must not sell, lease or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party, except that a Debtor may, until a Credit Event occurs, deal with its money or sell items of Inventory in the ordinary course of its business so that the purchaser thereof takes title thereto free and clear of the security interest, assignment and mortgage and charge granted hereby, but all proceeds of any such sale will continue to be subject to the security granted hereby.  Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, all money received by a Debtor will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.02          **Rights and Duties of the Secured Party**

(1)          The Secured Party may perform any of its rights and duties hereunder by or through agents and is entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to its rights and duties hereunder.

(2)          In the holding of the Collateral, the Secured Party and any agent on its behalf is only bound to exercise the same degree of care as it would exercise with respect to similar property of its own of similar value held in the same place. The Secured Party and any agent on its behalf will be deemed to have exercised reasonable care with respect to the custody and preservation of the Collateral if it takes such action for that purpose as any Debtor reasonably requests in writing, but failure of the Secured Party or its agent to comply with any such request will not of itself be deemed a failure to exercise reasonable care.

5.03          **Registration of Securities**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Secured Party may have any Securities registered in its name, as pledgee, or in the name of its nominee, as pledgee, and upon a Credit Event will be entitled but not required to exercise any of the rights that any holder of such Securities may at any time have. However, until a Credit Event has occurred and the Secured Party has exercised any of its rights and remedies under Section 6.02, a Debtor will be entitled to exercise, in a manner not prejudicial to the interests of the Secured Party or which would not violate or be inconsistent with this Agreement, all voting power from time to time exercisable in respect of the Securities. The Secured Party will not be responsible for any loss occasioned by its exercise of any of such rights or by failure to exercise the same within the time limited for the exercise thereof. A Debtor must from time to time forthwith upon the request of the Secured Party deliver to the Secured Party those Securities requested by the Secured Party duly endorsed for transfer to the Secured Party or its nominee.

5.04          **Notification of Account Debtors**

Before an Event of Default occurs, the Secured Party may give notice of this Agreement and the security granted hereby to any account debtor of a Debtor or to any other person liable to a Debtor and, after the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, may give notice to any such account debtors or other person to make all further payments to the Secured Party. Any payment or other proceeds of Collateral received by a Debtor from account debtors or from any other person liable to a Debtor after the occurrence of such Credit Event and exercise of such rights and remedies will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.05          **Purchase-Money Security Interests**

A Debtor will be permitted to grant purchase-money security interests in the ordinary course of its business in connection with the purchase or lease of Inventory or Equipment provided that, except to the extent permitted by the Credit Agreements, the foregoing will not constitute a subordination of the security interest and mortgage and charge granted hereby to such purchase-

money security interests or a waiver by the Secured Party of the requirements prescribed by statute that, if complied with, would result in such purchase-money security interests ranking in priority to the security interest and mortgage and charge granted hereby.

5.06       **Application of Funds**

Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.03, all money collected or received by the Secured Party in respect of the Collateral may be applied on account of such parts of the Obligations as the Secured Party in its sole discretion determines, or may be held unappropriated in a collateral account, or in the discretion of the Secured Party may be released to a Debtor, all without prejudice to the Secured Party's rights against such Debtor.

## ARTICLE 6 - DEFAULT AND REMEDIES

6.01       **Consequences of a Default**

On or after the occurrence of any Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreement, at the option of the Secured Party, (a) any or all of the Obligations not yet payable will become immediately payable, without presentment, protest, notice of protest or notice of dishonour, all of which are expressly waived; (b) the obligation, if any, of the Secured Party to extend further credit to a Debtor will cease; and (c) the security granted hereby will become immediately enforceable.

6.02       **Remedies**

In addition to any right or remedy otherwise provided herein or by law, on or after the occurrence of any Event of Default that has not been either cured or waived, the Secured Party will have the rights and remedies set out below, all of which may be enforced successively or concurrently:

(a)      the Secured Party may take possession of the Collateral and require a Debtor to assemble the Collateral and deliver or make the Collateral available to the Secured Party at such places as may be specified by the Secured Party, and neither the Secured Party nor any Receiver will be or be deemed to be a mortgagee in possession by virtue of any such actions;

(b)      the Secured Party may take such steps as it considers desirable to maintain, preserve or protect the Collateral;

(c)      the Secured Party may carry on, or concur in the carrying on of, all or any part of the business of a Debtor;

(d)      the Secured Party may have, exercise or enforce any rights of a Debtor in respect of the Collateral;

- 10 -

(e)     the Secured Party may sell, lease or otherwise dispose of the Collateral at public auction, by private tender, by private sale or otherwise either for cash or upon credit, upon such terms and conditions as the Secured Party may determine and without notice to a Debtor unless required by law;

(f)     the Secured Party may accept all or any part of the Collateral in total or partial satisfaction of the Obligations in the manner provided by law;

(g)     the Secured Party may, for any purpose specified herein, including for the maintenance, preservation or protection of any Collateral or for carrying on any of the business or undertaking of a Debtor, borrow money on the security of the Collateral, which security will rank in priority to the security granted hereby;

(h)     the Secured Party may occupy and use all or any of the premises, buildings and plants occupied by a Debtor and use all or any of the Equipment and other property of a Debtor for such time as the Secured Party requires to facilitate the realization of the Collateral, free of charge and the Secured Party will not be liable for any rent, charges, depreciation or damages in connection with such actions, nor will the Secured Party or any Receiver be or be deemed to be a mortgagee in possession by virtue of any such actions;

(i)     the Secured Party may appoint a receiver or receiver and manager (each herein referred to as the **"Receiver"**) of the whole or any part of the Collateral and may remove or replace such Receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of a Receiver of the Collateral;

(j)     the Secured Party may discharge any claim, lien, mortgage, charge, security interest, encumbrance or any rights of others that may exist or be threatened against the Collateral, and in every such case the amounts so paid together with costs, charges and expenses incurred in connection therewith will be added to the Obligations.

6.03     **Powers of the Receiver**

Any Receiver will have all of the rights and powers that the Secured Party is entitled to exercise pursuant to Section 6.02 but the Secured Party will not be in any way responsible for any misconduct or negligence of any such Receiver.

6.04     **Liability of Secured Party**

The Secured Party will not be liable or responsible for any failure to seize, collect, realize, or obtain payment with respect to the Collateral and is not bound to institute proceedings or to take other steps for the purpose of seizing, collecting, realizing or obtaining possession or payment with respect to the Collateral or for the purpose of preserving any rights of the Secured Party, any Debtor or any other person in respect of the Collateral.  In the exercise of its rights and the performance of its obligations, the Secured Party will only be liable for gross negligence or wilful misconduct.

6.05        **Proceeds of Realization**

       The Secured Party may apply any proceeds of realization of the Collateral to payment of costs, fees and expenses mentioned in Section 3.02(i), including those related to the realization of the Collateral, and the Secured Party may apply any balance to payment of all other Obligations in such order as the Secured Party sees fit. If there is any surplus remaining, the Secured Party may pay it to any person entitled thereto by law of whom the Secured Party has knowledge and any balance remaining may be paid to the Debtor entitled thereto. If the realization of the Collateral fails to satisfy the Obligations of a particular Debtor, then such Debtor will be liable to pay any deficiency to the Secured Party.

6.06        **Waivers by a Debtor**

       The Secured Party may (a) grant extensions of time, (b) take and perfect or abstain from taking and perfecting security, (c) give up any security, (d) accept compositions or compromises, (e) grant releases and discharges, and (f) otherwise waive rights against any Debtor, debtors of a Debtor, guarantors and others and with respect to the Collateral and other security as the Secured Party sees fit. No such action or omission will reduce the Obligations or affect the Secured Party's rights hereunder.

## ARTICLE 7 - GENERAL

7.01        **Failure of a Debtor to Perform**

       If a Debtor fails to perform any of its covenants or obligations under this Agreement, the Secured Party may, in its absolute discretion, but without being required to do so, perform any such covenant or obligation. If any such covenant or obligation requires the payment of monies, the Secured Party may make such payment. All sums so paid by the Secured Party will be payable by such Debtor to the Secured Party and, for greater certainty, Section 3.02(i) will apply to such sums. No such performance or payment will relieve a Debtor from any default under this Agreement or any consequences of such default.

7.02        **Appointment of Consultant**

       Upon the occurrence of a Material Event of Default or a Credit Event, the Secured Party will be entitled to appoint a consultant to provide such services and advice as the Secured Party may determine in its sole discretion, with power to enter a Debtor's premises, to inspect and evaluate the Collateral, to make copies of a Debtor's records, to review a Debtor's business plans and projections, to assess the conduct and viability of a Debtor's business, to prepare reports on a Debtor's affairs and to distribute such reports to the Secured Party or to other such persons as the Secured Party may direct. Such consultant will act as an agent for the Secured Party and will owe no duty to such Debtor. The consultant is to have no managerial or advisory capacity and will have no decision making responsibility. Each Debtor authorizes the Secured Party to provide confidential information to the consultant. All fees and expenses in connection with the engagement of a consultant are payable by each Debtor to the Secured Party and for greater certainty, Section 3.02(i) will apply to such fees and expenses.

7.03      **Waivers of Legal Limitations**

To the fullest extent permitted by law, each Debtor waives all of the rights, benefits and protections that is given by the provisions of any law that imposes limitations upon the powers, rights or remedies of a secured party, including any law that limits the rights of a secured party to both seize Collateral and sue for any deficiency following realization of Collateral.

7.04      **Additional Debtors**

If, at the option of the Borrower or as required pursuant to either Credit Agreement, the Borrower shall cause any party that is not a Debtor to become a Debtor hereunder, such party shall execute and deliver to the Secured Party a Joinder Agreement substantially in the form of Schedule 7.04 and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Debtor party hereto on the date of this Agreement.

7.05      **Benefit of the Agreement**

This Agreement will be binding upon the successors of each Debtor and will enure to the benefit of the Secured Party and its successors and assigns.

7.06      **Acknowledgement**

Each Debtor acknowledges and agrees that this Agreement has been executed and delivered to and in favour of the Secured Party, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

7.07      **Entire Agreement**

This Agreement has been entered into pursuant to the provisions of the Credit Agreements and is subject to all the terms and conditions thereof and, if there is any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreements, the rights and obligations of the parties will be governed by the provisions of the Credit Agreements. This Agreement cancels and supersedes any prior understandings and agreements between the parties with respect thereto. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the Secured Party and any Debtor with respect to the subject matter hereof except as expressly set forth herein or in the Credit Agreements.

7.08      **Amendments and Waivers**

No amendment to this Agreement will be valid or binding unless set forth in writing and duly executed by all of the parties. No waiver of any breach of any provision of this Agreement will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, will be limited to the specific breach waived.

7.09        **Assignment**

The rights of the Secured Party under this Agreement may be assigned by the Secured Party without the prior consent of the Debtors.  No Debtor may assign its obligations under this Agreement.

7.10        **Severability**

If any provision of this Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

7.11        **Conflicts**

In the event of a conflict in or between the provisions of this Agreement and the provisions of either Credit Agreement then, despite anything contained in this Agreement, the provisions of the applicable Credit Agreement will prevail and the provisions of this Agreement will be deemed to be amended to the extent necessary to eliminate the conflict.

7.12        **Notices**

Any demand, notice or other communication to be given under this Agreement to any Debtor or the Secured Party shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Debtor and the Secured Party may change their respective address for notices in accordance with the said provisions.

7.13        **Remedies Cumulative; Additional Continuing Security**

The rights and remedies of the Secured Party hereunder are cumulative and are in addition to and not in substitution for any other security now or hereafter held by the Secured Party or any other rights or remedies available at law or in equity or otherwise. No single or partial exercise by the Secured Party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Secured Party may be entitled.  This Agreement is a continuing agreement and security that will remain in full force and effect until discharged by the Secured Party.

7.14        **Further Assurances**

Each of the Debtors and the Secured Party will from time to time execute and deliver all such further documents and instruments, including financing statements and schedules, and do all acts and things as the other party may reasonably require to effectively carry out or better evidence or perfect the security granted hereby and the full intent and meaning of this Agreement.

7.15        **Power of Attorney**

Each Debtor hereby irrevocably appoints any officer for the time being of the Secured Party the true and lawful attorney of such Debtor upon the occurrence of an Event of Default that is continuing, with full power of substitution, to do all things and execute and deliver all such documents and instruments, including financing statements and schedules, as are referred to in Section 7.14 above, with the right to use the name of such Debtor whenever and wherever the officer may deem necessary or expedient and from time to time to exercise all rights and powers and to perform all acts of ownership in respect to the Collateral in accordance with this Agreement.

7.16        **Discharge**

A Debtor will be entitled to a discharge of this Agreement upon written request by such Debtor and full and irrevocable payment, performance and satisfaction of the Obligations. No discharge will be effective unless in writing and executed by the Secured Party.

7.17        **Governing Law**

This Agreement is governed by and will be construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

7.18        **Copy of Documents and Consent to Filings**

Each Debtor acknowledges having received a fully executed copy of this Agreement and, to the extent permitted by applicable law, waives all rights to receive from the Secured Party a copy of any financing statement, financing change statement, or verification statement, filed or issued at any time in respect of this Agreement. Each Debtor confirms its consent to the filing by the Secured Party or on its behalf of any financing statement or financing change statement filed or issued at any time in respect of this Agreement.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Agreement.

BORROWER:                          **VOOM MEDIA CORP.**

                                   Per: _____
                                        Name:
                                        Title:

                                   Per; _____
                                        Name:
                                        Title:

OTHER DEBTORS:                     **MUNDO MEDIA LTD.**

                                   Per: _____
                                        Name:
                                        Title:

                                   Per: _____
                                        Name:
                                        Title:


                                   **2518769 ONTARIO LTD.**

                                   Per: _____
                                        Name:
                                        Title:

                                   Per: _____
                                        Name:
                                        Title:


                                   **2307521 ONTARIO INC.**

                                   Per: _____
                                        Name:
                                        Title:

                                   Per: _____
                                        Name:
                                        Title:

[SIGNATURE PAGE TO GENERAL SECURITY AGREEMENT]

SECURED PARTY:

**ROYAL BANK OF CANADA**

Per: _____

     Name:   Hogan Mak
     Title:    Director

Per: _____

     Name:
     Title:

## SCHEDULE 3.01

**VOOM MEDIA CORP.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

> Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Other place(s) of business: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

2.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

> Address: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

**MUNDO MEDIA LTD.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

> Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Other place(s) of business: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1
>
> Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

2.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

> Address: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

**2518769 ONTARIO LTD.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

> Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Other place(s) of business: 120 East Beaver Creek Road, Suite 200, Richmond
> Hill, ON L4B 4V1
>
> Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
> Richmond Hill, ON L4B 4V1

2.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

> Address: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

**2307521 ONTARIO INC.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

> Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Other place(s) of business:
>
> > (i)  120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1;
> > and
> >
> > (ii) Country of Luxembourg
>
> Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
> Richmond Hill, ON L4B 4V1

2.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

> Address: 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B 4V1

## SCHEDULE 7.04

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT dated as of ●, 20●, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of July 26, 2016, by **VOOM MEDIA CORP.** (the "**Borrower**") and others which are from time to time party thereto as Debtors in favour of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder.  The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules A to the General Security Agreement.  By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement and that the Collateral listed on Annex B-1 to this Joinder Agreement shall be and become part of the Collateral referred to in the General Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    [NAME OF ADDITIONAL DEBTOR]

Per:    _____

        Name:
        Title:

        _____

        Name:
        Title:

SECURED PARTY:                    **ROYAL BANK OF CANADA**

Per:    _____

        Name:
        Title:

Per:    _____

        Name:
        Title:

**Annex 1**

**[Name of Additional Debtor]**

1.       ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

        Chief executive office:

        Registered/head office:

        Other place(s) of business:

        Books & records relating to Receivables:

2.       LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

        Address(es):

**Execution Version**

## JOINDER AGREEMENT

THIS JOINDER AGREEMENT dated as of October 13, 2016, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of July 26, 2016, by **VOOM MEDIA CORP.** (a predecessor by amalgamation to MUNDO MEDIA LTD.) and others which are from time to time party thereto as Debtors in favour of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder.  The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules 3.01 to the General Security Agreement.  By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                 **2538853 ONTARIO LTD.**

Per: _____

                    Name: Jason Theofilos
                    Title:  Director

                   _____
                    Name:
                    Title:

SECURED PARTY:                 **ROYAL BANK OF CANADA**

Per: _____

                    Name:
                    Title:

Per: _____

                    Name:
                    Title:

[SIGNATURE PAGE TO JOINDER TO GSA]

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    **2538853 ONTARIO LTD.**

Per:    _____

Name:
Title:

_____

Name:
Title:

SECURED PARTY:                    **ROYAL BANK OF CANADA**

Per:    _____

Name:        Hogan Mak
Title:        Director

Per:    _____

Name:
Title:

**Annex 1**

**2538853 ONTARIO LTD.**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
       RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

> Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
> ON L4B 4V1
>
> Other place(s) of business: 120 East Beaver Creek Road, Suite 200, Richmond
> Hill, ON L4B 4V1
>
> Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
> Richmond Hill, ON L4B 4V1

2.    LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

> Address(es): 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B
> 4V1

**Execution Version**

## JOINDER AGREEMENT
## (GENERAL SECURITY AGREEMENT)

**THIS JOINDER AGREEMENT** dated as of June 2, 2017, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of July 26, 2016, by **VOOM MEDIA CORP.** (a predecessor by amalgamation to **MUNDO MEDIA LTD.**) and others which are from time to time party thereto as Debtors in favour of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder.  The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules 3.01 to the General Security Agreement.  By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    **MUNDO INC.**

                                       Per:  _____
                                             Name:  Jason Theofilos
                                             Title:  C.E.O.

                                             _____
                                             Name:
                                             Title:

SECURED PARTY:                        **ROYAL BANK OF CANADA**

                                       Per:  _____
                                             Name:
                                             Title:

                                       Per:  _____
                                             Name:
                                             Title:

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    **MUNDO INC.**

Per: _____
Name:
Title:

_____
Name:
Title:

SECURED PARTY:                    **ROYAL BANK OF CANADA**

Per: _____
Name:
Title:    Hogan Mak
          Director

Per: _____
Name:
Title:

**Annex 1**

**MUNDO INC.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

>       Chief executive office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
>       ON L4B 4V1
>
>       Registered/head office: 120 East Beaver Creek Road, Suite 200, Richmond Hill,
>       ON L4B 4V1
>
>       Other place(s) of business: 120 East Beaver Creek Road, Suite 200, Richmond
>       Hill, ON L4B 4V1
>
>       Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
>       Richmond Hill, ON L4B 4V1

2.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(d))

>       Address(es): 120 East Beaver Creek Road, Suite 200, Richmond Hill, ON L4B
>       4V1

This is **Exhibit "K"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

_____

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Execution Version**

# GENERAL SECURITY AGREEMENT

**THIS AGREEMENT** is made as of December 1, 2016

**BETWEEN**

> **MUNDO MEDIA (US), LLC**, a limited liability company formed under the laws of the State of Delaware (together with all successors, **"New LLC2"** and a **"Debtor"**),
>
> - and -
>
> each of the Restricted Parties signatory hereto or that becomes a party hereto pursuant to Section 7.04 (each a **"Debtor"**, and together with New LLC2, the **" Debtors"**),
>
> - and -
>
> **ROYAL BANK OF CANADA**, a Canadian chartered bank (together with all successors, the **"Secured Party"**).

**WHEREAS** Mundo Media Ltd. (a successor by amalgamation to Voom Media Corp., the **"Borrower"**) has entered into certain Credit Agreements with the Secured Party pursuant to which certain credit facilities were extended to the Borrower;

**AND WHEREAS** each Debtor has entered into the Guarantee in favor of the Secured Party pursuant to which each Debtor has guaranteed the Obligations of the Borrower;

**AND WHEREAS** each Debtor has agreed to grant a security interest and assignment, mortgage and charge in the Collateral to the Secured Party in order to secure the performance of the Obligations;

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1 - INTERPRETATION

1.01        **Interpretation**

Unless otherwise defined herein or the context otherwise requires, (i) capitalized terms used herein which are not otherwise defined herein shall have the meanings provided in the Credit Agreements (as hereinafter defined) and (ii) all terms defined in the Uniform Commercial Code from time to time in effect in the State of New York ("**UCC**") and not defined herein or in the Credit Agreements shall have the meanings specified therein (and if defined in more than one article of the UCC, shall have the meaning specified in Article 9 thereof).  In this Agreement:

**"Agreement"** means this general security agreement, including its recitals and schedules, as amended from time to time.

**"Business Day"** means any day other than a Saturday or Sunday on which banks generally are open for business in Toronto, Ontario.

**"Collateral"** has the meaning set out in Section 2.01.

**"Control Agreement"** means:

    (a)    with respect to any uncertificated securities included in the Collateral, an agreement between the issuer of such uncertificated securities and another Person whereby such issuer agrees to comply with instructions that are originated by such Person in respect of such uncertificated securities, without the further consent of the Debtors;

    (b)    with respect to any security entitlements in respect of financial assets deposited in or credited to a securities account included in the Collateral, an agreement between the securities intermediary and another Person in respect of such security entitlements pursuant to which such securities intermediary agrees to comply with any entitlement orders with respect to such security entitlements that are originated by the Secured Party, without the further consent of the Debtors;

    (c)    with respect to any commodities account and any commodities contract credited to such account included in the Collateral, an agreement between the commodities intermediary and another Person in respect of such commodities account and commodities contracts credited thereto pursuant to which such commodities intermediary agrees to comply with any orders with respect to such commodities account and commodities contracts credited thereto that are originated by the Secured Party, without the further consent of the Debtors; and

    (d)    with respect to any deposit accounts included in the Collateral, an agreement between the depositary bank and another Person in respect of such deposit account pursuant to which such depositary bank agrees to comply with any instructions with respect to such deposit account that are originated by the Secured Party, without the further consent of the Debtor;

**"Credit Agreements"** means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

**"Credit Event"** means any accelerated demand for payment made by the Secured Party in respect of the Obligations following an Event of Default which is continuing.

**"Event of Default"** means any of the events described as "Events of Default" in either Credit Agreement and, in the case of any Debtor, a failure on the part of any Debtor to pay, when required, any amount due to the Secured Party pursuant to the Guarantee.

**"Guarantee"** means the guarantee of the Debtors made as of October 13, 2016 in favor of the Secured Party, as supplemented by a joinder agreement made as of December 1, 2016.

**"Material Event of Default"** means (a) any of the events described in Sections 10.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Senior Credit Agreement; (b) any of the events described in Sections 9.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Subordinate Credit Agreement; (c) the breach of any of the covenants in Section 8.02 of the Senior Credit Agreement; or (d) the breach of any of the covenants in Section 7.02 of the Subordinate Credit Agreement.

**"Obligations"** means the Obligations (as defined in the Guarantee).

**"Permitted Encumbrances"** has the meaning given to such term in the Credit Agreements.

**"Policy"** has the meaning set out in Section 4.01(2).

**"Senior Credit Agreement"** means the credit agreement made as of July 26, 2016 between the Borrower and the Secured Party, as amended by first amending agreement made as of October 13, 2016.

**"Subordinate Credit Agreement"** means the subordinate credit agreement made as of July 26, 2016 between the Borrower and the Secured Party, as amended by first amending agreement made as of October 13, 2016.

**"UCC"** shall have the meaning assigned to such term in this Section 1.01; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Secured Party's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

In this Agreement, the words "accessions", "account", "chattel paper", "commercial tort claims", "commodity account", "commodity contract", "deposit account", "document", "equipment", "fixtures", "goods", "instrument", "investment property", "general intangible", "inventory" and "proceeds", "certificated security", "financial asset", "security", "securities account", "security entitlement", "securities intermediary", "supporting obligations" and "uncertificated security" whenever used herein have the meanings given to these terms in the UCC.

1.02    **Headings**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Agreement. The terms "hereof", "hereunder" and similar expressions refer to this Agreement and not to any particular Article, Section or other portion hereof. Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Agreement.

- 4 -

1.03        **Extended Meanings**

In this Agreement words importing the singular number only include the plural and *vice versa*, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities.  The term "including" means "including without limiting the generality of the foregoing". A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GRANT OF SECURITY INTEREST

2.01        **Security Interest**

As general and continuing security for the payment and performance of all Obligations, each Debtor hereby grants to the Secured Party a security interest in, and, as further general and continuing security for the payment and performance of the Obligations, each Debtor hereby also assigns (other than with respect to trademarks) to the Secured Party and mortgages and charges as and by way of a fixed and specific mortgage and charge to the Secured Party, all right, title and interest that such Debtor now has or may hereafter have or acquire, in any manner whatsoever, (including by way of amalgamation or merger) in the following property (collectively, the **"Collateral"**):

(a)    Receivables:  all debts, accounts, claims and choses in action for monetary amounts (collectively, the **"Receivables"**);

(b)    Inventory:  all inventory of whatever kind and wherever situated (collectively, the **"Inventory"**);

(c)    Equipment:  all machinery, equipment, fixtures, furniture, plant, vehicles and other tangible personal property that are not Inventory (collectively, the **"Equipment"**);

(d)    Chattel Paper:  all chattel paper;

(e)    Documents of Title:  all warehouse receipts, bills of lading and other documents of title, whether negotiable or not;

(f)    Securities:   all shares, bonds, debentures, and other securities (collectively, the **"Securities"**);

(g)    Intangibles:  all intangibles not otherwise described in this Section 2.01 including all goodwill, patents, trademarks, copyrights and other intellectual property;

(h)    Instruments and Money: all bills, notes, cheques and other instruments and all coins or bills or other medium of exchange adopted for use as part of the currency of Canada or of any foreign government;

- 5 -

(i) <u>Books, Records, Etc.</u>:  all books, invoices, documents and other records in any form evidencing or relating to the Collateral;

(j) <u>Fixtures</u>: all fixtures;

(k) <u>Substitutions, Etc.</u>:  all replacements of, substitutions for and increases, additions and accessions to any of the property described in this Section 2.01;

(l) <u>Proceeds</u>:  all proceeds of any Collateral in any form derived directly or indirectly from any dealing with the Collateral or that indemnifies or compensates for the loss of or damage to the Collateral;

(m) <u>General Intangibles</u>: all general intangibles, all money, cheques, letters of credit, advances of credit, goodwill, indemnification claims, all rights and interests in partnerships, limited partnerships, limited liability companies and other unincorporated entities, corporate or other business records,  and contract rights (including rights under leases, whether entered into as lessor or lessee, swap contracts and other agreements), franchises and tax refund claims;

(n) <u>Deposit Accounts</u>: all deposit accounts;

(o) <u>Letters of Credit</u>: all letters of credit and letter-of-credit rights;

(p) <u>Supporting Obligations</u>: all supporting obligations;

(q) <u>Investment Property</u>: all investment property (including, without limitation, all securities (whether certificated securities or uncertificated securities), commodity contracts and commodity accounts); and

(r) <u>Commercial Tort Claims</u>: all commercial tort claims set forth on Schedule 3.01 hereto as updated from time to time;

provided that the said grant of a security interest, assignment, mortgage and charge will not render the Secured Party liable to observe or perform any term, covenant or condition of any agreement, document or instrument to which such Debtor is a party or by which it is bound.

## 2.02 **Attachment of Security Interest**

Each Debtor acknowledges that value has been given and agrees that the security interest granted hereby attaches upon the execution of this Agreement by such Debtor (or, in the case of any after-acquired property, at the time of acquisition by such Debtor of any rights therein).

## 2.03 **Exception for Contractual Rights**

The security interest granted hereby does not and will not extend to, and Collateral will not include any agreement, right, franchise, licence or permit (the "**contractual rights**") to which any Debtor is a party or of which any Debtor has the benefit or any other property, to the extent that, after giving effect to the applicable anti-assignment provisions of the Uniform

Commercial Code of any applicable jurisdiction, the creation of the lien or security interest herein would constitute a breach of the terms of or permit any person to terminate the contractual rights or otherwise constitute a breach of or violation under any existing law, statute or regulation to which the Debtors are subject.

2.04      **Intellectual Property**

Nothing in Section 2.01 is to be construed as constituting an absolute transfer or assignment of any present or future intellectual property rights, but that Section is to be construed as granting to the Secured Party a security interest in and a charge on all present and after-acquired intellectual property rights.

**ARTICLE 3 - REPRESENTATIONS,
WARRANTIES AND COVENANTS OF THE DEBTORS**

3.01      **Representations and Warranties**

Each Debtor hereby represents and warrants to the Secured Party that:

(a)      such Debtor is a corporation duly incorporated, organized and subsisting under the laws of its jurisdiction of incorporation, with the corporate power to enter into this Agreement; this Agreement has been duly authorized by all necessary corporate action on the part of such Debtor and constitutes a valid and legally binding agreement enforceable against such Debtor in accordance with its terms; the making and performance of this Agreement will not contravene, result in a breach of, constitute a default under or result in the creation of any lien, charge, security interest, encumbrance or any other rights of others upon any property of such Debtor pursuant to, any agreement, indenture or other instrument to which such Debtor is a party or by which such Debtor or any of its property may be bound or affected;

(b)      except for Permitted Encumbrances and except as otherwise provided herein or disclosed in a schedule hereto, all of the Collateral is the sole property of such Debtor free from any liens, charges, security interests, encumbrances or any rights of others that rank prior to or *pari passu* with the security interest, assignment and mortgage and charge granted hereby;

(c)      the jurisdiction of incorporation or formation and the chief executive office and the registered office of such Debtor, and the office where such Debtor keeps its books & records relating to Receivables, are located at the addresses specified in Schedule 3.01;

(d)      each Debtor has not granted "control" (within the meaning of such term under Section 8-106 or Section 9-106 of the UCC, as the case may be) over any investment property forming part of the Collateral to any Person other than the Secured Party;

(e)      all deposit accounts of each Debtor that are required by the Debtor in the United States and Canada are held with the Secured Party, as depositary bank, and each

- 7 -

Debtor has not otherwise granted ""control"" (within the meaning of such term under Section 9-104 of the UCC) over any deposit accounts forming part of the Collateral to any Person other than the Secured Party;

(f)    as of the date hereof and the date of each delivery of any supplemental schedules, each Debtor holds no (A) commercial tort claims other than those listed on Schedule 3.01 hereto and (B) commodity accounts other than those set forth on Schedule 3.01 hereto; and (C) deposit accounts other than those set forth on Schedule 3.01; and

(g)    the Inventory, Equipment and Securities of such Debtor are located at the addresses specified in Schedule 3.01, except for goods in transit or on lease or consignment.

3.02    **Covenants**

Each Debtor covenants with the Secured Party that such Debtor will:

(a)    ensure that the representations and warranties of such Debtor set forth in Section 3.01 and, where applicable, in the Credit Agreements will be true and correct at all times;

(b)    maintain, use and operate the Collateral and carry on and conduct its business in a lawful and business-like manner;

(c)    not permit the Collateral to be affixed to real or personal property so as to become a fixture or accession without the prior written consent of the Secured Party;

(d)    defend the Collateral against all claims and demands respecting the Collateral made by all persons at any time and, except as otherwise provided herein, keep the Collateral free and clear of all security interests, mortgages, charges, liens and other encumbrances except for Permitted Encumbrances and those disclosed in a schedule hereto or hereafter approved in writing by the Secured Party prior to their creation or assumption;

(e)    not change its jurisdiction of incorporation or formation, the chief executive office, the registered office or the location of the office where it keeps its records respecting the Receivables, or move any of the Inventory, Securities or Equipment from the locations specified in any schedule hereto, without the prior written consent of the Secured Party;

(f)    each Debtor shall at all times maintain all commodities accounts owned by it subject to a Control Agreement.  In the event any Debtor shall at any time hold or acquire any commodity account, such Debtor will notify the Secured Party thereof and deliver to the Secured Party a Control Agreement and will take, or cause to be taken, as promptly as practicable and, in any event within ten (10) Business Days after it obtains such additional Collateral, all steps and actions as the Secured Party reasonably deems necessary or appropriate to grant control of, or otherwise perfect a security interest in such commodity account and commodity contracts credited therein;

(g)     pay all rents, taxes, levies, assessments and government fees or dues lawfully levied, assessed or imposed in respect of the Collateral or any part thereof as and when the same become due and payable, and exhibit to the Secured Party, when required, the receipts and vouchers establishing such payment;

(h)     (i) keep proper books of account in accordance with sound accounting practice, (ii) furnish to the Secured Party in writing such financial information and statements and all such information and statements relating to the Collateral as the Secured Party may from time to time require, (iii) permit the Secured Party or its authorized agents at any time at the expense of such Debtor to examine the books of account and other financial records and reports relating to the Collateral and to make copies thereof and take extracts therefrom;

(i)     not change its name, its identity or type of organization or corporate structure, its jurisdiction of organization or incorporation, its organizational identification number or, if such Debtor is a corporation, not amalgamate or merge with any other corporation without first giving notice to the Secured Party of its new name and the names of all surviving entity and the date when such new name or amalgamation or merger is to become effective;

(j)     each Debtor shall at all times maintain all deposit accounts required by such Debtor in the United States and Canada with the Secured Party, as depositary bank. In the event any such deposit account is not held with the Secured Party as the depositary bank for any reason, each Debtor shall close such account and deposit or cause to be deposited all funds therein to a deposit account held with the Secured Party or, if such deposit account is otherwise permitted to remain outstanding under the Loan Documents, such Debtor shall cause to be executed and delivered to the Secured Party a Control Agreement with respect to such depositary account;

(k)     if any Debtor shall at any time hold or acquire a commercial tort claim having a value (i) individually in excess of $250,000 or (ii) together with all amounts payable evidenced by any commercial tort claims not previously delivered to the Secured Party, in excess of $500,000 in the aggregate for all Debtors who are Guarantors, such Debtor shall promptly notify the Secured Party thereof and grant to the Secured Party in writing signed by such Debtor a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party. The Debtors shall have sole control of all aspects of commercial tort claims that are subject to this Section 3.02(k) unless and until an Event of Default has occurred and is continuing and the Secured Party has provided written notice that it shall exercise rights with respect to Collateral under this Agreement;

(l)     pay to the Secured Party forthwith upon demand all reasonable costs, fees and expenses (including all legal, Receiver's, consulting and accounting fees and expenses) incurred by or on behalf of the Secured Party in connection with the preparation, execution, perfection, administration and discharge of this Agreement and the security granted hereby and the preservation and exercise of the rights,

powers and remedies of the Secured Party, and all such costs, fees and expenses will bear interest at the highest rate borne by any of the Obligations and will form part of the Obligations; and

(m)    not consent to:

    (i)    the entering into by any issuer of any uncertificated securities included in or relating to the Collateral of a Control Agreement in respect of such uncertificated securities with any Person other than the Secured Party or such nominee or agent as it may direct;

    (ii)    the entering into by any securities intermediary for any security entitlements in respect of the financial assets deposited in or credited to a securities account included in or relating to the Collateral of a Control Agreement with respect to such securities accounts or security entitlements with any Person other than the Secured Party or such nominee or agent as it may direct;

    (iii)    the entering into by any depositary bank for any deposit account included in or relating to the Collateral of a Control Agreement with respect to such deposit accounts with any Person other than the Secured Party or such nominee or agent as it may direct; or

    (iv)    the entering into by any commodities intermediary for any commodities account in respect of commodities contract credited to a commodities account included in or relating to the Collateral of a Control Agreement with respect to such commodities accounts or commodities contract with any Person other than the Secured Party or such nominee or agent as it may direct.

## ARTICLE 4 - INSURANCE

4.01    **Insurance**

(1)    A Debtor must obtain and maintain, at its own expense, insurance against loss or damage to the Collateral including loss by fire (including so-called extended coverage), theft, collision and such other risks as are customarily insured against for each type of Collateral, in an amount not less than the full replacement value thereof, in such form and with such insurers as are reasonably satisfactory to the Secured Party.

(2)    If any policy of insurance referred to in Section 4.01(1) (a **"Policy"**) contains a co-insurance clause, such Debtor will either cause any such co-insurance clause to be waived or maintain at all times a sufficient amount of insurance to meet the requirements of any such co-insurance clause so as to prevent such Debtor from becoming a co-insurer under the terms of any such policy.

(3)    All Policies must name the Secured Party as an additional insured and loss payee thereof, as the Secured Party's interests may appear, and must provide that the insurer will give the Secured Party at least 15 days written notice of intended cancellation or non-renewal.

- 10 -

(4)     At the Secured Party's request, a Debtor must furnish the Secured Party with evidence satisfactory to the Secured Party that the required insurance coverage is in effect.

(5)     A Debtor must give the Secured Party notice of any damage to, or loss of, the Collateral forthwith upon the occurrence of any such damage or loss.

(6)     Should a Debtor fail to make any payment or perform any other obligation provided in this Section, the Secured Party will have the right, but not the obligation, without notice or demand upon such Debtor and without releasing such Debtor from any obligation hereunder or waiving any rights to enforce this Agreement, to perform any or all of such obligations.  The amount of all such payments made and all costs, fees and expenses incurred by the Secured Party in performing such obligations will be immediately due and payable by such Debtor.

## ARTICLE 5 - DEALING WITH COLLATERAL

5.01     **Dealing with Collateral by the Debtors**

A Debtor must not sell, lease or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party, except that a Debtor may, until a Credit Event occurs, deal with its money or sell items of Inventory in the ordinary course of its business so that the purchaser thereof takes title thereto free and clear of the security interest, assignment and mortgage and charge granted hereby, but all proceeds of any such sale will continue to be subject to the security granted hereby.  Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, all money received by a Debtor will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.02     **Rights and Duties of the Secured Party**

(1)     The Secured Party may perform any of its rights and duties hereunder by or through agents and is entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to its rights and duties hereunder.

(2)     The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account.  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property.  Neither the Secured Party nor any of its respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Debtors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interests in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers.  The Secured Party shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be

responsible to the Debtors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Nothing herein contained shall be construed as requiring or obligating the Secured Party to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Secured Party, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.

5.03     **Registration of Securities**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Secured Party may have any Securities registered in its name, as pledgee, or in the name of its nominee, as pledgee, and upon a Credit Event will be entitled but not required to exercise any of the rights that any holder of such Securities may at any time have. However, until a Credit Event has occurred and the Secured Party has exercised any of its rights and remedies under Section 6.02, a Debtor will be entitled to exercise, in a manner not prejudicial to the interests of the Secured Party or which would not violate or be inconsistent with this Agreement, all voting power from time to time exercisable in respect of the Securities.  The Secured Party will not be responsible for any loss occasioned by its exercise of any of such rights or by failure to exercise the same within the time limited for the exercise thereof.  A Debtor must from time to time forthwith upon the request of the Secured Party deliver to the Secured Party those Securities requested by the Secured Party duly endorsed for transfer to the Secured Party or its nominee.

5.04     **Notification of Account Debtors**

Before an Event of Default occurs, the Secured Party may give notice of this Agreement and the security granted hereby to any account debtor of a Debtor or to any other person liable to a Debtor and, after the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, may give notice to any such account debtors or other person to make all further payments to the Secured Party.  Any payment or other proceeds of Collateral received by a Debtor from account debtors or from any other person liable to a Debtor after the occurrence of such Credit Event and exercise of such rights and remedies will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.05     **Purchase-Money Security Interests**

A Debtor will be permitted to grant purchase-money security interests in the ordinary course of its business in connection with the purchase or lease of Inventory or Equipment provided that, except to the extent permitted by the Credit Agreements, the foregoing will not constitute a subordination of the security interest and mortgage and charge granted hereby to such purchase-money security interests or a waiver by the Secured Party of the requirements prescribed by statute that, if complied with, would result in such purchase-money security interests ranking in priority to the security interest and mortgage and charge granted hereby.

5.06        **Application of Funds**

Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, all money collected or received by the Secured Party in respect of the Collateral may be applied on account of such parts of the Obligations as the Secured Party in its sole discretion determines, or may be held unappropriated in a collateral account, or in the discretion of the Secured Party may be released to a Debtor, all without prejudice to the Secured Party's rights against such Debtor.

## ARTICLE 6 - DEFAULT AND REMEDIES

6.01        **Consequences of a Default**

On or after the occurrence of any Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreement, at the option of the Secured Party, (a) any or all of the Obligations not yet payable will become immediately payable, without presentment, protest, notice of protest or notice of dishonour, all of which are expressly waived; (b) the obligation, if any, of the Secured Party to extend further credit to a Debtor will cease; and (c) the security granted hereby will become immediately enforceable.

6.02        **Remedies**

In addition to any right or remedy otherwise provided herein or by law, on or after the occurrence of any Event of Default that has not been either cured or waived, the Secured Party will have the rights and remedies set out below, all of which may be enforced successively or concurrently:

(a)        the Secured Party may take possession of the Collateral and require a Debtor to assemble the Collateral and deliver or make the Collateral available to the Secured Party at such places as may be specified by the Secured Party, and neither the Secured Party nor any Receiver will be or be deemed to be a mortgagee in possession by virtue of any such actions;

(b)        the Secured Party may take such steps as it considers desirable to maintain, preserve or protect the Collateral;

(c)        the Secured Party may carry on, or concur in the carrying on of, all or any part of the business of a Debtor;

(d)        the Secured Party may have, exercise or enforce any rights of a Debtor in respect of the Collateral;

(e)        the Secured Party may sell, lease or otherwise dispose of the Collateral at public auction, by private tender, by private sale or otherwise either for cash or upon credit, upon such terms and conditions as the Secured Party may determine and without notice to a Debtor unless required by law;

(f)    the Secured Party may accept all or any part of the Collateral in total or partial satisfaction of the Obligations in the manner provided by law;

(g)    the Secured Party may, for any purpose specified herein, including for the maintenance, preservation or protection of any Collateral or for carrying on any of the business or undertaking of a Debtor, borrow money on the security of the Collateral, which security will rank in priority to the security granted hereby;

(h)    the Secured Party may occupy and use all or any of the premises, buildings and plants occupied by a Debtor and use all or any of the Equipment and other property of a Debtor for such time as the Secured Party requires to facilitate the realization of the Collateral, free of charge and the Secured Party will not be liable for any rent, charges, depreciation or damages in connection with such actions, nor will the Secured Party or any Receiver be or be deemed to be a mortgagee in possession by virtue of any such actions;

(i)    the Secured Party may appoint a receiver or receiver and manager (each herein referred to as the **"Receiver"**) of the whole or any part of the Collateral and may remove or replace such Receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of a Receiver of the Collateral;

(j)    the Secured Party may discharge any claim, lien, mortgage, charge, security interest, encumbrance or any rights of others that may exist or be threatened against the Collateral, and in every such case the amounts so paid together with costs, charges and expenses incurred in connection therewith will be added to the Obligations;

(k)    sell, transfer or use any investment property included in the Collateral of which the Secured Party or its agent has "control" within the meaning of (i) in the case of deposit accounts, Section 9-104 of the UCC, (ii) in the case of any security entitlement, "control," as such term is defined in Section 8-106(d) of the UCC, and (iii) in the case of any commodity contract, "control," as such term is defined in Section 9-106(b) of the UCC.

6.03    **Powers of the Receiver**

Any Receiver will have all of the rights and powers that the Secured Party is entitled to exercise pursuant to Section 6.02 but the Secured Party will not be in any way responsible for any misconduct or negligence of any such Receiver.

6.04    **Liability of Secured Party**

The Secured Party will not be liable or responsible for any failure to seize, collect, realize, or obtain payment with respect to the Collateral and is not bound to institute proceedings or to take other steps for the purpose of seizing, collecting, realizing or obtaining possession or payment with respect to the Collateral or for the purpose of preserving any rights of the Secured Party, any Debtor or any other person in respect of the Collateral.  In the exercise of its rights and the

performance of its obligations, the Secured Party will only be liable for gross negligence or wilful misconduct.

6.05        **Proceeds of Realization**

The Secured Party may apply any proceeds of realization of the Collateral to payment of costs, fees and expenses mentioned in Section 3.02(l), including those related to the realization of the Collateral, and the Secured Party may apply any balance to payment of all other Obligations in such order as the Secured Party sees fit. If there is any surplus remaining, the Secured Party may pay it to any person entitled thereto by law of whom the Secured Party has knowledge and any balance remaining may be paid to the Debtor entitled thereto. If the realization of the Collateral fails to satisfy the Obligations of a particular Debtor, then such Debtor will be liable to pay any deficiency to the Secured Party.

6.06        **Waivers by a Debtor**

The Secured Party may (a) grant extensions of time, (b) take and perfect or abstain from taking and perfecting security, (c) give up any security, (d) accept compositions or compromises, (e) grant releases and discharges, and (f) otherwise waive rights against any Debtor, debtors of a Debtor, guarantors and others and with respect to the Collateral and other security as the Secured Party sees fit. No such action or omission will reduce the Obligations or affect the Secured Party's rights hereunder.

## ARTICLE 7 - GENERAL

7.01        **Failure of a Debtor to Perform**

If a Debtor fails to perform any of its covenants or obligations under this Agreement, the Secured Party may, in its absolute discretion, but without being required to do so, perform any such covenant or obligation. If any such covenant or obligation requires the payment of monies, the Secured Party may make such payment. All sums so paid by the Secured Party will be payable by such Debtor to the Secured Party and, for greater certainty, Section 3.02(l) will apply to such sums. No such performance or payment will relieve a Debtor from any default under this Agreement or any consequences of such default.

7.02        **Appointment of Consultant**

Upon the occurrence of a Material Event of Default or a Credit Event, the Secured Party will be entitled to appoint a consultant to provide such services and advice as the Secured Party may determine in its sole discretion, with power to enter a Debtor's premises, to inspect and evaluate the Collateral, to make copies of a Debtor's records, to review a Debtor's business plans and projections, to assess the conduct and viability of a Debtor's business, to prepare reports on a Debtor's affairs and to distribute such reports to the Secured Party or to other such persons as the Secured Party may direct. Such consultant will act as an agent for the Secured Party and will owe no duty to such Debtor. The consultant is to have no managerial or advisory capacity and will have no decision making responsibility. Each Debtor authorizes the Secured Party to provide confidential information to the consultant. All fees and expenses in connection with the engagement of a

consultant are payable by each Debtor to the Secured Party and for greater certainty, Section 3.02(l) will apply to such fees and expenses.

7.03        **Waivers of Legal Limitations**

To the fullest extent permitted by law, each Debtor waives all of the rights, benefits and protections that is given by the provisions of any law that imposes limitations upon the powers, rights or remedies of a secured party, including any law that limits the rights of a secured party to both seize Collateral and sue for any deficiency following realization of Collateral.

7.04        **Additional Debtors**

If, at the option of the Borrower or as required pursuant to either Credit Agreement, the Borrower shall cause any party that is not a Debtor to become a Debtor hereunder, such party shall execute and deliver to the Secured Party a Joinder Agreement substantially in the form of Schedule 7.04 and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Debtor party hereto on the date of this Agreement.

7.05        **Benefit of the Agreement**

This Agreement will be binding upon the successors of each Debtor and will enure to the benefit of the Secured Party and its successors and assigns.

7.06        **Acknowledgement**

Each Debtor acknowledges and agrees that this Agreement has been executed and delivered to and in favor of the Secured Party, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

7.07        **Entire Agreement**

This Agreement has been entered into pursuant to the provisions of the Credit Agreements and is subject to all the terms and conditions thereof and, if there is any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreements, the rights and obligations of the parties will be governed by the provisions of the Credit Agreements. This Agreement cancels and supersedes any prior understandings and agreements between the parties with respect thereto. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the Secured Party and any Debtor with respect to the subject matter hereof except as expressly set forth herein or in the Credit Agreements.

7.08        **Amendments and Waivers**

No amendment to this Agreement will be valid or binding unless set forth in writing and duly executed by all of the parties. No waiver of any breach of any provision of this Agreement will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, will be limited to the specific breach waived.

7.09      **Assignment**

     The rights of the Secured Party under this Agreement may be assigned by the Secured Party without the prior consent of the Debtors.  No Debtor may assign its obligations under this Agreement.

7.10      **Severability**

     If any provision of this Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

7.11      **Conflicts**

     In the event of a conflict in or between the provisions of this Agreement and the provisions of either Credit Agreement then, despite anything contained in this Agreement, the provisions of the applicable Credit Agreement will prevail and the provisions of this Agreement will be deemed to be amended to the extent necessary to eliminate the conflict.

7.12      **Notices; Sales**

     The Secured Party shall give each Debtor ten (10) days' written notice (which each Debtor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Secured Party's intention to make any sale of Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Secured Party may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral may (in its sole and absolute discretion) determine.  The Secured Party shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Secured Party until the sale price is paid by the purchaser or purchasers thereof, but the Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Debtors (all said rights being also hereby waived and released to the extent permitted by

law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Secured Party from the Debtors as a credit against the purchase price, and the Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Debtors therefor.  For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Secured Party shall be free to carry out such sale pursuant to such agreement and the Debtors shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Secured Party shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full in cash.  As an alternative to exercising the power of sale herein conferred upon it, the Secured Party may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver.  Any sale pursuant to the provisions of this Section 7.12 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

7.13    **Notices**

Any demand, notice or other communication to be given under this Agreement to any Debtor or the Secured Party shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Debtor and the Secured Party may change their respective address for notices in accordance with the said provisions.

7.14    **Remedies Cumulative; Additional Continuing Security**

The rights and remedies of the Secured Party hereunder are cumulative and are in addition to and not in substitution for any other security now or hereafter held by the Secured Party or any other rights or remedies available at law or in equity or otherwise. No single or partial exercise by the Secured Party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Secured Party may be entitled.  This Agreement is a continuing agreement and security that will remain in full force and effect until discharged by the Secured Party.

7.15    **Further Assurances**

Each of the Debtors and the Secured Party will from time to time execute and deliver all such further documents and instruments, including financing statements and schedules, and do all acts and things as the other party may reasonably require to effectively carry out or better evidence or perfect the security granted hereby and the full intent and meaning of this Agreement.

7.16    **Power of Attorney**

Each Debtor hereby irrevocably appoints any officer for the time being of the Secured Party the true and lawful attorney of such Debtor upon the occurrence of an Event of Default that is continuing, with full power of substitution, to do all things and execute and deliver all such documents and instruments, including financing statements and schedules, as are referred to in Section 7.15 above, with the right to use the name of such Debtor whenever and wherever the officer

may deem necessary or expedient and from time to time to exercise all rights and powers and to perform all acts of ownership in respect to the Collateral in accordance with this Agreement.

7.17    **Discharge**

A Debtor will be entitled to a discharge of this Agreement upon written request by such Debtor and full and irrevocable payment, performance and satisfaction of the Obligations. No discharge will be effective unless in writing and executed by the Secured Party.

7.18    **Governing Law**

This Agreement is governed by the laws of the State of New York (without reference to its choice of law rules).  Any litigation based hereon, or arising out of, under, or in connection with, this Agreement, or any course of conduct, course of dealing, statements (whether oral or written) or actions of the Secured Party or the Debtors in respect of this Agreement shall be brought and maintained exclusively in the courts of the State of New York or in any federal court sitting in New York County; provided, however, that any suit seeking enforcement against any collateral or other property may be brought, at the option of the Secured Party, in the courts of any jurisdiction where such collateral or other property may be found. Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the  jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto irrevocably agrees to be bound any final, non-appealable judgment rendered in such court and such judgment may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that the Secured Party may otherwise have to bring any action or proceeding relating to any Loan Document against any Debtor or its properties in the courts of any jurisdiction.

7.19    **Venue; Forum; Etc.**

Each Debtor hereby expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation has been brought in an inconvenient forum.  To the extent that each Debtor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, to the fullest extent permitted by law, such Debtor hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

7.20    **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING

- 19 -

TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

7.21     **Consent to Filings**

With respect to the foregoing and the grant of the security interest hereunder, each Debtor hereby authorizes the Secured Party to file at any time and from time to time in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto and continuations thereof that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment or continuation, including whether the Debtor is an organization, the type of organization and any organizational identification number issued to such Debtor.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner such as "all assets" or "all personal property, whether now owned or hereafter acquired" of such Debtor or words of similar effect as being of an equal or lesser scope or with greater detail.  Each Debtor agrees to provide such information to the Secured Party promptly upon request.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Agreement.

DEBTORS:

**MUNDO MEDIA (US), LLC**

Per:  _____

Name: Jason    Theofilos

Title:  President

Per:  _____

Name:

Title:

**ACTIVE SIGNAL MARKETING, LLC**

Per:  _____

Name: Jason    Theofilos

Title:  President

Per:  _____

Name:

Title:

**FIND CLICK ENGAGE, LLC**

Per:  _____

Name: Jason    Theofilos

Title:  President

Per:  _____

Name:

Title:

[Mundo – Signature Page to US General Security Agreement]

**FLI DIGITAL, INC.**

Per: _____

Name: Jason Theofilos

Title: President

Per: _____

Name:

Title:

**36 LABS, LLC.**

Per: _____

Name: Jason Theofilos

Title: President

Per: _____

Name:

Title:

[Mundo – Signature Page to US General Security Agreement]

SECURED PARTY:

**ROYAL BANK OF CANADA**

Per: _____

       Name:   Hogan Mak

       Title:   Director

Per: _____

       Name:

       Title:

**SCHEDULE 3.01**

**MUNDO MEDIA (US), LLC**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

Jurisdiction of Incorporation/Formation: State of Delaware

Chief executive office: 300 Delaware Avenue, Suite 210, Wilmington, Delaware
19801

Registered/head office: 300 Delaware Avenue, Suite 210, Wilmington, Delaware
19801

Other place(s) of business: nil

Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
Richmond Hill, Ontario, Canada L4B 4V1

2.    DEPOSIT ACCOUNTS (Section 3.01(f))

Nil.

3.    COMMERCIAL TORT CLAIMS (Section 3.01(f))

Nil.

4.    COMMODITY ACCOUNTS (Section 3.01(f))

Nil.

5.    LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B
4V1

**ACTIVE SIGNAL MARKETING, LLC**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

Jurisdiction of Incorporation/Formation: State of Delaware

Chief executive office: 337 Garden Oaks Blvd, #50564, Houston, TX 77018

Registered/head office: 337 Garden Oaks Blvd, #50564, Houston, TX 77018

Other place(s) of business: nil

Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1

2.    DEPOSIT ACCOUNTS (Section β.01(f))

Account No.4880 5958 9550 – Bank of America, P.O. Box 15284, Wilmington, DE 19850

3.    COMMERCIAL TORT CLAIMS (Section β.01(f))

Nil.

4.    COMMODITY ACCOUNTS (Section β.01(f))

Nil.

5.    LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section β.01(g))

Nil.

**FIND CLICK ENGAGE, LLC**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND RECORDS RELATING TO RECEIVABLES (Section β.01(c))

Jurisdiction of Incorporation/Formation: State of Delaware

Chief executive office: 9450 SW Gemini Drive, #87125, Beaverton, OR 97008-7105

Registered/head office: 9450 SW Gemini Drive, #87125, Beaverton, OR 97008-7105

Other place(s) of business: Nil

Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1

2.    DEPOSIT ACCOUNTS (Section β.01(f))

Account No.3250 5280 2960 – Bank of America, P.O. Box 15284, Wilmington, DE 19850

3.      COMMERCIAL TORT CLAIMS (Section 3.01(f))

Nil.

4.      COMMODITY ACCOUNTS (Section 3.01(f))

Nil.

5.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

Nil.

**FLI DIGITAL, INC.**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

Jurisdiction of Incorporation/Formation: State of New York

Chief executive office: 9450 SW Gemini Drive, #77068, Beaverton, OR 97008-7105

Registered/head office: 9450 SW Gemini Drive, #77068, Beaverton, OR 97008-7105

Other place(s) of business: nil

Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1

2.      DEPOSIT ACCOUNTS (Section 3.01(f))

Account No.4830 1948 3442 – Bank of America, P.O. Box 15284, Wilmington, DE 19850

3.      COMMERCIAL TORT CLAIMS (Section 3.01(f))

Nil.

4.      COMMODITY ACCOUNTS (Section 3.01(f))

Nil.

5.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section β.01(g))

Nil.

## 36 LABS, LLC.

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section β.01(c))

Jurisdiction of Incorporation/Formation: State of Delaware

Chief executive office: 548 Market Street, #77068, San Francisco, CA 94104-
5401

Registered/head office: 548 Market Street, #77068, San Francisco, CA 94104-
5401

Other place(s) of business: Nil

Books & records relating to Receivables: 120 East Beaver Creek Road, Suite 200,
Richmond Hill, Ontario, Canada L4B 4V1

2.      DEPOSIT ACCOUNTS (Section β.01(f))

Account No.3250 3247 7810 – Bank of America, P.O. Box 15284, Wilmington,
DE 19850

3.      COMMERCIAL TORT CLAIMS (Section β.01(f))

Nil.

4.      COMMODITY ACCOUNTS (Section β.01(f))

Nil.

5.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section β.01(g))

Nil.

## SCHEDULE 7.04

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT dated as of ●, 20●, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of December 1, 2016, by **MUNDO MEDIA (US), LLC, ACTIVE SIGNAL MARKETING, LLC, FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., 36 LABS., LLC** and others which are from time to time party thereto as Debtors in favor of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder. The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules 3.01 to the General Security Agreement. By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    [NAME OF ADDITIONAL DEBTOR]

Per: _____
     Name:
     Title:

     _____
     Name:
     Title:


SECURED PARTY:                        **ROYAL BANK OF CANADA**

Per: _____
     Name:
     Title:

Per: _____
     Name:
     Title:

**Annex 1**

**[Name of Additional Debtor]**

1.      ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

Jurisdiction of Incorporation/Formation:

Chief executive office:

Registered/head office:

Other place(s) of business:

Books & records relating to Receivables:

2.      DEPOSIT ACCOUNTS (Section 3.01(f))

●

3.      COMMERCIAL TORT CLAIMS (Section 3.01(f))

● [ Describe nature of claim(s); see Comment 5 to UCC Section 9 -108]

4.      COMMODITY ACCOUNTS (Section 3.01(f))

●

5.      LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

Address(es):

**Executed Version**

## JOINDER AGREEMENT
## (NEW YORK LAW GOVERNED GENERAL SECURITY AGREEMENT)

**THIS JOINDER AGREEMENT** dated as of November 14, 2017, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of December 1, 2016, by **MUNDO MEDIA (US), LLC, ACTIVE SIGNAL MARKETING, LLC, FIND CLICK ENGAGE, LLC, FLI DIGITAL, INC., 36 LABS, LLC.** and others which are from time to time party thereto as Debtors in favour of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder. The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules 3.01 to the General Security Agreement. By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                          **M ZONE MARKETING INC.**

Per: _____

Name: Mitchell Richler
Title:  President

_____

Name:
Title:


SECURED PARTY:                              **ROYAL BANK OF CANADA**

Per: _____

Name:
Title:

Per: _____

Name:
Title:

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                **M ZONE MARKETING INC.**

Per:     _____
         Name:
         Title:

         _____
         Name:
         Title:


SECURED PARTY:                    **ROYAL BANK OF CANADA**

Per:     _____
         Name:     Hogan Mak
         Title:    Director

Per:     _____
         Name:
         Title:

**Annex 1**

**M ZONE MARKETING INC.**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS, LOCATION OF BOOKS AND
      RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

        Jurisdiction of Incorporation/Formation: State of Delaware

        Chief executive office: 548 Market Street, Suite 77068
                                San Francisco, CA 94014-5401
                                USA

        Registered/head office:  c/o Cogency Global Inc.
                                 850 New Burton Rd, Suite 201,
                                 Dover, County of Kent, Delaware 19904
                                 USA

        Other place(s) of business: n/a

        Books & records relating to Receivables: Dorsey & Whitney LLP
                                                 161 Bay Street, Suite 4310
                                                 Toronto, ON M5J 2S1
                                                 Canada

2.    DEPOSIT ACCOUNTS (Section 3.01(f))

            NONE

3.    COMMERCIAL TORT CLAIMS (Section 3.01(f))

            NONE

4.    COMMODITY ACCOUNTS (Section 3.01(f))

            NONE

5.    LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

        Address(es): N/A

This is **Exhibit "L"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

_____

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**Execution Version**

# GENERAL SECURITY AGREEMENT

**THIS AGREEMENT** is made as of February 5, 2019

**BETWEEN**

> **APPTHIS HOLDINGS, INC.** a corporation incorporated under the laws of the State of Delaware, and each of the Restricted Parties and other Persons signatory hereto or that becomes a party hereto pursuant to Section 7.04 (each a **"Debtor"**, and collectively, the "**Debtors**"),
>
> - and -
>
> **ROYAL BANK OF CANADA**, a Canadian chartered bank (together with all successors, the **"Secured Party"**).

**WHEREAS** Mundo Media Ltd. (a successor by amalgamation to Voom Media Corp., the "**Borrower**")  has entered into certain Credit Agreements with the Secured Party pursuant to which certain credit facilities were extended to the Borrower;

**AND WHEREAS** each Debtor has entered into the Guarantee in favor of the Secured Party pursuant to which each Debtor has guaranteed the Obligations of the Borrower;

**AND WHEREAS** each Debtor has agreed to grant a security interest and assignment, mortgage and charge in the Collateral to the Secured Party in order to secure the performance of the Obligations;

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1 - INTERPRETATION

1.01    **Interpretation**

Unless otherwise defined herein or the context otherwise requires, (i) capitalized terms used herein which are not otherwise defined herein shall have the meanings provided in the Credit Agreements (as hereinafter defined) and (ii) all terms defined in the Uniform Commercial Code from time to time in effect in the State of New York ("**UCC**") and not defined herein or in the Credit Agreements shall have the meanings specified therein (and if defined in more than one article of the UCC, shall have the meaning specified in Article 9 thereof).  In this Agreement:

**"Agreement"** means this general security agreement, including its recitals and schedules, as amended from time to time.

"**Business Day**" means any day other than a Saturday or Sunday on which banks generally are open for business in Toronto, Ontario.

"**Collateral**" has the meaning set out in Section 2.01.

"**Control Agreement**" means:

(a)     with respect to any uncertificated securities included in the Collateral, an agreement between the issuer of such uncertificated securities and another Person whereby such issuer agrees to comply with instructions that are originated by such Person in respect of such uncertificated securities, without the further consent of the Debtors;

(b)     with respect to any security entitlements in respect of financial assets deposited in or credited to a securities account included in the Collateral, an agreement between the securities intermediary and another Person in respect of such security entitlements pursuant to which such securities intermediary agrees to comply with any entitlement orders with respect to such security entitlements that are originated by the Secured Party, without the further consent of the Debtors;

(c)     with respect to any commodities account and any commodities contract credited to such account included in the Collateral, an agreement between the commodities intermediary and another Person in respect of such commodities account and commodities contracts credited thereto pursuant to which such commodities intermediary agrees to comply with any orders with respect to such commodities account and commodities contracts credited thereto that are originated by the Secured Party, without the further consent of the Debtors; and

(d)     with respect to any deposit accounts included in the Collateral, an agreement between the depositary bank and another Person in respect of such deposit account pursuant to which such depositary bank agrees to comply with any instructions with respect to such deposit account that are originated by the Secured Party, without the further consent of the Debtor;

"**Credit Agreements**" means, collectively, the Senior Credit Agreement and the Subordinate Credit Agreement.

"**Credit Event**" means any accelerated demand for payment made by the Secured Party in respect of the Obligations following an Event of Default which is continuing.

"**Event of Default**" means any of the events described as "Events of Default" in either Credit Agreement and, in the case of any Debtor, a failure on the part of any Debtor to pay, when required, any amount due to the Secured Party pursuant to the Guarantee.

"**Guarantee**" means the guarantee of the Debtors made as of February 5, 2019 in favor of the Secured Party.

**"Material Event of Default"** means (a) any of the events described in Sections 10.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Senior Credit Agreement; (b) any of the events described in Sections 9.01(a), (b), (f), (g), (j), (k), (l) or (m) of the Subordinate Credit Agreement; (c) the breach of any of the covenants in Section 8.02 of the Senior Credit Agreement; or (d) the breach of any of the covenants in Section 7.02 of the Subordinate Credit Agreement.

**"Obligations"** means all present and future indebtedness, liabilities and obligations of the Debtors, or any of them, to the Secured Party under or in connection with the Credit Agreements, the Guarantee or the other Loan Documents, including all debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by the Debtors, or any of them, to the Secured Party, in any currency or remaining unpaid by the Debtors, or any of them, to the Secured Party, under or in connection with the Credit Agreements, the Guarantee or the other Loan Documents, whether arising from dealings between the Secured Party and any of the Debtors or from any other dealings or proceedings by which the Secured Party may be or become in any manner whatever a creditor of a Debtor pursuant to the Credit Agreements, the Guarantee or the other Loan Documents, and wherever incurred, and whether incurred by a Debtor alone or with another or others and whether as principal or surety, and all interest, fees, legal and other costs, charges and expenses relating thereto.

**"Permitted Encumbrances"** has the meaning given to such term in the Credit Agreements.

**"Policy"** has the meaning set out in Section 4.01(2).

**"Senior Credit Agreement"** means the amended and restated credit agreement made as of December 21, 2017 between the Borrower and the Secured Party.

**"Subordinate Credit Agreement"** means the amended and restated subordinate credit agreement made as of December 21, 2017 between the Borrower and the Secured Party.

**"UCC"** shall have the meaning assigned to such term in this Section 1.01; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Secured Party' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

In this Agreement, the words "accessions", "account", "chattel paper", "commercial tort claims", "commodity account", "commodity contract", "deposit account", "document", "equipment", "fixtures", "goods", "instrument", "investment property", "general intangible", "inventory" and "proceeds", "certificated security", "financial asset", "security", "securities account", "security entitlement", "securities intermediary", "supporting obligations" and "uncertificated security" whenever used herein have the meanings given to these terms in the UCC.

1.02    **Headings**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of

this Agreement. The terms "hereof", "hereunder" and similar expressions refer to this Agreement and not to any particular Article, Section or other portion hereof. Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections of this Agreement.

1.03     **Extended Meanings**

In this Agreement words importing the singular number only include the plural and *vice versa*, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities. The term "including" means "including without limiting the generality of the foregoing". A reference to any agreement, instrument or declaration means such agreement, instrument or declaration as the same may be amended, supplemented, modified, restated or replaced from time to time.

## ARTICLE 2 - GRANT OF SECURITY INTEREST

2.01     **Security Interest**

As general and continuing security for the payment and performance of all Obligations, each Debtor hereby grants to the Secured Party a security interest in, and, as further general and continuing security for the payment and performance of the Obligations, each Debtor hereby also assigns (other than with respect to trademarks) to the Secured Party and mortgages and charges as and by way of a fixed and specific mortgage and charge to the Secured Party, all right, title and interest that such Debtor now has or may hereafter have or acquire, in any manner whatsoever, (including by way of amalgamation or merger) in the following property (collectively, the **"Collateral"**):

(a)     Receivables:  all debts, accounts, claims and choses in action for monetary amounts (collectively, the **"Receivables"**);

(b)     Inventory:  all inventory of whatever kind and wherever situated (collectively, the **"Inventory"**);

(c)     Equipment:  all machinery, equipment, fixtures, furniture, plant, vehicles and other tangible personal property that are not Inventory (collectively, the **"Equipment"**);

(d)     Chattel Paper:  all chattel paper;

(e)     Documents of Title:  all warehouse receipts, bills of lading and other documents of title, whether negotiable or not;

(f)     Securities:  all shares, bonds, debentures, and other securities (collectively, the **"Securities"**);

(g)     <u>Intangibles</u>:  all intangibles not otherwise described in this Section 2.01 including all goodwill, patents, trademarks, copyrights and other intellectual property;

(h)     <u>Instruments and Money</u>:  all bills, notes, cheques and other instruments and all coins or bills or other medium of exchange adopted for use as part of the currency of Canada or of any foreign government;

(i)     <u>Books, Records, Etc.</u>:  all books, invoices, documents and other records in any form evidencing or relating to the Collateral;

(j)     <u>Fixtures</u>: all fixtures;

(k)     <u>Substitutions, Etc.</u>:  all replacements of, substitutions for and increases, additions and accessions to any of the property described in this Section 2.01;

(l)     <u>Proceeds</u>:  all proceeds of any Collateral in any form derived directly or indirectly from any dealing with the Collateral or that indemnifies or compensates for the loss of or damage to the Collateral;

(m)     <u>General Intangibles</u>: all general intangibles, all money, cheques, letters of credit, advances of credit, goodwill, indemnification claims, all rights and interests in partnerships, limited partnerships, limited liability companies and other unincorporated entities, corporate or other business records,  and contract rights (including rights under leases, whether entered into as lessor or lessee, swap contracts and other agreements), franchises and tax refund claims;

(n)     <u>Deposit Accounts</u>: all deposit accounts;

(o)     <u>Letters of Credit</u>: all letters of credit and letter-of-credit rights;

(p)     <u>Supporting Obligations</u>: all supporting obligations;

(q)     <u>Investment Property</u>: all investment property (including, without limitation, all securities (whether certificated securities or uncertificated securities), commodity contracts and commodity accounts); and

(r)     <u>Commercial Tort Claims</u>: all commercial tort claims set forth on Schedule 3.01 hereto as updated from time to time;

provided that the said grant of a security interest, assignment, mortgage and charge will not render the Secured Party liable to observe or perform any term, covenant or condition of any agreement, document or instrument to which such Debtor is a party or by which it is bound.

## 2.02     **Attachment of Security Interest**

Each Debtor acknowledges that value has been given and agrees that the security interest granted hereby attaches upon the execution of this Agreement by such Debtor (or, in the case of any after-acquired property, at the time of acquisition by such Debtor of any rights therein).

2.03      **Exception for Contractual Rights**

The security interest granted hereby does not and will not extend to, and Collateral will not include any agreement, right, franchise, licence or permit (the "**contractual rights**") to which any Debtor is a party or of which any Debtor has the benefit or any other property, to the extent that, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction, the creation of the lien or security interest herein would constitute a breach of the terms of or permit any person to terminate the contractual rights or otherwise constitute a breach of or violation under any existing law, statute or regulation to which the Debtors are subject.

2.04      **Intellectual Property**

Nothing in Section 2.01 is to be construed as constituting an absolute transfer or assignment of any present or future intellectual property rights, but that Section is to be construed as granting to the Secured Party a security interest in and a charge on all present and after-acquired intellectual property rights.

## ARTICLE 3 - REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE DEBTORS

3.01      **Representations and Warranties**

Each Debtor hereby represents and warrants to the Secured Party that:

(a)      such Debtor is a corporation, company, limited liability company, partnership or trust, as applicable, duly incorporated, formed, amalgamated, merged or continued, as the case may be, organized and subsisting under the laws of its jurisdiction of organization, with the corporate power to enter into this Agreement; this Agreement has been duly authorized by all necessary corporate action on the part of such Debtor and constitutes a valid and legally binding agreement enforceable against such Debtor in accordance with its terms; the making and performance of this Agreement will not contravene, result in a breach of, constitute a default under or result in the creation of any lien, charge, security interest, encumbrance or any other rights of others upon any property of such Debtor pursuant to, any agreement, indenture or other instrument to which such Debtor is a party or by which such Debtor or any of its property may be bound or affected;

(b)      except for Permitted Encumbrances and except as otherwise provided herein or disclosed in a schedule hereto, all of the Collateral is the sole property of such Debtor free from any liens, charges, security interests, encumbrances or any rights of others that rank prior to or *pari passu* with the security interest, assignment and mortgage and charge granted hereby;

(c)      the jurisdiction of incorporation or formation and the chief executive office and the registered office of such Debtor, and the office where such Debtor keeps its books &

records relating to Receivables, are located at the addresses specified in Schedule 3.01;

(d)     each Debtor has not granted "control" (within the meaning of such term under Section 8-106 or Section 9-106 of the UCC, as the case may be) over any investment property forming part of the Collateral to any Person other than the Secured Party;

(e)     all deposit accounts of each Debtor that are required by the Debtor in the United States and Canada are held with the Secured Party, as depositary bank, and each Debtor has not otherwise granted "control" (within the meaning of such term under Section 9-104 of the UCC) over any deposit accounts forming part of the Collateral to any Person other than the Secured Party;

(f)     as of the date hereof and the date of each delivery of any supplemental schedules, each Debtor holds no (A) commercial tort claims other than those listed on Schedule 3.01 hereto and (B) commodity accounts other than those set forth on Schedule 3.01 hereto; and (C) deposit accounts other than those set forth on Schedule 3.01; and

(g)     the Inventory, Equipment and Securities of such Debtor are located at the addresses specified in Schedule 3.01, except for goods in transit or on lease or consignment.

3.02     **Covenants**

Each Debtor covenants with the Secured Party that such Debtor will:

(a)     ensure that the representations and warranties of such Debtor set forth in Section 3.01 and, where applicable, in the Credit Agreements will be true and correct at all times;

(b)     maintain, use and operate the Collateral and carry on and conduct its business in a lawful and business-like manner;

(c)     not permit the Collateral to be affixed to real or personal property so as to become a fixture or accession without the prior written consent of the Secured Party;

(d)     defend the Collateral against all claims and demands respecting the Collateral made by all persons at any time and, except as otherwise provided herein, keep the Collateral free and clear of all security interests, mortgages, charges, liens and other encumbrances except for Permitted Encumbrances and those disclosed in a schedule hereto or hereafter approved in writing by the Secured Party prior to their creation or assumption;

(e)     not change its jurisdiction of incorporation or formation, the chief executive office, the registered office or the location of the office where it keeps its records respecting the Receivables, or move any of the Inventory, Securities or Equipment from the locations specified in any schedule hereto, without the prior written consent of the Secured Party;

- 8 -

(f)    each Debtor shall at all times maintain all commodities accounts owned by it subject to a Control Agreement.  In the event any Debtor shall at any time hold or acquire any commodity account, such Debtor will notify the Secured Party thereof and deliver to the Secured Party a Control Agreement and will take, or cause to be taken, as promptly as practicable and, in any event within ten (10) Business Days after it obtains such additional Collateral, all steps and actions as the Secured Party reasonably deems necessary or appropriate to grant control of, or otherwise perfect a security interest in such commodity account and commodity contracts credited therein;

(g)    pay all rents, taxes, levies, assessments and government fees or dues lawfully levied, assessed or imposed in respect of the Collateral or any part thereof as and when the same become due and payable, and exhibit to the Secured Party, when required, the receipts and vouchers establishing such payment;

(h)    (i) keep proper books of account in accordance with sound accounting practice, (ii) furnish to the Secured Party in writing such financial information and statements and all such information and statements relating to the Collateral as the Secured Party may from time to time require, (iii) permit the Secured Party or its authorized agents at any time at the expense of such Debtor to examine the books of account and other financial records and reports relating to the Collateral and to make copies thereof and take extracts therefrom;

(i)    not change its name, its identity or type of organization or corporate structure, its jurisdiction of organization or incorporation, its organizational identification number or, if such Debtor is a corporation, not amalgamate or merge with any other corporation without first giving notice to the Secured Party of its new name and the names of all surviving entity and the date when such new name or amalgamation or merger is to become effective;

(j)    each Debtor shall at all times maintain all deposit accounts required by such Debtor in the United States and Canada with the Secured Party, as depositary bank. In the event any such deposit account is not held with the Secured Party as the depositary bank for any reason, each Debtor shall close such account and deposit or cause to be deposited all funds therein to a deposit account held with the Secured Party or, if such deposit account is otherwise permitted to remain outstanding under the Loan Documents, such Debtor shall cause to be executed and delivered to the Secured Party a Control Agreement with respect to such depositary account;

(k)    if any Debtor shall at any time hold or acquire a commercial tort claim having a value (i) individually in excess of $250,000 or (ii) together with all amounts payable evidenced by any commercial tort claims not previously delivered to the Secured Party, in excess of $500,000 in the aggregate for all Debtors who are Guarantors, such Debtor shall promptly notify the Secured Party thereof and grant to the Secured Party in writing signed by such Debtor a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party.  The

Debtors shall have sole control of all aspects of commercial tort claims that are subject to this Section 3.02(k) unless and until an Event of Default has occurred and is continuing and the Secured Party has provided written notice that it shall exercise rights with respect to Collateral under this Agreement;

(l)     pay to the Secured Party forthwith upon demand all reasonable costs, fees and expenses (including all legal, Receiver's, consulting and accounting fees and expenses) incurred by or on behalf of the Secured Party in connection with the preparation, execution, perfection, administration and discharge of this Agreement and the security granted hereby and the preservation and exercise of the rights, powers and remedies of the Secured Party, and all such costs, fees and expenses will bear interest at the highest rate borne by any of the Obligations and will form part of the Obligations;

(m)     not consent to:

(i)     the entering into by any issuer of any uncertificated securities included in or relating to the Collateral of a Control Agreement in respect of such uncertificated securities with any Person other than the Secured Party or such nominee or agent as it may direct;

(ii)    the entering into by any securities intermediary for any security entitlements in respect of the financial assets deposited in or credited to a securities account included in or relating to the Collateral of a Control Agreement with respect to such securities accounts or security entitlements with any Person other than the Secured Party or such nominee or agent as it may direct;

(iii)   the entering into by any depositary bank for any deposit account included in or relating to the Collateral of a Control Agreement with respect to such deposit accounts with any Person other than the Secured Party or such nominee or agent as it may direct; or

(iv)    the entering into by any commodities intermediary for any commodities account in respect of commodities contract credited to a commodities account included in or relating to the Collateral of a Control Agreement with respect to such commodities accounts or commodities contract with any Person other than the Secured Party or such nominee or agent as it may direct.

## ARTICLE 4 - INSURANCE

4.01    **Insurance**

(1)     A Debtor must obtain and maintain, at its own expense, insurance against loss or damage to the Collateral including loss by fire (including so-called extended coverage), theft, collision and such other risks as are customarily insured against for each type of Collateral, in an amount not less than the full replacement value thereof, in such form and with such insurers as are reasonably satisfactory to the Secured Party.

(2)     If any policy of insurance referred to in Section 4.01(1) (a **"Policy"**) contains a co-insurance clause, such Debtor will either cause any such co-insurance clause to be waived or maintain at all times a sufficient amount of insurance to meet the requirements of any such co-insurance clause so as to prevent such Debtor from becoming a co-insurer under the terms of any such policy.

(3)     All Policies must name the Secured Party as an additional insured and loss payee thereof, as the Secured Party's interests may appear, and must provide that the insurer will give the Secured Party at least 15 days written notice of intended cancellation or non-renewal.

(4)     At the Secured Party's request, a Debtor must furnish the Secured Party with evidence satisfactory to the Secured Party that the required insurance coverage is in effect.

(5)     A Debtor must give the Secured Party notice of any damage to, or loss of, the Collateral forthwith upon the occurrence of any such damage or loss.

(6)     Should a Debtor fail to make any payment or perform any other obligation provided in this Section, the Secured Party will have the right, but not the obligation, without notice or demand upon such Debtor and without releasing such Debtor from any obligation hereunder or waiving any rights to enforce this Agreement, to perform any or all of such obligations.  The amount of all such payments made and all costs, fees and expenses incurred by the Secured Party in performing such obligations will be immediately due and payable by such Debtor.

## ARTICLE 5 - DEALING WITH COLLATERAL

5.01     **Dealing with Collateral by the Debtors**

A Debtor must not sell, lease or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party, except that a Debtor may, until a Credit Event occurs, deal with its money or sell items of Inventory in the ordinary course of its business so that the purchaser thereof takes title thereto free and clear of the security interest, assignment and mortgage and charge granted hereby, but all proceeds of any such sale will continue to be subject to the security granted hereby.  Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, all money received by a Debtor will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.02     **Rights and Duties of the Secured Party**

(1)     The Secured Party may perform any of its rights and duties hereunder by or through agents and is entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to its rights and duties hereunder.

(2)     The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account.  The Secured Party shall be deemed to have exercised reasonable care in the custody and

preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property. Neither the Secured Party nor any of its respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Debtors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interests in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers. The Secured Party shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to the Debtors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Nothing herein contained shall be construed as requiring or obligating the Secured Party to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Secured Party, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.

5.03     **Registration of Securities**

Upon the occurrence of an Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreements, the Secured Party may have any Securities registered in its name, as pledgee, or in the name of its nominee, as pledgee, and upon a Credit Event will be entitled but not required to exercise any of the rights that any holder of such Securities may at any time have. However, until a Credit Event has occurred and the Secured Party has exercised any of its rights and remedies under Section 6.02, a Debtor will be entitled to exercise, in a manner not prejudicial to the interests of the Secured Party or which would not violate or be inconsistent with this Agreement, all voting power from time to time exercisable in respect of the Securities. The Secured Party will not be responsible for any loss occasioned by its exercise of any of such rights or by failure to exercise the same within the time limited for the exercise thereof. A Debtor must from time to time forthwith upon the request of the Secured Party deliver to the Secured Party those Securities requested by the Secured Party duly endorsed for transfer to the Secured Party or its nominee.

5.04     **Notification of Account Debtors**

Before an Event of Default occurs, the Secured Party may give notice of this Agreement and the security granted hereby to any account debtor of a Debtor or to any other person liable to a Debtor and, after the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, may give notice to any such account debtors or other person to make all further payments to the Secured Party. Any payment or other proceeds of Collateral received by a Debtor from account debtors or from any other person liable to a Debtor after the occurrence of such Credit Event and exercise of such rights and remedies will be held by such Debtor in trust for the Secured Party and must be held separate and apart from other money of such Debtor and paid over to the Secured Party on request.

5.05        **Purchase-Money Security Interests**

A Debtor will be permitted to grant purchase-money security interests in the ordinary course of its business in connection with the purchase or lease of Inventory or Equipment provided that, except to the extent permitted by the Credit Agreements, the foregoing will not constitute a subordination of the security interest and mortgage and charge granted hereby to such purchase-money security interests or a waiver by the Secured Party of the requirements prescribed by statute that, if complied with, would result in such purchase-money security interests ranking in priority to the security interest and mortgage and charge granted hereby.

5.06        **Application of Funds**

Upon the occurrence of a Credit Event and the exercise by the Secured Party of any of its rights and remedies under Section 6.02, all money collected or received by the Secured Party in respect of the Collateral may be applied on account of such parts of the Obligations as the Secured Party in its sole discretion determines, or may be held unappropriated in a collateral account, or in the discretion of the Secured Party may be released to a Debtor, all without prejudice to the Secured Party's rights against such Debtor.

## ARTICLE 6 - DEFAULT AND REMEDIES

6.01        **Consequences of a Default**

On or after the occurrence of any Event of Default that has not been either cured or waived in accordance with the provisions of the Credit Agreement, at the option of the Secured Party, (a) any or all of the Obligations not yet payable will become immediately payable, without presentment, protest, notice of protest or notice of dishonour, all of which are expressly waived; (b) the obligation, if any, of the Secured Party to extend further credit to a Debtor will cease; and (c) the security granted hereby will become immediately enforceable.

6.02        **Remedies**

In addition to any right or remedy otherwise provided herein or by law, on or after the occurrence of any Event of Default that has not been either cured or waived, the Secured Party will have the rights and remedies set out below, all of which may be enforced successively or concurrently:

(a)        the Secured Party may take possession of the Collateral and require a Debtor to assemble the Collateral and deliver or make the Collateral available to the Secured Party at such places as may be specified by the Secured Party, and neither the Secured Party nor any Receiver will be or be deemed to be a mortgagee in possession by virtue of any such actions;

(b)        the Secured Party may take such steps as it considers desirable to maintain, preserve or protect the Collateral;

- 13 -

(c)     the Secured Party may carry on, or concur in the carrying on of, all or any part of the business of a Debtor;

(d)     the Secured Party may have, exercise or enforce any rights of a Debtor in respect of the Collateral;

(e)     the Secured Party may sell, lease or otherwise dispose of the Collateral at public auction, by private tender, by private sale or otherwise either for cash or upon credit, upon such terms and conditions as the Secured Party may determine and without notice to a Debtor unless required by law;

(f)     the Secured Party may accept all or any part of the Collateral in total or partial satisfaction of the Obligations in the manner provided by law;

(g)     the Secured Party may, for any purpose specified herein, including for the maintenance, preservation or protection of any Collateral or for carrying on any of the business or undertaking of a Debtor, borrow money on the security of the Collateral, which security will rank in priority to the security granted hereby;

(h)     the Secured Party may occupy and use all or any of the premises, buildings and plants occupied by a Debtor and use all or any of the Equipment and other property of a Debtor for such time as the Secured Party requires to facilitate the realization of the Collateral, free of charge and the Secured Party will not be liable for any rent, charges, depreciation or damages in connection with such actions, nor will the Secured Party or any Receiver be or be deemed to be a mortgagee in possession by virtue of any such actions;

(i)     the Secured Party may appoint a receiver or receiver and manager (each herein referred to as the **"Receiver"**) of the whole or any part of the Collateral and may remove or replace such Receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of a Receiver of the Collateral;

(j)     the Secured Party may discharge any claim, lien, mortgage, charge, security interest, encumbrance or any rights of others that may exist or be threatened against the Collateral, and in every such case the amounts so paid together with costs, charges and expenses incurred in connection therewith will be added to the Obligations;

(k)     sell, transfer or use any investment property included in the Collateral of which the Secured Party or its agent has "control" within the meaning of (i) in the case of deposit accounts, Section 9-104 of the UCC, (ii) in the case of any security entitlement, "control," as such term is defined in Section 8-106(d) of the UCC, and (iii) in the case of any commodity contract, "control," as such term is defined in Section 9-106(b) of the UCC.

6.03        **Powers of the Receiver**

Any Receiver will have all of the rights and powers that the Secured Party is entitled to exercise pursuant to Section 6.02 but the Secured Party will not be in any way responsible for any misconduct or negligence of any such Receiver.

6.04        **Liability of Secured Party**

The Secured Party will not be liable or responsible for any failure to seize, collect, realize, or obtain payment with respect to the Collateral and is not bound to institute proceedings or to take other steps for the purpose of seizing, collecting, realizing or obtaining possession or payment with respect to the Collateral or for the purpose of preserving any rights of the Secured Party, any Debtor or any other person in respect of the Collateral.  In the exercise of its rights and the performance of its obligations, the Secured Party will only be liable for gross negligence or wilful misconduct.

6.05        **Proceeds of Realization**

The Secured Party may apply any proceeds of realization of the Collateral to payment of costs, fees and expenses mentioned in Section 3.02(l), including those related to the realization of the Collateral, and the Secured Party may apply any balance to payment of all other Obligations in such order as the Secured Party sees fit.  If there is any surplus remaining, the Secured Party may pay it to any person entitled thereto by law of whom the Secured Party has knowledge and any balance remaining may be paid to the Debtor entitled thereto.  If the realization of the Collateral fails to satisfy the Obligations of a particular Debtor, then such Debtor will be liable to pay any deficiency to the Secured Party.

6.06        **Waivers by a Debtor**

The Secured Party may (a) grant extensions of time, (b) take and perfect or abstain from taking and perfecting security, (c) give up any security, (d) accept compositions or compromises, (e) grant releases and discharges, and (f) otherwise waive rights against any Debtor, debtors of a Debtor, guarantors and others and with respect to the Collateral and other security as the Secured Party sees fit. No such action or omission will reduce the Obligations or affect the Secured Party's rights hereunder.

**ARTICLE 7 - GENERAL**

7.01        **Failure of a Debtor to Perform**

If a Debtor fails to perform any of its covenants or obligations under this Agreement, the Secured Party may, in its absolute discretion, but without being required to do so, perform any such covenant or obligation.  If any such covenant or obligation requires the payment of monies, the Secured Party may make such payment. All sums so paid by the Secured Party will be payable by such Debtor to the Secured Party and, for greater certainty, Section 3.02(l) will apply to such sums. No such performance or payment will relieve a Debtor from any default under this Agreement or any consequences of such default.

7.02        **Appointment of Consultant**

Upon the occurrence of a Material Event of Default or a Credit Event, the Secured Party will be entitled to appoint a consultant to provide such services and advice as the Secured Party may determine in its sole discretion, with power to enter a Debtor's premises, to inspect and evaluate the Collateral, to make copies of a Debtor's records, to review a Debtor's business plans and projections, to assess the conduct and viability of a Debtor's business, to prepare reports on a Debtor's affairs and to distribute such reports to the Secured Party or to other such persons as the Secured Party may direct.  Such consultant will act as an agent for the Secured Party and will owe no duty to such Debtor.  The consultant is to have no managerial or advisory capacity and will have no decision making responsibility.  Each Debtor authorizes the Secured Party to provide confidential information to the consultant.  All fees and expenses in connection with the engagement of a consultant are payable by each Debtor to the Secured Party and for greater certainty, Section 3.02(l) will apply to such fees and expenses.

7.03        **Waivers of Legal Limitations**

To the fullest extent permitted by law, each Debtor waives all of the rights, benefits and protections that is given by the provisions of any law that imposes limitations upon the powers, rights or remedies of a secured party, including any law that limits the rights of a secured party to both seize Collateral and sue for any deficiency following realization of Collateral.

7.04        **Additional Debtors**

If, at the option of the Borrower or as required pursuant to either Credit Agreement, the Borrower shall cause any party that is not a Debtor to become a Debtor hereunder, such party shall execute and deliver to the Secured Party a Joinder Agreement substantially in the form of Schedule 7.04 and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Debtor party hereto on the date of this Agreement.

7.05        **Benefit of the Agreement**

This Agreement will be binding upon the successors of each Debtor and will enure to the benefit of the Secured Party and its successors and assigns.

7.06        **Acknowledgement**

Each Debtor acknowledges and agrees that this Agreement has been executed and delivered to and in favor of the Secured Party, in its capacity as both the senior lender under the Senior Credit Agreement and the subordinate lender under the Subordinate Credit Agreement.

7.07        **Entire Agreement**

This Agreement has been entered into pursuant to the provisions of the Credit Agreements and is subject to all the terms and conditions thereof and, if there is any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreements, the rights and obligations of the parties will be governed by the provisions of the Credit Agreements.  This Agreement cancels and supersedes any prior understandings and agreements

between the parties with respect thereto.  There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the Secured Party and any Debtor with respect to the subject matter hereof except as expressly set forth herein or in the Credit Agreements.

7.08      **Amendments and Waivers**

No amendment to this Agreement will be valid or binding unless set forth in writing and duly executed by all of the parties.  No waiver of any breach of any provision of this Agreement will be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, will be limited to the specific breach waived.

7.09      **Assignment**

The rights of the Secured Party under this Agreement may be assigned by the Secured Party without the prior consent of the Debtors.  No Debtor may assign its obligations under this Agreement.

7.10      **Severability**

If any provision of this Agreement is determined by any court of competent jurisdiction to be illegal or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either of the parties.

7.11      **Conflicts**

In the event of a conflict in or between the provisions of this Agreement and the provisions of either Credit Agreement then, despite anything contained in this Agreement, the provisions of the applicable Credit Agreement will prevail and the provisions of this Agreement will be deemed to be amended to the extent necessary to eliminate the conflict.

7.12      **Notices; Sales**

The Secured Party shall give each Debtor ten (10) days' written notice (which each Debtor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Secured Party's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Secured Party may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral may (in its sole and absolute discretion) determine.  The Secured Party shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Secured Party may, without notice or publication,

adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Secured Party until the sale price is paid by the purchaser or purchasers thereof, but the Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Debtors (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Secured Party from the Debtors as a credit against the purchase price, and the Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Debtors therefor.  For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Secured Party shall be free to carry out such sale pursuant to such agreement and the Debtors shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Secured Party shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full in cash.  As an alternative to exercising the power of sale herein conferred upon it, the Secured Party may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver.  Any sale pursuant to the provisions of this Section 7.12 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

7.13    **Notices**

Any demand, notice or other communication to be given under this Agreement to any Debtor or the Secured Party shall be effective if given in accordance with the provisions of the Credit Agreements as to the giving of notice to each, and each Debtor and the Secured Party may change their respective address for notices in accordance with the said provisions.

7.14    **Remedies Cumulative; Additional Continuing Security**

The rights and remedies of the Secured Party hereunder are cumulative and are in addition to and not in substitution for any other security now or hereafter held by the Secured Party or any other rights or remedies available at law or in equity or otherwise. No single or partial exercise by the Secured Party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which the Secured Party may be entitled.  This Agreement is a continuing agreement and security that will remain in full force and effect until discharged by the Secured Party.

7.15        **Further Assurances**

Each of the Debtors and the Secured Party will from time to time execute and deliver all such further documents and instruments, including financing statements and schedules, and do all acts and things as the other party may reasonably require to effectively carry out or better evidence or perfect the security granted hereby and the full intent and meaning of this Agreement.

7.16        **Power of Attorney**

Each Debtor hereby irrevocably appoints any officer for the time being of the Secured Party the true and lawful attorney of such Debtor upon the occurrence of an Event of Default that is continuing, with full power of substitution, to do all things and execute and deliver all such documents and instruments, including financing statements and schedules, as are referred to in Section 7.15 above, with the right to use the name of such Debtor whenever and wherever the officer may deem necessary or expedient and from time to time to exercise all rights and powers and to perform all acts of ownership in respect to the Collateral in accordance with this Agreement.

7.17        **Discharge**

A Debtor will be entitled to a discharge of this Agreement upon written request by such Debtor and full and irrevocable payment, performance and satisfaction of the Obligations. No discharge will be effective unless in writing and executed by the Secured Party.

7.18        **Governing Law**

This Agreement is governed by the laws of the State of New York (without reference to its choice of law rules).  Any litigation based hereon, or arising out of, under, or in connection with, this Agreement, or any course of conduct, course of dealing, statements (whether oral or written) or actions of the Secured Party or the Debtors in respect of this Agreement shall be brought and maintained exclusively in the courts of the State of New York or in any federal court sitting in New York County; provided, however, that any suit seeking enforcement against any collateral or other property may be brought, at the option of the Secured Party, in the courts of any jurisdiction where such collateral or other property may be found. Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the  jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto irrevocably agrees to be bound any final, non-appealable judgment rendered in such court and such judgment may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that the Secured Party may otherwise have to bring any action or proceeding relating to any Loan Document against any Debtor or its properties in the courts of any jurisdiction.

7.19        **Venue; Forum; Etc.**

Each Debtor hereby expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation has been brought in an inconvenient forum.  To the extent that each Debtor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, to the fullest extent permitted by law, such Debtor hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

7.20        **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

7.21        **Consent to Filings**

With respect to the foregoing and the grant of the security interest hereunder, each Debtor hereby authorizes the Secured Party to file at any time and from time to time in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto and continuations thereof that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment or continuation, including whether the Debtor is an organization, the type of organization and any organizational identification number issued to such Debtor.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner such as "all assets" or "all personal property, whether now owned or hereafter acquired" of such Debtor or words of similar effect as being of an equal or lesser scope or with greater detail.  Each Debtor agrees to provide such information to the Secured Party promptly upon request.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Agreement.

DEBTORS:

**APPTHIS HOLDINGS, INC.**

Per: _____

Name: Angelo Pollistrone

Title: Director

Per: _____

Name:

Title:

SECURED PARTY:                **ROYAL BANK OF CANADA**

Per:        _____

        Name:    **Hogan Mak**
        Title:    **Director**

Per:        _____

        Name:    JOE RODRICUES
        Title:    DIRECTOR

[Mundo – Signature Page to US General Security Agreement]

**SCHEDULE 3.01**

**APPTHIS HOLDINGS, INC.**

1.    ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND
       RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

Jurisdiction of Incorporation/Formation: State of Delaware

| | |
|---|---|
| Chief executive office: | 3001 Brighton Boulevard, Suite 730, Denver, CO 80216, United States |
| Registered/head office: | c/o Cogency Global Inc. 850 New Burton Road, Suite 201 Dover, County of Kent, Delaware 19904 United States |
| Other place(s) of business: | 14 Nahmani Street, 2nd Floor Tel Aviv 6579424, Israel |
| Books & records relating to Receivables: | #200- 120 East Beaver Creek Road Richmond Hill, Ontario L4B 4V1 Canada |

2.    DEPOSIT ACCOUNTS (Section 3.01(f))

Account No.:        3302523156

Financial Institution:  Silicon Valley Bank

3.    COMMERCIAL TORT CLAIMS (Section 3.01(f))

NONE

4.    COMMODITY ACCOUNTS (Section 3.01(f))

NONE

5.    LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

3001 Brighton Boulevard, Suite 730, Denver, CO 80216, USA

14 Nahmani Street, 2nd Floor, Tel Aviv 6579424, Israel

## SCHEDULE 7.04

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT dated as of ●, 20●, is delivered pursuant to Section 7.04 of the General Security Agreement, dated as of February 5, 2019, by **APPTHIS HOLDINGS, INC.** and others which are from time to time party thereto as Debtors in favor of **ROYAL BANK OF CANADA** (as amended, restated, supplemented or otherwise modified from time to time, the "**General Security Agreement**"). Capitalized terms used herein without definition are used as defined in the General Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 7.04 of the General Security Agreement, hereby becomes a party to the General Security Agreement as a Debtor thereunder with the same force and effect as if originally named as a Debtor therein and, without limiting the generality of the foregoing, as general and continuing security for the payment and performance of all Obligations, hereby grants to the Secured Party a security interest in all of the undersigned's Collateral and, as further general and continuing security for the payment and performance of the Obligations, hereby also assigns the Collateral (other than trademarks) to the Secured Party and mortgages and charges the Collateral as and by way of a fixed and specific mortgage and charge to the Secured Party and expressly assumes all obligations and liabilities of a Debtor thereunder.  The undersigned hereby agrees to be bound as a Debtor for the purposes of the General Security Agreement.

The information set forth in Annex 1 is hereby added to the information set forth in Schedules 3.01 to the General Security Agreement.  By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agrees that this Joinder Agreement may be attached to the General Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article 3 of the General Security Agreement is true and correct on and as the date hereof as if made on and as of such date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties have executed this Joinder Agreement.

ADDITIONAL DEBTOR:                    [NAME OF ADDITIONAL DEBTOR]

Per: _____
     Name:
     Title:

     _____
     Name:
     Title:


SECURED PARTY:                        **ROYAL BANK OF CANADA**

Per: _____
     Name:
     Title:

Per: _____
     Name:
     Title:

**Annex 1**

**[Name of Additional Debtor]**

1.     ADDRESS(ES) OF PLACE(S) OF BUSINESS , LOCATION OF BOOKS AND RECORDS RELATING TO RECEIVABLES (Section 3.01(c))

        Jurisdiction of Incorporation/Formation:     ●

        Chief executive office:     ●

        Registered/head office:     ●

        Other place(s) of business:     ●

        Books & records relating to Receivables:     ●

2.     DEPOSIT ACCOUNTS (Section 3.01(f))

        ●

3.     COMMERCIAL TORT CLAIMS (Section 3.01(f))

        ● [Describe nature of claim(s); see Comment 5 to UCC Section 9-108]

4.     COMMODITY ACCOUNTS (Section 3.01(f))

        ●

5.     LOCATION OF INVENTORY, EQUIPMENT AND SECURITIES (Section 3.01(g))

        Address(es):     ●

This is **Exhibit "M"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

_____

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B

**svb** ›
**Silicon Valley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| **Account** | **Cash Sweep** | **Account** | **Cash Sweep** |
|---|---|---|---|
| 3302138099 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer:   Mundo Media (US), LLC
Creditor:   Royal Bank of Canada
Date:   11/29/17

    This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

    All parties agree as follows:

**1.**    **Deposit Account.**  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account"). The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail. The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC. Bank's jurisdiction for purposes of Section 9304 of the UCC is California. The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.**    **Security Interests.**  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account"). Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

    (a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account.  GDO  [GDO initials]

    (b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.**    **Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

    (a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

    (b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____

_____

_____

_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.    Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and, (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.    Creditor's Control of Deposit Account**. Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.    Priorities of Security Interests; Rights Reserved by Bank**. (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

7.    **Statements**.  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.  Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

8.    **Returned Items, Account Charges, and Adjustments**.  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.  If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

9.    **Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

10.    **Indemnification and Hold Harmless of Bank by Creditor**.  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits.  Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

11.    **Limitation of Liability.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

12.    **Amendments**.    This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

13.    **Notices**.  (a)    Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)    A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c) If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.    Integration Provision**. This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.    Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.    Relationship of the Parties**. Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.    Governing Law and Jurisdiction**. The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.    Jury Trial Waiver. CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief.    The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings.    The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge.  The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies.  The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.**    The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank.  Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement.  Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.**  In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.**    Customer may terminate this Agreement only with the written consent of Creditor.    Creditor may terminate this Agreement by giving Bank and Customer written notice of termination.    Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination <u>unless</u> termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof.  Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes.  Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]



**SiliconValley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

**BANK:**

SILICON VALLEY BANK
By
Title:
Global Deposit Operations

*Chris Dyson*
Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

Mundo Media (US), LLC
a  Delaware  Limited  Liability  Company
TIN* 32-0509924

By
Name:  Philip Jones
Title:  CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B 4V1

Telephone:
Facsimile:

**CREDITOR:**

Royal Bank of Canada
a  Bank chartered under the Bank Act of Canada
TIN* 13  Foreign

By
Name:  Hogan Mak
Title:  Director

Address for Notices:
200 BAY STREET  ROYAL BANK PLAZA
4th FLOOR  NORTH TOWER
TORONTO ON  M5J 2W7
Telephone:  416-842-9874
Facsimile:  416-842-4090

\* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:     Silicon Valley Bank ("Bank")
From:   _____  ("Creditor")
Re:     _____  ("Customer")
Date:   _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:

_____

By _____
Title: _____

ACKNOWLEDGED BY:          SILICON VALLEY BANK

(for facsimile only)

By: _____
Name:
Title:
Date:
Time:

**svb** ›
**Silicon Valley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| Account | Cash Sweep | Account | Cash Sweep |
|---|---|---|---|
| 0018335000 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer:    Mundo Media Ltd
Creditor:    Royal Bank of Canada
Date:        11/29/17

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account**.  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account").  The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail.  The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC.  Bank's jurisdiction for purposes of Section 9304 of the UCC is California.   The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests**.  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account").  Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☒ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements**.

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☒ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____  [GDO initials]

SVB Deposit Account Control Agreement (May 2015)

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.    Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.    Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.    Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.    Statements.**  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.    Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.    Returned Items, Account Charges, and Adjustments.**  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.    If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.    Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.    Indemnification and Hold Harmless of Bank by Creditor**.  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits.  Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.    Limitation of Liability.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

**12.    Amendments**.  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.    Notices.** (a)    Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)    A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)   If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.**   **Integration Provision**.   This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.**   **Counterparts: Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.**   **Relationship of the Parties**.   Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.**   **Governing Law and Jurisdiction**.   The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.**   **Jury Trial Waiver.**   **CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.   EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

## DEPOSIT ACCOUNT CONTROL AGREEMENT

**BANK:**

**SILICON VALLEY BANK**
By
Title:
Global Deposit Operations          *Chris Dyson*
Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone: (480) 557-4964
Facsimile: (408) 728-9746

**CUSTOMER:**

Mundo Media Ltd

a                    Ontario Corporation
TIN* Foreign

By
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA

a    Bank chartered under the Bank Act of Canada
TIN* 13-555-5645 Foreign

By
Name: Hogan Mak
Title: Director

Address for Notices:
200 Bay Street, Royal Bank Plaza
4th Floor, North Tower
Toronto, ON, M5J2W7
Telephone: 416-842-9874
Facsimile: 416-842-4090

\* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:     Silicon Valley Bank ("Bank")
From: _____ ("Creditor")
Re:     _____ ("Customer")
Date:  _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                                         _____

                                                          By _____
                                                          Title: 

ACKNOWLEDGED BY:               SILICON VALLEY BANK

(for facsimile only)

                                                          By: _____
                                                          Name:
                                                          Title:
                                                          Date:
                                                          Time:



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| Account | Cash Sweep | Account | Cash Sweep |
|---|---|---|---|
| 3300868481 | ☐ ☐ ☐ ☐ ☐ | | ☐ ☐ ☐ ☐ ☐ |

Customer:     Mundo Media Ltd _____
Creditor:      Royal Bank of Canada _____
Date:        11/29/17

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account**.  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account").  The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail.  The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC.  Bank's jurisdiction for purposes of Section 9304 of the UCC is California.  The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests**.  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account").  Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _CD_ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements**.

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _CD_ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.** **Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.** **Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.** **Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.    Statements**.  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.    Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.    Returned Items, Account Charges, and Adjustments**.  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.   If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.    Indemnity and Hold Harmless of Bank by Customer**.  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.    Indemnification and Hold Harmless of Bank by Creditor**.  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits. Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.    Limitation of Liability**.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.

**12.    Amendments**.  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.    Notices**. (a)    Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)    A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)    If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

14.    **Integration Provision**.    This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

15.    **Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

16.    **Relationship of the Parties**.    Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

17.    **Governing Law and Jurisdiction**.    The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

18.    **Jury Trial Waiver.**    **CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

svb

**Silicon Valley Bank**

## DEPOSIT ACCOUNT CONTROL AGREEMENT

**BANK:**

**SILICON VALLEY BANK**
By
Title:    *Chris Dyson*
Global Deposit Operations    Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

Mundo Media Ltd
a ___ Ontario Corporation
TIN*  Foreign

By
Name:  Philip Jones
Title:  CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA
a ___ Bank chartered under the Bank Act of Canada
TIN* ~~~~~~~~~ Foreign

By
Name:  Hogan Mak
Title:  Director

Address for Notices:
200 Bay Street, Royal Bank Plaza
4th Floor, North Tower
Toronto, ON, M5J2W7
Telephone:  416-842-9874
Facsimile: 416-842-4090

* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:    Silicon Valley Bank ("Bank")
From: _____ ("Creditor")
Re:    _____ ("Customer")
Date: _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                          _____

                                   By _____
                                   Title:

ACKNOWLEDGED BY:                   SILICON VALLEY BANK

(for facsimile only)

                                   By: _____
                                   Name:
                                   Title:
                                   Date:
                                   Time:



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| Account | Cash Sweep | Account | Cash Sweep |
|---|---|---|---|
| 3301036420 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer:    Movil Wave

Creditor:    Royal Bank of Canada

Date:    11/29/17

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account.**  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account").  The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail.  The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC.  Bank's jurisdiction for purposes of Section 9304 of the UCC is California.  The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests.**  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account").  Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account.  _____ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account.  _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party.  _____ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties:  _____
_____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.     Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.     Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.     Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.** <u>Statements</u>. At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement. Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.** <u>Returned Items, Account Charges, and Adjustments</u>. Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments. If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.** <u>Indemnity and Hold Harmless of Bank by Customer</u>. Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "<u>Indemnified Person</u>") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "<u>Claim</u>"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; <u>provided</u> that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.** <u>Indemnification and Hold Harmless of Bank by Creditor</u>. To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; <u>provided</u> that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits. Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.** <u>Limitation of Liability</u>. **IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

**12.** <u>Amendments</u>. This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.** <u>Notices</u>. (a) Any notice, <u>other than</u> a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto. The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b) A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c) If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.** **Integration Provision**. This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.** **Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.** **Relationship of the Parties**. Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.** **Governing Law and Jurisdiction**. The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.** **Jury Trial Waiver.** **CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

# DEPOSIT ACCOUNT CONTROL AGREEMENT

**BANK:**

**SILICON VALLEY BANK**
By
Title:
Global Deposit Operations    *Chris Dyson*
Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone: (480) 557-4964
Facsimile: (408) 728-9746

**CUSTOMER:**

Movil Wave                                    ,
a  Luxembourg Corporation
TIN*  Foreign
By
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA ,
a  Bank chartered under the Bank Act of Canada
TIN~                              Foreign

By
Name: Hogan Mak
Title: Director

Address for Notices:
200 Bay Street, Royal Bank Plaza
4th Floor, North Tower
Toronto, ON, M5J2W7
Telephone: 416-842-9874
Facsimile: 416-842-4090

\* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:     Silicon Valley Bank ("Bank")
From:   _____   ("Creditor")
Re:     _____   ("Customer")
Date:   _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                        _____

                                 By _____
                                 Title: _____

ACKNOWLEDGED BY:                 SILICON VALLEY BANK

(for facsimile only)

                                 By: _____
                                 Name: _____
                                 Title: _____
                                 Date: _____
                                 Time: _____



# DEPOSIT ACCOUNT CONTROL AGREEMENT

| Account | Cash Sweep | Account | Cash Sweep |
|---|---|---|---|

3300897583

| | |
|---|---|
| Customer: | Mogenio |
| Creditor: | Royal Bank of Canada |
| Date: | 11/29/17 |

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account.** Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account"). The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail. The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC. Bank's jurisdiction for purposes of Section 9304 of the UCC is California. The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests.** Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account"). Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____

_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.     Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent.   Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.     Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct.   For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.     Priorities of Security Interests; Rights Reserved by Bank.** (a)  Creditor  agrees  that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b)     Creditor     agrees     that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.      Statements.**  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.    Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.      Returned Items, Account Charges, and Adjustments.**  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.    If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.      Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.     Indemnification and Hold Harmless of Bank by Creditor.**  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits. Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.     Limitation of Liability.**  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.

**12.     Amendments.**  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.     Notices.**  (a)      Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

          (b)      A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)    If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.    Integration Provision.** This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.    Counterparts; Electronic Signatures.** This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.    Relationship of the Parties.** Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.    Governing Law and Jurisdiction.** The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.    Jury Trial Waiver.** **CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED           TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.       EACH      PARTY      HAS REVIEWED     THIS     WAIVER     WITH     ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.     Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in

writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.     Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.     Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination <u>unless</u> termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

svb >
**Silicon Valley Bank**

## DEPOSIT ACCOUNT CONTROL AGREEMENT

**BANK:**

**SILICON VALLEY BANK**
By _____
Title: _____ *Chris Dyson*
Global Deposit Operations Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone: (480) 557-4964
Facsimile: (408) 728-9746

**CUSTOMER:**

Mogenio _____ ,
a    Luxembourg Corporation
TIN* *Foreign* _____

By _____
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA ,
a ___ Bank chartered under the Bank Act of Canada
TIN* 13-535 7855 Foreign

By _____
Name: Hogan Mak
Title: Director

Address for Notices:
200 Bay Street, Royal Bank Plaza
4th Floor, North Tower
Toronto, ON, M5J2W7
Telephone: 416-842-9874
Facsimile: 416-842-4090

* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:    Silicon Valley Bank ("Bank")
From:  _____ ("Creditor")
Re:    _____ ("Customer")
Date:  _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:

                                         _____

                                         By _____
                                         Title:

ACKNOWLEDGED BY:                SILICON VALLEY BANK

(for facsimile only)

                                         By: _____
                                         Name:
                                         Title:
                                         Date:
                                         Time:



**svb** ›
**Silicon Valley Bank**

# DEPOSIT ACCOUNT CONTROL AGREEMENT

| Account | Cash Sweep | Account | Cash Sweep |
|---|---|---|---|
| 3302207114 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer:    M Zone Marketing Inc.

Creditor:    Royal Bank of Canada

Date:        11/29/17

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account.** Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account"). The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail. The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC. Bank's jurisdiction for purposes of Section 9304 of the UCC is California. The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests.** Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account"). Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☒ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☒ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.    Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent.    Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.    Creditor's Control of Deposit Account**. Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein.  Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control.  Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment.  Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer.  Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct.  For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.    Priorities of Security Interests; Rights Reserved by Bank**. (a)    Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

7.    **Statements**.  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.    Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

8.    **Returned Items, Account Charges, and Adjustments**.  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.  If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

9.    **Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

10.    **Indemnification and Hold Harmless of Bank by Creditor**.  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits.  Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

11.    **Limitation of Liability**.  **IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

12.    **Amendments**.  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

13.    **Notices**. (a)    Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)    A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)     If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.     Integration Provision.** This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.     Counterparts; Electronic Signatures.** This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.     Relationship of the Parties.** Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.     Governing Law and Jurisdiction.** The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.     Jury Trial Waiver. CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.     Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.     Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.     Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

**svb** >
**Silicon Valley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

**BANK:**

SILICON VALLEY BANK
By
Title:    *Chris Dyson*
Global Deposit Operations Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone: (480) 557-4964
Facsimile: (408) 728-9746

**CUSTOMER:**

M Zone Marketing Inc.
a _ Delaware Corporation
TIN*            82-1956400
By
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA
a    Bank chartered under the Bank Act of Canada
TIN* 13-5357855 Foreign
By
Name: Hogan Mak
Title: Director

Address for Notices:
200 Bay Street, Royal Bank Plaza
4th Floor, North Tower
Toronto, ON, M5J2W7
Telephone: 416-842-9874
Facsimile: 416-842-4090

\* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:    Silicon Valley Bank ("Bank")
From: _____ ("Creditor")
Re:    _____ ("Customer")
Date: _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                          _____

                                   By _____
                                   Title:

ACKNOWLEDGED BY:                   SILICON VALLEY BANK

(for facsimile only)

                                   By: _____
                                   Name:
                                   Title:
                                   Date:
                                   Time:



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

## Silicon Valley Bank

| **Account** | **Cash Sweep** | **Account** | **Cash Sweep** |
|---|---|---|---|
| 3302138130 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer: FLI Digital, Inc.
Creditor: Royal Bank of Canada
Date: 11/29/17

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account.**  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account").  The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail.  The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC.  Bank's jurisdiction for purposes of Section 9304 of the UCC is California.  The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests.**  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account").  Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account.  _____ [GDO initials]

(b)    ☐ Bank has a security interest in the Deposit Account.  _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party.  _____ [GDO initials]

(b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties:  _____
_____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.    Customer's Rights in Deposit Account.**
Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.    Creditor's Control of Deposit Account.**
Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.    Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.    Statements.**  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.    Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.    Returned Items, Account Charges, and Adjustments.**  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.    If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.    Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.    Indemnification and Hold Harmless of Bank by Creditor.**  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits. Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.    Limitation of Liability.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

**12.    Amendments.**  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.    Notices.**  (a)     Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)     A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)   If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.   Integration Provision**. This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.   Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.   Relationship of the Parties**. Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.   Governing Law and Jurisdiction**. The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.   Jury Trial Waiver. CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination <u>unless</u> termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

**BANK:**

**SILICON VALLEY BANK**
By
Title:                                    *Chris Dyson*
Global Deposit Operations    **Deposit Operations**

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

FLI Digital Inc.                          ,
a    New York Corporation
TIN*  81-0553530

By
Name:  Philip Jones
Title:  CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B 4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA ,
a    Bank chartered under the Bank Act of Canada
TIN·                          Foreign

By
Name:  Hogan Mak
Title:  Director

Address for Notices:
200 BAY STREET   ROYAL BANK PLAZA
4th FLOOR  NORTH TOWER
TORONTO ON, M5J 2W7
Telephone:  416-842-9874
Facsimile:  416-842-4090

* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:    Silicon Valley Bank ("Bank")
From:  _____ ("Creditor")
Re:    _____ ("Customer")
Date:  _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:

                                _____

                                By _____
                                Title:

ACKNOWLEDGED BY:          SILICON VALLEY BANK

(for facsimile only)

                                By: _____
                                Name:
                                Title:
                                Date:
                                Time:



**Silicon Valley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| **Account** | **Cash Sweep** | **Account** | **Cash Sweep** |
|---|---|---|---|
| 3302138126 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer:   Find Click Engage, LLC
Creditor:   Royal Bank of Canada
Date:   11/29/2017

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.   Deposit Account.** Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account"). The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail. The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC. Bank's jurisdiction for purposes of Section 9304 of the UCC is California. The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.   Security Interests.** Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account"). Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

(a)   ☒ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

(b)   ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.   Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

(a)   ☒ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

(b)   ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.    Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.    Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.    Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.      Statements**.  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.   Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.      Returned Items, Account Charges, and Adjustments**.  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.  If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.      Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.     Indemnification and Hold Harmless of Bank by Creditor**.  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits.  Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.     Limitation of Liability.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

**12.     Amendments**.  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.     Notices**. (a)      Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)      A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)     If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.     Integration Provision**.     This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.     Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.     Relationship of the Parties**.     Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.     Governing Law and Jurisdiction**.     The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.     Jury Trial Waiver.     CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED              TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.          EACH     PARTY     HAS REVIEWED     THIS     WAIVER     WITH     ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.**  The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.**  In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.**  Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

**BANK:**

**SILICON VALLEY BANK**
By
Title: _Chris Dyson_
Global Deposit Operations    Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

Find Click Engage, LLC. _____,
a  Delaware Limited Liability Corporation
TIN* 47-2718097

By
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek road, Suite 200
Richmond Hill, ON, L4B 4V1

Telephone:
Facsimile:

**CREDITOR:**

_ROYAL BANK OF CANADA_
a  Bank chartered under the Bank Act of Canada
TIN 13 2337077 Foreign

By
Name: Hogan Mak
Title: Director

Address for Notices:
200 BAY STREET  ROYAL BANK PLAZA
4TH FLOOR  NORTH TOWER
TORONTO ON  M5J 2W7
Telephone: 416-842-9874
Facsimile: 416-842-4090

* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:     Silicon Valley Bank ("Bank")
From:   _____  ("Creditor")
Re:     _____  ("Customer")
Date:   _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                       _____

                                By _____
                                Title: _____

ACKNOWLEDGED BY:                SILICON VALLEY BANK

(for facsimile only)

                                By: _____
                                Name: _____
                                Title: _____
                                Date: _____
                                Time: _____



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| **Account** | **Cash Sweep** | **Account** | **Cash Sweep** |
|---|---|---|---|
| 3302138111 | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |
| | ☐ | | ☐ |

Customer: Active Signal Marketing, LLC
Creditor: Royal Bank of Canada
Date: 11/29/17

    This Deposit Account Control Agreement ("<u>Agreement</u>") is entered into as of the above date among Silicon Valley Bank ("<u>Bank</u>"), Creditor identified above ("<u>Creditor</u>"), and Customer identified above ("<u>Customer</u>").

    All parties agree as follows:

**1.**     **Deposit Account.** Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "<u>Account</u>"). The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "<u>Deposit Agreement</u>"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail. The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "<u>UCC</u>") and Bank is a "bank" within the meaning of Section 9102 of the UCC. Bank's jurisdiction for purposes of Section 9304 of the UCC is California. The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.**     **Security Interests.** Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "<u>Deposit Account</u>"). Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only – Bank representative to check box, if necessary, and insert initials.]

    (a)     ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

    (b)     ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.**     **Other Deposit Control Agreements.**

[For Bank use only – Bank representative to check appropriate box below and insert initials.]

    (a)     ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

    (b)     ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____

_____
_____
_____

_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

### 4. Customer's Rights in Deposit Account.

Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent. Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

### 5. Creditor's Control of Deposit Account.

Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

### 6. Priorities of Security Interests; Rights Reserved by Bank.

(a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b) Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.     Statements.**  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement.     Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.     Returned Items, Account Charges, and Adjustments.**  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments.  If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.     Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.     Indemnification and Hold Harmless of Bank by Creditor.**  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits.  Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.     Limitation of Liability.  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR     ANY     SPECIAL,     INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING     TO     THIS     AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY     OF     LIABILITY     (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN     TO     SUCH     PARTY     AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.**

**12.     Amendments.**  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.     Notices.** (a)     Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto.  The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)     A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c) If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.    Integration Provision**.  This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.    Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.    Relationship of the Parties**.  Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.    Governing Law and Jurisdiction**.  The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.    Jury Trial Waiver.  CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.   EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive.  The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers.   All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed.  If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.** **Successors.** The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in

writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.** **Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.** **Termination; Survival.** Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination <u>unless</u> termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]



DEPOSIT ACCOUNT CONTROL AGREEMENT

**BANK:**

**SILICON VALLEY BANK**
By
Title: *Chris Dyson*
Global Deposit Operations Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

Active Signal Marketing, LLC
a _____ Delaware Limited Liability Corporation _____
TIN* 47-5544096

By
Name: Philip Jones
Title: CFO

Address for Notices:
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B 4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA
a Bank chartered under the Bank Act of Canada
TIN* 13 5357825 Foreign

By
Name: Hogan Mak
Title: Director

Address for Notices:
200 BAY STREET ROYAL BANK PLAZA
4TH FLOOR NORTH TOWER
TORONTO ON M5J 2IN7
Telephone: 416-842-9874
Facsimile:  416-842-4090

* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:     Silicon Valley Bank ("Bank")

From: _____ ("Creditor")

Re: _____ ("Customer")

Date: _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:

_____

By _____

Title:

ACKNOWLEDGED BY:                    SILICON VALLEY BANK

(for facsimile only)

By: _____

Name:

Title:

Date:

Time:



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

| **Account** | **Cash Sweep** | **Account** | **Cash Sweep** |
|---|---|---|---|
| 3302138107 | ☐ ☐ ☐ ☐ ☐ ☐ | | ☐ ☐ ☐ ☐ ☐ ☐ |

Customer:    36 Labs, LLC
Creditor:    Royal Bank of Canada
Date:        11/29/2017

This Deposit Account Control Agreement ("Agreement") is entered into as of the above date among Silicon Valley Bank ("Bank"), Creditor identified above ("Creditor"), and Customer identified above ("Customer").

All parties agree as follows:

**1.    Deposit Account.**  Bank maintains one or more demand, time, savings, passbook, certificates of deposit or other similar accounts that are identified above in which Customer has an interest (collectively, the "Account").  The Deposit Account (as defined below) is subject to Bank's Deposit Agreement and Disclosure Statement (the "Deposit Agreement"), provided that, in the case of any conflict between the terms of this Agreement and the Deposit Agreement, the terms of this Agreement will prevail.  The parties acknowledge that the Deposit Account constitutes a "deposit account" within the meaning of Section 9102 of the Uniform Commercial Code of the State of California (the "UCC") and Bank is a "bank" within the meaning of Section 9102 of the UCC.  Bank's jurisdiction for purposes of Section 9304 of the UCC is California.  The provisions of this Agreement constitute "control" over the Deposit Account within the meaning of Section 9104 of the UCC or, if the box under the heading "Cash Sweep" opposite the Account above is checked and such Account is deemed investment property within the meaning of Division 9102 of the UCC, Section 9106 of the UCC.

**2.    Security Interests.**  Pursuant to a security agreement or similar agreement, Customer has granted to Creditor a security interest in the Account and in all cash, funds, items, instruments, and any other amounts now or later deposited into or held therein (collectively, the "Deposit Account").  Bank acknowledges the lien on and security interest in the Deposit Account granted by Customer to Creditor.

[For Bank use only - Bank representative to check box, if necessary, and insert initials.]

    (a)    ☑ Other than as set forth in Section 6 below, Bank does not have a security interest in the Deposit Account. _____ [GDO initials]

    (b)    ☐ Bank has a security interest in the Deposit Account. _____ [GDO initials]

If the box in Section 2(b) above is checked, the priorities of Creditor's security interest and Bank's security interest in the Deposit Account are governed by an intercreditor or other similar agreement between Bank and Creditor.

**3.    Other Deposit Control Agreements.**

[For Bank use only - Bank representative to check appropriate box below and insert initials.]

    (a)    ☑ Bank has not entered into any other control agreement governing the Deposit Account with any other party. _____ [GDO initials]

    (b)    ☐ Bank has entered into other control agreement(s) governing the Deposit Account with the following party or parties: _____
_____
_____
_____
_____ [GDO initials]

Bank agrees that it will not enter into a control agreement with any other party with respect to the Deposit Account without Creditor's prior written consent.

**4.     Customer's Rights in Deposit Account.** Customer, Bank and Creditor agree that (a) Creditor has control over the Deposit Account, and (subject to the requirements set forth in Section 5 and the notice requirements set forth in Section 13(b)) Bank will comply with the instructions originated by Creditor as to the withdrawal or disposition of any funds credited to the Deposit Account without further consent by Customer and (b) until Bank receives a Notice of Exclusive Control (as described and set forth in Section 13(b) below), Customer will be entitled to draw items on and to withdraw or otherwise direct the disposition of funds from the Deposit Account. So long as this Agreement is in effect, Customer may not close the Deposit Account without Creditor's prior written consent.   Bank may close the Deposit Account in accordance with the Deposit Agreement and as may be required by applicable law. After Bank receives a Notice of Exclusive Control, Bank will notify Creditor not less than thirty (30) calendar days prior to closing the Deposit Account in non-emergency circumstances and substantially contemporaneously with closing the Deposit Account in emergency circumstances (for example, in response to fraud or returned items), unless prohibited by law. Customer will notify Creditor promptly if Bank closes the Deposit Account.

**5.     Creditor's Control of Deposit Account.** Except as permitted in Section 6 hereof, after Bank receives a Notice of Exclusive Control and has reasonable opportunity to comply with it, but no later than two Business Days (as defined below) after the Notice of Exclusive Control has been validly given (in accordance with Section 13(b) below), Bank and Customer agree that: (a) Bank will comply only with Creditor's instructions as to the withdrawal or disposition of any funds credited to the Deposit Account and to any other matters relating to the Deposit Account, without Customer's further consent, and (b) Bank will not comply with any instructions from Customer concerning the Deposit Account or any funds therein. Bank shall have no duty to inquire or determine whether Creditor is entitled to send a Notice of Exclusive Control. Creditor's instructions may include the giving of stop payment orders for any items being presented to the Deposit Account for payment. Bank will be fully entitled to rely upon such instructions from Creditor even if such instructions are contrary to any instructions or demands given by Customer. Customer confirms that

Bank (x) should follow instructions from Creditor even if the result of following such instructions is that Bank dishonors items presented for payment from the Deposit Account, and (y) will have no liability to Customer for wrongful dishonor of such items in following such instructions from Creditor except to the extent such liability arises from Bank's gross negligence or willful misconduct. For purposes of this Agreement, "Business Day" means a day on which Bank is open to the public for business and is measured in a 24 hour increment.

**6.     Priorities of Security Interests; Rights Reserved by Bank.** (a) Creditor agrees that nothing herein subordinates or waives, and that Bank expressly reserves, any and/or all of Bank's present and future rights (whether described as rights of setoff, banker's liens, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account) with respect to:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the date of this Agreement, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made ("Returned Items");

(ii) service charges, fees or expenses payable or reimbursable to the Bank in connection with the Deposit Account or any related services for the Deposit Account ("Account Charges"); and

(iii) any adjustments or corrections of any posting or encoding errors ("Adjustments").

(b)     Creditor agrees that notwithstanding receipt of the Notice of Exclusive Control, Bank may exercise Bank's rights and remedies in connection with any liens or claims it

may have in or on the Deposit Account as described in this Section 6.

**7.    Statements.**  At Customer's expense, Bank will send copies of all statements sent to Customer for the Deposit Account to Creditor at Creditor's address set forth below Creditor's signature at the end of this Agreement. Until this Agreement is terminated, Customer authorizes Bank to disclose to Creditor at Creditor's request any information concerning the Deposit Account, including but not limited to the identity of any other party with which Customer and Bank have executed control agreements.

**8.    Returned Items, Account Charges, and Adjustments.**  Bank may debit the Deposit Account for Returned Items, Account Charges and Adjustments. If at any time that a Notice of Exclusive Control is effective with respect to the Deposit Account (a) funds are not available in the Deposit Account to cover the amount of any Returned Item, Account Charge or Adjustment, and (b) Customer fails to pay such amount within fifteen (15) Business Days of Bank's written demand therefor, then Creditor agrees that it will pay, within ten (10) Business Days of a written demand by Bank, amounts owed for each such Returned Item, Account Charge or Adjustment that is not paid in full by Customer up to the amount of the proceeds received by Creditor from the Deposit Account, provided that Bank must make a demand from Creditor within 180 days of termination of this Agreement.

**9.    Indemnity and Hold Harmless of Bank by Customer.**  Customer hereby agrees to indemnify and hold harmless Bank, its affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Person") against any and all claims, causes of action, liabilities, lawsuits, demands and damages (each, a "Claim"), asserted by any person other than an Indemnified Person, including without limitation, any and all court costs and reasonable and documented out-of-pocket attorneys' fees, in any way related to or arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified to the extent that such Claims result from the gross negligence or willful misconduct of such Indemnified Person.

**10.    Indemnification and Hold Harmless of Bank by Creditor.**  To the extent that an Indemnified Person is not promptly indemnified by Customer, Creditor shall indemnify and hold harmless such Indemnified Person against any and all Claims (including reasonable and documented out-of-pocket attorneys' fees) asserted by persons other than an

Indemnified Person and arising from any Notice of Exclusive Control from Creditor except to the extent such Claims result from the gross negligence or willful misconduct of Bank or any other Indemnified Person; provided that in no event shall Creditor be liable for any special, indirect, consequential or punitive damages, or lost profits. Creditor agrees that Bank is released from any and all liabilities to the Creditor arising from the terms of this Agreement except to the extent such liabilities arise from Bank's or another Indemnified Person's gross negligence or willful misconduct.

**11.    Limitation of Liability.**  IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT WHETHER ANY CLAIM IS BASED ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION ANY THEORY IN CONTRACT OR TORT) AND WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO SUCH PARTY AND REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION.

**12.    Amendments.**  This Agreement and all exhibits attached hereto may be amended only by a written agreement signed by Bank, Creditor, and Customer.

**13.    Notices.** (a)    Any notice, other than a Notice of Exclusive Control, or other communication provided for or allowed hereunder shall be in writing and shall be considered to have been validly given (i) when received if delivered personally (whether by messenger, hand delivery or otherwise) or by overnight delivery or by facsimile to the recipient to the address or facsimile number set forth below the signature of the applicable party hereto, or (ii) 72 hours after being deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, if sent to the address and addressee as set forth below the signature of the applicable party hereto. The addresses and facsimile numbers to which notices or other communications are to be given (including statements delivered pursuant to Section 7 and a Notice of Exclusive Control pursuant to Section 13(b) below) may be changed from time to time by notice given as provided herein.

(b)    A Notice of Exclusive Control shall be in writing, must be substantially in the form set forth in Exhibit A hereto, must be delivered to the address

listed below Bank's signature at the end of this Agreement via hand delivery, messenger, overnight delivery or facsimile, and shall be considered to have been validly given when actually received, except that a facsimile will be considered to have been validly given only when acknowledged in writing by Bank (Bank agrees that it will use its good faith effort to promptly acknowledge receipt of such facsimile). To the extent Creditor does not deliver the Notice of Exclusive Control as set forth in this Section 13 or to the address listed below Bank's signature at the end of this Agreement, Creditor (a) acknowledges that Bank may not be able to respond to such Notice of Exclusive Control pursuant to Section 5 above, and (b) agrees that Bank will not be held liable for any failure to respond to such Notice of Exclusive Control.

(c)    If deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act, Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control, unless such documentation has previously been provided to Bank, and Bank can verify that such documentation is still maintained in Bank's files (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).

**14.    Integration Provision**.    This Agreement constitutes the entire agreement among Bank, Customer and Creditor with respect to Creditor's control over the Deposit Account and matters related thereto, and all prior communications, whether verbal or written, between any of the parties hereto with respect to the subject matter hereof shall be of no further effect or evidentiary value.

**15.    Counterparts; Electronic Signatures**. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature" and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act

**16.    Relationship of the Parties**.    Nothing in this Agreement shall create any agency or fiduciary relationship between Customer, Creditor and Bank.

**17.    Governing Law and Jurisdiction**.    The parties hereto agree that this Agreement shall be governed exclusively under and in accordance with the laws of the State of California. All parties hereto each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

**18.    Jury Trial Waiver. CUSTOMER, CREDITOR, AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time out of or based upon this Agreement or any transaction contemplated herein shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The referenced proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but

a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**19.    Successors.**    The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives. Customer may not assign this Agreement without the prior written consent of Creditor and Bank. Creditor may assign this Agreement upon written notice to Bank; provided, that such assignee must assume in writing or by operation of law all of Creditor's obligations under this Agreement. Bank may assign this Agreement upon written notice to Customer and Creditor; provided, that such assignee must assume in writing or by operation of law all of Bank's obligations under this Agreement.

**20.    Attorneys' Fees, Costs and Expenses.**    In any action or proceeding between Bank and any other party to this Agreement, the prevailing party will be entitled to recover its reasonable and documented out-of-pocket attorneys' fees and other reasonable costs and expenses incurred, in addition to any other relief to which it may be entitled.

**21.    Termination; Survival.**    Customer may terminate this Agreement only with the written consent of Creditor. Creditor may terminate this Agreement by giving Bank and Customer written notice of termination. Bank may terminate this Agreement by giving Creditor and Customer thirty (30) calendar days' prior written notice of termination unless termination is a result of Bank's closure of the Deposit Account pursuant to its rights set forth in the Deposit Agreement or in accordance with applicable law, in which case, Creditor's receipt of notice shall be governed by Section 4 hereof. Subject to the foregoing, this Agreement automatically terminates when the Deposit Account closes. Sections 9, 10, 11, 17, 18 and 20 shall survive the termination of this Agreement.

[Signature page follows.]

svb

**Silicon Valley Bank**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

**BANK:**

**SILICON VALLEY BANK**
By
Title:                          *Chris Dyson*
Global Deposit Operations  Deposit Operations

Address for Notices:
Silicon Valley Bank
Global Deposit Operations
80 East Rio Salado Parkway, Mail Sort AZ145
Tempe, AZ 85281
Telephone:  (480) 557-4964
Facsimile:  (408) 728-9746

**CUSTOMER:**

36 Labs, LLC                              ,
a ___ Delaware Limited Liability Corporation _____
TIN* 46-3967960

By
Name:  Philip Jones
Title:  CFO

Address for Notices:
120 east Beaver Creek Road, Suite 200
Richmond Hill, ON, L4B 4V1

Telephone:
Facsimile:

**CREDITOR:**

ROYAL BANK OF CANADA ,
a ___ Bank chartered under the Bank Act of Canada
TIN* _____ Foreign

By
Name:  Hogan Mak
Title:  Director

Address for Notices:
200 BAY STREET ROYAL BANK PLAZA
4th FLOOR, NORTH TOWER
TORONTO ON M5J 2W7
Telephone:  416-842-9874
Facsimile:  416-842-4090

\* Pursuant to §326 of the USA PATRIOT Act, Bank is required to obtain a Tax Identification
Number (TIN) from all parties to this Agreement.

SVB Deposit Account Control Agreement (May 2015)



**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Exhibit A

**Notice of Exclusive Control**

To:    Silicon Valley Bank ("Bank")
From:    _____  ("Creditor")
Re:    _____  ("Customer")
Date:    _____

Pursuant to the Deposit Account Control Agreement dated _____ ("Agreement") entered among Bank, Customer and Creditor, Creditor hereby notifies Bank of Creditor's exercise of Creditor's rights under the Agreement and directs Bank to cease complying with instructions or any directions originated by Customer or its agents.

**Creditor agrees that it will provide Bank with a copy of its formation documentation when delivering a Notice of Exclusive Control if deemed necessary by Bank to enable Bank to comply with the provisions of §326 of the USA PATRIOT Act (provided that no such request by Bank shall delay the effectiveness of any such Notice of Exclusive Control).**

CREDITOR:                      _____

                                  By _____
                                  Title:

ACKNOWLEDGED BY:        SILICON VALLEY BANK

(for facsimile only)

                                  By: _____
                                  Name:
                                  Title:
                                  Date:
                                  Time:

This is **Exhibit "N"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**Royal Bank**

**Gary Ivany**
Senior Director
Group Risk Management

**Royal Bank of Canada**
20 King Street West, 2nd Floor
Toronto, Ontario M5H 1C4

Tel: (416) 974-2189
Fax: (416) 974-8508
Email: gary.ivany@rbc.com

February 26, 2019

*Delivered by Email*

**Mundo Media Ltd.**
120 East Beaver Creek Road, Suite 200
Richmond Hill, ON L4B 4V1

Attention:    Jason Theofilos, Chief Executive Officer

Dear Sir:

**Re:    Credit Facilities made available by Royal Bank of Canada (the "Bank")
to Mundo Media Ltd. (the "Company")**

Reference is made to the Credit Agreement between the Company and the Bank dated December 21, 2017, as amended on March 2, 2018 (the "**Credit Agreement**"), pursuant to which the Bank made certain credit facilities available to the Company (the "**Credit Facilities**"). All capitalized terms not otherwise defined herein are as defined in the Credit Agreement.

The Company is in default of certain of its obligations under the Credit Agreement and the Credit Facilities have been fully drawn and as a result, there is no further availability thereunder.

We also refer to the engagement letter dated February 15, 2019 (the "**Engagement Letter**") in which the Company consented to the engagement of Ernst & Young Inc. (the "**Consultant**") as the Bank's consultant. Pursuant to the Engagement Letter, the Company agreed to, among other things, promptly provide the Consultant with all information and records of every kind and description which the Consultant may request from time to time.

On February 25, 2019, the Consultant provided your advisor, FTI Capital Advisors – Canada ULC ("**FTI**"), with specific information requests (the "**Information Requests**"), which the Consultant anticipates receiving responses to on a timely basis. The Information Requests are attached as Schedule "A" to this letter. **Please ensure that the Consultant and the Bank receive complete responses to each of the Information Requests by no later than 5:00 p.m. on Wednesday, February 26, 2018.** Please provide to the Consultant responses to Information Requests as soon as the information is made available to the Company, in order to allow the Consultant to immediately begin reviewing such responses and information provided.

2

Additionally, please immediately provide the Consultant and the Bank with a copy of (i) any confidential information memorandum, teaser document, or otherwise, made available by FTI to potential bidders outlining the sale opportunity and information about the Company (which the Bank assumes was only made available to those third parties that have executed a non-disclosure agreement); and (ii) any letters of intent or expressions of interest delivered to the Company or FTI in connection with the Company's sale process, in any form.

**The Bank requests an in-person meeting with the Company, its legal counsel and FTI at 8:30 a.m. on Friday, March 1, 2019 at the offices of Thornton Grout Finnigan LLP, counsel to the Bank, located at 100 Wellington Street West, Suite 3200, Toronto, Ontario.** At the meeting, the Bank intends to discuss certain matters including but not limited to: (a) the Company's responses to the Information Requests; (b) the Company's cash flow forecast and proposed payments thereunder; (c) the Company's liquidity requirements and funding for same; (d) the status of any process leading to a transaction; and (e) the Company and its subsidiaries' organizational, governance and operational structure.

The Bank confirms that there is no arrangement on the part of the Bank to forbear from enforcing any of its rights and remedies under the Credit Agreement, security documents granted to the Bank, or otherwise. Further, the Bank has not waived the Company's defaults under the Credit Agreement and explicitly reserves and preserves all of its rights and remedies under the Credit Agreement and otherwise.

Yours truly,

**ROYAL BANK OF CANADA**

Gary Ivany
Senior Director, Group Risk Management

c.c.   *D.J. Miller and Rachel Bengino, Thornton Grout Finnigan LLP*
c.c.   *Stuart Clinton, David Saldanha and Michael Nathaniel, Ernst & Young Inc.*

This is **Exhibit "O"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616  F 416.304.1313

Rachel Bengino
T: 416-304-1153
E: rbengino@tgf.ca
File: 300-205

April 3, 2019

**VIA E-MAIL**

Mundo Media Ltd.
120 East Beaver Creek Road
Suite 200
Richmond Hill, ON
L4B 4V1

**Attention:    Mr. Jason Theofilos**

Dear Sir:

**Re:    Indebtedness of Mundo Media Ltd. (the "Borrower") to Royal Bank of Canada (the "Bank")**

We are the lawyers for the Bank with respect to the above-captioned matter.

We refer to the credit facilities made available by the Bank to the Borrower (the "**Credit Facilities**"), pursuant to the amended and restated credit agreement dated December 21, 2017, as amended (the "**Senior Credit Agreement**") and the amended and restated subordinate credit agreement dated December 21, 2017 (the "**Subordinate Credit Agreement**" and, together with the Senior Credit Agreement, the "**Credit Agreements**"). As at the close of business on April 2, 2019, the Borrower was indebted to the Bank in the amounts of CAD$43,594.76 and USD$25,694,011.23, plus accrued and accruing costs and accruing interest, with respect to the Credit Facilities (the "**Indebtedness**"), which amounts are more fully set out in Schedule "**A**".

We also refer to the default notification letter dated February 26, 2019 addressed to the Borrower, which confirmed the defaults under the Credit Agreements and reserved all the Bank's rights and remedies under the Credit Agreement and otherwise.

The Indebtedness under the Credit Agreement is immediately due and payable. **On behalf of the Bank, we hereby demand payment from the Borrower of the Indebtedness, namely the sum of CAD$43,594.76 and USD$25,694,011.23, plus accruing interest and accrued and accruing costs (including legal costs on a full indemnity basis).**

tgf.ca

Please note that this amount will continue to accrue interest at the rate set out in the Credit Agreements, and costs will continue to be incurred by the Bank, for which you will be responsible, until payment of all the Indebtedness is received by the Bank pursuant to the following wire transfer instructions:

| USD | Clearing Agent/Pay: | JP Morgan Chase Bank, New York |
|-----|---------------------|-------------------------------|
| | Intermediary Field | CHASUS33 |
| | ABA Number | 0210-000-21 |
| | SWIFT: | ROYCCAT2 |
| | Name of Account: | Royal Bank of Canada, Toronto |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Beneficiary Account Name: | Global Loans Administration |
| | Beneficiary Account Number: | 000024005716 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

| CAD | SWIFT: | ROYCCAT2 |
|-----|--------|----------|
| | ABA UID No. | NA |
| | Beneficiary Account: | Global Loans Administration |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Transit No. | 00002 |
| | Account Number: | 000021026830 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

If full payment, as set forth above, is not received by noon on April 13, 2019, the Bank will take whatever steps it deems appropriate to seek repayment of the Indebtedness.

We confirm that, in accordance with the terms of the Credit Agreements, the Bank's obligation to make further credit or other accommodations available to the Borrower under the Credit Facilities is hereby terminated. We further confirm that, in accordance with the engagement letter dated February 15, 2019, Ernst & Young Inc. will continue to access the premises and review the Borrower's books and record.

We also enclose at this time a Notice of Intention to Enforce Security pursuant to the *Bankruptcy and Insolvency Act* (Canada) together with a consent thereto. If you consent to the Bank enforcing its right and remedies without further delay, please date and execute one copy of the consent attached to the enclosed Notice of Intention to Enforce Security and return same to the undersigned forthwith.

Yours very truly,

**Thornton Grout Finnigan LLP**

Rachel Bengino

Encl.

cc:     Mundo Inc., as Guarantor
        2307521 Ontario Inc., as Guarantor
        2518769 Ontario Ltd., as Guarantor
        2538853 Ontario Ltd., as Guarantor
        36 Labs, LLC, as Guarantor
        Active Signal Marketing, LLC, as Guarantor
        Find Click Engage, LLC, as Guarantor
        Fli Digital, Inc., as Guarantor
        Mogenio S.A., as Guarantor
        Movil Wave S.a. r.L., as Guarantor
        Mundo Media (US), LLC, as Guarantor
        M Zone Marketing Inc., as Guarantor
        Mundo Media (Luxembourg) S.a. r.L., as Guarantor
        AppThis Holdings, Inc., as Guarantor
        11281828 Canada Inc., as Guarantor
        2683661 Ontario Inc., as Guarantor

## SCHEDULE "A"

### Indebtedness of Mundo Media Ltd. to Royal Bank of Canada
### as at the close of business on April 2, 2019

| Facility | Principal Balance | Accrued Interest and Charges | Per Diem Interest | Total |
|---|---|---|---|---|
| Senior Secured Term Facility (USD) | USD$8,678,550.00 | USD$1,783.26 | USD$1,783.26 | USD$8,680,333.26 |
| Senior Secured Revolving Facility (USD) | USD$5,497,305.41 | USD$2,290.54 | USD$1,145.27 | USD$5,499,595.95 |
| Mezzanine Term Facility | USD$10,600,000.00 | USD$8,712.32 | USD$4,356.16 | USD$10,608,712.32 |
| Visa (CAD) | CAD$43,594.76 | N/A | N/A | CAD$43,594.76 |
| Overdrawn Amount | USD$905,352.26 | N/A | N/A | USD$905,352.26 |
| **TOTAL** | **CAD$43,594.76 USD$25,681,207.67** | **USD$12,803.56** | **USD$7,302.13** | **CAD$43,594.76 USD$25,694,011.23** |

a)  Interest accrues as follows: (a) at the Bank's Prime Rate plus 1.50% for Prime Rate Loans and Base Rate Loans; and (b) at the Bank's Prime Rate plus 3.00% for LIBO Rate Loans and BA Rate Loans, (c) at 0.60% for Standby Fees (each capitalized term as defined in the Senior Credit Agreement), and (d) at 15.00% for all amounts owing under the Subordinate Credit Agreement. As at February 28, 2019, the Bank's Prime Rate is **3.95%.**

E.&O.E.

## NOTICE OF INTENTION TO ENFORCE SECURITY
## PURSUANT TO SECTION 244 OF THE
## *BANKRUPTCY AND INSOLVENCY ACT* (CANADA)

**TO:    MUNDO MEDIA LTD.**

Take notice that:

1.          Royal Bank of Canada (the "**Bank**"), a secured creditor, intends to enforce its security on the property of Mundo Media Ltd. (the "**Company**") described below:

      (a)    all property, assets and undertaking of the Company, now owned or hereafter acquired, wheresoever located;

      (b)    the share of the common stock of 2518769 Ontario Ltd., 2307521 Ontario Inc. and 2538853 Ontario Ltd. held by the Company;

      (c)    account numbers 0018335000 and 3300868481 held by the Company at the Silicon Valley Bank; and

      (d)    all securities accounts, financial assets, security entitlements, and proceeds in respect of the foregoing held by the Company.

2.          The security that is to be enforced is in the form of:

      (a)    General Security Agreement;

      (b)    Deposit Account Control Agreement; and

      (c)    Share Pledge Agreement.

3.          The total amount of the indebtedness secured by the security is CAD$43,594.76 and USD$25,694,011.23 as at the close of business on April 2, 2019, plus interest and all costs and fees incurred by or charged to the Bank up to and including the date of payment.  Interest accrues on the indebtedness at a rate that varies with the Bank's Canadian Dollar Prime Rate, subject to fluctuations in the principal amount of the indebtedness from time to time.

4.          The secured creditor will not have the right to enforce the security until after the expiry of the 10-day period following the sending of this notice, unless the Company consents to an earlier enforcement.

Dated at Toronto this 3rd day of April, 2019.

**ROYAL BANK OF CANADA by its solicitors**
**Thornton Grout Finnigan LLP**

Per:    _____

Rachel Bengino

# CONSENT

**TO:**          **ROYAL BANK OF CANADA (the "Bank")**

**FROM:**      **MUNDO MEDIA LTD. (the "Company")**

The Company acknowledges receipt of a Notice of Intention to Enforce Security delivered by the Bank.

For consideration received, the receipt and sufficiency of which is hereby irrevocably acknowledged, the Company hereby consents to the immediate enforcement by the Bank of the security held by the Bank from the Company, and for the same consideration waives completely all rights to any delay by or any further notice from the Bank with respect to the enforcement of its security and the exercise of the other remedies of the Bank against the Company.

DATED at                          this          day of                          , 2019.

**MUNDO MEDIA LTD.**

Per:     _____  c/s
Name:
Title:

(I have authority to bind the Corporation)

This is **Exhibit "P"**, referred to in the

**Affidavit of Gary Ivany**, sworn before me

this 8th day of April, 2019

_____
A Commissioner for taking Affidavits, etc.

Owen Gaffney
Barrister & Solicitor
LSO# 75017B



**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616 F 416.304.1313

Rachel Bengino
T: 416-304-1153
E: rbengino@tgf.ca
File: 300-205

April 3, 2019

**VIA E-MAIL**

11281828 Canada Inc.
1000 Sherbrooke St. West
Suite 2700
Montreal, QC
H3A 3G4

**Attention:    Mr. Sam Pai**

Dear Sir:

**Re:    Indebtedness of Mundo Media Ltd. (the "Borrower") to Royal Bank of Canada (the "Bank")**

We are the lawyers for the Bank with respect to the above-captioned matter.

We refer to the credit facilities made available by the Bank to the Borrower (the "**Credit Facilities**"), pursuant to the amended and restated credit agreement dated December 21, 2017, as amended (the "**Senior Credit Agreement**") and the amended and restated subordinate credit agreement dated December 21, 2017 (the "**Subordinate Credit Agreement**" and, together with the Senior Credit Agreement, the "**Credit Agreements**"). As at the close of business on April 2, 2019, the Borrower was indebted to the Bank in the amounts of CAD$43,594.76 and USD$25,694,011.23, plus accrued and accruing costs and accruing interest, with respect to the Credit Facilities (the "**Indebtedness**"), which amounts are more fully set out in Schedule "**A**".

We also refer to your limited guarantee of the Borrower's indebtedness to the Bank dated March 22, 2019 (the "**Guarantee**"). Pursuant to the Guarantee, you guaranteed the Indebtedness plus interest and costs owing to the Bank. Your obligations under the Guarantee are payable on demand.

**On behalf of the Bank, we hereby demand payment from you of the same sum of CAD$43,594.76 and USD$25,694,011.23, plus accruing interest and accrued and accruing costs (including legal costs on a full indemnity basis) in respect of the Indebtedness.**

Please note that these amounts will continue to accrue interest at the rate set out in the Credit Agreements, and costs will continue to be incurred by the Bank, for which you will be responsible, until payment of all the Indebtedness is received by the Bank pursuant to the following wire transfer instructions:

| USD | Clearing Agent/Pay: | JP Morgan Chase Bank, New York |
|---|---|---|
| | Intermediary Field | CHASUS33 |
| | ABA Number | 0210-000-21 |
| | SWIFT: | ROYCCAT2 |
| | Name of Account: | Royal Bank of Canada, Toronto |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Beneficiary Account Name: | Global Loans Administration |
| | Beneficiary Account Number: | 000024005716 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

| CAD | SWIFT: | ROYCCAT2 |
|---|---|---|
| | ABA UID No. | NA |
| | Beneficiary Account: | Global Loans Administration |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Transit No. | 00002 |
| | Account Number: | 000021026830 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

If full payment, as set forth above, is not received by noon on April 13, 2019, the Bank will take whatever steps it deems appropriate to seek repayment of the Indebtedness.

We also enclose at this time a Notice of Intention to Enforce Security pursuant to the *Bankruptcy and Insolvency Act* (Canada) together with a consent thereto. If you consent to the Bank enforcing its right and remedies without further delay, please date and execute one copy of the consent attached to the enclosed Notice of Intention to Enforce Security and return same to the undersigned forthwith.

Yours very truly,

**Thornton Grout Finnigan LLP**

Rachel Bengino

Encl.

## SCHEDULE "A"

### Indebtedness of Mundo Media Ltd. to Royal Bank of Canada
### as at the close of business on April 2, 2019

| Facility | Principal Balance | Accrued Interest and Charges | Per Diem Interest | Total |
|---|---|---|---|---|
| Senior Secured Term Facility (USD) | USD$8,678,550.00 | USD$1,783.26 | USD$1,783.26 | USD$8,680,333.26 |
| Senior Secured Revolving Facility (USD) | USD$5,497,305.41 | USD$2,290.54 | USD$1,145.27 | USD$5,499,595.95 |
| Mezzanine Term Facility | USD$10,600,000.00 | USD$8,712.32 | USD$4,356.16 | USD$10,608,712.32 |
| Visa (CAD) | CAD$43,594.76 | N/A | N/A | CAD$43,594.76 |
| Overdrawn Amount | USD$905,352.26 | N/A | N/A | USD$905,352.26 |
| **TOTAL** | **CAD$43,594.76 USD$25,681,207.67** | **USD$12,803.56** | **USD$7,302.13** | **CAD$43,594.76 USD$25,694,011.23** |

a)    Interest accrues as follows: (a) at the Bank's Prime Rate plus 1.50% for Prime Rate Loans and Base Rate Loans; and (b) at the Bank's Prime Rate plus 3.00% for LIBO Rate Loans and BA Rate Loans, (c) at 0.60% for Standby Fees (each capitalized term as defined in the Senior Credit Agreement), and (d) at 15.00% for all amounts owing under the Subordinate Credit Agreement. As at February 28, 2019, the Bank's Prime Rate is **3.95%.**

E.&O.E.

### NOTICE OF INTENTION TO ENFORCE SECURITY
### PURSUANT TO SECTION 244 OF THE
### *BANKRUPTCY AND INSOLVENCY ACT* (CANADA)

**TO:    11281828 CANADA INC.**

Take notice that:

1.          Royal Bank of Canada (the "**Bank**"), a secured creditor, intends to enforce its security on the property of 11281828 Canada Inc. (the "**Company**") described below:

(a)    any and all promissory notes, debentures, bonds or similar instruments issued by AppThis Holdings, Inc. in favour of the Company; and

(b)    any and all present and future shares in the capital stock of AppThis Holdings, Inc. or interests participations or equivalent rights in AppThis Holdings, Inc.'s equity or capital.

2.          The security that is to be enforced is in the form of:

(a)    Hypothec on Securities.

3.          The total amount of the indebtedness secured by the security is CAD\$43,594.76 and USD\$25,694,011.23 as at the close of business on April 2, 2019, plus interest and all costs and fees incurred by or charged to the Bank up to and including the date of payment. Interest accrues on the indebtedness at a rate that varies with the Bank's Canadian Dollar Prime Rate, subject to fluctuations in the principal amount of the indebtedness from time to time.

4.          The secured creditor will not have the right to enforce the security until after the expiry of the 10-day period following the sending of this notice, unless the Company consents to an earlier enforcement.

Dated at Toronto this 3rd day of April, 2019.

**ROYAL BANK OF CANADA by its solicitors**
**Thornton Grout Finnigan LLP**

Per:

Rachel Bengino

# CONSENT

**TO:**          **ROYAL BANK OF CANADA (the "Bank")**

**FROM:**     **11281828 CANADA INC. (the "Company")**

The Company acknowledges receipt of a Notice of Intention to Enforce Security delivered by the Bank.

For consideration received, the receipt and sufficiency of which is hereby irrevocably acknowledged, the Company hereby consents to the immediate enforcement by the Bank of the security held by the Bank from the Company, and for the same consideration waives completely all rights to any delay by or any further notice from the Bank with respect to the enforcement of its security and the exercise of the other remedies of the Bank against the Company.

DATED at                          this           day of                          , 2019.

**11281828 CANADA INC.**

Per: _____  c/s
Name:
Title:

(I have authority to bind the Corporation)


**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616  F 416.304.1313

Rachel Bengino
T: 416-304-1153
E: rbengino@tgf.ca
File: 300-205

April 3, 2019

**VIA E-MAIL**

2538853 Ontario Ltd.
120 East Beaver Creek Rd
Suite 200
Richmond Hill, ON
Canada L4B 4V1

**Attention:    Mr. Jason Theofilos**

Dear Sir:

**Re:    Indebtedness of Mundo Media Ltd. (the "Borrower") to Royal Bank of Canada (the
        "Bank")**

We are the lawyers for the Bank with respect to the above-captioned matter.

We refer to the credit facilities made available by the Bank to the Borrower (the "**Credit
Facilities**"), pursuant to the amended and restated credit agreement dated December 21, 2017, as
amended (the "**Senior Credit Agreement**") and the amended and restated subordinate credit
agreement dated December 21, 2017 (the "**Subordinate Credit Agreement**" and, together with
the Senior Credit Agreement, the "**Credit Agreements**"). As at the close of business on April 2,
2019, the Borrower was indebted to the Bank in the amounts of CAD$43,594.76 and
USD$25,694,011.23, plus accrued and accruing costs and accruing interest, with respect to the
Credit Facilities (the "**Indebtedness**"), which amounts are more fully set out in Schedule "**A**".

We also refer to your unlimited guarantee of the Borrower's indebtedness to the Bank dated July
26, 2016 (pursuant to the Joinder Agreement dated October 13, 2016, the "**Guarantee**").
Pursuant to the Guarantee, you guaranteed the Indebtedness plus interest and costs owing to the
Bank. Your obligations under the Guarantee are payable on demand.

**On behalf of the Bank, we hereby demand payment from you of the same sum of
CAD$43,594.76 and USD$25,694,011.23, plus accruing interest and accrued and accruing
costs (including legal costs on a full indemnity basis) in respect of the Indebtedness.**

tgf.ca

Please note that these amounts will continue to accrue interest at the rate set out in the Credit Agreements, and costs will continue to be incurred by the Bank, for which you will be responsible, until payment of all the Indebtedness is received by the Bank pursuant to the following wire transfer instructions:

| USD | Clearing Agent/Pay: | JP Morgan Chase Bank, New York |
|---|---|---|
| | Intermediary Field | CHASUS33 |
| | ABA Number | 0210-000-21 |
| | SWIFT: | ROYCCAT2 |
| | Name of Account: | Royal Bank of Canada, Toronto |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Beneficiary Account Name: | Global Loans Administration |
| | Beneficiary Account Number: | 000024005716 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

| CAD | SWIFT: | ROYCCAT2 |
|---|---|---|
| | ABA UID No. | NA |
| | Beneficiary Account: | Global Loans Administration |
| | Address if Applicable: | 200 Bay Street, Toronto |
| | Transit No. | 00002 |
| | Account Number: | 000021026830 |
| | Reference: | Attn: GLA, Mundo Media Ltd. |

If full payment, as set forth above, is not received by noon on April 13, 2019, the Bank will take whatever steps it deems appropriate to seek repayment of the Indebtedness.

We also enclose at this time a Notice of Intention to Enforce Security pursuant to the *Bankruptcy and Insolvency Act* (Canada) together with a consent thereto. If you consent to the Bank enforcing its right and remedies without further delay, please date and execute one copy of the consent attached to the enclosed Notice of Intention to Enforce Security and return same to the undersigned forthwith.

Yours very truly,

**Thornton Grout Finnigan LLP**

per

Rachel Bengino

Encl.

## SCHEDULE "A"

### Indebtedness of Mundo Media Ltd. to Royal Bank of Canada
### as at the close of business on April 2, 2019

| Facility | Principal Balance | Accrued Interest and Charges | Per Diem Interest | Total |
|---|---|---|---|---|
| Senior Secured Term Facility (USD) | USD$8,678,550.00 | USD$1,783.26 | USD$1,783.26 | USD$8,680,333.26 |
| Senior Secured Revolving Facility (USD) | USD$5,497,305.41 | USD$2,290.54 | USD$1,145.27 | USD$5,499,595.95 |
| Mezzanine Term Facility | USD$10,600,000.00 | USD$8,712.32 | USD$4,356.16 | USD$10,608,712.32 |
| Visa (CAD) | CAD$43,594.76 | N/A | N/A | CAD$43,594.76 |
| Overdrawn Amount | USD$905,352.26 | N/A | N/A | USD$905,352.26 |
| **TOTAL** | **CAD$43,594.76 USD$25,681,207.67** | **USD$12,803.56** | **USD$7,302.13** | **CAD$43,594.76 USD$25,694,011.23** |

a)    Interest accrues as follows: (a) at the Bank's Prime Rate plus 1.50% for Prime Rate Loans and Base Rate Loans; and (b) at the Bank's Prime Rate plus 3.00% for LIBO Rate Loans and BA Rate Loans, (c) at 0.60% for Standby Fees (each capitalized term as defined in the Senior Credit Agreement), and (d) at 15.00% for all amounts owing under the Subordinate Credit Agreement. As at February 28, 2019, the Bank's Prime Rate is **3.95%.**

E.&O.E.

**NOTICE OF INTENTION TO ENFORCE SECURITY
PURSUANT TO SECTION 244 OF THE
*BANKRUPTCY AND INSOLVENCY ACT* (CANADA)**

**TO:    2538853 ONTARIO LTD.**

Take notice that:

1.         Royal Bank of Canada (the "**Bank**"), a secured creditor, intends to enforce its security on the property of 2538853 Ontario Ltd. (the "**Company**") described below:

        (a)    all property, assets and undertaking of the Company, now owned or hereafter acquired, wheresoever located;

        (b)    the share of the common stock of M Zone Marketing Inc. held by the Company;

        (c)    the share of units of Mundo Media (US), LLC held by the Company; and

        (d)    all securities accounts, financial assets, security entitlements, and proceeds in respect of the foregoing held by the Company.

2.         The security that is to be enforced is in the form of:

        (a)    General Security Agreement; and

        (b)    Share Pledge Agreement.

3.         The total amount of the indebtedness secured by the security is CAD\$43,594.76 and USD\$25,694,011.23 as at the close of business on April 2, 2019, plus interest and all costs and fees incurred by or charged to the Bank up to and including the date of payment. Interest accrues on the indebtedness at a rate that varies with the Bank's Canadian Dollar Prime Rate, subject to fluctuations in the principal amount of the indebtedness from time to time.

4.         The secured creditor will not have the right to enforce the security until after the expiry of the 10-day period following the sending of this notice, unless the Company consents to an earlier enforcement.

Dated at Toronto this 3rd day of April, 2019.

**ROYAL BANK OF CANADA by its solicitors
Thornton Grout Finnigan LLP**

Per:    _____

Rachel Bengino

# CONSENT

TO:      **ROYAL BANK OF CANADA (the "Bank")**

FROM:    **2538853 ONTARIO LTD. (the "Company")**

The Company acknowledges receipt of a Notice of Intention to Enforce Security delivered by the Bank.

For consideration received, the receipt and sufficiency of which is hereby irrevocably acknowledged, the Company hereby consents to the immediate enforcement by the Bank of the security held by the Bank from the Company, and for the same consideration waives completely all rights to any delay by or any further notice from the Bank with respect to the enforcement of its security and the exercise of the other remedies of the Bank against the Company.

DATED at          this     day of        , 2019.

**2538853 ONTARIO LTD.**

Per: _____ c/s
Name:
Title:

(I have authority to bind the Corporation)



**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616 F 416.304.1313

Rachel Bengino
T: 416-304-1153
E: rbengino@tgf.ca
File: 300-205

April 3, 2019

**VIA E-MAIL**

2518769 Ontario Ltd.
1 Yonge Street
Suite 1801
Toronto, ON
Canada M5E 1W7

**Attention:    Mr. Jason Theofilos**

Dear Sir:

**Re:    Indebtedness of Mundo Media Ltd. (the "Borrower") to Royal Bank of Canada (the "Bank")**

We are the lawyers for the Bank with respect to the above-captioned matter.

We refer to the credit facilities made available by the Bank to the Borrower (the "**Credit Facilities**"), pursuant to the amended and restated credit agreement dated December 21, 2017, as amended (the "**Senior Credit Agreement**") and the amended and restated subordinate credit agreement dated December 21, 2017 (the "**Subordinate Credit Agreement**" and, together with the Senior Credit Agreement, the "**Credit Agreements**"). As at the close of business on April 2, 2019, the Borrower was indebted to the Bank in the amounts of CAD$43,594.76 and USD$25,694,011.23, plus accrued and accruing costs and accruing interest, with respect to the Credit Facilities (the "**Indebtedness**"), which amounts are more fully set out in Schedule "**A**".

We also refer to your unlimited guarantee of the Borrower's indebtedness to the Bank dated July 26, 2016 (the "**Guarantee**"). Pursuant to the Guarantee, you guaranteed the Indebtedness plus interest and costs owing to the Bank. Your obligations under the Guarantee are payable on demand.

**On behalf of the Bank, we hereby demand payment from you of the same sum of CAD$43,594.76 and USD$25,694,011.23, plus accruing interest and accrued and accruing costs (including legal costs on a full indemnity basis) in respect of the Indebtedness.**

tgf.ca